IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

Christopher Cantwell,               )
     Plaintiff,                       )                    Civil Action No. 3:17Cv000089
                         )
v.                                  )                    Judge: Norman K. Moon
                         )
                         )
Emily Gorcenski et al.              )
     Defendant.                     )

# Memorandum in Support of 12(b)6 Motion to Dismiss the Amended Counterclaim

Defendants' Amended Counterclaim sets forth no claims upon which relief can be granted.

## I.      Standard of Review

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain facts sufficient "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." When considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true, and must draw all reasonable inferences in favor of the plaintiff. However, a court is not required to "accept the legal conclusions drawn from the facts"

or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." <u>Caner v. Autry</u>, 16 F.Supp.3d 689 (W.D. VA, Lynchburg Division, 2014). As set forth below Defendants' counterclaim falls far below this standard.

## II.     The Amended Counterclaim does not state a claim for Assault.

"The tort of assault was an intentional offer to touch the person of another that created in the mind of the victim a reasonable apprehension of an immediate battery. *See* Charles E. Friend, *Personal Injury Law in Virginia* § 6.3, at 214 (1990); W. Page Keeton *et al., Keeton & Prosser on the Law of Torts* § 10 (5th ed.1984). It requires only that the plaintiff reasonably believe that the defendant had such ability. *See* Friend, *supra,* § 6.3, at 214 n. 4. "Any act of such a nature as to excite an apprehension of a battery may constitute an assault." Prosser, *supra,* § 10, at 43. "[T]he apprehension must be one which would normally be aroused in the mind of a reasonable person." *Id.* at 44. There must be an apparent ability and opportunity to carry out the threat immediately. There is no assault where the defendant is too far away to make contact. *See id.* <u>Epps v. Com</u>., 502 S.E.2d 140, 28 Va. App. 58 (1998).

Defendants' Amended Counterclaim sets forth only conclusory allegations rather than facts to support its claim of assault. It sets forth only that "Plaintiff made menacing, threatening, and/or frightening gestures and acts (including brandishing of pepper spray and making physical contact) combined with threatening comments, towards a number of people, including both Ms. Gorcenski and Mr. Goad, which gestures and comments reasonably put both Defendants in imminent fear of bodily harm. See, e.g., Compl. Exs. MP42, MP48."

As set forth above, the tort consists of an act. It does not consist of any comments. Further, neither actually identify any actual gestures or acts intended by Cantwell to reasonably

cause apprehension in them; they merely refer to actions that occurred. To state a claim for

assault, Defendants must allege facts. For example, in <u>Bowie v. Murphy</u>, 624 S.E.2d 74, 271 Va.

127 (Va., 2006), there was an altercation at a church. In determining whether the plaintiff had set

for a claim for assault, the court reviewed the facts in the motion for judgment:

  As alleged in the motion for judgment, David M. Bowie is a member of the Board of Deacons
of Greater Little Zion Baptist Church (the Church), a congregational church located in Fairfax
County. James T. Murphy, Jr. became pastor of the Church in 1990. The Church experienced
"divisiveness and strife" under Murphy's leadership. Ultimately, in 2003, the strife became so
pervasive that members of the congregation, in accordance with the Church constitution,
petitioned the Board of Deacons for the removal of Murphy as pastor.

    Upon receiving the petition, the Board of Deacons sent a letter to the congregation on June
6, 2003 informing the church members that a vote on whether to retain Murphy as pastor would
take place on June 21, 2003. The vote took place at the Church as scheduled. Supporters of
Murphy, including Audrey Thornton, attended the meeting to disrupt, intimidate, harass, and
coerce congregation members who were trying to vote. Thornton brought two of her children to
help her disrupt the vote, and she used Church computers and printers to produce placards and
posters reflecting her support of Murphy. Thornton's children placed the placards around the
designated voting area while Thornton was in an upstairs area. When members of the Board of
Deacons removed the placards, Thornton's daughter went to the upstairs area and informed
Thornton, who became "enraged."

    At this time, Bowie and another Deacon were standing at the base of some steps directly
adjacent to the voting area. Thornton, displaying an "extraordinary and visibly angry look on her
face," charged down the stairs past Bowie and the other Deacon, both of whom had been
assigned to provide security to the voting area. Thornton, carrying a large camera in her right
hand, forcefully opened the door to the voting area. The door automatically closed behind her.
Bowie observed bright flashes of light and opened the door. Once inside the voting area, Bowie
saw Thornton taking pictures and writing down the names of poll workers, voters, and staffers.

    Bowie approached Thornton, who had her back to Bowie, and asked Thornton what she was
doing. However, apparently due to noise in the room, Thornton did not hear Bowie. Bowie then
"gently touched the right shoulder of Thornton in order to gain her attention and again called her
by name." Thornton looked back over her right shoulder, realized it was Bowie, and cursed him.
Thornton then attempted to strike Bowie with the camera she held in her right hand.

    In order to protect himself from being struck, Bowie grasped Thornton's right wrist.
Thornton "violently pushed back and forth" to free her wrist, which caused Bowie to take several
steps backward into a hallway. In the hallway, Bowie released Thornton's wrist and verbally
tried to calm her. Upon her release, Thornton put the camera in her left hand and struck Bowie in
the chest with her right hand.

