IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION


Christopher Cantwell,       )
      Plaintiff,        )            Civil Action No. 3:17Cv000089
                 )
v.                      )            Judge: Norman K. Moon
                 )
                 )
Emily Gorcenski et al.      )
      Defendant.        )


# Memorandum in Support of the Motion for Partial Summary Judgment against Defendant Goad

Comes now the Plaintiff, by counsel, and submits this memorandum in support of its

motion for partial summary judgment against Defendant Goad.

## Statement of Facts

1. On the night of August 11, 2017, Plaintiff participated in a political rally at the Thomas

    Jefferson Monument, near the Rotunda on the public property of the Commonwealth of

    Virginia known as the University of Virginia.   Cantwell Declaration, Exhibit GPSJ 1.


2.  The statue of Jefferson faces generally north, towards University Avenue.  The Rotunda

    building is behind him, or generally south.  A rough diagram is attached as Exhibit G.

    Cantwell Declaration, Exhibit GPSJ 1.

3. For orientation purposes, an ANTIFA group had a large white sign on the south face of Jefferson. An ANTIFA in a wheelchair (hereinafter "Wheelchair") had taken up a position at the northeast corner of the Monument. [MP1] The court may take judicial notice of these facts; Defendants chose not to respond. Answer, 13, 14.

4. For orientation purposes, by approximately 10:07 p.m., a blinding white camera light was in place near the northwest corner of the monument, shining southward towards the Rotunda. [MP3] The court may take judicial notice of these facts; Defendants chose not to respond. Answer, 13, 14.

5. Approximately 20 ANTIFA had chosen to link arms around the base of the Thomas Jefferson statue; the arriving Monumentals formed a doughnut around them. [MP4]; the two groups were within feet of each other, each exercising their rights to free speech. The court may take judicial notice of these facts; Defendants chose not to respond. Answer, 13, 14, and 15.

6. Defendants Goad and Gorcenski were present. Answer, 16.

7. Some distance off of the north<u>west</u> corner, Plaintiff was standing in the Monumentals' doughnut. [MP5] Answer, 19.

8. Near the northwest corner, Undersleeves, Beanyman, and others attacked the man wearing a tank top. Tank Top defended himself, knocked Undersleeves to the ground, knocked Beanyman to the ground, and then retreated approximately 6 feet, as did nearby Monumentals. [MP10] Defendant Goad's glasses were on his nose. Complaint 23, Answer 23.

9. Defendant Goad was near the north<u>west</u> corner, approximately six feet to Beanyman's right and rear from Beanyman during Beanyman's attack on Undersleeves. [MP11] Defendant Goad's glasses were on his nose. Compliant 24, Answer 25.

10. Beanyman rose up from the ground, and changed front to face Plaintiff. He and Defendant Goad led ANTIFA forward at Plaintiff. [MP12] Defendant Goad's glasses were on his nose. Rother Declaration, Exhibit GPSJ 2; Answer 25.

11. Beanyman's face was contorted with rage, his teeth were clenched, he assumed an attack stance, and drew back his left clenched hand to strike the Plaintiff. [MP12], [MP13] [MP14]. Rotter Declaration Exhibit GPSJ 2, Answer 28.

12. Outnumbered, Plaintiff pepper sprayed the leader, Beanyman, in the face at distance of about 12 inches. Beanyman retreated back to the Monument. Plaintiff retreated

approximately five feet to the west. [MP15] Defendant Goad's glasses were on his nose. Rotter Declaration, Exhibit GPSJ 2, Answer 28.

13. Unaffected by Plaintiff's spray at Beanyman, within a split second Defendant identified Plaintiff as the sprayer and pointed to him for about two more whole seconds. [MP16] Defendant Goad's glasses were on his nose. Cantwell Declaration, Exhibit GPSJ 1; Answer, 31.

14. To Defendant Goad's left (south), Undersleeves was brawling and then kicked the head of a Monumental on the ground in a tracksuit (hereinafter "Tracksuit"). As Tracksuit attempted to rise up off the ground, Undersleeves kicked him mightily in the torso, and then then attacked in a northwesterly direction directly at Plaintiff and others, who were moving forward to rescue Tracksuit. [MP17] Cantwell displayed pepper spray from the rear rank. About to be overwhelmed by four or five Monumentals, Undersleeves turned around and attacked right back into the fight occurring to his rear and over tracksuit. Cantwell Declaration, Exhibit GPSJ 1.

