|  |  |  |
|---|---|---|
| | ) | |
| Plaintiff/Counter Defendant | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 3:17-CV-00089 (NKM/JCH) |
| | ) | |
| Emily Gorcenski, | ) | |
| Kristopher Goad, | ) | |
| Defendants/Defendants | ) | |

## OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANTS'/ COUNTER CLAIMANTS' AMENDED (FIRST) COUNTERCLAIMS

Defendants/Counter Claimants Emily Gorcenski and Kristopher Goad (collectively, "Defendants"), by counsel, oppose Plaintiff's 12(b)(6) Motion to Dismiss (ECF Nos. 30, 31) Defendants' Amended (First) Counterclaims (ECF No. 25, corrected at ECF No. 26). In support of their opposition to Plaintiff's Motion to Dismiss, Defendants state as follows:

### Introductory Statement

Plaintiff Christopher Cantwell initiated this action by filing a complaint in this court on December 28, 2017 (the "Complaint", ECF 1). Defendants filed an Answer to the Complaint on February 12, 2018 (ECF 9), and in the Answer asserted a number of Counterclaims. Plaintiff filed a motion to dismiss Defendants' original counterclaims pursuant to Rule 12(b)(6) on February 27, 2018 (ECF No. 12). Although Defendants contend that each of their counterclaims as originally stated was legally sufficient and would have survived Plaintiff's motion to dismiss, in response to Plaintiff's motion, Defendants amended their counterclaims as a matter of course pursuant to 15(a)(the "Amended Counterclaims", ECF Nos. 25, 26). Plaintiff subsequently filed the immediate 12(b)(6) Motion to Dismiss the Amended Counterclaims. The second Motion to Dismiss largely replicated the

1

arguments made in Plaintiff's first Motion to Dismiss the initial Counterclaims.

## Legal Standard

The U.S. Supreme Court has articulated the legal standard applied to a motion to dismiss under Rule 12(b)(6) as follows:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678–79, 129 S. Ct. 1937, 1949–50, (2009)(internal citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 647 (4th Cir.)(2017)(noting that the *Iqbal* pleading standard applies "to all civil actions"). Thus, to survive a motion to dismiss, the pleader is not required to demonstrate a probability of success on the merits of a claim, but must allege sufficient facts which, if true, together with reasonable inferences drawn in favor of the pleader would be sufficient to "nudge [the pleader's] claims across the line from conceivable to plausible." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955, 1960 (2007).

## Argument

For each of their counterclaims, Defendants have pleaded more than sufficient facts which, if proven to be true, would "nudge" their claim across the line from conceivable to plausible. As such, Plaintiff's Motion to Dismiss should be denied with respect to each of Defendants claims.

### I. Defendants' Assault Claims and Battery Claims are Plausible and Supported by Ample Factual Allegations—Including Plaintiff's Own Admissions.

In Virginia, the elements of the independent but related torts of assault and battery are well-settled:

> The tort of assault consists of an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery. The tort of battery is an

2

unwanted touching which is neither consented to, excused, nor justified. Although these two torts "go together like ham and eggs," the difference between them is "that between physical contact and the mere apprehension of it. One may exist without the other."

*Koffman v. Garnett*, 265 Va. 12, 16, 574 S.E.2d 258, 261 (2003)(citing to Restatement (Second) of Torts § 21 (1965); other internal citations omitted). "The contact requirement for battery is satisfied in cases where the actor causes the distribution of substances, such as hazardous or toxic chemicals or pollutants, that contact the plaintiff in an offensive or harmful way." Restatement (Third) of Torts: § 101 (2015). Thus, making unwanted, unjustified, intentional contact with another by deploying pepper spray that contacts the victim may constitute a battery, and placing a victim in imminent apprehension of contact by pepper spray may constitute assault. Under the well-established doctrine of transferred intent, "one who intends a battery is liable for that battery when he unexpectedly hits a stranger instead of the intended victim." *Davis v. White*, 18 B.R. 246, 249 (Bankr. E.D. Va. 1982).

In ¶ 4, p. 3[1] of the Amended Counterclaims, Defendants allege that Plaintiff intentionally and knowingly deployed pepper spray into a crowded group of people. Plaintiff himself has admitted to intentionally deploying pepper spray, twice, with the intention to make contact with other individuals in the crowd, and has provided ample photo and video evidence of this act. *See, e.g.* Amended Counterclaims, ¶ 5, p. 3. Defendants have both alleged that Plaintiff's deployment of pepper spray was unjustified, that the overspray from Plaintiff's admitted, intentional deployment of pepper spray contacted them causing physical harm (thus constituting a battery), and that they were placed in reasonable, imminent fear of the pepper spray attack prior to contact actually being made (thus constituting assault).