Bowie immediately called the Fairfax County Police Department. Police arrived and took statements from a number of people. Thornton "willfully, falsely, and with malice" told police and Church members, including Murphy, that Bowie had assaulted her. She also solicited others who were not witnesses to the incident to provide false information and statements to the Fairfax County police.

The court found that this level of factual detail stated a claim. In contrast, Goad and Gorcenski merely refer to "gestures" and refer to videos full of acts and gestures that show no intentional act directed at them. In MP 48, Goad claims that his unsuccessful attack on Cantwell somehow was an assault on him. In MP 42, Gorcenski claims that a man retreating with his arms in front of his face was somehow an assault on her. Neither show that any claimed apprehension was reasonable. Since the offered examples of alleged conduct are not reasonable, this court cannot assume that unstated examples are more so. The assault claim should be dismissed.

### III.    The Amended Counterclaim does not state a claim for Battery.

Defendants' Battery claim also fails to state a cause of action. The tort of battery is an unwanted touching which is neither consented to, excused, nor justified. <u>Koffman v. Garnett</u>, 265 Va. 12, 574 S.E.2d 258 (Va., 2003). Here, Plaintiffs fail to allege any facts to support their conclusory allegation that Cantwell's, and only Cantwell's pepper spray, "made contact" with them, that his use thereof was not excused or justified, or that Cantwell contacted them in any other wrongful way. Again they refer to MP 42 and MP 48, but neither of those show any contact by Cantwell, nor even his pepper spray, with either Defendant. They state no other facts as to contact nor touching to support their claims. It should be dismissed.

**IV.    The Amended Counterclaim does not state a Cause of Action for Negligence.**

Defendant's Negligence claim must also fail, as it approbates by claiming that his intentional use of pepper spray was intentional, and then reprobates by claiming that it was also negligent.  Defendant claims that Cantwell "failed to exercise the reasonable care expected of a person of ordinary prudence in such a situation."

Virginia Code 18.2-312 is instructive as the reasonable care expected of a person of ordinary in use of pepper spray:

Nothing herein contained shall prevent the use of tear gas or other gases by police officers or other peace officers in the proper performance of their duties, **or by any person or persons in the protection of person, life or property.** (Emphasis added).

In short, use of pepper spray in self-defense is legally excusable or legally justified, and therefore not wrongful.  Plaintiffs allege only some "situation," but then allege no facts to support any situation upon which to judge the reasonableness of Cantwell's action. The claim should be dismissed.

**V.    The Amended Counterclaim does not state a cause of action for the three intentional torts above**.

As shown in MP 48 and MP 42, Defendants concede that the 'situation' was that they and Cantwell were in a boisterous crowd, and accordingly Defendants must allege facts to show that the alleged intentional torts were somehow wrongful. MP 48 and 42 show that Cantwell was being attacked, thus raising the issue of whether Cantwell's actions were done of necessity, such as self-defense. "The common law of Virginia `has long recognized that a person who reasonably apprehends bodily harm by another is privileged to exercise reasonable force to

repel the assault.'" Id. (quoting Diffendal v. Commonwealth, 8 Va. App. 417, 421, 382 S.E.2d 24, 25 (1989)); see also Jackson v. Commonwealth, 96 Va. 107, 113, 30 S.E. 452, 454 (1898) (recognizing the right of a person who is in fear of bodily injury or death "to repel such assault by all the force he deemed necessary, . . . [and to] become the assailant, inflicting bodily wounds until his person was out of danger"). Furthermore, whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted." McGhee v. Commonwealth, --- Va. ---, ---, 248 S.E.2d 808, 810 (1978). Defendants' amended counterclaim cannot state a cause of action by ignoring facts they themselves have plead, to wit MP 42 and 48.

Since Cantwell's actions appear to be justified as to his attacker, they are also justified as any bystanders, including Goad or Gorcenski. "Courts in many other jurisdictions have recognized the wisdom inherent in the principle of "transferred intent self-defense." See Holloman v. State, 51 P.3d 214, 221 (Wyo. 2002)adopting the "general rule . . . that if a person acting in necessary self-defense unintentionally injures or kills a third person, he is not guilty of homicide or assault and battery"); Brown v. State, 94 So. 874, 874 (Fla. 1922) (recognizing that "if the killing of the party intended to be killed would . . . have been excusable or justifiable homicide upon the theory of self-defense, then the unintended killing of a bystander, . . . is also excusable or justifiable"); accord Nelson v. State, 853 So.2d 563, 565 (Fla. Dist. Ct. App. 2003). See also People v. Conley, 713 N.E.2d 131, 136 (Ill. App. Ct. 1999) (noting, the "defendant's intent to shoot his assailant in self-defense is transferred to the unintended victim"); State v. Arrellano, 736 S.W.2d 432, 434 (Mo. Ct. App. 1987) (finding that "[i]f the assault upon the bystander was committed in self-defense against an attack by the intended victim, self-defense furnishes a defense against a charge of assault upon the bystander"). Hill v. Com., Va. Ct. App. 2010 (Unpublished). In like manner, if Cantwell's actions were defending himself against Beanyman's attacks, as shown in

MP 48 and 42, then Defendant's complaints do not state a claim. Because they have not asserted any facts to support an inference that Cantwell's actions were not justified, the intentional tort allegations do not state a claim.