15. ANTIFA shifted laterally to their own left, putting a person (hereinafter "Gingham Shirt") in front of Defendant Goad. [MP18] Defendant Goad's glasses were on his nose. Cantwell Declaration, Exhibit GPSJ 1.

16. A man with a 35 mm camera (hereinafter "Cameraman") was to Defendant Goad's immediate right. A large bearded Monumental in a gray shirt and baseball cap with a flashlight (hereinafter "Flashlight") was to Cameraman's right, and between Defendant and Plaintiff. [MP19] Defendant Goad looked to <u>his</u> right (north). [MP20] Defendant Goad's glasses were on his nose. Compliant 31, Answer 31.

17. While Goad was looking north, to Goad's and Cameraman's right, an arm with a dragon tattoo "(hereinafter Dragonarm') went between Cameraman and Flashlight and pepper sprayed Goad, to which he reacted by covering his face. Gingham shirt reacted similarly. [MP21]  Defendant Goad's glasses were on his nose. Compliant 32, Answer 32.

18. At the time that Dragonarm sprayed Goad, Cantwell was approximately 10 feet from Goad, near the south<u>west</u> corner, heading to the south<u>east</u>.  [MP21] Compliant 33, Answer 33.

19. Cantwell was trying to stop Undersleeves from joining the fight above Tracksuit. [MP22] Compliant 34 Answer 34.

20. About three seconds after Cantwell's interaction with Undersleeves, Dragonarm, not Cantwell, sprayed Defendant Goad. [MP23], [MP 21] Defendant Goad's glasses were on his nose. Cantwell Declaration, GPSJ 1.

21. At the northwest corner, two torch candles fell to the ground, and the respective lines

    parted.  Gingham shirt was in front of and to the left of Defendant Goad, both on the

    north side of the monument. [MP24] Defendant Goad's glasses were on his nose.

    Complaint 36, Answer 36.


22. Defendant Goad and ANTIFA moved back across the north face approximately 4 feet,

    putting their front midway on the north face of the monument. A person in a white shirt

    with a tiki torch (hereinafter "White Shirt Tiki" approached Gingham Shirt and

    Defendant Goad. Goad has his hands in a curious "praying mantis" position. [MP25] By

    this time, Plaintiff had been near the <u>southwest</u> corner of the monument for

    approximately four seconds.  Defendant Goad's glasses were on his nose. Complaint 37,

    Answer 37.



23. White Shirt Tiki lowered his tiki torch and faked at Gingham Shirt.  This caused White

    Shirt Tiki's torch candle to fall out of said torch towards Gingham Shirt.  It bounced off

    of his thigh and onto the ground. [MP25] At this time, Plaintiff was near the south<u>east</u>

    corner. Compliant 38, Answer 38.


24. Defendant Goad looked at White Shirt Tiki's candle on the ground. White Shirt swung

    his rattan at Gingham Shirt, causing Gingham Shirt to retreat.  Defendant's vision

focused on White Shirt Tiki's candle and attempted to extinguish it. White Shirt Tiki swung his rattan at Defendant, who saw it coming and retreated. [MP26] At the same time, to Goad's right, a man in a red shirt swung his rattan at Goad, which also caused Goad to retreat. [MP27] Defendant Goad's glasses were on his nose. Complaint 39, Answer 39.

25. Goad and ANTIFA retreated east across the north face of the monument. [MP28] Defendant Goad himself retreated across the north face of the monument to the northeast corner. Compliant 40, Answer 40.

26. On or about August 17, 2017, Defendant Goad travelled to Charlottesville and met with Sgt. Acord of the UVa. Police. He narrated the sequence of events to Acord: "I saw a person in a brown shirt get pepper sprayed by a person I know is Christopher Cantwell. I yelled 'this man has mase [sic] and people started swinging torches at me. I dodged them and removed my prescription glasses. I saw a canister of citronella on fire and tried to exhaustion [sic] the fire with my foot. When I failed to do so, I looked up and Cantwell mased [sic] me, I could not see, [sic] beyond that but felt strikes to my body after that." Complaint 62 Answer 62; Acord Report, Exhibit GPSJ C.