In addition, Defendants have alleged that the video evidence submitted by Plaintiff demonstrates that, on the night of August 11, Plaintiff intentionally and knowingly made other

---

[1] In preparing this filing, Defense counsel noticed a numbering error in the Amended Counterclaims, such that there are two ¶ 4s and two ¶ 5s in the document, one each on p. 2 and p. 3. Counsel regret and apologize for any inconvenience or confusion caused by this error.

3

offensive, unwanted, harmful, and unjustified contact with both Defendants in a number of instances where the video shows him variously coming in to contact with them by hitting, shoving, and/or slapping at them. Defendants have alleged that each instance of unwanted contact constitutes a separate battery, and that Plaintiff's conduct in engaging in such unwanted contact constituted assault as well as battery.

Though Plaintiff may believe he has a defense to such claims (*e.g.,* his purported claim that he was acting in self-defense), such defense is not self-evident as a matter of law, and as such is a question of disputed fact. Defendants have alleged that Plaintiff's unwanted contact with them on August 11 was unjustified. Amended Counterclaims ¶ 62. Although Plaintiff appears to imply that it is somehow incumbent on Defendants to plead specific facts showing that Plaintiff was *not* acting in self-defense, this is not how pleadings work. Defendants have plead adequate facts to sustain a claim for assault and battery, and Plaintiff has the right to assert the defense of justification. Whether he can adequately establish that defense is a disputed question of fact, and as such does not render Defendants' assault and battery claims susceptible to dismissal at this stage.

Similarly, although Plaintiff alleges that the video shows his pepper spray did not make contact with Defendants, Defendants have pleaded that it did, and contend that the video and other evidence substantiates this claim. Thus, whether the pepper spray made contact with Defendants is also a disputed question of fact, and does not subject the claim to dismissal at this stage.

Defendants have pleaded more than adequate facts, substantiated by video and photo evidence along with Plaintiff's own admission that he intentionally deployed pepper spray with the intent to contact another individual in the crowd, to sustain their assault and battery claims as a matter of law. Plaintiff's Motion to Dismiss the assault and battery claims should be denied.

4

## II. Defendants' Negligence Claims are Plausible, Supported by Ample Factual Allegations, and are Properly Pleaded as either Supplemental or in the Alternative to, Their Assault and Battery Claims.

As an alternative theory of recovery, Defendants have alleged that Plaintiff's intentional deployment of pepper spray in a crowded area on August 11 breached his duty to act with reasonable care, and that Plaintiff is thus alternatively liable to Defendants for the harm caused by his pepper spray deployment under a negligence theory. Plaintiff's Motion to Dismiss appears to imply that Defendants may not plead negligence as an additional theory of recovery that is either supplemental or in the alternative to their assault and battery claims. This is clearly not correct, as it is well-established that Rule 8 of the Federal Rules of Civil Procedure unambiguously permits pleading in the alternative.[2]

Plaintiff also asserts in his motion to dismiss that Defendants' negligence claim must fail, because his deployment of pepper spray, purportedly in self-defense, was reasonable under the circumstances. However, as noted above, the question of whether Plaintiff was acting in self-defense is a disputed question of fact for the fact-finder, not appropriate for disposition in a Motion to Dismiss stage. Furthermore, Plaintiff's reliance on his allegation that he did not violate Virginia Code 18.2-312 (the felony Illegal Use of Gas statute under which he has been criminally charged and is awaiting trial) is misplaced in relation to the negligence claim. As a matter of law, Plaintiff could (for the sake of argument) be found not guilty of Illegal Use of Gas on the grounds that he was acting in self-defense, but could still be found in this civil action to have acted without reasonable care under the circumstances, thus rendering him liable for damages under a negligence theory.

Whether Plaintiff was acting in self-defense and whether his actions were consistent with the duty to act with the reasonable care a person of ordinary prudence would exercise under the

---

[2] The assertion that pleading in the alternative is not allowed is so plainly contradictory to the plain language of Rule 8 and well-settled, fundamental principles of tort law that including it in the Motion to Dismiss arguably constitutes a violation of Rule 11 subject to possible sanction.

circumstances of August 11 are both disputed questions of fact, and thus cannot render Defendants' claims susceptible to dismissal at this stage. Defendants have pleaded more than adequate facts, supported again by Plaintiff's own admissions and photo and video evidence, to state a claim for negligence as an alternative theory of recovery for Plaintiff's deployment of pepper spray. As such, Plaintiff's motion to dismiss the negligence claims should be denied.

### III. Defendants' Claims for Stalking in Violation of <u>Va. Code</u> § 8.01-42.3 are Plausible and Supported by Ample Factual Allegations.