**VI. The Amended Counterclaim does not state a claim for Stalking.**

Va. Code Sec 8.01-42.3 establishes a cause of action for a violation of Va. Code 18.260.3 60.3. The former specifies that a victim may file a civil action for a violation of the latter. Accordingly, a civil claim must allege facts to support the elements of Va. Code 18.260.3. The Supreme Court has explained that the crime comprises three elements:

> (1) the defendant directed his ... conduct toward the victim on at least two occasions; (2) the defendant intended to cause fear or knew or should have known that his ... conduct would cause fear; and (3) the defendant's conduct caused the victim "to experience reasonable fear of death, criminal sexual assault, or bodily injury."

Stephens v. Rose, 288 Va. 150, 155, 762 S.E.2d 758, 761 (2014).

**1. Conduct by defendant directed toward the victims on at least two occasions.**

**(a) Conduct.**

The first requirement of the first element is "conduct" by the defendant. Mere words are insufficient. "… [T]he statute is tailored so that it does not substantially infringe upon speech protected by the First Amendment. It regulates the manner in which individuals interrelate with one another and prohibits individuals from communicating with others in a way that is intended or known to cause fear of physical harm. Code § 18.2-60.3 is not directed primarily at speech nor does it overreach to prevent contact, speech or otherwise, between quarreling lovers as appellant

suggests. Indeed, the statute permits all communications between individuals that are conducted in a time, place and manner that do not intentionally or knowingly cause the receiver of the message reasonably to fear for his or her physical safety. The statute's legitimate sweep does not portend any substantial burden on constitutionally protected conduct, and we find no realistic danger that the statute will compromise the First Amendment rights of parties not before the Court." Parker v. Com., 485 S.E.2d 150 24 Va.App. 681 (1997).

Accordingly, the court in Parker pointed out: "Turning to appellant's conduct, we hold that Code § 18.2-60.3 was not overbroad as applied to him. Contrary to his assertion, appellant was not convicted of stalking solely because of the seven sentences he uttered on March 5 and March 8. He violated the stalking statute because he made a barrage of calls to a person with whom he had an abusive relationship with the knowledge that the calls caused the victim to reasonably fear bodily injury at his hands. Appellant's intimidating phone contact and veiled threats rendered his interaction with the victim from March 5 to March 11 without constitutional protection and violative of Code § 18.2-60.3."

Similarly, in Banks v. Commonwealth, it was not the Defendant's words that stalked, but his attempted renewal of a relationship after 15 years by locating her, leaving her letters at her workplace, being in the parking lot at work when the victim left, waiting a year and then grabbing her car door as she was trying to enter it, and then years later showing up again in the parking lot asking her to be his "doctor." Banks v. Com., 67 Va.App. 273 795 S.E.2d 908 (Va. Ct. App. 2017).

In Jordan v. Com., Record No. 2689-09-2, Va. Ct App. 2011 (Unpublished), Jordan called the victim at work asking her to meet him somewhere. She refused and went home, where

Defendant was waiting; he reached in the car door and groped her. Some months later, Jordan banged on the door to her home, was following her as she drove, and calling her at work. See also <u>Peters v. Com</u>, Record No. 1888-15-1 Va. Ct. App. 2016 (Unpublished)(100s of text messaged and hundreds of phone calls after relationship ended, house damaged and followed by defendant); <u>Frazier v. Com</u>., Record No. 0725-06-2. Va. Ct. App. 2007 (Unpublished) (accosting in various places, driving around victim's neighborhood).

In this case, Defendants assert that Plaintiff pepper sprayed *someone else* "in an area where the Defendants were present." Para. 143. They assert that at the same time, he made "menacing, threatening, and/or frightening" gestures that night at the Jefferson monument, at same time, and once again, in their presence. There is no allegation of what these menacing, threatening or frightening gestures were, nor whether any Defendant knew of them at the time. One would think that a victim who was menaced, threatened, or frightened would be able to detail which gestures did so, and which ones were which. It may well be that these gestures were not within the personal knowledge of the Defendants, but conjured only after "reviewing videos." Defendants then allege that Plaintiff talked about his defensive use of pepper spray on a blog, Para. 144, and on a podcast (Para. 148), and on other media (Para. 149). Plaintiffs allege no more actual ***conduct*** other than that occurring on August 11, 2017, other than citing a "swatting" incident made by unknown persons while Defendant was in jail. Accordingly, they have not alleged conduct on at least two occasions, and have not stated a claim.