27. On August 17, 2017, and pursuant to Va. Code Sec. 19.2-71 and 72, Defendant Goad completed a form entitled "Criminal Complaint" before the magistrate. On it, Goad swore that the statements thereon were true to the best of his knowledge and belief, including the statement "Cantwell used a gel mase [sic] pepper spray at my face and

cause [sic] me to lose my vision temporarily [sic]. I was struck by torches by unknown persons while my vision was gone." A copy teste of the Goad charges is attached to the Complaint as Exhibit J. Complaint 63, Answer 63. It is duplicated here as GPSJ Exhibit E.

28. Goad filled out and signed the warrant. Excerpts of Preliminary Hearing, Exhibit GPSJ 4, Transcript pages14-15.

29. On or about August 21, 2017, Plaintiff turned himself in to the Lynchburg police. The Charlottesville magistrate denied bond. Compliant 65, Answer 65.

30. On Goad's charge, the Albemarle General District Court found as follows: "I order the accused discharged at preliminary hearing and the charge dismissed. Exhibit J, second page, upper left hand corner. Compliant 96, Answer 96.

31. Plaintiff posted bond and was released from jail, having served 107 days in durance vile. Compliant 96 Answer 96.

   **Nota Bene:** References to MP ## files are those attached to the Compliant.

## Standard of Review

Summary judgment should only be granted if, viewing the record as a whole in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Terry's Floor Fashions, Inc. v.

Burlington Industries, Inc., 763 F.2d 604, 610 (4th Cir.1985). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the non-moving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.1994) (citations omitted), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994). Tigrett v. Rector and Visitors of Univ. Of Va, 137 F.Supp.2d 670 (W.D. Va., 2001; Moon, J.). As set forth below, no genuine issue of material fact exists as to whether Goad maliciously prosecuted Cantwell.

# Argument

To prevail on a malicious prosecution claim, the plaintiff must allege and prove by a preponderance of the evidence that: (1) the prosecution was set on foot by the defendant and was terminated in a manner not unfavorable to the plaintiff; (2) it was instituted or procured by the cooperation of the defendant; (3) it was without probable cause; and (4) it was malicious. Hudson v. Lanier, 497 S.E.2d 471, 255 Va. 330 (Va., 1998); Ayyildiz v. Kidd, 220 Va. 1080, 266 S.E.2d 108 (Va., 1980).

## The Elements

**(1) The prosecution was set on foot by the defendant and was terminated in a manner not unfavorable to the plaintiff.**

As Defendant Goad has admitted, he travelled to Charlottesville, spoke with Sgt. Acord, and signed the warrant in GPSJ Exhibit E. As set forth on the certified copy thereof, that charge was dismissed by the Albemarle County General District Court on November 9, 2017, thus

terminating in a manner not unfavorable to Cantwell.  No genuine issue of material fact exists as to this issue.

**(2) It was instituted or procured by the cooperation of the defendant;**

In making a statement to law enforcement, to wit, Sgt Acord, Goad said that "the group began swinging torches at Goad but he was able to dodge them and remove his glasses. After removing his glasses, he observed a fire on the ground from what appeared to be a citronella canister. Goad stomped on the fire and when he looked back up, Cantwell sprayed him in the face. Goad said during his temporary blinding, he was struck by tiki torches but is unable to identify the offenders striking him."  Acord Report, Exhibit GPSJ C.

On the Criminal Complaint, Goad said "I saw a person in a brown shirt get pepper sprayed by a person I know is Christopher Cantwell.  I yelled 'this man has mase [sic] and people started swinging torches at me. I dodged them and removed my prescription glasses. I saw a canister of citronella on fire and tried to exhaustion [sic] the fire with my foot. When I failed to do so, I looked up and Cantwell mased [sic] me, I could not see, [sic] beyond that but felt strikes to my body after that."  GPSJ Exhibit E.

The prosecution was instituted, set on foot, and procured by Kris Goad. No genuine issue of material fact exists as to this issue.