In the Amended Counterclaims, Defendants have set forth a civil claim for stalking, supported by detailed factual allegations and supporting documentary evidence that Plaintiff has, over a course of many months, engaged in a concerted campaign to communicate threats of violence, harassment, and intimidation against them in his blog, on his social media accounts, and in his online radio show. *See* Amended Counterclaims ¶¶ 23 – 27 and accompanying Exhibits. Defendants have alleged that each instance of such conduct constitutes a true threat, and that Plaintiff's repeated acts of making such threats constitute conduct directed at the victims on at least two occasions intending to cause, and in fact causing, the Defendants to experience reasonable fear of death or bodily injury, thus subjecting Plaintiff to civil liability for stalking under <u>Va. Code</u> § 8.01-42.3.

In his motion to dismiss, Plaintiff correctly sets for the elements necessary to establish a claim for civil liability for stalking under <u>Va. Code</u> § 8.01-42.3, under which a claimant must establish that:

> (1) the defendant directed his ... conduct toward the victim on at least two occasions;
> (2) the defendant intended to cause fear or knew or should have known that his ... conduct would cause fear; and (3) the defendant's conduct caused the victim "to experience reasonable fear of death, criminal sexual assault, or bodily injury."

*Stephens v. Rose*, 288 Va. 150, 155, 762 S.E.2d 758, 761 (2014). Plaintiff incorrectly, however, seems to believe that verbal or written statements can never constitute "conduct" that would satisfy

6

the conduct requirement of a stalking claim. Although there are unquestionably First Amendment concerns that arise in the gray zone between "speech" and "conduct", it is undisputed that threats against another person are conduct for which the person making them can be held both criminally and civilly liable, and are not protected speech or "mere words":

> It is settled that the Constitution does not protect true threats. *See Virginia v. Black*, 538 U.S. 343, 359–360, 123 S.Ct. 1536 (2003); *R.A.V. v. St. Paul*, 505 U.S. 377, 388, 112 S.Ct. 2538 (1992); *Watts v. United States*, 394 U.S. 705, 707-8, 89 S.Ct. 1399, 22 (1969). And there are good reasons for that rule: True threats inflict great harm and have little if any social value. A threat may cause serious emotional stress for the person threatened and those who care about that person, and a threat may lead to a violent confrontation. It is true that a communication containing a threat may include other statements that have value and are entitled to protection. But that does not justify constitutional protection for the threat itself.

*Elonis v. United States*, 135 S. Ct. 2001, 2016, 192 L. Ed. 2d 1 (2015)(Alito, J. concurring in part and dissenting in part). Nor is communicative conduct protected as "speech" where it "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S. Ct. 1827, 1829 (1969). Consequently, it is clear that verbal or written statements that constitute threats, or which are directed to inciting lawless action, such as violence or threats against another person, are conduct, and not speech, that may potentially subject the person making them to civil and criminal liability.

It is also clear that true threats made online may subject the person making them to liability (criminal or civil) under applicable law, including in cases where the person making the threats posts them to his/her/their own social media page or profile, and does not "tag" the victim or otherwise affirmatively alert the victim to the making of the threat. *See Elonis*, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015). In *Elonis*, the Supreme Court examined at length whether the defendant's conduct in posting threatening "rap lyrics" and images to his Facebook page could subject him to criminal liability under a federal statute prohibiting a person from transmitting in interstate commerce "any communication containing any threat ... to injure the person of another." The issue on appeal in that case had to do

7

with the requisite culpable mental state required to be proved under the statute. While the Court reversed and remanded the conviction in the case on the grounds that the federal statute required the prosecution to prove intent to convey a threat (rather than merely proving that a reasonable person would have interpreted the communication as a threat), notably, neither the defense nor the Court ever questioned whether threats communicated on the defendant's own Facebook wall, without having tagged the victim, could constitute a "threat" that was "communicated" under the statute. Furthermore, the Court explicitly noted that the heightened mental state requirement it was imposing under the federal criminal statute was more stringent than the standard that would be required for claims involving civil liability. *See id.* at 2011.

Published Virginia opinions do not appear to have addressed the precise question of whether repeated online threats alone may constitute "conduct" in violation of Va. Code § 8.01-42.3 or Va. Code 18.2-60.3. However, the Virginia Supreme Court has clearly established that communications such as phone calls can constitute conduct in violation of the stalking statute, *see Parker v. Com.*, 24 Va. App. 681, 685, 485 S.E.2d 150, 152 (1997)(upholding a conviction for stalking based on multiple threatening phone calls), and has clearly stated that the intent and effect of the statute is to "prohibit[] individuals from communicating with others in a way that is intended or known to cause fear of physical harm." *Id.* at 690, 154. If the act of making a phone call constitutes conduct, so do does the act of posting or making threats and harassment online. Where those threats and harassment are intended or known to cause fear of physical harm, they are not protected under the First Amendment, and thus may subject the issuer to criminal or civil liability under the Virginia stalking statutes. In the modern era of digital communication, and particularly in light of the Supreme Court's opinion in *Elonis*, a decision to the contrary would unjustifiably thwart the statutory purpose of "prohibit[ing] individuals from communicating with others in a way that is intended or known to cause fear of physical harm." *Id.* In light of the fact that threats posted online constitute conduct, Plaintiffs have

8

sufficiently pleaded conduct by Plaintiff under the Virginia stalking statutes.