### (b) Conduct directed at the victim.

The Defendants admit that the words about which they complain were on Cantwell's own "blog posts, podcasts, media interviews, and "other media" asking the court to infer somehow

that this is impermissible contact by Cantwell.  The Virginia Supreme Court considered the meaning of the word "contact" in the context of a protective order in <u>Elliott v. Com</u>., Record No. 081536 (Va. 2009)[Fastcase].  There, Elliott was alleged to have "contacted" the protectee by answering a phone call *from* her and on another occasion by standing a block away from her dwelling house, and perhaps "gesturing." The Court pointed out that the protective order statute is broad enough to prohibit many activities, but:

> "We are of opinion, however, that "**such contacts**" contemplated by the statute to be included as a condition in a protective order **are intentional acts**. In other words, contacts are those acts by the respondent that intentionally pierce the protective barrier between the petitioner and the respondent fashioned by the protective order." [Emphasis added]

Cantwell's posting to his own property is certainly not an intentional act that pierces any protective barrier. Accordingly, it is not "conduct: under the statute.


   **(2) Intended to cause fear or reasonably should have known so.**

   Defendants have alleged no facts to support any inference that Cantwell intended to cause fear, or reasonably should have known so, by defensively pepper spraying someone else in Defendants' presence. Plaintiff has admitted that he deployed pepper spray in response to an immediate threat of harm to his person, to wit, Beanyman.

Va. Code Sec. 18.2-312, illegal use of tear gas, provides:

Nothing herein contained shall prevent the use of tear gas or other gases by police officers or other peace officers in the proper performance of their duties, or by any person or persons in the protection of person, life or property.

Furthermore, Cantwell had the right to arm himself under <u>Gilbert v. Com.</u>, 506 S.E.2d

543, 28 Va.App. 466 (Va. App., 1998):

> …We note the "fundamental doctrine that a person who has been threatened with death or serious bodily harm and has reasonable grounds to believe that such threats will be carried into execution, has the right to arm himself [or herself] in order to combat such an emergency." *Bevley v. Commonwealth,* 185 Va. 210, 215, 38 S.E.2d 331, 333 (1946). *See also Pike v. Commonwealth,* 24 Va.App. 373, 375, 482 S.E.2d 839, 840 (1997) (noting that "[t]he common law in this state has long recognized the right of a landowner to order a trespasser to leave, and if the trespasser refuses to go, to employ proper force to expel him").

Exercising one's right to self-defense is just that; coupling it with a requirement that it not

frighten anyone else makes the very concept of self-defense illusory.

Defendants have set forth no facts supporting their claims that Plaintiff's comments and

actions on the internet were intended to cause fear, or that he reasonably should have known so.

Parody songs and cartoons meant to cause persons to laugh are not reasonably calculated to

induce fear in anyone, but rather amusement and laughter. Elmer Fudd's shotgun will NOT

backfire in his face when Bugs Bunny puts his fingers in the barrel.

### (3) Caused victim to experience reasonable fear of death, criminal sexual assault, or bodily injury

A victim's fear must be reasonable.

While Defendants have claimed much fear, they have alleged no facts that their fear was

reasonable. Fearing Plaintiff while he is in jail is not reasonable. Fearing a cartoon is not

reasonable. Fearing parody Christmas songs is not reasonable. Fearing Plaintiff because of a

comment to his blog by another person is not reasonable. Fearing Plaintiff because someone else

attacked Plaintiff and got pepper sprayed is not reasonable. "Reasonable fear" is alien to a

person who thinks that Republicans will assassinate him while fueling his vehicle, or a person

who misidentifies a fat guy with a beard as a skinny guy with no hair. Curiously, neither Plaintiff

has even alleged fear enough to justify seeking a protective order after Plaintiff was released from jail on December 7, let alone the granting of one. Defendants' conclusory allegations of fear of bodily injury are insufficient to state a claim for stalking.

Defendants' allegations of stalking are conclusory allegations, unsupported by fact. The claim should be dismissed.


**VII. The Counterclaim does not state a claim for Unlawful use of Name and Photographs.**

Code § 8.01-40(A) provides that if a person's "name, portrait, or picture" is used for "advertising purposes or for the purposes of trade" without written consent, the person may maintain a suit in equity to prevent the use, and may sue and recover damages for any injuries resulting from such use.

The Virginia and New York statutes are similar, and thus New York law on the matter is instructive. Town & Country Properties, Inc. v. Riggins, 457 S.E.2d 356, 249 Va. 387 (Va., 1995).

In Flores v. Mosler Safe Co., 7 N.Y.2d 276, 196 N.Y.S.2d 975, 164 N.E.2d 853 (N.Y., 1959), Flores sued because Mosler used his name and photograph in an advertisement. Mosler defended on many grounds, including that the use "would not in any way draw trade to its firm. The court disagreed: "Such a contention might be valid if the only prohibited use was one for 'purposes of trade.'"

While in its Amended Counterclaim Defendants now allege some commercial purpose, they fail to state any facts to support that allegation. There are no allegations that Cantwell's

revenues nor even web traffic increased, donations increased, nor that he realized any other commercial benefit as a result of a few postings.