**(3) The prosecution was without probable cause.**

Va. Code Sec 18.2-312 provides:

*If any person maliciously release or cause or procure to be released in any private home, place of business or place of public gathering any tear gas, mustard gas, phosgene gas or other noxious or nauseating gases or mixtures of chemicals designed to, and capable of, producing*

*vile or injurious or nauseating odors or gases, and bodily injury results to any person from such gas or odor, the offending person shall be guilty of a Class 3 felony.*

*If such act be done unlawfully, but not maliciously, the offending person shall be guilty of a Class 6 felony.*

*Nothing herein contained shall prevent the use of tear gas or other gases by police officers or other peace officers in the proper performance of their duties, or by any person or persons in the protection of person, life or property.*

Accordingly, Goad must have had probable cause to believe that Cantwell, and not someone else, released a gas or mixture of chemicals

-designed to produce vile, injurious or noxious or nauseating odors or gasses; and

-that the gas or mixture of chemicals was capable of producing vile, injurious, or noxious or nauseating odors; and

-the release resulted in bodily injury to any person; and

-the release was in a private home, business, or public gathering; and

-the release was done with malice,

-and was not done by any person in the defense of person nor property.

The test for probably cause is whether the facts and circumstances known, or made known, to the prosecutor at the time are sufficient to justify a prudent and reasonable man in the belief that an accused is guilty of the crime charged. <u>Giant of Va., Inc. v. Pigg</u>, 152 S.E.2d 271, 207 Va. 679 (Va., 1967). Further, a prosecutor cannot close his eyes to the truth. "[The defendant's argument] disregards entirely the evidence in this case showing the opportunity of the prosecutor to obtain information which should have changed any prior opinion or belief he had." <u>Giant of Va., Inc. v. Pigg</u>, 152 S.E.2d 271, 207 Va. 679 (Va., 1967).

Here, Goad knowingly and intentionally accused Cantwell of another man's crime.

### a. The accused.

An accuser must have probable cause to believe that the accused is the perpetrator of the alleged crime. In Munger v. Cox, 146 Va. 574 (Va, 1926), Munger accused Cox of stealing dry goods, based on some incomplete footprints and tracks towards Cox's dwelling house. The jury found for Cox, and the Virginia Supreme Court affirmed.

The facts available to Goad were utterly insufficient to justify a reasonable man in the belief that "Cantwell used a gel mase [sic] pepper spray at my face..." Goad told Acord that "the group began swinging torches at Goad but he was able to dodge them and remove his glasses. After removing his glasses, he observed a fire on the ground from what appeared to be a citronella canister. Goad stomped on the fire and when he looked back up, Cantwell sprayed him in the face. Goad said during his temporary blinding, he was struck by tiki torches but is unable to identify the offenders striking him." Acord Report, Exhibit GPSJ C.

In fact, no "group" began swinging torches at him; only "White Shirt Tiki" swung at him, and that was a rattan, i.e., a torch without its candle. Goad did not remove his glasses between White Shirt Tiki's swing and stomping any "fire on the ground." When Goad, on the north face of the monument, near the NorthWEST corner, looked up, Cantwell was near the South EAST corner, headed south towards the Rotunda. In other words, at the time Goad claims "Cantwell sprayed him in the face," Cantwell was actually on the other side of the monument. See GPSJ Exhibit F.

In the Criminal Complaint, GPSJ Exhibit E, Goad swore under oath "Cantwell used a gel mase [sic] pepper spray at my face and cause [sic] me to lose my vision temporarily [sic]. I was struck by torches by unknown persons while my vision was gone." This too was a blatantly false

statement under oath. Cantwell never sprayed Goad in the face. In MP 23, center of frame,

Cantwell is ten feet from Goad, in the background, headed towards the southwest corner. Goad is

frame left, and Dragonarm, and his arm, are frame right. MP 19 shows even more clearly that

Cantwell was in front of Goad and many feet away when Goad was sprayed from the right.

Even after this event, by Goad's own admission, his glasses were on his nose, and he "observed a

fire on the ground from what appeared to be a citronella canister. Goad stomped on the fire and

when he looked back up…"  Goad cannot approbate by swearing under oath that "lost his vision

temporarily" yet reprobate by claiming at the same time he managed to observe a fire, from a

citronella canister and nothing else, accurately see where to stomp (the fire), and then look back

up.