Plaintiff also disputes whether threats or harassment posted online can constitute conduct "toward" the victim. Defendants have alleged that Plaintiff's conduct was directed toward them because, *inter alia*, he used his social media postings, blog, and online radio show as a way to intentionally encourage his supporters to harass, intimidate, and threaten Defendants. He directed his supporters towards Defendant by, *inter alia*, publishing their photos and personal identifying information, and republishing content from their social media accounts all of which were intended to, and in fact did, quickly direct his followers to Defendants social media accounts, where they harassed, threatened, and intimidated Defendants. Relatedly, by falsely accusing Defendants of crimes and by engaging in violent, vengeful, threatening, and harassing rhetoric about Defendants, Plaintiff was engaging in conduct towards Defendants by intentionally inciting others to contact, threaten, harass, and intimidate them on his behalf. Pursuant to Rule 11(b)(3), Defendants also believe that a reasonable opportunity for discovery and further investigation will likely yield additional evidentiary support to demonstrate that Plaintiff directed and encouraged his followers, supporters, and compatriots to harass, threaten, and intimidate Defendants.

Furthermore, Defendants contend that Plaintiff is fully aware that, given their status as victim-witnesses in his criminal case, and given his violent conduct on August 11, Defendants and/or their friends and loved ones would be monitoring his blog and social media account in order to be on the lookout for any potential threats made against Defendants or their loved ones. Where Plaintiff is repeatedly making public violent threats against Defendants on the internet that put them at fear for their physical safety and the safety of their loved ones, it is wholly unreasonable for Plaintiff to assert as a defense to the stalking claim that Defendants should just pretend he isn't making such threats, and not look at his online content. Defendants have alleged that Plaintiff posts such threats with the intent and hope that Defendants will see them and be intimidated by them—and in fact, such

motivation is the only reasonable explanation for his seemingly endless threats and harassment against them.

In light of the foregoing, it is a disputed question of fact whether Plaintiff engaged in conduct "towards" Defendants under the Virginia stalking statutes, rendering Defendants' stalking claims in appropriate for dismissal on this element at the Motion to Dismiss stage.

Finally, Plaintiff appallingly contends that Defendants' stalking claims should be dismissed as a matter of law because *he* does not believe Defendants were actually put in fear of physical harm; that is, because *his opinion* is that any fear they experienced as a result of his threats and harassment was not objectively reasonable. But, where Defendants have alleged fear of physical harm, whether they actually experienced such fear and whether it was reasonable is a quintessential disputed question of fact for the fact-finder. Though he seems to strongly resent this fact, Plaintiff is not the sole arbiter of what constitutes reasonableness as a matter of law.

Further, Plaintiff's implication that, because he has nominally labelled his online conduct as speech, caricatures, or "parody", it is categorically exempt from being taken seriously as threatening is absurd. It is particularly absurd where such threats are not confined to a world of fantasy or cartoon violence, but arise in the context of real violence, including the violence experienced in the City of Charlottesville on August 12, 2017 at the hands of Plaintiff and his compatriots, which resulted in one murder and countless other serious injuries, and which violence Plaintiff has vociferously defended and valorized. Many of Plaintiff's online statements explicitly invoke actual harm done to each of the Defendants or to people ideologically aligned with them, calling for copycat attacks and attempting to make a real-world meme of bias-motivated vehicular homicide. Further, these threats issue from the keyboard and mouth of Plaintiff, an individual who derives income from the sale of English translations of Adolf Hitler's *Mein Kampf* on his website, who vociferously defends and idolizes Hitler and the Holocaust, and who make his living calling for the creation of a white ethno-state

10

which will grant "licenses" to "Right Wing Death Squads."  Each threat issues not from an animated rabbit with no material presence in the real world, but from a person who longs for the genocidal episodes of our too-recent past, and who exhorts his followers to actual violence.  Defendants' fear for their physical safety, and the safety of those they love, in the face of violent threats and harassment from Plaintiff is imminently reasonable, particularly in light of alarming and increasing number of murders and acts of violence committed by members of the so-called Alt-Right since 2016.  *See, e.g.,* Carless, Will and Sankin, Aaron, "The Hate Report: 43 alt-right murders in four years," *Reveal, from the Center for Investigative Reporting*, Feb. 9, 2018, available at https://www.revealnews.org/blog/the-hate-report-43-alt-right-murders-in-four-years/ (accessed April 24, 2018).