Plaintiff's use appears to be more in line with *Messenger v. Gruner + Jahr Printing and Publishing,* 94 N.Y.2d 436, 706 N.Y.S.2d 52, 727 N.E.2d 549 (2000), the New York Court of Appeals reiterated its long-standing position that the right of privacy does not extend "to reports of newsworthy events or matters of public interest." *Id.* at 552. So long as there is a "real relationship between" the use of a person's name or image and the report, and the report is not merely "an advertisement in disguise," there is no misappropriation. *Id.* at 554.

Based on Messenger, the Virginia Supreme Court dismissed a claim in WJAL-TV v. Levin, 564 S.E.2d 383264 Va. 140, 2002. There, WJAL ran a sexual abuse "dirty doctor" expose on Dr. Levin, who ran a clinic wherein sciatica was treated by internal vaginal massage. Levin sued, winning $2 million for defamation and $575,000 for the use of name and image. WJAL appealed. The Virginia Supreme Court reversed the $575,000 jury award on the illegal use of name, finding that a doctor accused of sexually abusing his patients is a matter of public interest and a newsworthy event.

Moreover, the public has an interest in knowing about persons who is a revolutionary communist, fears that Republicans intend to assassinate her, cannot identify assailants just a few feet away, and will make false statements to law enforcement to attack those who disagree with them.

Because the Complaint alleges no *facts* indicating that the use was for advertising nor trade, it should be dismissed.

**VIII.  The Counterclaim does not state a claim for a violation of Va. Code Sec. 8.01-42.1.**

Va. Code Sec. 8.01-42.1 provides:

A.  An action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts of (i) intimidation or harassment or (ii) violence directed against his person; or (iii) vandalism directed against his real or personal property, where such acts are motivated by racial, religious, or ethnic animosity.

Defendants have not alleged any vandalism to property.  Further, they have not alleged any violence directed at *their* persons. Paragraphs 143 and 144 merely allege that Plaintiff used pepper spray in their general presence, not specifically at them. Nowhere does the Complaint set forth any facts supporting any claim that the spraying was motivated by racial animosity, religious animosity, nor ethnic animosity. Indeed, MP 42 and 48 indicate that any spraying was done in self-defense.

Like Plaintiff, both Defendants appear to be white Europeans. Like plaintiff, their appearances do not indicate any religion, nor any particular religion.  One cannot discriminate against a minority without *some* indication that the alleged victim is actually a member of a minority, especially when in a crowd where both sides are expressing their views pursuant to the rights guaranteed them by the First Amendment. In short, Defendant's claims may only be those of "intimidation or harassment."

Like the stalking statute, Va. Code 8.01-42.1 is self-limited to "acts."  Expressing oneself under the First Amendment to the United States Constitution, whether in a newspaper, by holding a sign, by shouting in a crowd, or in a blog on the internet are not an "act" as contemplated by the statute, no matter how much the listener may claim "intimidation" or "harassment."  Indeed such utterly subjective standards may render this statute constitutionally overbroad, as every unagreed-to word uttered by a member of a different racial, religious, or

ethnic group than the hearer would create a civil cause of action, as would any "act" of disagreement, such as walking out of a human sacrifice "religious" service. "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted); *see also United States v. Williams*, 553 U.S. 285, 292 (2008) ("[S]tatute's overbreadth must be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.") (Emphasis in original). United States v. Battle, (4th Cir., 2017).

Once again, Defendants' allegations are conclusory allegations that Plaintiff used words that they did not like. They have alleged no facts indicating that these were directed at them because of racial, religious, nor ethnic grounds, other than to presume to know what Cantwell believes. They have offered no allegation that any of the words were motivated by anything other than Plaintiff's perfectly reasonable discomfiture with losing his liberty for 107 days in jail because of the false sworn testimony of the Defendants. This cause of action should be dismissed.

### IX.    The Amended Counterclaim does not state a claim for Conspiracy to Interfere with Civil Rights/Obstruction/Witness Intimidation.

42 U.S.C. 1985(2) says:

> (2) OBSTRUCTING JUSTICE; INTIMIDATING PARTY, WITNESS, OR JUROR
> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from

attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws

"Section 1985(2) prohibits obstructing justice in federal or state court, especially intimidating witnesses. *Id*.; s*ee Haddle v. Garrison*, 525 U.S. 121, 125 (1998) ("The gist of the wrong at which § 1985(2) is directed is . . . [the] intimidation or retaliation against witnesses in federal-court proceedings.")." Hunter v. Holsinger, (W.D. Va., 2016)

The second clause of section 1985(2) applies to "conspiracies to obstruct the course of justice in state courts" or, more specifically, joint efforts to prevent equal access to state judicial proceedings. *Kush v. Rutledge,* 460 U.S. 719, 725, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983); *see also Lewis v. Green,* 629 F.Supp. 546, 550 (D.D.C. 1986. *See Haddle v. Garrison,* 525 U.S. 121, 125, 119 S.Ct. 489, 142 L.Ed.2d 502 (1998) ("The gist of the wrong at which § 1985(2) is directed is ... [the] intimidation or retaliation against witnesses in federal-court proceedings.")." Shooting Point, L.L.C. v. Cumming, 238 F.Supp.2d 729 (E.D. Va., 2002).