   Goad himself admitted that he had reviewed the Unicorn Riot video of Dragonarm

spraying him in the face before speaking to Sgt. Acord and taking out the warrant:

Prelim p. 48

Commonwealth Q  So let the record reflect that we're going to begin the video at five seconds
into **the unicorn riot** video.
 (Video was played at this time.)
P. 61
Commonwealth Q  So you weren't able to immediately identify Mr. Cantwell at that time, were
you?
 A  I did not see Mr. Cantwell the rest of that night.
 Q  And you did review **video later and based upon that video,** what did you do?
 A  I reviewed video and I came back to the Charlottesville area to swear out a warrant and to
complete the process.
 Q  So you signed a statement and then a criminal complaint.
 A  That is correct.

Prelim p.72

Woodard Q  Now, after the event you learned of the existence of video, correct?
 A  That is correct.
 Q  Is **the video here, one of them that you reviewed?  The one you just looked at?**
 A  That is correct.
[Emphasis added]

Exhibit GPSJ D.

On November 9, 2017, at the Preliminary Hearing, Goad himself finally admitted that

Cantwell did not spray him in the face with gel, and that the person who did so was someone

else:

Prelim P. 77

Q  Now, a week ago you met with someone and determined that gel mace spray wasn't Mr.
Cantwell, correct?
 A  If we're talking about the additional deployments later then yes, I found out that that was not
Mr. Cantwell.
 Q  So the gel mace spray, you found out the gel mace spray guy was dragon arm, correct?
 A  That is correct.

Exhibit GPSJ D.

Even while watching the Unicorn Riot Video, Goad admitted that he falsely accused

Cantwell of Dragonarm's actions, and that Cantwell was some distance away from him when

Dragonarm sprayed:

Prelim p. 96

 Q  Bump it forward.  Bump it forward.  You look over there.  Bump it forward.

 A  I can see Mr. Cantwell's center frame.  I can see Mr. Cantwell's center frame.  I was looking

at him at the time.  **He had mace while someone else is macing me.  That led to the**

**misidentification of the gel mace.**

 Q  Mr. Cantwell is twenty (20) feet away from you now, isn't he?

 A  I wouldn't say that's twenty (20) feet.

 Q  Ten feet?

 A  Again, these are very difficult, but twenty (20) is a great distance.

Q  And you're getting, you're getting---the gel mace is coming from dragon arm, right?

A  Yeah, I would say that----

[Emphasis added]


Exhibits GPSJ G; also MP 23 attached to the Complaint; Exhibit GPSJ D; Exhibit GPSJ A.

As set forth in his report to Acord, the Criminal Complaint, and his own admissions, the facts available to Goad were insufficient to justify a reasonable man in the belief that Cantwell "used a gel mase [sic] pepper spray at my face..."


**b. The crime charged.**

1. The facts available to Goad were insufficient to justify a reasonable man in the belief that Cantwell was not acting in defense of person or property, or that Cantwell acted unlawfully or with malice.


Goad attempted to replace his false accusation of Cantwell by claiming that Cantwell's interaction with Beanyman and Undersleeves/Massey had affected him, but this does not obtain.

"[T]he law of self-defense is the law of necessity, [a jury] should also be told that in determining necessity "(a) defendant may always act upon reasonable appearance of danger, and whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted.". McGhee v. Commonwealth, --- Va. ---, ---, 248 S.E.2d 808, 810 (1978).

Accordingly, whether Cantwell was acting on the reasonable appearance of danger is to be determined from Cantwell's point of view, and only Cantwell's point of view.  He, too watched Beanyman enter the Tank Top-Massey fight, MP 10; Cantwell is just out of frame to the right) and watched Beanyman and Goad come at him thereafter. MP 12. Outnumbered at

minimum by four fists to two, Cantwell was perfectly justified in deploying pepper spray at the closest threat, Beanyman. Goad, whose charge with Beanyman was stopped, was three or four feet to Beanyman's right, with his glasses on, and had a perfect view of the whole thing. MP 12. Of especial note is that at the beginning of MP 12, Goad is about 8 feet from Beanyman, and is looking directly toward the Tank Top-Beanyman fight. Goad's right hand is on his glasses as he watches Beanyman (on the ground) swing a backhanded blow. Goad then moves forward so that he is only about 3 feet from Beanyman when Beanyman is sprayed. These facts do not justify any prudent and reasonable man in the belief that "Cantwell used a gel mase [sic] pepper spray at my face," nor that Cantwell was defending himself.