To compare the fear experienced by Defendants for their physical safety to the fanciful fear of an imaginary cartoon-viewer for the "life" of Elmer Fudd, brings the universe of false equivalencies to a new low.  In any event, Plaintiff's horrific indulgence of such false equivalency does not suffice to establish that Defendants' fear for their safety was and is unreasonable as a matter of law.  The question of reasonableness is a disputed question of fact for the fact finder, and Plaintiff's contention of unreasonableness does not subject Defendants' stalking claims to dismissal on a Motion to Dismiss.

In light of the foregoing, Defendants have pleaded sufficient facts which, if proven true, would sustain their stalking civil claims under the Virginia stalking statutes.  As such, Plaintiff's Motion to Dismiss these claims should be denied.


IV.     **Defendants' Claims for Unlawful Use of Name and Photographs is Violation of Va. Code § 8.01-40 are Plausible and Supported by Ample Factual Allegations.**

Defendants have pleaded that Plaintiff published the names and photographs of both Defendants, without permission, either directly to his website, or to his social media account in an effort to drive traffic to his website, for the purpose of advertising or trade, namely for the purpose of

11

soliciting commercial business from visitors to his site, including solicitations for monetary donations to his site, solicitations for visitors to purchase a paid membership to his site, and solicitations for visitors to purchase merchandise in Plaintiff's online store.[3] As such, Defendants have alleged that the publication of such statements and the use of Defendants' names and photographs were made for advertising purposes or for the purposes of trade. Amended Counterclaims ¶ 38.

Plaintiff appears to contend that his use of Defendants' names and images has not been for advertising or trade purposes, but merely for the purpose of "reporting" newsworthy events. He does not attempt to explain how, *e.g.*, including the photographs of Defendants alongside a grotesque, violently threatening song titled "Gassing Kikes and Trannies" constitutes reporting of the news. *See* Amended Counterclaims, ¶ 27(f). At worst the contention that such use is "newsworthy" is made in bad faith, but at best it renders the actual purpose of Plaintiff's unauthorized use of Defendants' names and images a disputed question of fact. As such, Defendants' claims for unlawful use of their names and photographs under Va. Code § 8.01-40 are not subject to dismissal as a matter of law.

## V. Defendants Claims for Harassment, Intimidation & Violence Motivated by Plaintiff's Racial, Religious, or Ethnic Animus Under Va. Code § 8.01-42.1 are Plausible and Supported by Ample Factual Allegations.

Va. Code § 8.01-42.1 provides for injunctive relief and/or civil damages where a claimant demonstrates that they have been:

> subjected to acts of (i) intimidation or harassment or (ii) violence directed against his person;…where such acts are motivated by racial, religious, or ethnic animosity.

As set forth above, Defendants have both alleged that Plaintiff subjected them to violence directed against them in the form of the same acts that constitute the basis of their assault and battery claims. Both Defendants have also pleaded ample facts outlining that Plaintiff, acting in concert with his

---

[3] As noted in the Amended Counterclaims, the merchandise available in Plaintiff's online store includes t-shirts and other apparel featuring the logo of Mr. Cantwell's website, bumper stickers with slogans such as "Physically Remove Democrats", "I [heart] Physical Removal", and "It's Okay to Be White," and an English translation of Adolf Hitler's *Mein Kampf*.

12

confederates, have engaged in an extended, ongoing campaign to intimidate, harass, and threaten them.

With respect to the allegation that Plaintiff's ongoing violence, intimidation, and harassment against Defendants is motivated by racial, religious, or ethnic animus, Defendants have pleaded more than sufficient facts, and provided supporting documentary evidence, that Plaintiff has referred, and continues to repeatedly refer to Defendants as "Jews", or often chooses instead to refer to them using the anti-Semitic slur "Kikes", often making Holocaust references about "gassing" them. For Plaintiff, a vociferous white nationalist and ardent supporter of Adolf Hitler's genocide, to now innocently feign an absence of religiously-motivated animus evidences extreme bad faith. Even based solely on Plaintiff's repeated use of anti-Semitic slurs against Defendants, Defendants have pleaded more than sufficient facts to sustain a claim that Plaintiff's conduct was motivated, at least in part, by his belief that Defendants are Jewish, or at a minimum, by a belief that they are supporters of Jewish people. In addition, though Plaintiff continues to insist that Ms. Gorcenski is white[4], she is in fact a transgender woman of Asian ancestry, and Ms. Gorcenski has alleged that his conduct is motivated by animus toward her based on her identity as such.