Federal law is instructive as to the elements of witness intimidation. 18 U.S.C. Sec. 1512(b)(1), which provides:

Whoever knowingly uses intimidation or physical force, or threatens another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to (1) influence, delay, or prevent the testimony of any person in an official proceeding shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

U.S. v. Workman, 860 F.2d 140 27 Fed. R. Evid. Serv. 77 94th Cir, 1988).

Nowhere does the complaint allege any facts support any inference that that either Defendant's testimony has been influenced, delayed, prevented, nor any facts to support any inference that either have been obstructed from "appearing" in any court. As set forth in the Complaint, both Goad and Gorcenski met with Albemarle Commonwealth's attorney on or about November 5, 2017, presumably in his offices at the Albemarle County courthouse, as set forth in the Complaint. On November 9, 2017, they both came to the Albemarle General District Court and testified, resulting in the dismissal of two charges. Other than exercising his rights to sue under Virginia and Federal law, the Counterclaim sets forth no facts supporting any act, nor conspiracy, to deny Defendants access to any court, as shown by the fact that each has filed an Amended Counterclaim herein and are presumably prepared to come to this court to testify in support of their claims.

As in Shooting Point, nowhere do Defendants they allege any facts to support a claim of interference with access to any state nor federal courts. The Amended Counterclaim merely sets forth a laundry list of Defendants' political opponents and claims their exercise of their free speech to disagree is some sort of conspiracy. Moreover, nowhere do Defendants allege any actual instance of failing to appear in court, or any influence on testimony, let alone one that is attributable to the alleged "conspiracy." This cause of action should be dismissed.

### X. The Amended Counterclaim does not state a claim for Conspiracy to Deprive Defendants of any other civil rights.

The 4th Circuit set for the law concerning 1985(3) conspiracies in Simmons v. Poe, 47 F.3d 1370 (C.A.4 (Va.), 1995):

Section 1985 of Title 42 of the United States Code provides:

> If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. Sec. 1985(3).

The law is well settled that to establish a sufficient cause of action for "conspiracy to deny equal protection of the laws" under section 1985(3), a plaintiff must prove: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy . Buschi v. Kirven, 775 F.2d 1240, 1257 (4th Cir.1985); see also Griffin v. Breckenridge, 403 U.S. 88, 102-03, 91 S.Ct. 1790, 1798-99, 29 L.Ed.2d 338 (1971). Moreover, the law is well settled that to prove a section 1985 "conspiracy," a claimant must show an agreement or a "meeting of the minds" by defendants to violate the claimant's constitutional rights. See Caldeira v. County of Kauai, 866 F.2d 1175, 1181 (9th Cir.1989), cert. denied, 493 U.S. 817, 110 S.Ct. 69, 107 L.Ed.2d 36 (1989); see also Lenard v. Argento, 699 F.2d 874, 882-83 (7th Cir.1983), cert. denied, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983) (a civil conspiracy under section 1985 is a combination of two or more persons acting in concert to commit an unlawful act, the principal element of which is an agreement or single plan between the parties to inflict a wrong against or injury upon another).

This Court, under that standard, has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985conspiracy, such that the claim can withstand a summary judgment motion. Indeed, we have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts. In Gooden v. Howard County, 954 F.2d 960 (4th Cir.1992) (en banc), for example, we rejected a section 1985 claim brought by an African-American apartment tenant against police officers who had responded to a report of a disturbance at an apartment complex, and had subsequently taken the tenant for an emergency psychiatric evaluation under the mistaken assumption that she was mentally ill. In dismissing the appellant's section 1985 conspiracy claim, we held:

> To avoid evisceration of the purposes of qualified immunity, courts have [ ] required that plaintiffs alleging unlawful intent in conspiracy claims under Sec. 1985(3) or Sec. 1983 plead specific facts in a nonconclusory fashion to survive a motion to dismiss. Here, plaintiff fails to satisfy that requirement. The Sec. 1985(3) claim was essentially an afterthought with little more to support it than the respective racial identities of the individuals involved. The mere statement, however, that the officers in question and Ms. Beck were white and Ms. Gooden was black cannot suffice to overcome the fact that the officers acted upon the

basis of a citizen's complaint, confirmed repeatedly by their own observations, that Ms. Gooden was in distress. Nor has Ms. Gooden presented any evidence of a conspiracy of two or more persons as required to state a claim under Sec. 1985(3). 954 F.2d at 969-70 (emphasis added); see also Scott v. Greenville County, 716 F.2d 1409, 1424 (4th Cir.1983) (rejecting the allegation that private citizens were liable for section 1985(3) conspiracy simply because they wrote letters and spoke at public meetings in opposition to low-income housing in an effort to influence the County Council's actions, because there was "no joint plan of action"); Ballinger v. North Carolina Agricultural Extension Service, 815 F.2d 1001, 1006-07 (4th Cir.1987), cert. denied, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987) (dismissing a section 1985(3) claim alleging conspiracy on the basis of age, because there was no direct or indirect proof of participation in any conspiracy by appellees).