"[A] person who reasonably apprehends bodily harm by another is privileged to exercise reasonable force to repel the assault." Diffendal v. Commonwealth, 8 Va.App. 417, 421, 382 S.E.2d 24, 25 (1989). However, the amount of force used to defend oneself must not be excessive and must be reasonable in relation to the perceived threat. Id. at 421, 382 S.E.2d at 26. Here, Cantwell was assailed by two persons, used pepper spray against only against the closest threat, specifically targeted that threat, and retreated when he had eliminated that threat. MP 15. Because Cantwell was acting in self-defense, he could not have acted with malice.

"Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed a purposeful and cruel act without any or without great provocation." Robertson v. Commonwealth, 31 Va.App. 814, 823, 525 S.E.2d 640, 645 (2000), and is a required element of 18.2-312. However, "Self-defense negates a finding of malice by providing a legal justification or excuse for a cruel act committed under the control of reason." Smith v. Commonwealth, 17 Va. App. 68, 435 S.E.2d 414 (1993). Goad watched Beanyman attack Cantwell (MP 15) and then intentionally concealed his knowledge of the self-defense

aspect, which he witnessed with his glasses on, to prompt the issuance of a no-bond felony warrant.

A witness, David Rother, was to Cantwell's right. " The person referred to as Beanyman and another person attacked a man in a white tank top shirt, who knocked Beanyman to the ground." "Beanyman popped up very quickly and aggressively and charged towards Mr. Cantwell. As Beanyman was coming forward, the people behind him were screaming and coming forward as well." Beanyman was coming right at Chris with a clenched fist. His face was enraged, furious, teeth clenched. If I was standing where Chris was standing and he was coming at me in that manner I would be ready to defend myself." Rother Declaration, GPSJ Exhibit B.

Even outside the express terms of Va. Code Sec. 18.2-312, again, "[A] person who reasonably apprehends bodily harm by another is privileged to exercise reasonable force to repel the assault." Diffendal v. Commonwealth, 8 Va.App. 417, 421, 382 S.E.2d 24, 25 (1989). However, the amount of force used to defend oneself must not be excessive and must be reasonable in relation to the perceived threat. Id. at 421, 382 S.E.2d at 26. Here, Cantwell, assailed by at least two persons, used pepper spray only against the closest threat, specifically targeted that threat, and retreated when he had eliminated that threat. MP 15. Because Cantwell was acting in self-defense, he could **_not_** have acted with malice. "Self-defense negates a finding of malice by providing a legal justification or excuse for a cruel act committed under the control of reason." Smith v. Commonwealth, 17 Va. App. 68, 435 S.E.2d 414 (1993). The facts available to Goad, viz., Beanyman fighting Tank Top, and then Goad's joining Beanyman going forward at Cantwell, were insufficient to justify a reasonable man in the belief that Cantwell was not acting in defense of person or property, or in self-defense.

Moreover, Goad himself was part of the attack on Cantwell, A man may not instigate a fray in order to provide an excuse for assaulting his enemy. Foster v. Com, 412 S.E.2d 198, 13 Va.App. 380 (Va. App. 1991). This is precisely what Goad did; he picked a fight and then falsely reported and swore under oath that he was the victim, concealing the fact that he was the aggressor.

No reasonable man could close his eyes to the truth that Cantwell was being attacked by a man who had just engaged in fighting and Goad himself, and that his use of spray was legally justified. No genuine issue of material fact exists as to this issue.