Further, Defendants have also alleged sufficient facts to demonstrate that Plaintiff's conduct has been motivated by animus based on the fact that they are supporters of and vocal advocates for equal rights, self-determination, and liberation for individuals who belong to protected classes under Va. Code § 8.01-42.1. Defendants have alleged that they are both:

> [A]nti-racist/anti-fascist activists and advocates of equal rights for black people, LGBTQ people, immigrants, and other equally vulnerable and marginalized minority groups. The status of Ms. Gorcenski and Mr. Goad as anti-racist and anti-fascist activists promoting equal rights for black people, LGBTQ people, immigrants, and other vulnerable and

---

[4] As noted in the Amended Counterclaims, the irony that Plaintiff, an avowed white supremacist and white ethno-nationalist, repeatedly insists that she is "white" is not lost on Defendants. It is a remarkable case study in the internal contradictions and logical unsustainability of white supremacist ideology, insomuch as it demonstrates that the construct of "race" does not have a biological basis, but is wholly a social construct that was conceived to justify chattel slavery and the trans-Atlantic slave trade, and which is maintained to justify the pernicious present-day consequences wrought by the legacies of slavery and structural white supremacy.

marginalized minority groups was generally known and was known to the Plaintiff through the online and in-person activism of Ms. Gorcenski and Mr. Goad, to include mobilizing and organizing in support of equal rights and against the rallies organized and planned by the Plaintiff and other racist, fascist organizers throughout the summer of 2017.

Amended Counterclaims, ¶ 4, p. 2. Though Plaintiff appears to be unaware of the well-settled case law regarding such civil rights statutes, the law is well-settled that state and federal civil rights statutes protecting individuals from class-based harassment, intimidation, and violence, such as Va. Code § 8.01-42.1, protect not only the individual members of the protected class, but also their known supporters and advocates from harassment and violence that is motivated by such support. Such statutes, often referred to as "anti-KKK laws" or "anti-Klan laws", first began to be enacted in the post-Civil War period. In the context of the federal Ku Klux Klan Act (42 U.S.C. § 1985(3), discussed *infra*), the Fourth Circuit has observed at length that:

> The passage of the Ku Klux Klan Act was in response to widespread violence and acts of terror directed at blacks ***and their supporters*** in the postwar South. Violent resistance to the changes of the Reconstruction Era in many southern States, including the transition from a slave to a free society, was led by a coalition of some Southern Democrats and the Ku Klux Klan. The primary goal of this resistance was viewed by Congress as the dismantling of the system of reconstruction, as well as the dilution of political rights gained by blacks through the post-Civil War Constitutional Amendments. The result of the Klan's activities was to limit the degree to which reconstruction policy was successfully implemented. The majority in Congress believed the provisions of the Act were necessary in order to compensate for the inability or unwillingness of southern governments and state judges to stem the tide of violence…
>
> This failure or inability on the part of local southern governments to control the Klan was particularly troubling to Republican Congressmen. During this period, Republicans were ***leading supporters*** of the emancipation of blacks, and as a result frequently joined the blacks as common victims of Klan intimidation and violence…Against this backdrop of political terrorism, Congress enacted § 1985(3), affording a remedy for the vindication of the civil rights of those being threatened and injured, notably blacks ***and advocates for their cause***, including Republicans.[5]

*Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 157 (4th Cir. 1985). It is unquestionable that the

---

[5] It is not relevant to this case, but it is noteworthy that the Fourth Circuit went on to hold in *Harrison* that the historical Republicans and their supporters did not constitute a protected class per se under § 1985(3), but rather that the mention of Republicans and their supporters in the legislative history of the predecessor was linked inextricably and solely dependent on their prominent support at the time for newly-freed Black Americans in the postwar era.

14

federal Ku Klux Klan Act protects both members of a protected racial class and known supporters of their equal rights from bias-motivated violence, harassment, and deprivation of rights. The federal act has also been construed to apply to non-race-based classes that are protected under the Fourteenth Amendment (*e.g.*, religious minorities). *See, e.g., Shooting Point, L.L.C. v. Cumming*, 238 F.Supp.2d 729 (E.D. Va., 2002)(noting that § 1985(3) applies to "unlawful class-based, discriminatory animus").