Under this relatively stringent standard for establishing section 1985 conspiracies, it is clear that Simmons did not put forth sufficient evidence that Appellees, McCann and Poe, "conspired" or participated in any joint plan, to deprive him of his constitutional rights under section 1985(3).

See also Heily v. Woodcrest Props. (W.D. Va., 2010).

The Fourth Circuit later opined:

"[W]here a conspiracy is alleged, the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy . . . . Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."' A Soc'y Without a Name, for People without a Home, Millennium Future-Present v. Virginia, 655 F.3d 342, 346 (4th Cir. 2011) (quoting Twombly, 550 U.S. at 556-57).

The Eastern District of Virginia explained the requirement of "a specific class-based, invidiously discriminatory animus:"

Finally, section 1985(3) prohibits conspiracies to deprive persons of the equal protection of the law. Griffin v. Breckenridge, 403 U.S. 88, 102-03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). This claim is fatally defective in that no allegation has been made that the acts of defendants were motivated by class-based animus. See United Brotherhood of Carpenters v. Scott, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (suggesting that nonracially motivated discrimination not actionable under § 1985(3)). A properly asserted section 1985(3) conspiracy must necessarily contain allegations of unlawful class-based, discriminatory animus on the part of defendants to deprive a plaintiff of equal protection of the laws. Simmons v. Poe, 47 F.3d 1370 (4th Cir.1995). Indeed, there

is no allegation of record that any of the plaintiffs are members of a suspect class or that any of the defendants' acts were based on racial animus.

Shooting Point, L.L.C. v. Cumming, 238 F.Supp.2d 729 (E.D. Va., 2002).

In 2015, this court had occasion to review a civil conspiracy case in Smalls v. Binner

(W.D. Va., 2015) Kiser, J.:

> Even if the Complaint did allege that Count IX was stating a conspiracy claim under § 1983, however, it would still fail under the standards outlined in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). "To establish a prima facie case of section 1983 conspiracy, a plaintiff must show, among other things, that the defendants 'reached an understanding to violate [the plaintiff's] rights.'" Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1283 (11th Cir. 2002) (quoting Strength v. Hubert, 854 F.2d 421, 425 (11th Cir. 1988). Plaintiff's Complaint lacks any allegation that Defendants ever reached an agreement—either explicitly or tacitly—to violate Lambert's rights. See Hinkle v. City of Clarksburg, W. Va., 81 F.3d 416, 421 (4th Cir. 1996).
> Plaintiff argues that it can make the required showing through circumstantial evidence, but that misses the point. Although Plaintiff can make her required *showing* by circumstantial evidence, she cannot *plead* her claim by innuendo. Plaintiff has failed "to allege a meeting of the minds, a necessary element of a conspiracy . . . ." Smith v. McCarthy, 349 F. App'x 851, 858 (4th Cir. 2009) (per curiam) (unpublished). The allegations she does make are "wholly conclusory and devoid of sufficient allegation of a meeting of the minds." Id. Therefore, even if Count IX of Plaintiff's Complaint could be read as asserting a conspiracy to violate civil rights under 42 U.S.C. § 1983, Count IX would still fail to state a claim. Therefore, Count IX will be dismissed.

Though Defendant's Amended counterclaim contains more conclusory allegations of a

conspiracy, it contains no allegation of facts setting it forth, other than, at best, "parallel conduct"

by Plaintiff and a laundry list of Gorcenski's enemies, whose actions in the conspiracy remain as

mysterious as the event where their minds met. It sets forth no facts alleging any class, nor any

animus based on class at all, other than the class of those two persons having criminal cases

against Cantwell dismissed. Further, it contains no allegation of any "meeting of the

conspirators' minds," let alone some overt act. This cause of action should be dismissed.

**XI.    The Amended Counterclaim does not state a claim for Abuse of Process.**

The Virginia Supreme Court set for the law of abuse of process, malicious prosecution, and the interrelation between the two in civil and criminal matters in <u>Donahoe Construction Co., Inc. v. Mount Vernon Associates</u>, 369 S.E.2d 857, 235 Va. 531 (1988).