**(4) The prosecution was malicious.**

'Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed a purposeful and cruel act without any or without great provocation.' " Robertson v. Commonwealth, 31 Va.App. 814, 823, 525 S.E.2d 640, 645 (2000). "A 'common theme running through [the definitions of malice] is a requirement that a wrongful act be done willfully or purposefully.' Williams v. Commonwealth, 767 S.E.2d 252, 64 Va.App. 240 (Va. App., 2015). "Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will. It may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury." Dawkins v. Commonwealth, 186 Va. 55, 61, 41 S.E.2d 500, 503 (1947). Malice may well be inferred from the want of probable cause. Freezer v. Miller, *supra*. But the latter will not be inferred from the former. The burden of proof of both is on the plaintiff, and although the want of probable cause is a negative, the burden is nevertheless on the plaintiff to prove it. Clinchfield Coal Corp. v. Redd, 123 Va. 420, 96 S.E. 836; L.R.A. 1918A 872. Burks Pleading & Practice, 4th Ed. § 151, page 262.

No genuine issue of material fact exists as to whether Goad acted with malice. Goad intentionally lied about the perpetrator, concealed the self-defense aspects of the incident, and then then made a false statement to Acord, a criminal act under Va. Code Sec. 18.2-460(C), to wit, "the group began swinging torches at Goad but he was able to dodge them and remove his glasses. After removing his glasses, he observed a fire on the ground from what appeared to be a citronella canister. Goad stomped on the fire and when he looked back up, Cantwell sprayed him in the face. Goad said during his temporary blinding, he was struck by tiki torches but is unable to identify the offenders striking him." As set forth above, only White Shirt Tiki swung at him; that swing was the only one Goad dodged. Goad never removed his glasses. He had them on while observing the fire, the source thereof, and aimed hid foot thereat. He had them on after that. In fact, Cantwell never sprayed Goad in the face. He had no basis to claim that the stuff he got sprayed with was gel, liquid, or aerosol, but nevertheless specified that it was "gel." Goad was intentionally lying to Sgt. Acord, and then swore under oath to that lie on the Criminal Complaint. His false reference to the "group" shows that his motivation was to punish the Monumentals for perceived slights, not bring an offender to justice. This is also shown by his intentional misidentification of his sprayer and the concealment of the self-defense circumstances. Goad, with his glasses on his nose, in the blinding light of the camera, somehow identified the bald young man in a black t shirt with huge white lettering on it, Complaint Exhibit A, as the man in Complaint Exhibit L, a fat guy with a beard and ball cap in a work shirt.

On November 9, Goad doubled down on his false statements when questioned by the Commonwealth's Attorney. He blamed his false identification on the false statement that he did not have his glasses on:

Prelim 64-65:
Q How well do you see without your glasses?

A  I would say my vision is about 20/60, so I can see up close really well, but further than that things get a little blurry.  So like if I take it off right now I can see you.  I can see the judge all right, but I can't see what's going on in the gallery.
 Q  Fair to say if it were dark and there was a lot of chaos going on it would be difficult to identify everything that's going on, everything happening?
 A  Yes, that would definitely be the case.

Exhibit GPSJ D, Transcript Pages 65-65.

In fact, Goad's vision was good enough on August 11 that despite the alleged "darkness and chaos," he testified to on November 9, on the night of August 11, 2017, Goad gave an accurate description of Cantwell as his sprayer to Officer Thompson as set forth in Exhibit GPSJ H.

Furthermore, Goad testified that he had been the victim of no less than four separate sprays, yet out of the four, yet he only identified Cantwell, who never, ever, sprayed him in the face, apparently having some means of distinguishing Cantwell's  from the others:

Prelim P119

RECROSS-EXAMINATION
By:  Mr. Woodard
 Q  Mr. Goad, now there are four pepper spray incidents with you, right?
 A  Yeah, you saw the video.

GPSH Exhibit D

As of February 12, 2018, when he filed his answer, Goad knew the identity of at least one other who sprayed him, yet makes no mention of any charges against him. Answer, 32.  Even after "discovering" additional sprays, Goad did not take warrants out. Prelim p. 75-76, Exhibit GPSJ D. Clearly, Goad was only interested in Cantwell, not bringing offenders to justice.