Though no Virginia court appears to have addressed the precise question of whether <u>Va. Code § 8.01-42.1</u> protects supporters and advocates of equal rights for a protected class, such an interpretation is clearly within the plain meaning of the statute and is consistent with the broader national context in which the statute arose and continues to apply. The utility of the statute in advancing and protecting civil rights would be severely thwarted if it were interpreted to freely permit white supremacists to engage in bias-motivated harassment, intimidation, and violence against the supporters and loved ones of individual protected class members. The plain language of the statute provides that the acts of harassment, intimidation, or violence must be "motivated by racial, religious, or ethnic animosity" to be actionable. This language can plainly be interpreted to encompass Plaintiff's conduct towards Defendants, which Defendants' have alleged is motivated by his virulent animosity towards, *inter alia*, Black people and people of color, black people, LGBTQ people, immigrants, and other vulnerable and marginalized minority groups. Defendants have alleged, and provided ample specific factual allegations to support their allegations, that Plaintiff has targeted them for his animus because they are vocal and known supporters for equal rights of such marginalized groups. Thus, Defendants have alleged sufficient facts to sustain their claims under <u>Va. Code</u> § 8.01-42.1, and Plaintiff's Motion to Dismiss these claims should be denied.

**VI.     Defendants Claims for Conspiracy to Interfere with Civil Rights, Obstruction, and Witness Intimidation Under 42 U.S.C. §§ 1985(2) and (3) are Plausible and Supported by Ample Factual Allegations.**

15

As stated above in Part III (Defendants' claims for stalking), Defendants have pleaded ample facts which, if true, would demonstrate that Plaintiff has engaged in a sustained campaign of harassment, intimidation, and threats against Defendants. Defendants have alleged that this conduct is motivated in part based on Plaintiff's racial, religious, and or ethnic animosity (either towards Defendants themselves or towards the members of the protected classes whose equal rights Defendants support and advocate for). Defendants have also specifically alleged, and have alleged ample facts to support, that Plaintiff's harassment, intimidation, and threats towards them is motivated by his desire to retaliate against them for cooperating in the criminal case against him, and by his intentional efforts to intimidate and threaten them from testifying as witnesses at his criminal trial. *See*, *e.g.*, Amended Counterclaims ¶¶ 23, 28, 29, 30, 78 -89.

With respect to Defendants' Witness Intimidation and Obstruction claims under 42 U.S.C. § 1985(2), the goal of the statute is to prohibit "obstructing justice in federal or state court, especially intimidating witnesses." *Haddle v. Garrison*, 525 U.S. 121, 125 (1998). Plaintiff strangely appears to imply that Defendants must plead that they have actually been prevented from testifying in a court proceeding in order to state a claim under the statute. This is clearly inconsistent with the plain language of the statute, which imposes liability on those who "conspire to deter, by force, intimidation or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully." 42 U.S.C. § 1985(2). This does not require that the Plaintiff and his co-conspirators to have been successful in their quest to deter Defendants from testifying in order to impose liability, but only requires them to have engaged in a conspiracy with the intent to accomplish such goal. Further, the statute also imposes liability where the goal of the conspiracy is to "injure [a witness] in [their] person or property on account of [their] having so attended or testified" in a court proceeding. Defendants have alleged and provided ample factual allegations to support their claim that Plaintiff's campaign of harassment, intimidation,

and threats has been in retaliation for their having attended and testified against him in his preliminary hearing, and that they have been injured as a result thereof. Thus, Defendants have alleged sufficient facts to sustain this element of their claims under § 1985(2).

With respect to Defendants' claim for deprivation of civil rights under § 1985(3), as noted at length above, Defendants have alleged ample facts to support their allegation that they were targeted for depravation of their equal rights under the law, including, *inter alia*, their right to access the court system to testify in the criminal proceedings against Plaintiff, and their right to be free from harassment, intimidation, and threads of violence, which was motivated by Plaintiff's racial, religious, and or ethnic animosity. Thus, Defendants have alleged sufficient facts to sustain this element of their claims under § 1985(3).

With respect to the conspiracy aspect of Defendants' claims, Defendants have alleged with specificity that Plaintiff has:

> conspired explicitly and/or tacitly with one or more other persons and entities whose identities are known and unknown to Mr. Goad, including but not limited to Jason Kessler, David Rotter, Daniel McMahon, Corey Mahler, Zyniker Law, Hannah Zarski, all persons and entities (known and unknown) acting as agents of the Plaintiff through creation, posting, promotion and/or maintenance of content on the Plaintiff's blog, podcast, social media accounts, and all persons and entities (known and unknown) who support, encourage, and contribute to the Plaintiff's actions against Mr. Goad via fundraising, promotion, donation of money, goods, and labor...