> "To sustain a cause of action for abuse of process, a plaintiff must plead and prove: (1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings. Mullins v. Sanders, 189 Va. 624, 633, 54 S.E.2d 116, 121 (1949); Glidewell v. Murray-Lacy, 124 Va. 563, 570, 98 S.E. 665, 668 (1919).
>
> The distinctive nature of malicious abuse of process lies in the perversion of regularly-issued process to accomplish some ulterior purpose for which the procedure was not intended. Glidewell, [235 Va. 540] 124 Va. at 569, 98 S.E. at 667. A legitimate use of process to its authorized conclusion, even when carried out with bad intention, is not a malicious abuse of that process. Id. at 570, 98 S.E. at 668. Process is maliciously abused when it is used oppressively, e.g., as "a whip to force the payment of an alleged indebtedness," Mullins, 189 Va. at 635, 54 S.E.2d at 122 (citation omitted), or as a means of extortion, see Glidewell, 124 Va. at 575, 98 S.E. at 669. The gravamen of the tort lies in the abuse or the perversion of the process after it has been issued. Consequently, "it is not necessary to allege or prove that the process was maliciously [issued]." Id. at 571, 98 S.E. at 668.
>
> A kindred, but distinctly different, cause of action lies for malicious prosecution. An action for malicious prosecution most often is based upon an underlying criminal proceeding maliciously instigated without probable cause, which terminated in a manner not unfavorable to the plaintiff. Pallas v. Zaharopoulos, 219 Va. 751, 754, 250 S.E.2d 357, 359 (1979); Bain v. Phillips, 217 Va. 387, 393, 228 S.E.2d 576, 581 (1976).
>
> We also have recognized that a cause of action for malicious prosecution will lie for the malicious institution of a groundless civil proceeding. Ailstock v. Moore Lime Co., 104 Va. 565, 570-71, 52 S.E. 213, 215 (1905). Because we have adopted the strict English position, a plaintiff in a malicious prosecution action based upon civil proceedings must plead and prove arrest of his person, seizure of his property, or special injury. Ayyildiz v. Kidd, 220 Va. 1080, 1084, 266 S.E.2d 108, 111 (1980). Malicious prosecution differs from abuse of process in that malicious prosecution lies for "maliciously causing process to issue," Glidewell, 124 Va. at

570, 98 S.E. at 667-68, while abuse of process "lies for the improper use of process after it has been issued," id

The Defendants have not stated a claim for abuse of process. Nowhere do they allege any act in the use of regularly issued process that is not proper in the regular prosecution of Plaintiff's civil claims against them.  These claims arise out of dismissed actions, not any pending one. Nowhere do they allege any sort facts indicating "abuse or perversion of the process after it has been issued, such as enforcing a debt." Nowhere do they plead any facts, as required by Ayvildiz, (see *infra*) alleging any arrest of their persons, seizures of their property, nor any special injury.  Accordingly, this cause of action should be dismissed.

### XII.    The Amended Complaint does not state a claim for Malicious Prosecution arising out of a Civil Matter.

To allege a malicious prosecution claim, one must allege and prove (1) that the prosecution was set on foot by the defendant and that it terminated in a manner not unfavorable to the plaintiff; (2) that it was instituted, or procured by the cooperation of the defendant; (3) that it was without probable cause; and (4) that it was malicious. Niese v. Klos, 216 Va. 701, 222 S.E.2d 798 (Va., 1976).  Defendants do not even allege that the prosecution terminated in a manner not unfavorable to them, nor that it was without probable cause.   Moreover, Defendants have not alleged the special injury required to state a claim for malicious prosecution arising out of a civil case.

 In Ayyilidiz v, Kidd, 266 S.E.2d 108 (1980), the Virginia Supreme Court held that to state a claim for malicious prosecution in a civil setting, the plaintiff must  allege personal arrest, property seizure, or special injury.  220 Va. at 1083, 266 S.E.2d at 111.  The allegations of

special injury were costs to defend the malpractice action, injury to his professional reputation and good name, plus the loss of present and future earnings and profits from his profession. The Virginia Supreme Court said "special injury as "a special loss or unusual hardship resulting from the malicious prosecution of the original action, ... that would not stem normally from a medical malpractice suit." 220 Va. at 1084, 266 S.E.2d at 111-12. "Applying that definition, we held that allegations regarding the costs of defending the malpractice action, the damages to the physician's professional reputation, and the loss of present and future professional income did not satisfy the definition of special injury. 220 Va. at 1084-85, 266 S.E.2d at 112." Later, in, Ely v. Whitlock, 385 S.E.2d 893, 238 Va. 670 (Va., 1989), Whitlock alleged all of the above, and additionally, as special injury "anxiety and great mental anguish" and "unusual and unnecessary stress, in addition to other claims of damage" The Virginia Supreme Court held that this was not special injury, either.  Defendants have not state a claim for malicious prosecution arising out of a civil action.

## XIII. Conclusion.

Defendant's amended counterclaim further asks these court to accept the legal conclusions drawn from the facts and accept as true unwarranted inferences, unreasonable conclusions, and arguments, as did the counterclaim that Defendants themselves amended because of its many fallacies.  In amending, Defendants add few if any facts, but merely screech their old allegations more shrilly.  It should be dismissed.

Chris Cantwell
By Counsel

_____

Elmer Woodard
Attorney at Law
5661 US Hwy 29
Blairs VA 24527
434-878-3422
VSB 27734
isuecrooks@comcast.net


CERTIFICATE OF SERVICE

The undersigned, being an attorney duly licensed to practice law in the State of Virginia, does hereby certify that a copy of the foregoing was duly served upon the opposing counsel this date as follows:

By personally hand delivering a copy the same to him or to one of his employees at his office;

By fax transmission;

XXX        By electronic mail or the court's electronic means;

By depositing a copy of same in the United States Mail, postage prepaid, and addressed as follows:

ADDRESSEE:
Sandra C. Freeman, Esq.
Virginia State Bar No. 78499
5023 W. 120th Avenue, #280
Broomfield, Colorado 80020
sandra.c.freeman@protonmail.com 720-593-9004


This Tuesday, April 10, 2018.