Goad's repeated false statements to law enforcement, and his affirmative false statements under oath, show that he set the prosecution on foot with malice.  Goad himself admitted as much when he tried to recant his sworn statement that Cantwell gel maced him in the face:

Goad testified that before he ever went to Sgt. Acord, he reviewed the Unicorn Riot Video

Prelim p. 48
Commonwealth Q  So let the record reflect that we're going to begin the video at five seconds
into **the unicorn riot** video.
 (Video was played at this time.)
P. 61
Commonwealth Q  So you weren't able to immediately identify Mr. Cantwell at that time, were
you?
 A  I did not see Mr. Cantwell the rest of that night.
 Q  And you did review **video later and based upon that video,** what did you do?
 A  I reviewed video and I came back to the Charlottesville area to swear out a warrant and to
complete the process.
 Q  So you signed a statement and then a criminal complaint.
 A  That is correct.

Prelim p.72

Woodard Q  Now, after the event you learned of the existence of video, correct?
 A  That is correct.
 Q  Is **the video here, one of them that you reviewed?  The one you just looked at?**
 A  That is correct.
[Emphasis added]


Exhibit GPSJ D.

        After testifying that he reviewed the Unicorn Riot video before August 17, the date that

he "filled that form out," with Sgt Acord, when caught in his fraudulent sequence of events,

Goad falsely testified that he had _**not**_ reviewed the Unicorn Riot video before August 17th:

Prelim P103

Q  So your testimony is Cantwell maced you after the citronella candle from the other side of the
monument, right?
 A  When it was really before when I did not remember that because I did not have---
 Q  So this is another----
 A  Please let me finish, sir.

Prelim P104
Q  Another false statement.
 A  I did not have the luxury of this video when I filled that form out**.  If I had the luxury of this
video I would be able to correctly remember the sequence of events.**  I put the sequence of
events in wrong.

Q Go ahead. You testified earlier that before you came down there to Charlottesville on August 17th you knew it was Cantwell because you had reviewed all kinds of video and all kinds of social media, correct?
A Yeah, but this video was not out.
Q Okay. Now this video wasn't out.
A I did not have access to that video on August 17th. Sergeant Acord asked to see this video or to see, probably this video. I did not have that at the time and I was able to later find this video.

[Emphasis added]

Exhibit GPSJ D.

In fact, Goad had reviewed the Unicorn Riot video before speaking with Acord, and did not tell the truth anyway, as follows:

"the group began swinging torches at Goad but he was able to dodge them and remove his glasses. After removing his glasses, he observed a fire on the ground from what appeared to be a citronella canister. Goad stomped on the fire and when he looked back up, Cantwell sprayed him in the face. Goad said during his temporary blinding, he was struck by tiki torches but is unable to identify the offenders striking him." Acord Report, Exhibit GPSJ C.

Goad then did not tell the truth to the magistrate, who had not seen the Unicorn Riot video, under oath, as follows: "Cantwell used a gel mase [sic] pepper spray at my face and cause [sic] me to lose my vision temporarily [sic]. I was struck by torches by unknown persons while my vision was gone."

As set forth above, "malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed a purposeful and cruel act without any or without great provocation." In falsely accusing Cantwell, Goad clearly acted with a sedate deliberate mind and a formed design, AND committed a purposeful and cruel act without any great provocation. No genuine issue exists as to this fact.

# Conclusion

No genuine issue of material fact exists as to whether, by a preponderance of the evidence, Goad maliciously prosecuted Cantwell by knowingly and intentionally accusing him of another man's crime, and summary judgement on that claim is appropriate. Cantwell does not ask for an assessment of damage at this time, nor for a determination as to punitive damages attendant to this cause of action.

Christopher Cantwell

_____

Elmer Woodard
Attorney at Law
5661 US Hwy 29
Blairs VA 24527
434-878-3422
VSB 27734
isuecrooks@comcast.net

CERTIFICATE OF SERVICE

The undersigned, being an attorney duly licensed to practice law in the State of Virginia, does hereby certify that a copy of the foregoing was duly served upon the opposing counsel this date as follows:

By personally hand delivering a copy the same to him or to one of his employees at his office;

By fax transmission;

XXX        By electronic mail or the court's electronic means;

By depositing a copy of same in the United States Mail, postage prepaid, and addressed as follows:

ADDRESSEE:

Sandra C. Freeman, Esq.
Virginia State Bar No. 78499
5023 W. 120th Avenue, #280
Broomfield, Colorado 80020
sandra.c.freeman@protonmail.com 720-593-9004

This Friday, April 20, 2018.

Elmer Woodard