*See* Amended Complaint, ¶¶ 91, 95. Defendants have made specific allegations relating to the currently-known participants in the alleged conspiracy, the object of the conspiracy, and the means of the conspiracy, as well as the injury Defendants have suffered as a result of the conspiracy. Amended Complaint, ¶¶ 43 - 44 (allegations of agreement between Plaintiff and Jason Kessler), 73 -102. Contrary to Plaintiff's assertion, Defendants have, in fact, alleged an agreement or "meeting of the minds" among Plaintiff and his various co-conspirators. Id. ¶¶ 79, 80, 83, 84, 87, 92, 96, 99. Defendants have also alleged numerous overt acts in furtherance of the conspiracy, in the form of, *inter alia*, each act of harassment, intimidation, or threat levied

17

toward them by Plaintiff or one of his supporters. Pursuant to Rule 11(b)(3), Defendants also believe that a reasonable opportunity for discovery and further investigation will likely yield additional evidentiary support to demonstrate that Plaintiff directed and encouraged his followers, supporters, and compatriots to harass, threaten, and intimidate Defendants in furtherance of the conspiracy, and that his followers, supporters, and compatriots expressly or tacitly agreed to do so. As such, Defendants have pleaded ample factual allegations to sustain the conspiracy element of their claims under §§ 1985(2) and (3), along with each and every other element of these claims. As such, these claims are not subject to dismissal as a matter of law.

### VII. Defendants Claims for Abuse of Process and Malicious Prosecution are Plausible and Supported by Ample Factual Allegations.

Plaintiff correctly states that a claim for abuse of process requires Defendants to plead facts sufficient to demonstrate (1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings. *See Donahoe Construction Co., Inc. v. Mount Vernon Associates,* 369 S.E.2d 857, 235 Va. 531 (1988). Here, Defendants have amply alleged that Plaintiff's ulterior purpose in prosecuting this action is to harass, intimidate, and threaten them in retaliation for their cooperation in the criminal proceedings against him, and to prevent them from further cooperation. They have also alleged that Plaintiff has perverted the use of this Court's process in furtherance of his campaign to threaten, intimidate, and harass Defendants, and for no proper purpose. Notably, Plaintiff continues to engage in the transphobic, harassing practice of misgendering Ms. Gorcenski and of making horrific statements such as the statement that she "pretends to be a transgender woman of color." Such unprofessional, uncivil use of this Court's processes is a perversion of process that satisfies this element of the abuse of process claim.

With respect to Defendants malicious prosecution claims, Plaintiff correctly asserts that Defendants have not pleaded that the prosecution of this civil action has been terminated. Defendants

18

have asserted this claim pending the termination of the action, under the theory that it might otherwise be deemed waived pursuant to Rule 13(a). This element will be satisfied if and when the current case is resolved in Defendants' favor. As described throughout this opposition and in the Amended Counterclaims, Defendants have amply pleaded facts to support all other elements of their malicious prosecution claims.

*****

In light of the foregoing, for each and every one of their counterclaims, Defendants have pleaded more than sufficient facts which, if proven to be true, would sustain their causes of action as legally plausible. As such, Plaintiff's Motion to Dismiss should be denied in whole with respect to each of Defendants claims. Defendants respectfully request that the Court deny Plaintiff's Motion to Dismiss the Amended Counter Claims in its entirety, award them their reasonable attorneys' fees for any aspects of the Motion to Dismiss that the Court deems to have been assert in violation of Rule 11, and award them any other such relief as the Court deems just and proper.

*****

Respectfully submitted,

EMILY GORCENSKI
KRISTOPHER GOAD
By Counsel

April 24, 2018                           /s/ *Sandra Freeman*
                                         Sandra C. Freeman, Esq.
                                         Virginia State Bar No. 78499
                                         5023 W. 120th Avenue, #280
                                         Broomfield, Colorado 80020
                                         sandra.c.freeman@protonmail.com
                                         720-593-9004


                                          /s/ *Pamela Starsia*
                                         Pamela Starsia, Esq.
                                         Virginia State Bar No. 88657
                                         3006 Maplelawn Circle
                                         Austin, Texas  78723
                                         pamstarsia@starsialaw.com
                                         518-441-2695


                                         /s/ *Moira Meltzer-Cohen*
                                         Moira Meltzer-Cohen, Esq.
                                         Admitted Pro Hac Vice
                                         277 Broadway, Suite 1501
                                         New York, New York  10007
                                         meltzercohen@gmail.com
                                         718-450-3035


                                         *Counsel for Emily Gorcenski and Kristopher Goad*

<u>CERTIFICATE OF SERVICE</u>

I, Pamela Starsia, hereby certify that on April 24, 2018, I electronically filed the foregoing Defendants'
Motion for Enlargement of Time with the Clerk of the Court for the United States District Court for
the Western District of Virginia by using the CM/ECF system. I certify that counsel for all
participants in the case are registered CM/ECF users and that service will be accomplished by the
CM/ECF system.

Dated: <u>April 24, 2018</u>.

<u>/s/ <i>Pamela Starsia</i></u>
Pamela Starsia
