# Exhibit 2

**to Rule 56(d) Declaration of Pamela Starsia, Esq.:
Transcript from Preliminary Hearing in**
***Commonwealth of Virginia v. Christopher Charles
Cantwell*, taken on November 9, 2017**

1   VIRGINIA: IN THE GENERAL DISTRICT COURT FOR THE COUNTY OF
        ALBEMARLE
2

3

4   COMMONWEALTH OF VIRGINIA,

5                       Plaintiff,

6   v.

7

8   CHRISTOPHER CHARLES CANTWELL,

9                       Defendant

10

11

12

13

14

15

16                   COURT PROCEEDINGS

17                      Taken on

18                  November 9, 2017

19

20

21

22

23

24

25

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 2 of 291   Pageid#: 616

APPEARANCES:

Robert Tracci                    Elmer R. Woodard, III
410 E. High Street               5661 US Hwy. 29
Charlottesville, VA  22902       Blairs, VA  24527
Attorney for Commonwealth        Attorney for Defendant

BEFORE: The Honorable William G. Barkley

WITNESSES

Motion before Preliminary Hearing

| WITNESSES – Defense | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Kristopher Goad | 12 | | | |

Preliminary Hearing

| WITNESSES – Commonwealth | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Kristopher Goad | 40 | 68 | 107/111 | 113/119 |
| Emily Gorcenski | 123 | 146 | 185 | |

| WITNESSES – Defense | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Teddy Newcome | 194 | 205 | | |
| David Rotter | 212 | 223 | | |
| Christopher Cantwell | 223 | 236 | 253 | |
| Sergeant Pleasants | 254 | 260 | 262 | |
| Elliott Cline | 264 | 269 | 271 | |

1          **November 9, 2017**

2

3          THE COURT:  All right, this is the Albemarle Gen-

4    eral District Court and this is the matter of Commonwealth

5    v. Cristopher Cantwell.  Mr. Cantwell's counsel is present,

6    Mr. Woodard, a representative of Mr. Woodard's office, Mr.

7    Tracci is here, Albemarle County's Commonwealth's Attorney,

8    a representative from his office, various member of the

9    sheriff's office, the clerk, the court reporter and Judge

10   Barkley.  We are here in a private session at the request

11   of Mr. Woodard.  He said there a matter that he wanted to

12   take out---take up privately with the Court.  There was a

13   brief discussion in regard to most of the hearings that

14   this court does are a matter of public record.  I can't

15   rule on Mr. Woodard's motion though, or his statement,

16   whatever he wants to tell the Court without excluding the

17   public from hearing from it.  So I'm going to hear from Mr.

18   Woodard, hear from Mr. Tracci and then we'll see the status

19   of the case.  All right, Mr. Woodard.

20         MR. WOODARD:  Your Honor, I regret to have to

21   bring to the Court's attention what I believe may be a

22   fraud perpetrated on it.  That's why I requested privacy.

23   I received this email.  It is my only copy of it.  I re-

24   ceived this email yesterday from Mr. Tracci.  I'll let the

25   Court read that.

1          THE COURT:  All right, the Court's reviewed the--
2  -

3          MR. WOODARD:  I submit to the Court the document
4  marked emailed copy. This is a copy of a criminal complaint
5  in this matter. The operative words are in the middle of it,
6  Cantwell used a gel mace pepper spray at my face and caused
7  me to lose my vision temporarily. Below that the statements
8  above are true and accurate to the best of my knowledge and
9  belief.  Signed Kristopher Chaney Goad, Signature, Com-
10 plainant, Kristopher Chaney Goad.  The purpose of that---
11 well I'll let you read that.

12         THE COURT:  All right, the Court has reviewed the
13 criminal complaint.

14         MR. WOODARD:  All right, first going to my duty
15 as his attorney and a humble officer of this court that is
16 all the private session, that's all the private session is
17 about. It's your decision whether it is.  It is my duty to
18 bring it to the tribunal's attention.  But it's going to
19 cause problems, all of which don't need to be in private
20 session unless, Your Honor, wills that. I have motions
21 based on this. I don't know if you want to hear them now or
22 if you want to bring the public back in because---

23         THE COURT:  Well you are the one that requested
24 that it be done in private.

25         MR. WOODARD:  Yes, sir.

1          THE COURT: Are you continuing to request that it

2   be done in private session?

3          MR. WOODARD:  It's kind of up to you, Judge.

4          THE COURT:  You're---you're the one that request-

5   ed it.

6          MR. WOODARD:  Yes, sir.

7          THE COURT:  And you filed it.

8          MR. WOODARD:  Yes, sir.

9          THE COURT:  And I haven't heard, you know, any

10  motions at this point to receive the information.

11         MR. WOODARD:  Yes, sir.  So I have done my duty

12  and that's all I really think needs to be private.  But I

13  would like the Court to, and Mr. Tracci to consider, I

14  think that, because of the information, I think I have a

15  motion to make on that particular case number that arises

16  out of that.  And I think that is going to be another prob-

17  lem.  If the Court doesn't want to do that in private ses-

18  sion, it's fine with me.  I just wanted to give the Court

19  that option.

20         THE COURT: Well I'm going to make a determination

21  of what's in need for the private session.

22         MR. WOODARD:  I think the end---I think the need

23  for the private---my need for the private session is now

24  over.

25         THE COURT:  Oh, okay.

1          MR. WOODARD:  If you want to entertain those mo-

2    tions in public you can.  I can do it either way you want.

3          THE COURT:  I haven't heard a motion.  The only

4    thing the Court's done is receive these two documents.

5          MR. WOODARD:  Okay, then---

6          THE COURT: I don't know what position---I haven't

7    heard from Mr. Tracci.  I haven't asked him about it.  In

8    his email he indicates a position in regards to the other

9    two charges.

10          MR. TRACCI:  Yes, sir, in those cases.

11          THE COURT:  It's not absolutely clear from the

12    email, it may be implied as to what he may do in regard to

13    the form where Mr. Goad is---

14          MR. WOODARD: In which case I would move that Goad

15    case be quashed.

16          THE COURT:  All right, but I think—there is no

17    reason for that not to be taken up in a public hearing. Is

18    what I think.

19          MR. WOODARD:  Right, that's what I'm saying.

20    Yeah.  I don't know any reason that the private part is

21    over with.

22          THE COURT:  It's over with. All right.

23          MR. WOODARD:  And there are motions based on

24    that---I'm going to make a motion to quash.

25

1          THE COURT: Mr. Tracci, you don't have any inter-

2    est in the matter being private at this point?

3          MR. TRACCI: No, sir.

4          THE COURT: All right so these two will be marked

5    as Exhibits with the court reporter and we'll reopen the

6    hearing.

7          MR. WOODARD: Thank you, Your Honor, can we make

8    copies of those? They were the only ones I had.

9          THE COURT: Sure, we can do that. All right the

10   Sheriff's Office can reopen the courtroom and we've got

11   three other cases on the docket along with Mr. Cantwell's.

12   So this is the case of Commonwealth v. Christopher Cant-

13   well. The Court has two other cases on the docket and may

14   have to stop briefly to address those two issues. Before

15   we begin the case of Commonwealth v. Christopher Cantwell,

16   there's been a motion filed by Vice News to record the pro-

17   ceedings. You're here on behalf of Vice News?

18         MR. KELLY: Yes, sir, Your Honor.

19         THE COURT: All right, I'll be glad to hear your

20   motion.

21         MR. KELLY: Yes, sir, Your Honor. Matt Kelly for

22   Vice News. May it please the Court, as you may know, Vir-

23   ginia Code Section 19.2-266 provides the Court with discre-

24   tion to allow video and audio recording of court proceed-

25   ings. We ask that you allow us to record this portion of

1    these proceedings to allow the public to see for themselves

2    that Virginia Courts do indeed provide justice for all and

3    provide justice without regard to who the defendant is or

4    what the party is.  We are most certainly willing to abide

5    by any restrictions that, Your Honor, believes are required.

6    We certainly understand that the prosecution and the de-

7    fense do have concerns about recording.  And we intend to

8    be as unobtrusive as possible.  If there are witnesses that

9    do not want to be recorded, we most certainly will not rec-

10   ord them.  But we do believe that this is a case where the

11   public does deserve to have some view into the process.

12            THE COURT:  What are you proposing in regard to

13   video?  How would that be done?

14            MR. KELLY:  Certainly.  We have a video camera, a

15   relatively small video camera on a tripod.  We can position

16   it anywhere in the courtroom that you would deem adequate.

17   I would suggest that perhaps in the corner there in front

18   of that window behind the rail might be a good place to

19   place the camera in a fairly unobtrusive location, but it

20   could be anywhere in the courtroom that you direct.  We can,

21   you know, start and stop recording whenever you direct us

22   to and just do logistics however you would like.

23            THE COURT:  And what do you propose from an audio

24   standpoint?

25

1    MR. KELLY:  From an audio standpoint we can ei-

2 ther record from the camera which has a built in microphone

3 or we would have a sound person with a microphone in the

4 (unintelligible) somewhere.

5    THE COURT:  Mr. Tracci, does the Commonwealth

6 have a position?

7    MR. TRACCI:  Your Honor, the Commonwealth opposes

8 the placement of cameras in the courtroom.  The statute

9 does provide the Court very broad discretion to determine

10 whether cameras are placed in the courtroom.  But based on

11 the objection of one of the Commonwealth's witnesses and

12 the risk to public safety associated with the notoriety of

13 this trial and the legitimate threat that that person feels,

14 the Commonwealth strongly objects to the placement of a

15 camera in the courtroom.

16    THE COURT:  Mr. Woodard?

17    MR. WOODARD:  May wonders never cease.  I pretty

18 much agree with Mr. Tracci.  And, Your Honor, the notorie-

19 ty of this case is my paramount concern as to the identi-

20 ties and relations concerning the witnesses.  The truth is,

21 Judge, that there are people trying to identify them and

22 torture them.  (Unintelligible) chased them and I don't

23 think just because you come into Court and tell the truth

24 that you should be subjected to that.  And we have things

25 in place to where we have people's social security numbers

1   and respect their privacy and I think we should give some

2   consideration to that especially in a volatile case like

3   this.

4           THE COURT:  Mr. Kelly, anything else?  It's your

5   motion.

6           MR. KELLY:  Your Honor, we understand the con-

7   straints of these witnesses and as I said before, we are

8   perfectly willing to not record any witnesses at all if

9   they object to that.  I certainly want to protect the pri-

10  vacy of testifying here because of the sensitivity of this

11  case.  But we would like to be able to show at least some

12  footage to the public of this court proceeding.

13          THE COURT:  The statute does give the Court dis-

14  cretion.  Based upon all the circumstances, the Court is,

15  going to deny your motion.

16          MR. KELLY:  Thank you, Your Honor.

17          THE COURT:  Thank you, Mr. Kelly.  We'll proceed

18  with the preliminary hearing.  Mr. Tracci?

19          MR. WOODARD:  Your Honor, I have some preliminary

20  motions.

21          THE COURT:  All right.  Mr. Woodard?

22          MR. WOODARD:  The first one would be---what time

23  is it?  Yeah.  What does the Court's clock say?

24          THE COURT:  Excuse me?

25

1          MR. WOODARD:  What does the Court's clock say?

2     Is it 10:30?

3          THE COURT:  Yes, sir.

4          MR. WOODARD:  Okay.  I would move to quash the

5     case wherein Christopher Goad is the complainant.

6          THE COURT:  All right.

7          MR. WOODARD:  Your Honor, all right, well I'll

8     submit these to the Court again.  Here is Exhibit A.  Actu-

9     ally, let me go back.  Here is Exhibit A.  I received this

10    from Mr. Tracci yesterday.  This will be Exhibit B which is

11    the, is now a certified copy of a criminal complaint in

12    this case, but it is a copy of the complaint in this case.

13         THE COURT:  Any objection to either document?

14         MR. TRACCI:  No, sir.

15         MR. WOODARD:  May I have copies of those made

16    again?

17         THE COURT:  There's that one, I'll write on this

18    one.

19         MR. WOODARD:  Okay.  Thank you, Your Honor.  I

20    would call the witness Christopher Goad.

21         THE COURT:  Christopher Goad. (The witness was

22    sworn at this time.)

23         MR. WOODARD:  Who is this gentleman?  This is Mr.

24    Goad.

25

1          MR. TRACCI:  This is Mr. Rexrode.  Your Honor, do

2    you wish to swear the witnesses now or do you just want to

3    focus on Mr. Goad.

4          MR. WOODARD:  Who is Mr. Rexrode?

5          MR. TRACCI:  Victim witness.

6          MR. REXRODE:  Victim assistance.

7          MR. WOODARD:  Say again?

8          MR. REXRODE:  Victim witness, UVA police.

9          MR. WOODARD:  Okay, thank you.  Why is Mr.

10   Rexrode before the bar?

11         THE COURT:  Is there an objection?

12         MR. WOODARD:  I object.

13         THE COURT:  All right.  Do you want to be heard

14   on the objection?

15         MR. WOODARD:  The man is a witness.  He's a grown

16   man.  I have never seen someone who is not of the bar al-

17   lowed to accompany a witness to the stand and support him.

18   If he wants to show his moral support from the gallery, I

19   have no problem with it, but I don't believe he is entitled

20   to come before the bar of this court.  And I don't believe

21   he's entitled to be there.  If he wants to move back; then

22   I don't have a problem.

23         THE COURT:  This Court has ruled previously on

24   support people being around a witness and I had not permit-

25   ted that.  For the record, the officer is just seated in

1  the chairs on the Commonwealth's side, so I overrule your

2  motion.

3        MR. WOODARD:  Thank you, Your Honor.

4

5

6        **KRISTOPHER GOAD**, having been duly sworn testifies

7  as follows:

8

9                    DIRECT EXAMINATION

10 By:  Mr. Woodard

11        Q  Can you state your name, sir?

12        A  My name is Kristopher Goad.

13        Q  Mr. Goad, you were present in Charlottesville

14 at the Rotunda on August 11th, 2017, correct?

15        A  That is correct.

16        Q  And after that, shortly after that you made a

17 complaint to the magistrate, correct?

18        A  That is correct.

19        Q  You met with a---before you made that com-

20 plaint you met with one or more law enforcement officers,

21 correct?

22        A  That is correct.

23        Q  You met with Sergeant Acord

24        MR. TRACCI:  Your Honor, I'm going to just object

25 to try to inquire as to the purpose of this examination

1  here.  We are going to call Mr. Goad and he will have an,

2  counsel will have an opportunity to cross him as much as he

3  wishes, so I'm suggesting that this might be an unnecessary

4  step at this point.  If, Your Honor wishes to allow this

5  questioning to continue, the Commonwealth would like some

6  explanation as to what its purpose is.

7          THE COURT:  Are you opposing defense motion to

8  quash the warrant where Mr. Goad is the complainant?

9          MR. TRACCI:  We are opposing the motion to quash,

10  Your Honor.

11          THE COURT:  He's entitled to present his evidence.

12          MR. TRACCI:  Okay.

13          Q  May I have exhibit, the complaint?  Mr. Goad,

14  I show you a document.  Did you mark it just now?  Okay, I

15  don't care which one it is.  All I need is one.

16          THE COURT:  It should be on there.  I wrote an A

17  and I wrote a B.  Which one have you got?

18          Q  That was B.  All right, I'm showing you a doc-

19  ument entitled, it's got up at the top email copy.  It's

20  Defense Exhibit B.  Can you take a look at that document?

21  Do you recognize that document?

22          A  Yes, I do.

23          Q  I'm directing your attention down here.  May I

24  approach the witness, Judge?

25          THE COURT:  Yes.

1          Q   Could you read beginning right there, please?

2          A   It says, the statements above are true and ac-

3   curate to the best of my knowledge and belief.

4          Q   And what are the two things by the dots under-

5   neath that?

6          A   I swear---by swearing to these facts I agree

7   to appear in court and testify if a warrant or summons is

8   issued and the charge in this warrant cannot be dismissed

9   except by the Court even at my request.

10         Q   And there's a name under there, it's Christo-

11  pher Cheney Goad, correct?

12         A   That is correct.

13         Q   And that is your signature there, correct?

14         A   That is correct.

15         Q   And could you please read for the Court begin-

16  ning with the word I and going to the word temporarily?

17         A   I'm sorry, can you---starting with I and then

18  temporarily?

19         Q   Start right here.

20         A   Oh, I'm sorry.  Well, it's in the middle of a

21  sentence.

22         Q   I understand that.  Would you prefer to read

23  the whole thing?

24

25

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 16 of 291   Pageid#: 630

1          A   All right.  I was with, Cantwell used a jell

2    mace pepper spray at my face and caused me to lose my vi-

3    sion temporarily.

4          Q   Thank you.  And that's above your signature

5    where you swore to those facts being true to the best of

6    your knowledge, information and belief, correct?

7          A   It's to the best of my belief, yes.

8          Q   Best of your knowledge.

9          A   Best of my knowledge and belief, yes.

10          Q   Well, let's go back.  Knowledge and belief,

11    correct?

12          A   To the---at the time, yes, the best of my

13    knowledge and belief.

14          Q   Now, apparently you recently told somebody

15    that that information was not correct, is that right?

16          A   That is correct.

17          Q   Who did you tell?

18          A   I told the Commonwealth's Attorney.

19          Q   Okay.  Let's stop there for a second.  Is that

20    Mr. Tracci or----

21          A   That is correct.

22          Q   Okay.  When did that happen?

23          A   I'm not, I don't remember what day I said that.

24          Q   Was it yesterday?

25          A   No, it was before yesterday.

Case 3:17-cv-00089-NKM-JCH   Document 37-2   Filed 05/04/18   Page 17 of 291   Pageid#: 631

1          Q  Was it Monday or Tuesday?

2          A  I don't remember what day.

3          Q  Was it this week?

4          A  I don't remember what day.

5          Q  Was it last week?

6          A  I don't---

7          MR. TRACCI:  Your Honor, I think---

8          Q  Okay.

9          MR. TRACCI:  It's been asked and answered.

10         Q  (Unintelligible) rule on that.

11         THE COURT:  All right.

12         Q  And your statement now is that your statement

13    in that sworn paper is not true.  Is that right?  Is that

14    your position now?

15         A  Are you asking me if the entirety of the

16    statement or---

17         Q  No, I'm asking you if that line that says I

18    was with, Cantwell used---well, Cantwell used a gel based

19    pepper spray at my fact and caused me to lose my vision

20    temporarily.

21         A  Is you're asking if I would like to make revi-

22    sions to that if I could?

23         Q  No, that's not the question.  The questions is,

24    is that statement true today?

25         A  Is the statement true today?

1    Q Yes.

2    A Then I would say that it is not completely

3 true.

4    Q Your answer is no, that is not a true state-

5 ment. Right?

6    A Correct.

7    Q In fact, the truth revealed to Mr. Tracci re-

8 cently is that someone else used gel mace pepper spray at

9 your face, correct?

10    A There were multiple people.

11    Q Someone else besides Chris Cantwell, right?

12    A That is correct.

13    Q Okay, but you wrote on this piece of paper,

14 under oath, it was Chris Cantwell, isn't that right?

15    A That is correct.

16    Q Who told you it was Chris Cantwell?

17    A I was able to make that identification after

18 seeing videos on him online as well as other people making

19 that identification and confirming.

20    Q What other people made that identification?

21    A Do you want me to name every person who made

22 that---

23    Q Yes, I do.

24    A That would be---

25    MR. TRACCI: I object on relevance, You Honor.

1          Q   I don't, Your Honor.  Let me go back.  I'll
2     withdraw it.
3               THE COURT:  You're withdrawing the question?
4               Q   I'll withdraw it.
5               THE COURT:  All right.
6               Q   Before August 11th had you ever met Mr. Cant-
7     well?
8               A   Before August 11th I had not met Mr. Cantwell.
9               Q   After August 11th had you met Mr. Cantwell?
10              A   I have continued to never have contact with Mr.
11     Cantwell.
12              Q   Okay.  So, it would be a fair statement to say
13     that as of August 11 you don't have any idea whether I'm
14     Chris Cantwell or not.
15              A   I would not agree with that statement.
16              Q   Okay.  So you'd recognize Chris Cantwell be-
17     fore the 11th?
18              MR. TRACCI:  Your Honor, the witness has testi-
19     fied already that he identified Mr. Cantwell after review-
20     ing video evidence.
21              Q   I understand that.
22              THE COURT:  Go ahead.
23              Q   So you're reviewing video evidence and does
24     the video evidence identify him as Mr. Cantwell?
25              A   Yes.

```
 1            Q  How does it do that?

 2            A  I believe even on social media he admitted

 3   that was him in photos and videos.

 4            Q  Okay, and so you decided he was the one who

 5   sprayed you with gel mace pepper spray, right?

 6            A  Yes.

 7            Q  Did anyone else tell you that that was Chris

 8   Cantwell?  Did Officer Acord tell you that was Chris Cant-

 9   well?

10            A  Officer Acord, did not tell me that was Cant-

11   well.

12            Q  Okay.  Did Emily Gorcenski?

13            MR. TRACCI:  Asked and answered, Your Honor.

14            Q  No, I didn't.  I didn't ask him about Emily.

15            THE COURT:  Counsel has a right to make a deter-

16   mination of what the witness was relying on when he identi-

17   fied Mr. Cantwell.

18            Q  Okay, so you were relying on social media to

19   identify him, is that right?

20            A  Among other things, yes.

21            Q  So you swore the truth to something you saw on

22   the internet and on social media, correct?

23            A  Among other things, yes.

24            Q  Did you try to confirm that that was Mr. Cant-

25   well?
```

1         A  Can you elaborate?

2         Q  What did you do to confirm that that was Mr.

3 Cantwell as opposed to someone else, anything?

4         A  I'm sorry, I don't understand your question.

5         Q  Well, you said that the internet and social

6 media identified the guy with the gel mace as Mr. Cantwell.

7 What did you do to verify that?  Did you look up Mr. Cant-

8 well's web page or his pod casts and verify his picture?

9         A  Yes, as well as his own quote saying that he

10 had maced people.

11         Q  Okay, but he never said he maced you, right?

12 And so you just assumed that the macing you got was from Mr.

13 Cantwell, right?

14         A  That is correct.

15         Q  And you swore under oath that it was from Mr.

16 Cantwell.

17         A  That is correct.

18         Q  But, in fact, it's from somebody else with a

19 dragon tattoo on his arm, correct?

20         A  That is not correct.

21         Q  And, in fact---well, you got maced---the gel

22 mace guy has a dragon tattoo on his arm, correct?

23         A  Specifically a gel mace then only a gel mace.

24         Q  The guy with the gel mace had a dragon tat-

25 tooed arm, right?

1          A   Among other people who had mace, yes.

2          Q   No, I'm talking about the guy with the dragon

3    tattoo arm, and that wasn't Mr. Cantwell, was it?

4          A   I don't understand.

5          MR. TRACCI:  Your Honor, respectfully I think the

6    witness has repeatedly acknowledged that the person who he

7    thought sprayed him directly was not Mr. Cantwell.  He

8    identified subsequently that he was not, and he's acknowl-

9    edged as much.  I think that's been asked and answered

10   about six times now.

11         THE COURT:  In the Court's view Mr. Woodard has a

12   right to examine the witness in regard to how he arrives at

13   his statement under oath that Cantwell used the gel mace

14   pepper spray.  He didn't know him before August 11th.  On

15   August 17th before the magistrate you identify him.  What

16   did you rely upon for your identification?

17         A   I used various social media sites as well as

18   other people told me who it was.  I looked at the face, it

19   was a positive match upon looking at numerous photos of him

20   that were available online as well as his own testimony

21   online with him saying that he had maced people that night.

22         Q   So you watched the videos?

23         A   Which videos are you referring to?

24         Q   Well, videos of your macing?

25         A   Yes, I have.

1        Q   Okay.  Let's go back.  What other people told
2   you that?  You're now testifying that you verified it
3   through other people.  I want to know who they are.
4            A   What people?
5            Q   Yeah, what people verified it?
6            A   I'm not going to list the name of every single
7   person who has, but I will say that of people in the court
8   that would be Emily Gorcenski.
9            Q   Okay, so Emily Gorcenski told you it was Cant-
10  well, right?
11           A   That is correct.
12           Q   Okay.  Okay.  Now, and a week later or a week
13  before the preliminary hearing you, with thunderclap sur-
14  prise, realized that it is not Chris Cantwell, correct?
15           MR. TRACCI:  I think counsel is mischaracterizing
16  with his theatrical metaphors about thunderclaps and so
17  forth.
18           Q   I'll withdraw the thunderclap.  You met with
19  the Commonwealth's Attorney?
20           A   Yes.
21           Q   And the Commonwealth's Attorney, is that the
22  first time this misidentification comes on?
23           A   Yes.
24           Q   Okay.  And that puts a new wheel on the wagon.
25           A   Correct.

1          Q   Your Honor, I would now like to review the

2    video, or at least one of them, by which Mr. Goad claims

3    that he identified Mr. Cantwell.

4          THE COURT:  All right.  Yes?

5          MR. TRACCI:  May the Commonwealth be heard on the

6    motion to quash?

7          Q   I'm not done with the motion.

8          THE COURT:  He hasn't presented his evidence.  If

9    the Commonwealth is not opposing the motion to quash,

10   there's no point in having the hearing, but otherwise I've

11   got to have a hearing.  Now, if the Commonwealth has any

12   other motion in regard to that charge---

13         Q   Permission to roll---well, let me explain this,

14   Judge.  I am not sure my computer is compatible with you-

15   all's computer, so I brought (unintelligible) so I can ask

16   him to review it.

17         THE COURT:  One issue.  You have raised the issue

18   of the identification by the witness and when it occurred.

19         Q   Yes, sir.

20         THE COURT:  All right.  Mr. Tracci has just said

21   that he's not going to make any motion in regard to that

22   charge.

23         Q Yes, sir.

24

25

Case 3:17-cv-00089-NKM-JCH   Document 37-2   Filed 05/04/18   Page 25 of 291   Pageid#: 639

1          THE COURT:  All right.  So what is the effective-

2    ness of me hearing your evidence on a motion to quash be-

3    cause don't I have to hear from Mr. Tracci?

4          Q  I haven't finished.  I'm still, I'm still put-

5    ting on evidence for the motion.

6          THE COURT:  Right, I understand that, but if the

7    Commonwealth is not going to make any motion---

8          MR. TRACCI:  With respect to the, with respect to

9    his motion we are not going to amend it, but we will obvi-

10   ously move to certify the charge.

11         Q   Not the---not the right motion, Judge.

12         THE COURT:  The email from your office notifies

13   Mr. Woodard of some, of the issues in regard to the wit-

14   ness's identification.  Based upon that, is it possible

15   that the Commonwealth would have some motion in regard to

16   that charge?  If the Commonwealth is not going to, then it

17   seems to me aren't we back with they're going to have to

18   prove probable cause in regard to that charge?  And I'm

19   just not sure of the efficacy of having you put on a series

20   of evidence and then the Commonwealth puts on the evidence,

21   then what are we going to take up if there's a preliminary

22   hearing?  Isn't it more logical to hear from the Common-

23   wealth in regard to what their evidence is and you cross-

24   examination and you present evidence and then we'll see

25   what the status of that charge is?

1       Q  I don't think so, Judge, and here's why.  It's

2   complicated.  The Commonwealth has an outstanding charge

3   based on the sworn statement, sworn false statement of Mr.

4   Goad.  It seeks today to---

5       MR. TRACCI:  Your Honor, I think counsel has

6   clearly misstated the nature of that complaint.  At the

7   time it reflected the witness's true and accurate belief.

8   It was not a false statement.

9       THE COURT:  You can argue it however you want to.

10  Go ahead.  The issue you've raised has got to be resolved,

11  there's no question about it.

12      Q  Yes, sir.  Yes, sir.

13      THE COURT:  I'm just wondering about aren't we

14  doing it in a reverse order.

15      Q  And it is wise to wonder and I'm telling you

16  why I don't think we can do it in reverse order.

17      THE COURT:  Okay, tell me why we shouldn't do it

18  in reverse order.

19      Q  Because if we get to probable cause and let's

20  say, and let's say the case is not certified, okay.  Then

21  Mr. Tracci has the option of indicted my client on this ex-

22  act same charge.

23      THE COURT:  Right.

24      Q  On the other hand, if the warrant is quashed

25  because the supporting criminal complaint is now false,

1  then that counts as an acquittal for my client and he can't

2  indict him later.  That's why we need to do it in this or-

3  der.  And my client is real worried about getting---no mat-

4  ter what we do today, my client real worried about getting

5  indicted on this.  And if all we're going to fight, all

6  we're going to do---if we spend the whole morning here

7  fighting this out---

8          THE COURT:  I don't see any way this Court can

9  permanently dispose of a felony charge.

10         Q  I understand that, Judge.  I'm not sure you

11 can either, but I'd rather configure it as a quashed war-

12 rant.

13         THE COURT:  That may be a preference.

14         Q  Yeah.

15         THE COURT:  Okay.

16         Q   And then if---

17         THE COURT:  You could put on five hours of evi-

18 dence, all right, and raise questions in regard to the

19 identification.  Mr. Tracci then puts on another witness

20 who identifies him.

21         Q  Okay.

22         THE COURT:  Okay.

23         Q  Okay.

24         THE COURT:  So five hours may be valuable in some

25 other forum, all right, so why do we do it this way?

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 06/04/18   Page 28 of 291   Pageid#: 642

1          Q  Yes, sir.

2          THE COURT:  I'm just having difficulty seeing if

3   you want---you've asked some preliminary questions and he's

4   answered them.  So he's on the record in regard to how he

5   made the identification, okay.  And it seems to me the bur-

6   den is always on the Commonwealth and Mr. Tracci has not

7   indicated that he's going to back off on the charge.

8          Q  Yes, sir.

9          THE COURT:  So let him present his case and you

10  cross-examine him and we'll see where it goes.  I just

11  don't see why it's not more logical to go back and let's

12  have a preliminary hearing.

13         Q  You're exactly right, Your Honor, and I will

14  end my argument on the motion to quash by asking you to

15  grant it on the following grounds.  In Virginia a criminal

16  warrant that's not signed by a law enforcement officer has

17  to be signed by a citizen and authorized by a law enforce-

18  ment officer.  This is a false---this affidavit is not the

19  truth, therefore I do not believe the Court can proceed to

20  hear a charge that started with a falsehood, okay.  I don't

21  think you can do it.  The Court cannot participate in a

22  fraud.  And so I do not believe that the Court can go for-

23  ward on that case with a fraudulent and false criminal com-

24  plaint supporting it.  I think that case number is dead and

25  should be quashed.  Now, that's going to create, that's go-

1   ing to create another problem. It's not part of the motion

2   to quash, but we'll get there then. I do want that, I

3   don't think this Court can go forward on that warrant with-

4   out a more or less true, or true criminal complaint to sup-

5   port it. And I cite for that, I apologize, but I've got to

6   do it, Judge, Article 1 of the Constitution of Virginia,

7   in criminal prosecution a man has a right to demand a cause

8   and nature of his accusation. Mr. Tracci's email says he's

9   now going to try to pivot and call Mr. Goad here to testify

10   that something else happened besides Cantwell used a gel

11   mace pepper spray in my face and caused me to lose my vi-

12   sion temporarily. Mr. Tracci thinks he can amend the

13   charge, but he can't amend the warrant---or I'm sorry, he

14   can't amend the sworn statement and that's what he's trying

15   to do. He wants to go forward on that charge by changing

16   what's in the sworn statement and he's going to use him to

17   do it. And I don't think that's proper because that means

18   he doesn't have any idea---in twenty-four (24), less than

19   twenty-four (24) hours before this hearing he finds out the

20   not cause or nature of the charge against him. We've been

21   preparing for that. In less than twenty-four (24) hours

22   now he's going to say oh, he sprayed me some other time

23   with something other than gel mace spray or somebody else

24   sprayed me. God knows what he's going to say. And I think

25

1  that has to be, I think that case number has to be quashed

2  or it violates my client's right to due process.

3        THE COURT:  All right, what the Court is going to

4  do, I'm going to take your motion under advisement.  We're

5  going to conduct the preliminary hearing in the standard

6  fashion.  Mr. Tracci is going to call witnesses, you can

7  call witnesses, you can cross-examine.  At the conclusion

8  of the Commonwealth's evidence if you want to take it up,

9  I'll take up your motion.  All right, who is your first

10 witness going to be?

11       MR. TRACCI:  It's going to be Mr. Goad.

12       MR. WOODARD:  I've got another motion, Judge.

13       MR. TRACCI:  May I make one clarification?

14       THE COURT:  Yes.

15       MR. TRACCI:  Defense counsel indicated that this

16 is the first they ever heard that this misidentification

17 might have taken place. I think yesterday in our conversa-

18 tion---

19       MR. WOODARD:  I'm sorry, I heard yesterday.

20       MR. TRACCI:  I called you yesterday and you said

21 don't worry, we knew that, so we did our part to provide

22 you with information helpful to the defense.

23       MR. WOODARD:  Yes, you did.

24

25

1          MR. TRACCI:  I take very strong umbrage that he's

2    suggesting that one, we're either withholding information

3    or two you were unaware of this misidentification yesterday.

4          MR. WOODARD:  Mr. Tracci, you more than fulfilled

5    your ethical obligation.

6          MR. TRACCI:  Thank you.

7          MR. WOODARD:  You did not withhold any infor-

8    mation---

9          MR. TRACCI:  Thank you.

10          MR. WOODARD:  As far as I can tell because what

11    he told you is a little fuzzy, but as far as I know, you

12    notified me with all possible dispatch.  But, just because

13    I know it, doesn't mean they don't have to put it on the

14    paper and so---

15          THE COURT:  I'll look forward to the preliminary

16    hearing.  You have another motion?

17          MR. WOODARD:  I have a couple of other motions,

18    Judge.

19          THE COURT:  Okay.  What's your second motion?

20          MR. WOODARD:  As to the two charges where com-

21    plainant Goad---I'm done with him.

22          THE COURT:  He's going to be the first witness.

23          MR. WOODARD:  Okay.  As to the two charges con-

24    cerning the complainant Goad, I move to strike the 18.2-52

25    one---I'm sorry, Gorcenski.  I move to strike the 18.2-52

1    one on the grounds that it is double jeopardy and in viola-

2    tion of the United States Constitution.  I need to get my

3    statutes, Judge.  Jeremy come on back over here, please.

4    Your Honor, the Gorcenski charges, there are two of them,

5    18.2-52, 18.2-312.  18.2-52 requires that the Commonwealth

6    prove, and they've amended (unintelligible) but that's not

7    really the contention.  Maliciously causes any other person

8    bodily injury by means of any acid, lye or other caustic

9    substance.  The rest of it's not particularly---the rest is

10   not particularly applicable.  312 says---I'm sorry, it's

11   applicable but not in dispute.  312 says, if any person ma-

12   liciously release or cause or procure to be released in any

13   place of public gathering any various gases or noxious or

14   nauseating gases or mixtures of chemicals designed to, and

15   capable of, producing vile or injurious, etcetera, okay,

16   the proof is the same for both.  He's got to prove malice.

17   He's got to prove caustic or noxious and he's got to prove

18   bodily injury.  If you look at the Gorcenski complaint she

19   basically says she was affected one time.  And curiously

20   that same criminal complaint supports both of those charges.

21   I want to make sure this is the right case, yes, in Sommer-

22   ville v. Commonwealth of Virginia, Court of Appeals of Vir-

23   ginia, unpublished record number 053-14-2 (unintelligible)

24   remember the case.  Ms. Sommerville was shoplifting and she

25   made it outside the store and the loss prevention guy

1   stopped her and so she pepper sprayed him and was arrested.

2   She was charged under 312, not 52 and she got convicted.

3   And it went to the Virginia Court of Appeals.  And she had

4   a whole bunch of arguments why 312 didn't apply none of

5   which they bought, but one of her gripes was that she

6   should have been charged with 312---52, not 312 and here is

7   what the Court said.  The substance Sommerville sprayed on

8   Houdin, the guard, could have been mace rather than pepper

9   spray.  More importantly, however, the classification of a

10  substance, of a caustic substance under 18.2-52 does not

11  preclude the classification of the same substance as a nox-

12  ious gas under the code 18.2-312.  A substance may have the

13  characteristics of both a noxious gas under 18.2-312---I'm

14  sorry, a substance may have the characteristics of both a

15  noxious gas and a caustic substance.  A noxious gas, for

16  example, may cause both bodily injury through its caustic

17  or burning effects.  While Sommerville may have potentially

18  been charged with violating code 18.2-52 based on her ac-

19  tions in the present case, it is well established that the

20  choice of offenses for which a criminal defendant will be

21  charged is within the discretion of the Commonwealth's At-

22  torney, and it cites a couple of cases.  I submit that, and

23  I think I only have one copy of the case.

24          MR. TRACCI:  I've got the case.

25          MR. WOODARD:  You've got it?

1          MR. TRACCI:  Yeah.

2          MR. WOODARD:  Okay.  I would submit that, Judge.

3   I would submit that since what they've got to do is prove

4   caustic substance, bodily injury and malice, that's one

5   event.  They only get one bite at the apple.  Now, maybe

6   they ought to be able to get, you know, it might be their

7   prerogative to choose which one they want, but I don't see

8   any difference in the elements of either.  There is nothing

9   in 312 that they have to prove that that's different than

10  52 and vice versa.  Either the Court of Appeals or Virginia

11  Supreme Court has held that the caustic substance works for

12  both statutes.  And we're not talking about fire and we're

13  not talking about explosives, they're irrelevant.  And I

14  disagree with the Virginia Supreme Court.  I humbly submit

15  that if you take a jalapeno and put it on your tongue it

16  burns, but your tongue is still there.  On the other hand,

17  if you take some hydrochloric acid and put it on your

18  tongue, your tongue goes away, or at least part of it.  It

19  depends on how long he can stand it before he eats the bak-

20  ing soda.  So I humbly disagree with the superior court on

21  that, but I hear they have wonderful arguments for believ-

22  ing it.  It is the law of Virginia.  So, caustic evidence

23  is the same, analysis is the same, bodily injury is the

24  same.  I think the Commonwealth only has one bite at that

25  apple and I ask that the 52 charge be dismissed.

1          THE COURT:  Mr. Tracci.

2          MR. TRACCI:  Does, Your Honor, wish to hear argu-

3    ment on the double jeopardy claim at this point before the

4    Court has even received evidence on those charges?

5          THE COURT:  Mr. Woodard is saying that the Court

6    shouldn't receive evidence.  Do you want to respond to

7    that?

8          MR. TRACCI:  The charges are different, and the

9    Commonwealth does acknowledge Sommerville, but for a propo-

10   sition that supports the Commonwealth's argument that the

11   choice is to charge 18.2-52 and 18.2-312 are within the

12   discretion of the Commonwealth's Attorney.  If you look at

13   the elements for 18.2-52, it's maliciously cause bodily in-

14   jury to another by means of acid, lye or other caustic sub-

15   stance.  If you look at the elements of 312, it's mali-

16   ciously release in a public place without a named victim as

17   we have in the 18.2-52 charge for Ms. Gorcenski, tear gas,

18   mustard gas, phosgene gas or other noxious or nauseating

19   injurious odors producing bodily injury.  It's true that

20   malice is an element for the higher felony in both statutes

21   but Blockburger is not implicated and there is no double

22   jeopardy claim that lies at this point.  So we urge the

23   Court to reject the motion.

24         MR. WOODARD:  Briefly disagree, Your Honor.  It's

25   still bodily injury.  I mean, what Mr. Tracci is saying is

1    if you set off a tear gas bomb and there's no bodily injury,

2    and they haven't put on evidence of any bodily injury, it's

3    not a felony, right?  If I wanted---from the public place,

4    let's see, what's a place nobody goes, the courthouse lawn

5    in Chatham.  I can go there, I could set off a tear gas

6    bomb.  If there's no bodily injury, it's not a crime.  But

7    for 52 it says there has to be bodily injury.  Well,

8    they've still got to prove bodily injury.  Of course,

9    there's bodily injury to another.  If I set off a tear gas

10   station in my own---here's the question---if I shoot myself

11   with tear gas is that a crime.  I have bodily injury.

12   There's no bodily, you know, doesn't have to prove bodily

13   injury, then where's the crime?  It's still the same thing,

14   substance, malice, bodily injury on somebody.

15            THE COURT:  The Court overrules your motion.

16            MR. WOODARD:  Yes, sir.

17            THE COURT:  Do you have a third motion?

18            MR. WOODARD:  Yes, sir. I make another (unintel-

19   ligible)

20

21            (Pause in case while other cases taken up.)

22

23            THE COURT:  All right, Mr. Woodard, you had an-

24   other preliminary motion?

25            MR. WOODARD:  Yes, sir.

1          THE COURT:  All right.

2          MR. WOODARD:  I ask that a special prosecutor be

3   appointed.  My speaking with Mr. Goad---

4          THE COURT:  Do I have authority to do that?

5          MR. WOODARD:  Well, then I would ask that the

6   Commonwealth's Attorney's Office be disqualified because---

7          THE COURT:  Isn't that a circuit court matter?

8          MR. WOODARD:  Well, I'm here and a day before

9   this preliminary hearing I find out that one of the com-

10  plaints first disclosed to Mr. Tracci---

11         THE COURT:  Do I have authority to do it?

12         MR. WOODARD:  I believe you do or you certainly

13  have an opportunity to say I'm not sure if I have authority,

14  let's figure this out.  I'm not sure, I've never had a---

15         THE COURT:  As I understand it, based upon the

16  circuit court's ruling, your client is being held without

17  bond. Do you want me to continue this case?

18         MR. WOODARD:  Not really.

19         THE COURT:  All right. Do you have any authority

20  that I have the authority to tell Mr. Tracci he can't pros-

21  ecute the case in Albemarle County?

22         MR. WOODARD:  No, sir.

23         THE COURT:  Do you have any authority?

24         MR. WOODARD:  No, sir.  Okay.

25

1          THE COURT:  It's got to be taken up in the cir-

2    cuit court.

3          MR. WOODARD:  Yes, sir.

4          THE COURT:  All right.  Any other preliminary mo-

5    tions?

6          MR. WOODARD:  It's just a question of the wit-

7    nesses.

8          THE COURT:  Testimony has already begun. Do you

9    want to make a motion?

10          MR. WOODARD:  I'd move to sequester the witnesses,

11    but, Your Honor---

12          THE COURT:  Yes, sir.

13          MR. WOODARD:  I would ask that we are discreet in

14    figuring out whom those sequesteries (sic) are going to be.

15          THE COURT:  Well, I'd rely on counsel for that

16    since I don't call witnesses.  But there's a motion to se-

17    quester.

18          MR. WOODARD:  Yes, sir.

19          THE COURT:  All right, so if the Commonwealth

20    would just make sure their witnesses are sworn and defense,

21    make sure your witnesses are sworn.  Anybody that may tes-

22    tify in this case if you'll stand up.

23          MR. WOODARD:  Your Honor, permission to unap-

24    proach (sic) and go hunt them down.

25

1        THE COURT:  Ladies and gentlemen, the motion

2   that's been made is that the witnesses be sequestered.

3   What that means is that anyone who anticipates that they're

4   going to testify, you need to wait outside until you're

5   called to testify.  While you're waiting you shouldn't dis-

6   cuss the case with anybody or allow them to discuss it with

7   you.  So if you think---counsel are making sure that any-

8   body who may be a witness is identified so you can all be

9   sworn at the same time.  Mr. Goad, you were already sworn.

10  That's good till midnight.  We may have to do it again.

11        MR. GOAD:  Thank you, Your Honor.

12        THE COURT:  All right, so does counsel, counsel

13  identify that all the witnesses they intend to call are be-

14  fore the bar now?  All right, each of the witnesses, we'll

15  have you raise your right hand.

16

17        (Witnesses were sworn at this time.)

18

19        THE COURT:  Everyone has answered affirmatively.

20  All right, if you'll wait outside.  The sheriff will show

21  you where you can wait.  We'll get to you as quickly as we

22  can.

23

24        (Witnesses were excluded at this time.)

25

Case 3:17-cv-00089-NKM-JCH  Document 37-3  Filed 05/04/18  Page 40 of 291  Pageid#: 654

1          MR. WOODARD:  Your Honor, was Mr. Goad sworn?

2          THE COURT:  He's already been sworn.

3          MR. WOODARD:  Okay.

4          THE COURT:  All right, so this will begin the

5  preliminary hearing of Commonwealth v. Christopher Cantwell.

6  Mr. Tracci, Mr. Goad has already been sworn.

7          MR. WOODARD:  Your Honor, could I have a second

8  to compose myself?

9          THE COURT:  Yes, sir.

10          (Pause in case.)

11          THE COURT:  Okay, are you ready?

12          MR. WOODARD:  Yes, sir.

13          THE COURT:  All right, Mr. Tracci.

14

15

16          **KRISTOPHER GOAD**, having been duly sworn testified

17  as follows:

18

19                    DIRECT EXAMINATION

20  By:  Mr. Tracci

21          Q  Good morning.  Can you introduce yourself for

22  the Court, please?

23          A  Yes.  My name is Kristopher Goad.

24          Q  And can you spell that for the court reporter

25  please?

1          A   That is K-r-i-s-t-o-p-h-e-r and Goad, G-o-a-d.

2          Q   And did you travel to Charlottesville on Au-

3     gust 11th?

4          A   Yes, I did.

5          Q   From where?

6          A   From Richmond, Virginia.

7          Q   Did you learn about a planned event at the Ro-

8     tunda that night?

9          A   Yes, I did.

10         Q   How did you learn?

11         A   I learned through different social media cites.

12    It was posts all over Facebook, Twitter and I just heard

13    that it was going to happen.

14         THE COURT:  Mr. Goad, if you'll direct your an-

15    swers toward me---

16         A   Oh, I'm sorry.

17         THE COURT:  Then both sides of the courtroom can

18    year you a little bit better.

19         A   My apologies.

20         THE COURT:  It's hard when somebody is asking you

21    a question not to look at them, but if you'll direct it to-

22    ward me.

23         A   Yeah.

24         Q   And what was your goal that night by coming to

25    Charlottesville?  What were you thinking?

1          A  My goad that night was to---

2          MR. WOODARD:  Objection, Your Honor.  His goal as

3  to why he was there is utterly irrelevant and I would an-

4  ticipate is going to be self-serving.

5          Q  Your Honor, he's explaining why he was in

6  Charlottesville that evening.  It goes to his reason for

7  being here and the allegation it's likely that he was here

8  to cause violence.

9          THE COURT:  I think the reason why he came, his

10  goal may not be the issue.

11          Q  Yes, sir.

12          THE COURT:  Go ahead.

13          A  My reason to come was to have a peaceful pro-

14  test, to stand around and just, that's it.

15          MR. WOODARD:  I'm sorry, Your Honor, standing

16  around and just---

17          A  Oh, I'm sorry.  To stand around and just have

18  a peaceful demonstration.

19          Q  Have you gone to protests before?

20          A  Yes.

21          Q  And your intent when you went was to be peace-

22  ful as you pointed out.

23          MR. WOODARD:  Objection, Your Honor.  His intent

24  is not an issue and now it's a lot more than how he got to

25  Charlottesville.

1      Q  Can you describe what happened when you got to

2  the Charlottesville campus, Rotunda, in Albemarle County

3  that day?

4      A  When I arrived, I saw people scattered around

5  the statue and I tried to talk to as many people as we

6  could and reaffirmed our commitment to---

7      MR. WOODARD:  Objection, Your Honor, irrelevant.

8  He was around the statue.  What he reaffirmed is not really

9  relevant.

10      Q  I think he's just answering the question, what

11  he observed when he was there, sir.

12      THE COURT:  I can't rule on whether it's relevant.

13  I don't know what he's going to say.  Go ahead.

14      A  We just reaffirmed that we wanted to have a

15  peaceful protest against people who were going to come by.

16      Q  And how many, just for the sake of simplicity,

17  the sake of simplicity, we'll refer to the protestors and

18  counter protestors, it's a neutral way of describing thing.

19  You were a---which side were you on?

20      A  I would be a counter protestor.

21      Q  And can you explain to the Court the relative

22  size of the groups?

23      MR. WOODARD:  Objection, Your Honor, again, ir-

24  relevant.

25

1        THE COURT:  The relative size I assume is what

2   you're talking about, the relative size of what?

3        Q  The groups, the protestors and counter protes-

4   tors.

5        MR. WOODARD:  I don't see how it's relevant.  The

6   issue is whether he got pepper sprayed, not how big the

7   groups were.

8        THE COURT:  Some context is important though.

9        MR. WOODARD:  Yes, sir.

10        THE COURT:  I'll allow that.

11        A  I would say that the counter protestors was

12   made up of about fifty (50) and the protestors were made up

13   of a number higher than three hundred (300).

14        Q  And what were you doing when you were there,

15   when you saw these protestors with their tiki torches?

16        A  I stood with my back to the statue with other

17   people that were also counter protestors.

18        Q  Did you have any weapons to inflict harm on

19   anybody with you?

20        A  I did not have any weapons that---

21        MR. WOODARD:  Objection, Your Honor.  This is ir-

22   relevant whether he had weapons.  How does that prove Mr.

23   Cantwell pepper sprayed him?  It doesn't.

24        THE COURT:  I'll allow it.  Go ahead.

25        Q  And you were chanting, correct?

1          A   That is correct, I was chanting.

2          Q   What were you chanting?

3          A   It would be chants along the lines of black

4   lives matter, things that are, you would consider to be---

5          THE COURT:  What were you chanting?

6          A   Oh, specific things?

7          THE COURT:  That's what he's asking.

8          A   Black lives matter was probably the---it was

9   the one we used the most and I'm not certain about all the

10  other ones.

11         Q   And what were the---what was your observation

12  of what the protestors were doing when you were chanting?

13         MR. WOODARD:  Again, objection, Your Honor.  (Un-

14  intelligible) it is still irrelevant to this.

15         THE COURT:  Some context is necessary.

16         MR. WOODARD:  Yes, sir.

17         THE COURT:  Obviously it doesn't make any differ-

18  ent in regard to what position one group may or may not

19  have been taking.  That is irrelevant. but the Court has

20  got to have some context to consider the other evidence.

21  Go ahead.

22         Q   And we're going to play a video in a moment.

23  Were you throwing any punches?  Did you throw any punches?

24         A   I did not throw any punches.

25

1    Q And you learned after these events that they

2 had been recorded by a few people, correct?

3    A Yes. After the event I learned that there had

4 been videos of it.

5    Q Is it fair to say you've reviewed these videos

6 a couple of times?

7    A Yes.

8    Q A few times?

9    A More than a few times, yes.

10    Q And gone over those videos and what you

11 learned those videos showed in our office on multiple occa-

12 sions?

13    A Yes, that is correct.

14    Q Okay. Your Honor, I'm going to play a video

15 here and have him authenticate it.

16    THE COURT: Mr. Woodard, any objection to the

17 video?

18    MR. WOODARD: May I consult with the distin-

19 guished Commonwealth Attorney for a second?

20    (Attorneys confer.)

21    MR. WOODARD: I may object less if I see it first

22 (unintelligible) moving things along.

23    THE COURT: If you want, if you want to see it.

24 If there's an objection, I've got to rule on the objection.

25

1          MR. WOODARD:  If I think it's what I think it is,

2    then I won't have any objections.

3          THE COURT:  All right.  If you'll talk to the

4    Commonwealth Attorney.  I don't know how long the video is.

5          Q  It's very short, Your Honor.

6          (Pause.)

7          THE COURT:  Any objection to the admissibility of

8    the video?

9          MR. WOODARD:  Sir?

10         THE COURT:  Any objection to the admissibility of

11   the video?

12         MR. WOODARD:  Well, you know, subject to if he

13   lays a foundation.  I'm not going to object to authentica-

14   tion and that kind of stuff.  I'm not going to (unintelli-

15   gible).

16         Q  Would it be easier if Mr. Goad comes up here?

17         MR. WOODARD:  Yes, sir.

18         THE COURT:  Can you come up here please?  Can Mr.

19   Cantwell see it?

20         MR. WOODARD:  Yes.

21         Q  And what we'd like to do is run this once for

22   you and then we can slow it down.  Is the sound up on this?

23         MS. GALLOWAY:  It is.

24         Q  Okay.

25         (Video was played at this time.)

1          Q   So let the record reflect that we're going to

2    begin the video at five seconds into the unicorn riot video.

3               (Video was played at this time.)

4          Q   And I'm just going to as she is playing it in

5    slow motion as you motion, ask  you could you identify,

6    could you identify that person right there?.

7          A   That person is Christopher Cantwell.

8          Q   Is he in the courtroom?

9          A   Yes.

10         Q   Can you identify him?

11         A   This man.

12         Q   And we're going to identify a person here in a

13   moment---If you could pause it right there, Ms. Galloway.

14   And this is you again, Mr. Goad?

15         A   Yes, that is me in the denim jacket right

16   there.

17         Q   Okay.  That is at 21 seconds in the video on

18   the left side.  And can you stop it right there?  Now, who

19   are these two individuals here at 23 seconds in?  Who is

20   that spraying the mace?

21         A   That is Christopher Cantwell spraying the mace.

22         Q   Okay, and that's you right there?

23              MR. WOODARD:  Objection, Your Honor, to the extent

24   that he is somehow figuring out that that is mace instead

25   of pepper spray I would object.  If he's using the word

1  mace as a generic term for self-defense spray, I'm okay

2  with it.

3          THE COURT:  He can describe it has he wants and

4  then it would be a matter of argument in regard to what the

5  evidence shows.

6          Q  Now, the individual who he is spraying, we can

7  refer to him as beanie man because I understand that's how

8  folks have been recognizing him very widely.  Do you know

9  who that individual is?

10          A  I have met him before.

11          Q  Would it be fair to say that the Commonwealth

12  has asked you to have him come to court?

13          A  Yes, I have, yes.

14          Q  On more than one occasion?

15          A  Yes, very much so.

16          Q  And to your knowledge why has he declined?

17          MR. WOODARD:  Objection, Your Honor.

18          Q  His personal knowledge based on---

19          MR. WOODARD:  All right.

20          A  It would be because---

21          THE COURT:  Wait, wait, I've got to hear the ob-

22  jection and then I'll hear the---

23          MR. WOODARD:  His knowledge of somebody else's

24  excuse for not showing up is pretty speculative.  I mean,

25  he can answer it but---well, I don't think he can answer it

1    unless he can sit there and say yeah, this person told me,

2    but how do we know it's that guy.  Who knows, maybe it was

3    on social media.

4              THE COURT: (Unintelligible).

5              Q  How do you know that he doesn't want to be

6    here?

7              A  I have spoken to him.

8              THE COURT:  That's the question you're objecting

9    to.

10             MR. WOODARD:  Yeah, worried about a hearsay re-

11   sponse now, too.

12             Q  That goes to his reason and the intent.  It

13   doesn't go to the truth of the matter asserted.

14             MR. WOODARD:  This is the truth of the matter of

15   why the guy ain't here.

16             THE COURT:  What he's---what's the purpose of it?

17   If he's saying how he knows why, how he knows why someone

18   else is not here.

19             Q  I want the Court to understand that the Com-

20   monwealth has made every effort to contact this person and

21   for the record to reflect the reason why he's not here.

22             MR. WOODARD:  I assume that---

23             THE COURT:  But can't---doesn't that have to be

24   based on what somebody told Mr. Goad?

25

Case 3:17-cv-00089-NKM-JCH   Document 37-2   Filed 05/04/18   Page 51 of 291   Pageid#: 665

1    Q Yes, or other understanding that he might have

2 obtained through---

3    THE COURT: Sustain the objection. What's your

4 next question.

5    Q So beanie man, were you watching what was go-

6 ing on? Obviously you're very close to this event, cor-

7 rect?

8    A Yes.

9    Q Did you see any weapons in his hands?

10    A I saw absolutely no weapons.

11    Q Did you see him strike anyone? Was he violent

12 in any way?

13    A I did not see him strike anyone or be violent.

14    Q What was he doing?

15    A He was chanting along with me.

16    Q What was he chanting to the best of your

17 knowledge?

18    A Black lives matter, the slogan most commonly

19 used that night.

20    Q And if we can back it up again. We're going

21 to show stills of this as well, Your Honor. Okay, now,

22 stop there. This is you. This is obscured for some reason,

23 it looks like a hat of some kind. What are you observing

24 right now?

25

1       A   I'm observing the protestors with torches are

2   coming towards us and they are pushing and shoving and it

3   looks like they're throwing blows.

4       Q   Where do you think beanie man is here?  You'll

5   see in the next frame, but is he on the ground here?

6       A   Yes, he's on the ground.

7       Q   And here you see him, so that's him right here

8   getting up, correct?

9       A   Yes.

10      Q   Okay, and then, and then if you could play it

11  please, Ms. Galloway.  And then you see that deployment

12  right there and, and if you go back very quickly, did that

13  deployment affect you at all?

14      A   Yes, it did.

15      Q   And if we can see that again in slow motion,

16  it looks like you're---and I don't want to---what response

17  did you have after this individual identified as Mr. Cant-

18  well deployed mace or pepper gas or a caustic substance or

19  acid or lye in his face?  What was your response immediate-

20  ly?

21      A   I immediately felt burning on my face.

22      Q   Okay, if you could play it again. And you can

23  see in slow motion how you do recoil if that is accurate.

24      MR. WOODARD:  Objection, Your Honor.  Mr. Tracci

25  is testifying.  You can see how he's recoiled.

1          Q   Okay. I withdraw the question.  I'll rephrase

2     the question.  If you can describe, based on the video

3     what---

4          MR. WOODARD:  Objection, already answered.  He

5     said oh, my face is burning.

6          Q   I didn't ask how it affected him.

7          THE COURT:  That's another question.  Go ahead.

8          Q   Okay.  What did you do immediately afterwards.

9     Did you turn away?

10         A   Yeah.  I turned away like this.

11         Q   And what else is going on here?  What else do

12    you hear?  Is that Mr. Cantwell again?  And that was anoth-

13    er deployment?

14         A   Yes.

15         Q   Okay.  Stop please, Ms. Galloway.  What pre-

16    cipitated the---from your perspective was beanie man pre-

17    senting any sort of threat after getting up and being maced

18    in the face?

19         A   He was presenting no threat.  He was actually

20    coming closer towards the statute with me.

21         Q   And there was a second deployment.  You saw

22    the torch obscured as a result.  Did that affect you?

23         A   The second deployment I felt affected when

24    that was released.

25         Q   How long afterwards?

1           A   It took within a few seconds for me to com-

2    pletely lose my vision and I felt immediate burning on my

3    skin difficulty breathing.

4           Q   Okay.  And you can return to your seat, Mr.

5    Goad and we're going to play the rest of this video for

6    purposes of---and it's not going to be you directly (unin-

7    telligible) relevance, but, Your Honor, we're just going to

8    play this through for you because it's at 30 seconds now---

9           THE COURT:  I understand there's no objection.

10          Q   Get the video out of the way.  Now, if you can

11   go back, you will see another person other than the person

12   who you identified as Mr. Cantwell spraying mace again or

13   lye.

14          MR. WOODARD:  How about if we just call it caus-

15   tic substance.

16          Q   Sounds good.  This individual right here,

17   right, we'll call him---what was your name for him?

18          MR. WOODARD:  Dragon arm.

19          Q   Dragon arm.  And that hit you as well, cor-

20   rect?

21          A   Yes.

22          Q   And now we see---what are you observing here?

23   Is that you?

24          A   That is me.  That is William Fearce (sic) who

25   is swinging a torch at me.

1           Q   And if you could pause that, please?  And very

2   recently like this weekend and I'll ask you about this, Mr.

3   dragon arm was identified, is that true?

4           A   That is what I believe his identification is.

5           Q   Okay.  And where do you see based on your un-

6   derstanding Mr. Cantwell here?

7           A   I can't quite see with the glare.  Yes.

8           Q   Who is that?

9           A   That is him right there throwing blows on an

10  individual.

11          MR. WOODARD:  Objection, Your Honor.  That's him

12  right there.

13          Q   I think he's describing what he sees.  That's

14  what he sees.  Again, if you just---what is your under-

15  standing of the relative size of the crowd here and the

16  number.

17          MR. WOODARD:  Objection, asked and answered.

18          Q   I think the Court, I think the Court can see

19  that.

20          THE COURT:  Sustain that objection.

21          Q   Withdrawn.  Okay.

22          THE COURT:  Mr. Goad, if you'd have a seat.

23          Q   And, Your Honor, I've got several images that

24  capture exactly what we just saw.  They're from the actual-

25

1   --they're from the same feed other than this news to share

2   chat folder.

3           MR. WOODARD:  That wasn't in there.

4           Q  No, that's what I just said, other than this

5   news to share.

6           MR. WOODARD:  Okay.

7           Q  Do you have any questions about this image be-

8   fore I present it to the Court?  Just go through them.  And

9   these are all the unicorn riot stills that we just saw.

10          THE COURT:  Okay?

11          MR. WOODARD:  (Unintelligible)

12          THE COURT:  Seen it?

13          MR. WOODARD:  I'm done.

14          THE COURT:  Okay.  Is that compliant?

15          MR. WOODARD:  Uh-huh.  (Indicating yes.)

16          THE COURT:   Good?

17          MR. WOODARD:  No.  We haven't talked about her

18  yet.

19          Q  Well, she's going to testify.

20          MR. WOODARD:  That's nice, but---

21          Q  Okay.  We'll save this until she testifies.

22  Okay.

23          MR. WOODARD:   Right.  We don't have any objec-

24  tion to those.

25

1          Q  For purposes of speed and dispatch, Your Honor,

2    I'm going to ask the witness to identify, is that Mr. bean-

3    ie man as you know him?

4          A  Yes, that is him.

5          Q  And is that Mr.---who do you think that is, is

6    that Mr. Cantwell?

7          A  That is Mr. Cantwell.

8          Q  Does he have his finger on something?  Does it

9    look like he's got his thumb on something there?

10         A  Yes.

11         THE COURT:  No objection to this photograph?  No

12   objection?

13         MR. WOODARD:  Nah.

14         THE COURT:  The defense is not objecting to that.

15         MR. WOODARD:  No.

16         Q  And this is the same here?

17         THE COURT:  Mr. Goad, this is the one that you

18   first identified?

19         A  Yes.  That is Mr. Cantwell on the far left in

20   that picture.

21         THE COURT:  All right.  This is the second photo-

22   graph?

23         Q  Yes.  And this you could identify, is that you

24   right there and apparently Mr. beanie man on his knees, is

25   that it right there?

Case 3:17-cv-00089-NKM-JCH   Document 37-2   Filed 05/04/18   Page 58 of 291   Pageid#: 672

1            A   That is correct.  That is me in the bottom

2    left corner and Mr. beanie man in the center.

3            THE COURT:  No objection?

4            MR. WOODARD:  No, sir.

5            Q   And this is immediately afterwards.  This

6    looks like Mr. beanie man has gotten up.  Can you describe

7    the space between Mr. beanie man getting up and the pro-

8    testing sign?

9            A   Yes.  Mr. beanie man is getting up and it

10   looks like there is approximately six feet of room.

11           THE COURT:  I understand for all of these pic-

12   tures there's no objection.

13           MR. WOODARD:  Correct.

14           Q   And immediate still afterwards, what does this

15   depict?

16           A   This would depict Mr. Cantwell coming up to Mr.

17   beanie man in preparation---

18           MR. WOODARD:  Objection, Your Honor.  He can't

19   tell that from that picture.  All he can say is that's

20   beanie man and Cantwell facing off.  If he wants to refer

21   back to the video to add that saying this is a still of

22   that fine, but he can't interpret that picture that way.

23           Q   He just testified to the fact that Mr. beanie

24   man had been on the ground.

25           MR. WOODARD:  Uh-huh.  (Indicating yes.)

1          Q   And he's going to testify that there was six

2     feet behind Mr. Cantwell.  This is immediately afterwards

3     and Mr. Cantwell is in the scene.

4               MR. WOODARD:  Right.

5          Q   And that's what he's going to testify to.

6               MR. WOODARD:  But he can't testify he's going

7     forward.  That's what he just testified to.  He's in there,

8     though.

9          Q   Is it reasonable to say that he had to move in

10    this direction, Mr. Cantwell, to get to this position?

11              MR. WOODARD:  It's just as reasonable to say

12    beanie man came up and went at him.

13              THE COURT:  So it's a still photograph.

14              MR. WOODARD:  Yeah.

15              THE COURT:  The photograph speaks for itself and

16    the other testimony.

17              MR. WOODARD:  Yeah, the photograph speaks for it-

18    self.

19         Q   And this is immediately afterwards, Mr. Goad?

20    Now, can you describe in that picture that the Court is re-

21    viewing and in this picture the posture of Mr. beanie man?

22    Is he an offensive posture, his arms at his side?

23              MR. WOODARD:  I'm going to object to the question,

24    Judge, leading.

25         Q   Where are his arms in this picture?

1          A   Yes, his arms are now below his waist to his

2     side.

3          MR. WOODARD:  Objection, the picture speaks for

4     itself.

5          THE COURT:  I'll sustain the objection.

6          Q   And in this picture what do you see?

7          A   I see Mr. beanie man looking away as if he's

8     in pain.

9          MR. WOODARD:  Objection, picture speaks for it-

10    self.

11         THE COURT:  Sustain the objection.  The photo-

12    graphs come in without objection.

13         Q   Okay.  And this is the other shot you see the

14    aerosol from?

15         A   Yes.

16         Q   And this is a still of the same thing.

17         MR. WOODARD:  I haven't seen that one.

18         Q   And if you want that excluded, I think the

19    other picture does the same thing.

20         MR. WOODARD:  Yeah, I want this one excluded.

21         Q   Okay, okay.  Now, you described how you felt

22    after you got--were the recipient of this spray.  Can you

23    explain again for the Court what you did and how you felt

24    afterwards?

25

1          MR. WOODARD:  Objection, already asked and an-

2     swered.

3          Q   What did you do after being sprayed?

4          A   After being sprayed and losing vision, I tried

5     to open my eye just enough to see one person I was familiar

6     with, asked them to walk me out of here.  I have no idea

7     what direction we went.  It feels like we went around the

8     statue multiple times.  I was taken to an area where there

9     was not conflicts.  I had my eyes flushed out and I then

10    attempted to look for a law enforcement officer to have a

11    statement.

12         Q   So you weren't able to immediately identify Mr.

13    Cantwell at that time, were you?

14         A   I did not see Mr. Cantwell the rest of that

15    night.

16         Q   And you did review video later and based upon

17    that video, what did you do?

18         A   I reviewed video and I came back to the Char-

19    lottesville area to swear out a warrant and to complete the

20    process.

21         Q   So you signed a statement and then a criminal

22    complaint.

23         A   That is correct.

24

25

1          Q   And we heard about this earlier, but I'm going

2    to hand this to you for your benefit just to refresh your

3    recollection.

4          A   Thank you.

5          Q   And the Judge has heard the substance of that,

6    but that was true---was that true information?  It won't be

7    leading.  Was that statement true to the best of your abil-

8    ity at the time?

9          MR. WOODARD:  Objection.  He has previously tes-

10   tified that---he just testified that he didn't know who

11   sprayed him.  Not which one sprayed him, was it Cantwell or

12   dragon arm, he didn't know who.  He's identified three dif-

13   ferent spraying events and he doesn't know who did any of

14   them, and now he's---

15         THE COURT:  I'll allow the question to be asked.

16   You can cross-examine him on it.

17         Q   You can answer the question.

18         A   If I remember the question it was that yes, I

19   filled this out to the best of my knowledge and belief at

20   the time.

21         Q   And you did so, is it fair to say, because you

22   thought Mr. Cantwell had sprayed you directly in the face

23   with gel?

24         A   That is correct.

25

1           Q   And you subsequently learned after reviewing

2    the evidence, what?

3           A   I subsequently learned that there was a dif-

4    ferent person spraying mace and it was---

5           Q   To your knowledge has this person been posi-

6    tively identified?

7           A   This person has---

8           MR. WOODARD:  Objection, irrelevant.  It's anoth-

9    er person.

10          THE COURT:  Do you want to be heard on it?

11          Q   No, Your Honor.  Withdraw the question.

12          THE COURT:  Question is withdrawn.

13          Q   So you were---that's not the only event that

14   occurred that evening, correct?

15          MR. WOODARD:  Objection, irrelevant.  These are

16   the ones he's basing it on.  Why do we need to know whether

17   or not they played Monopoly later?

18          Q   It's highly relevant Judge because---

19          THE COURT:  When you said it's the only event

20   that happened, I'm not sure what that meant.

21          Q   Was that the only time that you were, you suf-

22   fered from the effects of a deployment of a caustic sub-

23   stance that evening?

24          A   Are you saying that after the first deploy-

25   ment?  No?

1          Q   No.  In your complaint you talk about the gel

2   directly to your face.

3          MR. WOODARD:  Objection, he's leading him now,

4   taking him to the complaint.  Let him go back and ask the

5   question.

6          THE COURT:  That question is all right.  I'll al-

7   low it.  Go ahead.

8          Q   Is that true?  That's what the complaint was

9   about?

10         A   Yes, that is correct.

11         Q   Was that the only time you suffered the ef-

12  fects of a caustic substance that night, August 11th, what

13  you described in the statement?

14         MR. WOODARD:  Objection, irrelevant.

15         THE COURT:  I'll allow it.  Go ahead.

16         A   I suffered more instances of being attacked

17  with a caustic agent than in my original statement.

18         Q   And that was made clear as a result of review-

19  ing the testimony and the video, correct?

20         A   That is correct.

21         Q   Some of which we just saw and the Court has

22  just observed, correct?

23         A   That is correct.

24         Q   How well do you see without your glasses?

25

Case 3:17-cv-00089-NKM-JCH   Document 37-2   Filed 05/04/18   Page 65 of 291   Pageid#: 679

1          A   I would say my vision is about 20/60, so I can

2   see up close really well, but further than that things get

3   a little blurry.  So like if I take it off right now I can

4   see you.  I can see the judge all right, but I can't see

5   what's going on in the gallery.

6          Q   Fair to say if it were dark and there was a

7   lot of chaos going on it would be difficult to identify

8   everything that's going on, everything happening?

9          A   Yes, that would definitely be the case.

10         Q   And you testified earlier that you suffered

11  after the first deployment toward Mr. beanie man, at Mr.

12  beanie man?

13         MR. WOODARD:  Objection, asked and answered.

14         THE COURT:  That has been asked and answered.

15  Sustain the objection.

16         Q   Okay, withdrawn.  Did you see any counter pro-

17  testors deploying?

18         A   I did not see any counter protestors---

19         MR. WOODARD:  Objection, Your Honor.  Just be-

20  cause he didn't see it doesn't mean it isn't happening.  He

21  probably (unintelligible) flying by either.

22         THE COURT:  Just as far as he knows.  I'll allow

23  it.  What he observed.  You can answer.

24         A   Oh.  I did not see any counter protestors use

25  any caustic agent or use any type of weapon.

1        Q  Did you see how Mr. beanie man was affected?

2        A  Yes, I did.

3        Q  And---

4        A  Mr. beanie man, he was immediately blinded.

5            MR. WOODARD:  Objection.  He can't tell whether

6    or not beanie man was blinded.

7        A  His eyes---

8            THE COURT:  Just testify as to what you observed.

9        A  I observed his eyes being shut.

10           MR. WOODARD:  Objection, Your Honor.  He just

11   testified that if it's dark and it's chaotic and he's got

12   20/60 vision now he can see eyelids position?

13           THE COURT:  You can cross him on it.

14           MR. WOODARD:  Yes, sir.

15           THE COURT:  What did you observe with regard to

16   beanie man?

17       A  I observed his eyes being close, his face be-

18   ing red, retreating, falling back and yelling in pain.

19           THE COURT:  All right.  Mr. Tracci?

20       Q  And I just want to make this clear, not at the

21   expense of being repetitive, but is it true to say, is it

22   accurate to say that you suffered the result of a caustic

23   substance on multiple occasions that night?

24

25

1          MR. WOODARD:  Objection, Your Honor.  This is not

2     Mr. Cantwell spraying it.  The evidence is already that he

3     got sprayed by dragon arm, too.

4          THE COURT:  What you're asking if for him to sum-

5     marize, is that---

6          Q  Yes, sir.

7          THE COURT:  All right, so I sustain the objection.

8     Do you have a specific question?

9          Q  You were sprayed by Mr. dragon arm, correct?

10         A  That is correct.

11         Q  You were also the recipient of secondary caus-

12    tic substance deployed at Mr. beanie man, correct?

13         THE COURT:  I'll allow that.

14         MR. WOODARD:  Objection.  He's already testified

15    to all this.

16         A  That is correct.

17         Q  And then there was a second deployment immedi-

18    ately after the first deployment which you also testified

19    ---that you testified to?  How did that affect you?

20         A  The second deployment also affected me in a

21    very similar way.

22         Q  Those are my questions, Judge.

23         MR. WOODARD:  Your Honor, can we have a break be-

24    fore we do this?

25         THE COURT:  Yes, sir.  How long a break.

1           MR. WOODARD:  It's up to, Your Honor.  I wouldn't

2   suggest a lunch break, but I would suggest a little lawyers'

3   break.

4           THE COURT:  The lawyer's break would be much

5   shorter I assume.

6           MR. WOODARD:  Yes, sir.

7           THE COURT:  I think we have a lot to do so I

8   think we need to---

9           MR. WOODARD:  I agree, Your Honor.

10          THE COURT:  Perhaps if you want to take just a

11  few minutes to accommodate that issue.

12          MR. WOODARD:  Can we say ten minutes?

13          (Discussion about lawyer's break.)

14          THE COURT:  All right, Mr. Woodard, we'll be back

15  in ten minutes.  All right, court will be in recess for ap-

16  proximately ten minutes.

17

18          (OFF THE RECORD.)

19

20          THE COURT:  All right, we're back in session.  Mr.

21  Woodard, you have some questions for Mr. Goad?

22          MR. WOODARD:  I do have a few, Judge.

23          THE COURT:  All right.

24          MR. WOODARD:  We don't need to look at the screen

25  right now because I'm going to do it from over here.

1           THE COURT:  All right.

2           MR. WOODARD: We'll get to the screen soon enough.

3

4                        CROSS-EXAMINATION

5   By:  Mr. Woodard

6           Q  Mr. Goad, you swore under oath earlier that

7   you wanted to go to a peaceful protest, correct?

8           MR. TRACCI:  We don't have the defendant.

9           Q  Oh, I withdraw that question.  They took him

10  downstairs, Judge.

11          (Pause.)

12          THE COURT:  All right.

13          Q  Mr. Goad, you said you went to the monument to

14  engage in a peaceful protest, correct?

15          A  That is correct.

16          Q  But when the fights broke out you didn't leave,

17  did you?

18          A  I did not have an option to leave.

19          Q  You didn't?

20          A  No, I was completely surrounded by three hun-

21  dred (300) people.

22          Q  Did anybody tell you, you couldn't leave?

23          A  They were physically forming a wall, I could

24  not leave.

25          Q  Nobody told you, you couldn't leave, did they?

1          A   No.

2          Q   You didn't attempt to walk through them, did

3    you?

4          A   Yes, I did attempt to move around.

5          Q   Immediately after the fighting in front of you

6    broke out?

7          A   I didn't see where else I could go.

8          Q   You didn't walk by the camera did you?  Did

9    you?  You didn't walk out alongside the camera, did you?

10         A   Can you rephrase that, please?

11         Q   You didn't try to leave when the fighting

12   broke out by walking by the camera that unicorn riot was

13   using, did you?

14         A   Did I immediately turn around?  No, I did not

15   immediately turn around and run.

16         Q   And you didn't try to leave either.  You

17   stayed right there, didn't you?

18         A   My first priority was my own safety before

19   trying to escape.

20         Q   Did you or did you not stay right there?

21         A   I was moving around.

22         Q   Now, you swore under oath just now you stood

23   back to back at the statue with others, right?

24         A   That is correct.

25

1        Q   But you didn't stand back to back the whole

2   time, did you?

3        A   Did I literally stand my back to the statue?

4        Q   I'm asking you, Mr. Goad.  You said you stood

5   back to the statue with others.  And I'm asking you if you

6   stayed there the whole time or if you moved with your back

7   off the statue.  You're the one who used the term.

8        MR. TRACCI:  I think, Your Honor, it's badgering

9   the witness.  The witness has testified that he had moved

10  around and that his back had been up.  They're not mutually

11  exclusive points to be in the course of an entire evening.

12       Q   Withdrawn.

13       THE COURT:  Okay, question withdrawn.  What's the

14  next question?

15       Q   And your sworn testimony is you didn't throw

16  any punches, right?

17       A   That is correct.

18       Q   Is your sworn testimony you didn't throw any

19  kicks?

20       A   I did not kick anybody, no.

21       Q   Is your sworn testimony that you didn't charge

22  forward at the---you were a counter, right?  He's a coun-

23  ter---yeah, at the protestors?

24       A   That is correct, I did not kick somebody.

25

1    Q  You stood there without any aggressive action

2  whatsoever, isn't that right?  That's your testimony,

3  right?

4         A  In regards to your client.

5         Q  No, any action whatsoever.  The question is

6  any aggressive action whatsoever, yes or no.

7         A  I do not---

8         MR. TRACCI:  I would like to ask the relevance of

9  that question, Your Honor.  I think we're talking about his

10  position with respect to the defendant in this case.  And

11  he also testified earlier, and it's been asked and answered,

12  that he was not engaged in aggressive behavior including

13  aggressive kicking or punching.

14         THE COURT:  I'll allow the question, go ahead.

15         Q  No aggressive behavior toward anyone, right?

16  That's your sworn testimony.

17         A  That is correct.

18         Q  Now, after the event you learned of the exist-

19  ence of video, correct?

20         A  That is correct.

21         Q  Is the video here, one of them that you re-

22  viewed?  The one you just looked at?

23         A  That is correct.

24         Q  Was that one of the videos you learned about?

25         A  That is correct.

1        Q  Where in that video does it identify they guy

2  with the radical agenda shirt as Christopher Cantwell?

3        A  Where in the video?

4        Q  Yeah?

5        A  Throughout the video, it's clearly him.

6        Q  No, where does it identify that it's Chris

7  Cantwell?  Does he have a sign over his head?  Is it tat-

8  tooed on his face?

9        A  I can look at his face.

10        Q  But it doesn't show, it doesn't identify his

11  name in the video correct?

12        A  No, it doesn't.  No video ever does that.

13        Q  Well, so your answer is no, it does not iden-

14  tify Chris Cantwell in the video, right?

15        A  Right.

16        Q  Okay.  You learned, you learned of somebody

17  who sprayed afterwards, isn't that right?

18        A  That is correct.

19        Q  And coincidentally that was from Emily Gorcen-

20  ski, correct?

21        A  That was from a lot of people and not just

22  Emily Gorcenski.

23        Q  You previously testified that it was from Emi-

24  ly Gorcenski and other people.

25

1      MR. TRACCI:  Mischaracterizing the response, Your

2  Honor.  I think the witness testified that he learned of

3  the identity of Mr. Cantwell from Ms. Gorcenski but he also

4  learned about it after reviewing video of those events.

5      Q  And one of them was---

6      THE COURT:  Mr. Goad can---if you disagree with

7  what's being asked, then you can state that.

8      A  I disagree with that.  Emily Gorcenski was not

9  the first person to tell me that it was Christopher Cant-

10  well.

11      Q  Okay, but she did tell you at some point.

12      A  That is correct.

13      Q  Did she tell you that she also had accused Mr.

14  Cantwell?

15      A  Um---

16      Q  She did, didn't she?

17      A  I believe at the time she did.

18      Q  And that prompted you, it was Emily's identi-

19  fication that prompted you on August 17th to go down to the

20  magistrate and swear out a warrant, correct?

21      A  No.

22      Q  Now, I'm showing you the criminal complaint.

23  Is that B?  Yeah.  I'm referring you to a copy of Exhibit B

24  and Mr. Tracci gave you.  So you went down and swore out a

25  complaint and swore under oath that Cantwell used a mace

1    pepper spray at my face and caused me to lose my vision

2    temporarily.  Is that what you swore under oath back then?

3              A   That is what I swore.

4              Q   You didn't say anything about Cantwell sprayed

5    beanie man next to me, correct?

6              A   I did not put that in that document.

7              Q   You didn't say anything about Cantwell sprayed

8    up in the air and it affected me, correct?

9              A   I did not put that in the document.

10             Q   The only thing you put in the document was

11   used gel mace pepper spray, right?

12             A   That is correct.

13             Q   So when you took this out you didn't give a

14   darn about anything but gel mace pepper spray, isn't that

15   right?  The other two weren't worth your time, right?

16             A   No, that is not correct.  I was answering it

17   on the best of my ability at the time.

18             Q   Well, you took out this charge just for gel

19   mace pepper spray and what about the other two?  Did you

20   care about those?  Weren't they worth filling out a crimi-

21   nal complaint?  No, correct?

22             A   No.

23             Q   Now.

24             A   No, as in I don't agree with your statement.

25

1          THE COURT:  Mr. Goad has got to answer the ques-

2    tion.

3          Q  Okay.

4          A  I filled out a criminal complaint on what I

5    had the best knowledge of at that time.

6          Q  But you were there, you had knowledge of the

7    beanie man spray and the up in the air spray, correct, when

8    you filled this out?  Correct?

9          A  I had knowledge of that but that person is re-

10   sponsible---

11         Q  But yet you didn't---

12         A  Let me finish my question please.  That person

13   is responsible for filling out their own crime reports.  I

14   cannot fill out their crime reports.

15         Q  You just testified you got affected by the

16   over two sprays.  You're the person who is supposed to fill

17   out the crime report, Mr. Goad, and you didn't do it.  You

18   only filled out the gel mace spray.

19         THE COURT:  Just ask---ask him a question.

20         Q  Isn't that right?

21         A  I filled out a crime report involving being

22   affected by gel mace spray.

23         Q  And no other sprays, correct?

24         A  At the time, yeah.

25

1          Q    Now, a week ago you met with someone and de-

2     termined that gel mace spray wasn't Mr. Cantwell, correct?

3          A    If we're talking about the additional deploy-

4     ments later then yes, I found out that that was not Mr.

5     Cantwell.

6          Q    So the gel mace spray, you found out the gel

7     mace spray guy was dragon arm, correct?

8          A    That is correct.

9          Q    Did you contact the police to correct your er-

10    roneous sworn statement?

11         A    I have been in contact with---

12         Q    Did you do it to correct this sworn statement

13    that was no longer true?

14         A    I don't know how to change a sworn statement

15    that has already been issued.

16         Q    Do you know how to call the police?

17         A    Yes.  I've been talking to---

18         Q    Okay.  And Mr. Tracci knew this thing was no

19    longer true.  Did you insist that he should file something

20    with the Court to bring to attention that your sworn state-

21    ment was no longer true?

22         MR. TRACCI:  Your Honor, that's not---

23         THE COURT:  Is there an objection?  Is there an

24    objection?

25

1          MR. TRACCI:  It is, Your Honor.  I don't see how

2  Mr. Goad's interest in disclosing something to the Court is

3  relevant.  I disclosed it to the Court in time for today's

4  hearing after I learned that the identity of the person who

5  sprayed him, Mr. dragon man, whoever he was, was not the

6  defendant in this case.  We've already heard testimony as

7  to how he was affected by multiple other additional deploy-

8  ments by Mr. Cantwell including the one and two beanie man

9  deployments.

10         THE COURT:  The question is whether or not Mr.

11  Goad asked the Commonwealth's office to do anything else.

12         Q  I'll withdraw the question.

13         THE COURT:  All right, what's the next question?

14         Q  So let me get this straight.  From August 17th

15  until let's say November 1st, you were perfectly happy to

16  live in the ignorance of the truth, correct?

17         MR. TRACCI:  Your Honor, I think that's---

18         Q  I'll withdraw the question.  Now, let me, let

19  me change it a little bit.  From August 17th to November 1st

20  or so when you told Mr. Tracci, you never went back and

21  took out any other charges for any other deployments, cor-

22  rect?

23         A  I've been in contact with local police in try-

24  ing to get warrants.  I do not live in the city, so it is

25  difficult for me to come down here and swear out warrants.

1          Q  Well, you managed to swear this one out,

2    right?  But for two months you didn't come down here to

3    swear out any warrants against the other---about the other

4    two deployments, did you?

5          A  Because I couldn't find the identities of the

6    people.

7          Q  They were Chris Cantwell.

8          A  Of the other deployments?

9          Q  No, the other two that you're now complaining

10   about today, the one at beanie man and the one up in the

11   air.  You never took out any warrants against that, right?

12   You didn't take out any warrants for two months, did you?

13         A  I thought there was one out.  I don't know ex-

14   actly how the warrant system works.

15         Q  This one says gel spray.  Well, you sure fig-

16   ured it out to take this one out, didn't you?  But now af-

17   ter you filled out a warrant and put a man in jail, you

18   can't figure out how the warrant system works.

19         THE COURT:  What's your question?

20         Q  Is that right?

21         A  I don't know---to best answer your question is

22   I don't know how to revise a warrant.

23         Q  You could have come down and taken out another

24   one based on he shot beanie man, but you didn't do that,

25   correct?

1          A  This is the first time this idea has ever been

2  thrown to me.

3          Q  You just forgot how to take out a warrant af-

4  ter having taken this one out, is that right?

5          MR. TRACCI:  Your Honor, I think that question

6  has been asked about four or five times.

7          Q  I'll withdraw it.  Okay.  Okay, let's---I'm

8  going to turn on the unicorn riot video here.  This is

9  probably a dumb question, but the way we are packed in here,

10  do you all have a pointer of any sort or a stick perhaps.

11  (unintelligible)

12          THE COURT:  How about this?

13          Q  I've got one of those, appreciate it.

14          THE COURT:  We're fresh out of sticks.

15          Q   Let's roll that video.

16          THE COURT:  Mr. Goad, can you see that?

17          A  Yes, I can see this.

18          THE COURT:  Mr. Cantwell---

19          MR. CANTWELL:  Yes, I can see it.

20          Q  You've heard the sound already.  Do you want

21  to hear it again?  It's not going to be that great.  It's

22  not that important.

23          THE COURT:  It's your evidence.

24

25

1          Q  All right, bump it forward just a hair.  No, a

2   little more.  A little more.  Now, you saw that.  You saw

3   those people doing that, correct, Mr. Goad?

4          A  I don't think I saw that.

5          Q  Never saw that?  You reviewed the video,

6   right?

7          A  That---

8          MR. TRACCI:  Your Honor, at this point I'm going

9   to object.  The purpose of today's hearing is a preliminary

10  hearing.  The Commonwealth has an obligation to put on evi-

11  dence to show that there is probable cause that a crime has

12  been committed and by the defendant.  I think we've met

13  this burden.  At this point this is becoming a fishing ex-

14  pedition.

15         Q  Certainly not.  I have a right to cross-

16  examine him.

17         THE COURT:  You can object to any question, but

18  he's got a right to cross-examine the witness.

19         Q  Move it forward.  Move it forward.  Keep going.

20  Keep going.  Keep going.  Little more.  Little more.  Lit-

21  tle more.  Little more.  Little more.  Little more.  Little

22  more.  Little more.  Now, Mr. Goad, you saw this fighting,

23  didn't you?

24         A  In this video or in person?

25         Q  In person.

1          A   I did not see this in person.

2          Q   You didn't?

3          A   No.

4          Q   Okay.  Jump a little forward, jump forward,

5   jump forward, jump forward, hold.

6          A   I see myself in the top left corner, but we're

7   looking at this on a freeze frame right now.

8          Q   Mr. Goad, you just swore under oath you didn't

9   see this fighting, but that's you right there, isn't it?

10         A   That is me.

11         Q   And that's the bald guy fighting, isn't it?

12  Isn't it?  You've got to answer out loud.

13         A   I do see myself right there in the top right

14  corner and I do see that bald man fighting.

15         Q   And you've got your glasses on, don't you?

16         A   I do have my glasses on.

17         Q   All right, bump it forward, bump it forward,

18  bump it forward, bump it forward, bump it forward, keep go-

19  ing, keep going.  And you touch your glasses there, cor-

20  rect?

21         A   I touch my glasses.

22         Q   Bump forward.  Now, who is that right there?

23         A   I cannot tell with this resolution.

24         Q   That looks like beanie man, doesn't it?

25         A   It could be.

1          Q  Okay, and that right there is bald guy, right?

2    Bald guy in the wife beater tee shirt?

3          A  Yes.

4          Q  Looks like bald guy has just dropped beanie

5    man, hasn't he?

6          A  Are you suggesting that the bald guy put down

7    beanie man physically?

8          Q  I'm asking you.  Is that what you saw?

9          A  I mean, that's what that video would suggest.

10         Q  Is that what you saw?

11         MR. TRACCI:  Your Honor, I think the witness has

12   testified to the fact that there was a lot going on and

13   this evidence speaks for itself.

14         Q  And he can testify to it.

15         A  Yeah, this is at zero seconds.  This video---

16         THE COURT:  Wait a minute.  I've got to rule on

17   the objection.

18         A  I'm sorry, sir.

19         THE COURT:  All right.  Mr. Woodard is asking you

20   did you see what is recorded on that frame?

21         A  This video has elapsed less than one second at

22   this point.  I had not seen this.

23         THE COURT:  All right.  What's your next ques-

24   tion?

25         Q  Okay.  So that's you right there, right?

1        A   That is correct.

2        Q   And your sworn testimony today is that you did

3   not see that back on August 11th, correct?

4        A   We're talking about this less than one second

5   that it happened and---

6        Q   Is your answer yes or no?

7        A   No, I don't, I---

8        Q   Okay, bump it forward.  Didn't see that either,

9   huh?  That's still you, right?

10       A   That's me right there.

11       Q   And you're looking right at it as it appears

12   in the video.

13       A   I don't know where my eyes are focused at.  I

14   could be looking at my glasses as I'm taking them off.

15       Q   Well, your head it turned there, right?

16       A   I mean, my head is facing that direction, but

17   we can't see my eyes.

18       MR. TRACCI:  Your Honor, if the witness could an-

19   swer the question.

20       Q   Yes, sir.

21       THE COURT:  Let him answer.

22       Q   Yes, sir.  Bump it forward, bump it forward,

23   bump it forward.  And your glasses, you just said you were

24   taking your glasses off, but they're still on your nose,

25   aren't they?

```
 1              MR. TRACCI:  Objection, Your Honor.  I think the
 2    witness said that he thinks he might have been taking his
 3    glasses, not that he had taken them off.
 4              Q  I'm not sure what he said.
 5              THE COURT:  Is the question are his glasses on
 6    there?
 7              Q  The glasses, the glasses are on your nose
 8    aren't they in that frame?
 9              A  Yeah.
10              Q  So, in the earlier frame you weren't taking
11    your glasses off at all, were you?
12              A  I could have been doing this.
13              Q  Is the answer yes or no?
14              A  Is the answer---were my glasses off a split
15    second later?  Then no, my glasses are still on a split
16    second later.
17              Q  Move forward, bump it forward.  Now, that's
18    beanie man, isn't it?
19              A  That is probably beanie man with this resolu-
20    tion.
21              Q  Bump it forward, move it forward.  Now, how
22    many feet would you reckon there are between beanie man and
23    these guys over here?
24              A  At this moment?
25              Q  Uh-huh (indicating yes).
```

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 86 of 291   Pageid#: 700

```
1          A   I would say that while beanie man is on the
2   ground they are about two feet apart.
3          Q   Two feet, could it be four feet?
4          A   I don't know.
5          Q   How about we compromise on three?
6          A   Why don't we just let the video speak for it-
7   self.
8          Q   Okay.
9          THE COURT:  Can you estimate from being there
10  what the distance is between beanie man and the crowd?  If
11  you can't, you can't.
12         A   Yeah, I would say, I mean, there's a buffer of
13  space of a few feet, but I can't be exact.
14         THE COURT:  All right, what's your next question.
15         Q   Okay.  Could you back it up just a bump?  And
16  just let it roll forward.  Keep going.  No, just let it
17  roll.  Stop.  Okay, all right.  Is that---that's you in
18  that frame, right?
19         A   That is me in the frame.
20         Q   And beanie man is getting back up, right?
21         A   Yes.
22         Q   And right there in front of your hand, his
23  hand is in a fist, isn't it?
24         A   No.
25         Q   And he's not retreating, is he?
```

1          A  His hand is not in a fist.  His hand is in a

2  blur.

3          Q  Okay, but he's not retreating like you said,

4  is he?

5          A  Uh---

6          Q  He's standing there---

7          A  He's getting up, but he's backing up from

8  where his butt was planted when he was down.

9          Q  Let's back it up a little bit more.  Now roll

10  it forward from there.  Just let it roll.  Stop it there

11  and so that forward movement of his is in your estimation

12  is him actually retreating?

13         A  What?

14         Q  Is that right?  Back it up a little bit.

15  Beanie man pops up.  Beanie man chooses a stance, right?

16  And then Cantwell sprays beanie man, right?

17         A  No.

18         Q  Cantwell didn't spray beanie man?

19         A  No, your whole statement is not true.

20         Q  My statement was, my question is, Cantwell,

21  did Cantwell spray beanie man?

22         A  To that question yes, Cantwell sprayed him.

23         Q  And, all right, bump forward.  All right.  And

24  that's where beanie man goes out of the frame, right?

25         A  In this video, yeah.

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 88 of 291   Pageid#: 702

1      Q   That's your elbow, isn't it, right there?

2      A   Yeah, it looks like a denim jacket.

3      Q   And there's one of the protestors with his

4  hand up like that, right?

5      A   Yeah.  Very commonly during that night they

6  were giving a salute that was very similar to a Nazi salute

7  so---

8      Q   Bump it forward, bump it forward, bump it for-

9  ward, bump it forward.  And now, that is, that's your hand,

10  right?  That's you, correct?

11      A   That's my pointing at Mr. Cantwell identifying

12  him as a person with mace.

13      Q   And you testified earlier that when beanie man

14  got sprayed you lost your vision.

15      A   I was losing my vision.

16      Q   Oh, now you were losing your vision.  You tes-

17  tified earlier that you temporarily lost your vision, but

18  after you temporarily lost your vision you could identify

19  the guy with mace, correct?

20      A   I was still able to keep my eyes open.

21      Q   Enough to where you could still identify the

22  guy with mace, correct?

23      MR. TRACCI:  Your Honor, respectfully counsel

24  is---

25

1          THE COURT:  I've got to hear the objection, I've

2    got to hear the objection.

3          MR. TRACCI:  Misrepresenting earlier testimony.

4    He indicated that he suffered from the recoil from the

5    first deployment and it started affecting his vision.  He

6    did not testify that he immediately was blind.  Stop mis-

7    representing his (unintelligible).

8          Q  Okay.

9          THE COURT:  Are you withdrawing the question or

10   not?

11         Q  No.

12         A  Then I would say at---

13         THE COURT:  Mr. Goad, it's what you recall.  If

14   someone asks you a question and the facts are different

15   than your recollection then you can respond in that way and

16   otherwise just answer the question.

17         Q  Let it go forward.  Stop there.  Okay, and you

18   didn't actually feel anything from that.  You saw the pep-

19   per spray and that's why you did it, because your vision

20   was so great, right?  You didn't feel anything there, did

21   you?

22         MR. TRACCI:  That question has been asked and an-

23   swered several times.

24         Q  No, it hasn't.

25         THE COURT:  I'll allow it.

1     Q   You didn't feel anything.  You recoiled be-

2   cause you saw the pepper spray deployed right?

3     A   No, I felt it on my face.

4     Q   Okay.  Move forward.  Go forward.  Go forward.

5   Go forward.  And that's you pointing at the guy with pepper

6   spray, right?

7     A   Correct.

8     Q   And now that pepper spray has been deployed,

9   you didn't try to get out of there then, did you?  You

10  stayed right in the front line, didn't you?

11    A   I don't see where I could have gone.

12    Q   Now, well, this is on the video.  Did you try

13  back then?

14    A   I don't---I was completely surrounded, 360 de-

15  grees, hundreds of people.  I did not try because I had no

16  way of trying.

17    Q   You could have said excuse me, couldn't you?

18  Bump it forward.  Bump it forward.  Bump it forward.

19  You're still saying that man has mace, that man as mace,

20  right?  Is that what you said on the video?

21    A   That's what I'm saying.

22    Q   Okay.  Bump it forward.  Bump it forward.

23  Bump it forward.  Bump it forward.  Bump it forward.  And

24  then there's somebody on the ground there, isn't it?  Right

25

1    there.  Right?  He's got a stripe going down the shoulder

2    of his arm?

3              A  I can't tell in this resolution.

4              Q  Okay.  But that's still your hand still point-

5    ing despite your impaired vision, right?

6              A  This is about one second elapsed time so, no.

7              Q  That's your hand still pointing, right, yes,

8    or no.

9              A  Yes, that it my hand pointing.

10             Q  Okay.  Bump it forward.  Bump it forward.

11   Bump it forward.  Bump it forward.  Now, you're still

12   pointing, right?  Bump it forward.  Bump it forward.  Now

13   ---bump it forward.  Bump it forward.  Now---

14             MR. TRACCI:  Your Honor, at this point I'd just

15   inquire into relevance.  The deployment has already taken

16   place.

17             Q  Which one?  He's now claiming there are three.

18   I can cross-examine him on all three.

19             MR. TRACCI:  Okay.

20             THE COURT:  I'll allow it.  I'll allow it.  Go

21   ahead.

22             Q  So despite your impaired vision and you're not

23   retreating from the site right in front of you, you're

24   still there, right?

25

1        A   Less, I would say about one second has passed

2   and I have not left the group of three hundred (300) people

3   surrounding me.

4        Q   Okay.  Bump it forward.  Bump it forward.

5   Bump it forward.  And now you're turning away, correct?

6        A   Yes.  About---

7        Q   Bump it forward.

8        A   Let me finish the answer.  About one second---

9        Q   Bump it forward.

10        A   Let me finish the question you asked.

11        Q   Well, go ahead.  I don't have to wait for you.

12   Go ahead.

13        A   You keep saying bump it forward while I'm

14   talking.

15        THE COURT:  Mr. Goad, Mr. Goad---

16        A   I'm sorry, sir.

17        THE COURT:  If there's an objection, Mr. Tracci

18   is going to make it.

19        Q   There is?

20        THE COURT:  You just have to just answer the

21   question.

22        Q   I didn't hear it.

23        THE COURT:  Go ahead.

24        A   As I was saying, about one second has passed

25   and now I'm retreating.

1           THE COURT:  What's your next question?

2           Q  Okay, now, you're up there in the upper right-

3  hand corner, right?

4           A  I'm not in the upper---

5           Q  I'm sorry, left-hand.

6           A  That is correct.

7           Q  And your glasses are still on your nose, cor-

8  rect?

9           A  At this point yes, my glasses are on my face.

10          Q  And your face is pointing that way, correct?

11          A  Um---

12          Q  It's pointing to the right of the frame.

13          A  Yes.

14          Q  And Mr. Cantwell is going towards the left of

15  the frame, correct?

16          A  Um---

17          Q  The perspective is a little off.

18          A  Yes.

19          Q  And let's count together.  One, two, three,

20  four, he's four people away from you, right?

21          A  All right.

22          Q  And he's spraying up in the air, correct?

23          A  All right.

24          Q  Bump it forward.  Then it comes down.  That's

25  still you up here in the corner, right?

```
 1          A  That is correct.

 2          Q  Bump it forward.  And Mr. Cantwell sprayed at

 3   this point, right, the second deployment.  He sprayed,

 4   right?

 5          A  I'm not sure if this has happened in this vid-

 6   eo yet, but---

 7          Q  Let's go back.  Bump it forward.  Bump it for-

 8   ward.  Bump it forward.  Bump it forward.  Bump it forward.

 9          A  All right.

10          Q  Okay, he sprayed there, right?

11          A  I think so.  It's hard to tell in this resolu-

12   tion for this video.

13          Q  Okay.  And let's look at you.  You're not wip-

14   ing our eyes, are you?

15          A  Again, would you immediately wipe your eyes?

16          Q  Are you or not wiping our eyes?

17          A  I am not immediately wiping my eyes.

18          Q  Okay.  You're not wiping your nose.

19          A  I never claimed I had a runny nose.

20          Q  Well, you're not wiping your nose in that im-

21   age, are you?

22          A  No, I'm not wiping my nose in that image.

23          Q  You're not recoiling one bit, are you?  You're

24   standing there like nothing has happened.

25          MR. TRACCI:  If you can ask---
```

1    Q Are you standing there like nothing has hap-

2 pened?

3    MR. TRACCI: Judge, if the witness could be ac-

4 corded the courtesy of answering the questions presented by

5 counsel.

6    Q I'm sorry.

7    THE COURT: I think that's a matter of argument.

8    Q Okay.

9    THE COURT: The photo speaks for itself.

10    Q Yes, sir.

11    THE COURT: It's not touching his face at all.

12    Q Yes, sir. Bump it forward. Bump it forward.

13 Bump it forward. Bump it forward. Bump it forward. Bump

14 it forward. Bump it forward. Now---bump it forward. Bump

15 it forward. Bump. Bump. Bump. Now, this is you over

16 there, correct?

17    A That is correct.

18    Q And you are reacting to being sprayed by the

19 man with the dragon arm, correct?

20    A Yes. If I may make one verification. If you

21 see where my face it looking at, I'm looking in the direc-

22 tion of where Mr. Cantwell is while being sprayed.

23    Q Go back. Go back. Bump it forward. Now, Mr.

24 Cantwell is in there. Bump it forward. Bump it forward.

25 Bump it forward. Bump it forward. Keep going. And now Mr.

1  Cantwell disappears towards the monument, doesn't he?  He's

2  no longer in the frame.

3          A  In the video, but I was still able to see him.

4          Q  Bump it forward.  Bump it forward.  Bump it

5  forward.  Bump it forward.  Bump it forward.  And right

6  there you're crouched down, isn't that right?  You're

7  crouched down in your fighting stance, aren't you?

8          A  That's not a fighting stance.

9          Q  Bump it forward.  Bump it forward.  You look

10  over there.  Bump it forward.

11          A  I can see Mr. Cantwell's center frame.  I can

12  see Mr. Cantwell's center frame.  I was looking at him at

13  the time.  He had mace while someone else is macing me.

14  That led to the misidentification of the gel mace.

15          Q  Mr. Cantwell is twenty (20) feet away from you

16  now, isn't he?

17          A  I wouldn't say that's twenty (20) feet.

18          Q  Ten feet?

19          A  Again, these are very difficult, but twenty

20  (20) is a great distance.

21          Q  And you're getting, you're getting---the gel

22  mace is coming from dragon arm, right?

23          A  Yeah, I would say that----

24          Q  Bump it forward.  Bump it forward.  Bump it

25  forward.  Bump it forward.  Bump it forward.  Bump it for-

1    ward.  Just hold it there for a second, Jeremy.  Mr. Tracci

2    can I have the original of his statement of 8-17, time

3    10:40?

4            MR. TRACCI:  Does the Court have a copy?

5            THE COURT:  No.

6            Q  And I don't.

7            MR. TRACCI:  I've got one.

8            Q  Your file has a copy.

9            THE COURT:  Is there any objection to this?

10           MR. TRACCI:  No, Your Honor.

11           THE COURT:  We'll make a copy of it if you're go-

12   ing to ask him about it.

13           Q  Your Honor, this is only the first page.

14           MR. TRACCI:  It's been in the discovery file for

15   quite a bit.

16           Q  I'm showing you a document dated 8-17 10:40.

17   Is that your---

18           THE COURT:  I'm going to have the clerk make a

19   copy.  Okay, let's do that.

20           Q  Okay.  I'm going to ask you to take a look at

21   this.  Would you take a look at that document and tell me

22   if that's your signature on the bottom of this page?

23           A  This is mine, yes.

24           Q  And you gave this statement to Sergeant Acord?

25           A  That is correct.

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 98 of 291   Pageid#: 712

1          Q   Did you tell him the truth?

2          A   I told him to the best of my ability at the

3   time, yes.

4          Q   Did you tell him the truth or not?

5          MR. TRACCI:  Your Honor, that question has been

6   asked and answered several times.

7          Q   And he keeps dodging it.  He keeps saying to

8   the best of my knowledge, not yes or no.  Do I need to ask

9   him if the sun came up?  To the best of my knowledge.

10         THE COURT:  Sustain the objection.

11         Q   All right.  Now, you told Sergeant Acord on 8-

12  17, I saw a person in a brown shirt get pepper sprayed by a

13  person I now know as Christopher Cantwell, isn't that

14  right?

15         A   That is correct.

16         Q   And you told him, I yelled this man has mace

17  and people started swinging torches at me.

18         A   That is correct.

19         Q   Then you say I dodged them, right?

20         A   Yeah.

21         Q   So, if you saw the people swinging torches at

22  you, your vision was okay, wasn't it?

23         A   I mean, it's right in front of me.

24         Q   Okay, and so---

25

1          A   Again, these are things that happened within a

2   second of the deployment.

3          Q   Your vision was okay, right?  And then you

4   said I dodged them and removed my prescription glasses, is

5   that what you said?

6          THE COURT:  You have to answer for the court re-

7   porter.

8          Q   Is that a yes?

9          A   I mean, you're holding it right now but I

10  would imagine that's what I wrote.

11         Q   Yeah, you can look at it.  It's your statement.

12         A   Yeah, that's what I wrote.

13         Q   Okay.  So when I saw a canister of Citrella

14  (sic) on fire and tried to exhaustion the fire with my foot,

15  right?  You can read along.

16         A   Yeah.

17         Q   So your vision was good enough for you to see

18  Citrella (sic).

19         A   I believe I intended to write the word extin-

20  guish the fire with my foot.

21         Q   Okay.  But you could see it, right?

22         A   I could see the flaming canister right in

23  front of me, yes.

24         Q   But I failed to do so.  I looked up and Cant-

25  well maced me.

1          A   Yeah.

2          Q   Isn't that what you wrote?

3          A   That is what I wrote.

4          Q   You wrote---

5          A   That is not, that sentence is not true.  He

6  did not mace me immediately after that time.  He had maced

7  me earlier.

8          Q   So you lied to Sergeant Acord.

9          A   That is not a lie, sir.

10         MR. TRACCI:  Your Honor---

11         Q   Well, he says---

12         THE COURT:  I think there's an objection.

13         MR. TRACCI:  Your Honor, he's arguing.  He's not

14  asking questions.

15         Q   No, I'm not.  Your Honor, the---

16         THE COURT:  I'll allow that exchange.  Go ahead.

17  What's your next question?

18         Q   On this it says, well, let's go back to the

19  video.  Bump it forward.  Bump it forward.  Bump it forward.

20  Now, you see a couple of citronellas on the ground, right?

21         A   Yeah.

22         Q   And who is this over here with the black shirt

23  and jeans with the radical agenda on his back?

24         A   That would be Cantwell.

25

1        Q   That's Cantwell.  Bump it forward.  Bump it

2   forward.  Bump it forward.  And that's Cantwell.  He's over

3   on the other side of the monument now, right?  Right?

4        A   Yeah.

5        Q   That's him right here, right?

6        A   Yeah.

7        Q   Okay, bump it forward.  Bump it forward.  Bump

8   it forward.  Bump it forward.  Bump it.  Bump it.  Bump it.

9   Bump it.  Bump it.  Bump it.  Bump it.  Bump it.  Bump it.

10  And there you are over on the left side of the frame,

11  right?

12       A   Yeah.

13       Q   And you, with all this fighting and pepper

14  spraying going on, again, you didn't leave, did you?

15       A   I had nowhere to go.

16       Q   Bump it.  Bump it.  Bump it.  And there's a

17  guy coming forward with a torch.  Bump it.  Right?  Right?

18       A   Correct.

19       Q   And a citronella candle falls off the end of

20  the torch, correct?

21       A   That is correct.

22       Q   Bump it.  Bump it.  Bump it.  Bump it.  Bump

23  it.  And a guy swung that torch at that unknown guy in the

24  picture, right?

25       A   Correct.

1          Q   Bump it.  Bump it.

2          A   Oh, there's another spray of mace at that mo-

3    ment.  You can see that huge stream right there, but I'm

4    looking down.

5          THE COURT:  Wait till there's a question.

6          Q   Did you test that to see what that was?

7          A   I didn't have that luxury of that video.

8          Q   Couldn't that be smoke from the torches lying

9    on the ground or lying in the air?

10         A   No, that is---

11         Q   It's not possible that that's torch smoke?

12         A   That is a stream, sir.

13         Q   It's not possible that's a layer of it.

14         MR. TRACCI:  Your Honor, he's going to testify as

15   to what he thinks it is based on the video.

16         Q   All right.

17         THE COURT:  Go ahead.  What's your next question?

18         Q   And you're looking down, right?

19         A   Yeah.

20         Q   And your glasses are still on your nose,

21   right?

22         A   It looks like it, yeah.

23         Q   Yeah.

24

25

1         A  No, wait, no, they're not.  It's in my hand.

2  That's why I'm making---my glasses are in my hand.  That's

3  why I'm making---

4         Q  Those glasses, those aren't glasses on your

5  nose?

6         A  I can't tell in this resolution.

7         Q  Bump it forward.

8         A  Look at how my hand---

9         Q  Bump it forward.  Bump it forward.  Bump it

10  forward.  Chris Cantwell is right over here on the other

11  side of the monument now, isn't he?

12         A  Yeah, that's what I'm been saying, that he

13  didn't get me in the last two deployments.

14         Q  And you said, when I failed to do so---when

15  you failed to put the citronella candle out you looked up

16  and Cantwell maced me, isn't that right?  That's what

17  you told---

18         A  That's what I wrote.

19         Q  So your testimony is Cantwell maced you after

20  the citronella candle from the other side of the monument,

21  right?

22         A  When it was really before when I did not re-

23  member that because I did not have---

24         Q  So this is another----

25         A  Please let me finish, sir.

1        Q   Another false statement.

2        A   I did not have the luxury of this video when I

3   filled that form out.  If I had the luxury of this video I

4   would be able to correctly remember the sequence of events.

5   I put the sequence of events in wrong.

6        Q   Go ahead.  You testified earlier that before

7   you came down there to Charlottesville on August 17th you

8   knew it was Cantwell because you had reviewed all kinds of

9   video and all kinds of social media, correct?

10       A   Yeah, but this video was not out.

11       Q   Okay.  Now this video wasn't out.

12       A   I did not have access to that video on August

13  17th.  Sergeant Acord asked to see this video or to see,

14  probably this video.  I did not have that at the time and I

15  was able to later find this video.

16       Q   No further questions.  That's not correct.

17  Bump it forward.  That was a tease.  Bump it forward.  Bump

18  it forward.  Bump it forward.  Keep rolling.  Okay, freeze

19  it.  A little more.  A little more.  Okay.  Bump it forward.

20  Bump it forward.  Now, isn't that Mr. Cantwell there?

21       A   It appears.  I can't make a positive---I can't

22  tell in this resolution.

23       Q   Bump it forward.  Bump it forward.  Bump it

24  forward.  Bump it forward.  Bump it forward.  Bump it for-

25  ward.  Bump it forward.  Bump it forward.  Bump it forward.

1    Keep going.  Keep going.  Keep going.  Stop.  Now, there's

2    the guy in the white shirt swinging the torch, right?

3              A    Yeah.

4              Q    And Cantwell is on the other side of the monu-

5    ment, isn't it?

6              A    Yeah.  I think I told---

7              Q    Stop.  Now, who is this guy?

8              A    Probably beanie man, pinned to the monument,

9    already been maced.

10              Q    That's beanie man.  Bump it forward.  Bump it

11   forward.  Bump it forward.  Bump it forward.  Bump it for-

12   ward.  And he's fighting that guy isn't it?

13              A    No.

14              Q    Bump it forward.

15              A    No.  He's not fighting that guy.

16              Q    Bump it forward.

17              A    Let me finish the question.  He's clearly like

18   walking away.

19              Q    Bump it forward.

20              A    Less than a second, three frames, he's walking

21   away.  He's putting his hand up to walk away.

22              Q    He's diving on Cantwell's back, isn't he?

23              A    He was sprayed directly in the eye.  I don't

24   even think he knows where he's going.

25

1        Q  Well, he's up there on the monument.  He made

2    it all the way to the other side of the monument, didn't

3    he?  Blind?

4        A  It doesn't immediately set in.  He has a few

5    seconds.

6        Q  Bump it forward.  Bump it forward.  Bump it

7    forward.  Bump it.  Bump it.  Bump it.  Oh, look, here's

8    beanie man right here---is that beanie man right there?

9        A  I can't tell in this resolution.  It looks

10    like---

11        Q  Bump it forward.

12        A  It looks like just a blur.  It looks like

13    somebody is hitting him, too.

14        Q  Move it back.  There you go.  Bump it forward.

15    Bump it forward.  Bump it forward.  Bump it forward.  Bump

16    it forward.  Little more.  Little more.  There you go,

17    isn't that beanie man?  He's fighting Cantwell now, isn't

18    he?

19        A  If we're talking about this is happening after

20    the deployment of mace, I don't see the relevance of---

21        Q  Is your answer, yes?

22        THE COURT:  You've got to answer the question.

23        A  The answer is I cannot tell from this video.

24    The resolution it too low.

25        THE COURT:  All right, that is your answer.

1          Q  Bump it forward.  Bump it forward.  Bump it

2  forward.  Bump it forward.  Bump it forward.  Bump it for-

3  ward.

4          A  He's getting his in the face multiple times.

5          THE COURT:  There's no question before you right

6  now.

7          Q  Bump it forward.  What does that look like?

8          A  I don't even know whose arm that is.

9          Q  Well, I didn't ask you whose arm it was.  I

10  said what does it look like?

11          A  Well, it could really be anything.  In this

12  resolution it could be anything.

13          Q  It looks like somebody with a can of mace,

14  doesn't it?

15          A  Yeah, but we don't know whose body that is.

16          Q  Bump it forward.  Bump it forward.  Bump it

17  forward.  Bump it forward.  Bump it forward.  Bump it for-

18  ward.  Bump it forward.  Bump it forward.  Bump it forward.

19  Almost getting to the end.  Bump it forward.  All right,

20  roll it forward.  That's all my questions for Mr. Goad.

21          THE COURT:  Any redirect?

22          MR. TRACCI:  Yes, Your Honor, very briefly.

23

24                  REDIRECT EXAMINATION

25  By:  Mr. Tracci

1      Q   Based off the video and your recollections,

2   you were sprayed by Mr. Cantwell with mace or a toxic sub-

3   stance.

4           MR. WOODARD:  Objection, asked and answered again.

5           Q   It's redirect, Your Honor.

6           THE COURT:  I'll allow it.  Go ahead.

7           Q   By a caustic substance, is that true?

8           A   Yes.  I was hit in the face by Cantwell with a

9   caustic substance.  I believe that video shows that and I

10  think we've reviewed that.

11          Q   At least twice?

12          A   Yeah.

13          Q   Did it impair you, that caustic substance?

14          A   It most certainly did.

15          Q   And another way to identify Mr. Cantwell was

16  based on what, not only how he looked but was he wearing

17  something distinctive?

18          A   Yes.  He was wearing a black shirt that said

19  radical agenda.  It had a helicopter on the back with a

20  person being thrown out of it.

21          Q   And you were asked whether you had an oppor-

22  tunity to retreat, correct?

23          A   Yes, I was asked that.

24          Q   And there was some suggestion that you could

25  just say please move out of the way.  Is that based on your

1   review of the video and your recollection of the events,

2   something that you reasonably could have done at the time.

3         A  I could not have reasonably asked the people

4   who were actively fighting me please excuse me.

5         Q  And we reviewed the deployments of mace, un-

6   contested at this point that it was Mr. Cantwell according

7   to his defense counsel.  Did it look like he had an oppor-

8   tunity, anyone behind him when he decided to mace beanie

9   man?

10        A  I'm sorry, can you repeat that?

11        Q  Did he have someone behind him when he decided

12   to mace beanie man?  Did he have---

13        A  Yes.

14        Q  Did he, in your view have an opportunity to

15   retreat at that point?

16        A  Cantwell did have an opportunity to retreat,

17   yes.

18        MR. WOODARD:  Objection, Your Honor.  He can't

19   tell what Cantwell's opportunities were.  He can ask him if

20   he did retreat or didn't.

21        THE COURT:  Based on his observation.  Go ahead.

22        A  Yes, he had an opportunity to retreat.  He did

23   not have people who were hostile behind him.

24

25

1        Q  Did you have anywhere to go?  Did you have an-

2  ywhere to walk back because you were against the statue at

3  that point?

4        A  I had nowhere else to go except maybe another

5  part of the statue.

6        Q  And we met several times ahead of today's pre-

7  liminary hearing.

8        A  That is correct.

9        Q  And each of those times I implored you that

10  the one rule was to be truthful at all stages, is that

11  true?

12        A  That is what you told me.

13        Q  And I told you that if there was information

14  that was relevant and needed to be disclosed it would be,

15  is that true?

16        A  Yes, that is true.

17        MR. WOODARD:  No, turn it back on Jeremy.

18        Q  And you recently discovered that the identity

19  of Mr. Cantwell, as you identified him at the time, was

20  somebody else.

21        A  I'm sorry, can you repeat that?

22        Q  You took out a criminal complaint and signed a

23  statement on the 17th, correct?

24        A  That is correct.

25

1       Q   Based on your best understanding at the time,

2   who did you think had deployed that gel mace directly at

3   you?

4       A   Based on my understanding at the time I

5   thought it was Cantwell.

6       Q   And after you discovered that it was not you

7   told me.

8       A   Yes, I did.

9       Q   When we were viewing the testimony and prepar-

10  ing for today, is that correct?

11      A   Yes.  I don't remember what day, but I did

12  tell you that.

13      MR. WOODARD:  I object, Your Honor.  We've been

14  over this three times, too.

15      THE COURT:  Yes.  It has been covered.

16      Q   And that has been disclosed as Mr., counsel

17  indicated.  You also met with, and we will testify later if

18  necessary with Sergeant Acord with the police department?

19      A   That is correct.

20      Q   And you let him know as well that it was pos-

21  sible misidentification, is that true?  I wasn't there at

22  every one of those early meetings.

23      A   I believe this was at a meeting that we had

24  together when we first discovered it.

25

1          Q   Okay.   Okay.   And based on your understanding

2    and review of testimony, of any evidence today, you have no

3    doubt in your mind that you were sprayed by Mr. Cantwell at

4    least twice.

5          A   Yes.

6          Q   And suffered the effects.

7          A   Yes.

8          Q   And you testified earlier as well, did you

9    identify other people suffering the effects?  Were there

10   other people impaired by those deployments?

11         MR. WOODARD:   Objection.   He can't testify if

12   somebody else is impaired or suffering or what anybody is

13   doing.

14         THE COURT:   He's already testified with regard to

15   it.

16         A   I will say to the best---

17         THE COURT:   No, sustain the objection.   What's

18   your next question?

19         Q   Did you notice other people---what did you ob-

20   serve in other people after those deployments?   Counter

21   protestors.

22         MR. WOODARD:   Objection.   It's utterly irrelevant

23   what happened to other people.   Were they dancing, were

24   they crying, who cares?   The question is, did Mr. Cantwell

25   spray him without legal justification.

1          THE COURT:  I assume that depends upon the Com-

2   monwealth's theory of the case.

3          Q  Did you notice other people suffering similar

4   effects, eyes running, difficult breathing as you described

5   it?

6          A  Yes, I did.

7          Q  Suggesting impairment from the caustic sub-

8   stance.

9          A  Yes, I did.  I saw that.

10          Q  Thank you.

11

12                    RECROSS-EXAMINATION

13   By:  Mr.  Woodard

14          Q  Open up the file on Goad's folder please.  Now,

15   Mr. Goad, you testified you just couldn't retreat, right?

16          A  Yes, I did.

17          Q  And you testified you couldn't possibly ask

18   any of those people to let you through, right?  Is that

19   right?

20          A  I think it would be absurd to immediately ask

21   the people who are engaging in violence with me to excuse

22   me.

23          Q  But you don't know because you didn't ask,

24   right?

25          A  I---

1          Q   All right, bump it forward.  Bump it.  Bump it.

2   Bump it.  Bump it.  Bump it.  Bump it.  Bump it.

3          MR. TRACCI:  It's cumulative and repetitive at

4   this point.  I think we've been through this video.  Is

5   this a new video?

6          Q   No, we haven't been through this video.  Bump

7   it.

8          MR. CANTWELL:  I can't see it.

9          Q   Bump it.  Bump it.  Bump it.  Bump it.  Keep

10  going.  Keep going.  Stop it there.  Isn't that you in the

11  jean jacket right there, Mr. Goad?

12         A   Yeah, it is.

13         Q   All right.

14         A   I have no idea where this is on the timeline

15  of events, though.

16         Q   Well, you were retreating, right?  You had

17  gotten out, right?

18         A   I can't---can I get more context from this

19  video?  I haven't seen it all the way through.

20         Q   This is the back of the monument isn't it?

21         A   I don't know where the back is.  I don't know

22  any points of reference on this video.

23         Q   Let's stop here.  Before you got sprayed were

24  you---did you do that or did you have praying mantis hands?

25

1          A   I don't know what's going on in this video.  I

2    have no frame of reference.

3          Q   Bump it forward.  Bump it forward.  Keep going.

4    You're smiling there.  You've got a big old grin on your

5    face don't you Mr. Goad?

6          A   I smile a lot, sir.

7          Q   Yes, sir.  Bump it forward.  Bump it forward.

8    Roll it back a little bit and turn on the sound.  That's

9    you, see, yeah, you're rolling right through there smiling,

10   aren't you?

11         A   I can't tell if I'm smiling in this video.

12         Q   That's all the questions.

13         A   How do you know I'm not murking in pain.

14         THE COURT:  There's no question, no question.

15         A   All right.

16         MR. TRACCI:  Nothing further, Your Honor.

17         THE COURT:  Mr. Goad, you said that there were

18   three deployments?

19         MR. WOODARD:  One more question, Judge.

20         A   There were four.  There was the first one by

21   Cantwell, the second one by Cantwell, the third one was by

22   the individual with the dragon tattoo.

23         THE COURT:  You said the last two deployments---

24         A   What?

25

1          THE COURT:  Mr. Cantwell---you said, Mr. Cantwell

2     did not get me with the last two deployments.  Is that

3     right?

4          A  Yes.  The last two deployments were not by Mr.

5     Cantwell.

6          THE COURT:  Mr. Tracci, go ahead.

7          A  But I also want to specify that there was the

8     fourth deployment that was through the air that you may

9     have been able to see the stream of.

10          THE COURT:  Mr. Tracci?

11          MR. WOODARD:  Oh, so now there's a fourth one?

12

13                    REDIRECT EXAMINATION

14     By:  Mr. Tracci

15          Q  For the sake of being repetitive, Your Honor,

16     just to clarify a point that's been (unintelligible).  A

17     point that's been made clearly and more than once, you suf-

18     fered from multiple deployments that day, is that true?

19          MR. WOODARD:  Objection, asked and answered for

20     the hundredth time.

21          Q  I'm just clarifying the testimony.

22          THE COURT:  He's been asked more than once.

23          Q  At least two of those were directly from Mr.

24     Cantwell, is that correct?

25          A  That is correct.

1          Q  And you suffered consequences, you were im-

2     paired as a result.

3          A  That is correct.

4          Q  And that's your best understanding now based

5     on reviewing these videos for hundreds of times.

6          A  That is correct.

7          MR. WOODARD:  Do I get another crack?  I'll make

8     it short.

9          THE COURT:  Mr. Goad, you just testified that two

10    of the deployments were from Mr. Cantwell.

11         A  That's correct.

12         THE COURT:  Have you also made the statement that

13    you can no longer be certain that the direct deployment of

14    gel pepper spray came from Mr. Cantwell?

15         A  If we're talking about dragon arm and the

16    fourth one from a person off camera, that was not by Mr.

17    Cantwell.

18         THE COURT:  You're saying that your testimony

19    this morning is that Mr. Cantwell sprayed you twice.

20         A  Yes.

21         THE COURT:  Okay.  And the email indicates that

22    you can no longer, you're no longer certain that the direct

23    deployment of gel pepper spray was from Mr. Cantwell.

24         A  Yes.

25

1          THE COURT:  Are those two statements incon-

2    sistent?

3          A   No.  I feel that the first two deployments

4    were the ones that were crucial in affecting me, that the

5    subsequent ones also affected me but I was already under

6    the influence of the toxification on my face.

7          THE COURT:  All right.  Go ahead.

8

9                    REDIRECT EXAMINATION

10   By:  Mr. Tracci

11         Q   You subsequently identified dragon arm as

12   someone not to be Mr. Cantwell, correct?

13         A   That's correct.

14         Q   But prior to that deployment you observed in

15   the video Mr. Cantwell deploying mace at beanie man on the

16   first occasion, correct?

17         A   That is correct.

18         Q   And after that deployment you recoiled and

19   testified that you suffered as a result of that first de-

20   ployment.

21         A   That is correct.

22         Q   And then a short time afterwards, literally

23   two seconds later we reviewed evidence video and photo-

24   graphs, screen shots of him deploying indiscriminately sort

25

1  of shooting above the crowd and you testified that you suf-

2  fered as a result of that deployment as well.

3           A  That is correct.

4           MR. WOODARD:  Your Honor, we're going over it all

5  again.

6           Q  Is that true?

7           MR. WOODARD:  I do have a question.

8           A  Yes.

9           THE COURT:  What's your question?

10

11                    RECROSS-EXAMINATION

12  By:  Mr. Woodard

13           Q  Mr. Goad, now there are four pepper spray in-

14  cidents with you, right?

15           A  Yeah, you saw the video.

16           Q  And two of those you didn't care about until

17  you talked to the Commonwealth's Attorney a week ago,

18  right?  Didn't take out any warrants on those, right?

19           A  Didn't know they existed.

20           Q  You didn't, now you didn't know you got pepper

21  sprayed four times?

22           A  No, uh---

23           Q  Okay, now you didn't take a warrant---

24           A  Let me finish, let me finish the question.

25           Q  Go ahead.  Go ahead.

1          A    I was, I was in the room with Mr. Tracci when

2    I found out that I had been hit multiple times.

3          Q    And you were in the room, you were in the room

4    when Mr. Tracci said it wasn't Cantwell spraying you with

5    the gel, it was Cantwell spraying you these two other times,

6    isn't that right?

7          MR. TRACCI:  That's inaccurate, Your Honor.  He's

8    misrepresenting---

9          Q    I'm asking him the question.  If he wants to

10   testify to what happened I'll call him as a witness.

11         THE COURT:  Mr. Woodard is correct.

12         Q    Isn't that right?

13         A    No, that is a gross mischaracter---

14         Q    Mr. Tracci is the one who told you you were

15   affected by the other two deployments, isn't that right?

16         A    No.  I can look at the video.  I can see my

17   face go ah---

18         Q    Now what about the fourth deployment?

19         A    The fourth deployment, the stream that I---

20         Q    You didn't take a warrant out about the fourth

21   deployment either, correct?

22         A    You can't even see---

23         Q    Correct?

24         A    You can't even see the person who it is.  How

25   am I supposed to say it, unknown person?

1          Q  Well, why did you say it was Chris Cantwell?

2    He did it two other times.

3          THE COURT:  That's a matter of argument.

4          Q  No further questions.

5          THE COURT:  All right.  Mr. Tracci, anything

6    else?

7          MR. TRACCI:  No, sir.

8          THE COURT:  Mr. Goad, you're free to go.  Thank

9    you.

10         A  Thank you very much, Your Honor.

11         THE COURT:  All right, who is the Commonwealth's

12   next witness?

13         MR. WOODARD:  Can I meet with the Commonwealth's

14   Attorney for just a second?

15         THE COURT:  That's up to you-all if you want to

16   meet.

17         (Attorneys confer.)

18         MR. WOODARD:  Your Honor, before he calls, before

19   he calls his next witness can we take a, if we're in for

20   another two hours.  Can we take another break?  I don't re-

21   ally need one but---

22         THE COURT:  How long a break?

23         MR. WOODARD:  Fifteen (15) minutes.

24         THE COURT:  Fine, sure.

25

1            MR. WOODARD:  I hate to delay things, but we've

2    been going for what---

3            THE COURT:  Somebody might disagree that we're

4    all delaying things.

5            MR. WOODARD:  Okay, well, I'd---

6            THE COURT:  Important issue.  If you need a break,

7    that's fine.  Otherwise---you need a fifteen (15) minute

8    break?

9            MR. WOODARD:  Yeah.

10           THE COURT:  That's fine.

11           MR. WOODARD:  Do you want a fifteen (15) minute

12   break?

13           MR. TRACCI:  I'll defer to you.

14           THE COURT:  All right.  We'll be in recess fif-

15   teen (15) minutes.

16

17           (OFF THE RECORD.)

18

19

20           THE COURT:  All right, Mr. Tracci, who is your

21   witness, next witness.

22           MR. TRACCI:  Ms. Gorcenski.

23           THE COURT:   Ms. Gorcenski, you've been sworn?

24           MS. GORCENSKI:  Yes.

25           THE COURT:  All right.  Mr. Tracci

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 123 of 291   Pageid#: 737

1          **EMILY GORCENSKI**, having been duly sworn testified

2    as follows:

3

4                      DIRECT EXAMINATION

5    By:  Mr. Tracci

6          Q   Good afternoon.  Can you identify yourself to

7    the Court and spell your name for the court reporter,

8    please?

9          A   It's Emily Florence Gorcenski.  Last name is

10   G-o-r-c-e-n-s-k-i.

11         Q   And were you involved or did you go to the

12   University of Virginia on August 11th 2017?

13         A   Yes, I did.

14         Q   What did you go for?  What was the purpose of

15   your visit there?

16         A   I went to observe and to film and broadcast

17   the torch lit march that was to happen that night.

18         Q   Is that in Albemarle County to the best of

19   your knowledge?

20         A   Yes.

21         Q   And how did you learn of the event?

22         A   I first learned about it when it was adver-

23   tised in a post on the Daily Stormer a few days prior.

24         Q   And did you go alone?

25

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 124 of 291   Pageid#: 738

1          A  I went to the University alone.  While I was

2     there I bumped into a couple of people that I knew.

3          Q  Did you have any weapons with you?

4          A  No.  I was unarmed.

5          Q  You had your camera?  You were there to video

6     record?

7          A  Yeah, my phone, camera phone.

8          Q  And you proceeded to the Jefferson statue?

9          A  I first went to the Jefferson statue and the

10    rotunda and I went to the lawn and to the amphitheater so

11    see if anyone was gathering.

12         Q  And can you describe the size of the respec-

13    tive parties, the protesters and counter protesters?

14         A  Yes.  Once I got to a Nameless Field, I ini-

15    tially saw I'd say between twenty (20) and forty (40) peo-

16    ple gathering and then over the next I'd say fifteen (15)

17    to twenty (20) minutes it became quickly apparent that

18    there were hundreds, probably over three hundred (300) peo-

19    ple.

20         Q  Were they shouting at you?

21         A  At that point, no.  They were assembling for

22    their torch lit march.  They were handing out torches.

23    They were milling about in groups, giving out security as-

24    signments, that sort of thing.

25         Q  What happened then?  What happened next?

1        A  As they started lighting the torches I was

2  filming the size of the procession and walking down.  Some

3  people started harassing me for my gender and at one point

4  I saw Mr. Cantwell and I asked him how his Walmart meet up

5  went.

6        Q  If I could take you one step back.

7        A  Sure.

8        Q  What were they saying about your gender?

9        MR. WOODARD:  Objection, Your Honor, it's irrele-

10  vant.  The issue here is whether or not she was pepper

11  sprayed by Mr. Cantwell, not what she, not whether she was

12  treated poorly by other people.

13        Q  Your Honor, it goes to one of the elements of

14  the offense which is malice.

15        MR. WOODARD:  Well, it's not his malice.  I mean,

16  she's saying she was being abused by unknown people.

17        THE COURT:  Again, it's some context that's rele-

18  vant.  I'm not sure when this is in relationship to any

19  other allegation by the Commonwealth, but I'll allow it on

20  a limited basis.  Go ahead.

21        A  Can you repeat the question, please?

22        Q  You indicated they were saying things to you,

23  inappropriate rude things about your gender.  Can you be

24  more specific?

25        A  Yes.  They were using a number of slurs---

1          MR. WOODARD:  Objection, Your Honor.  They?  Was

2   it Mr. Cantwell or not?  He's not responsible for what oth-

3   er people say.  And it's not---and he can't build malice

4   because of what somebody else said to this person.

5          THE COURT:  If you want to lay a foundation in

6   regard to the presence or absence of Mr. Cantwell when

7   whatever was being said by unnamed people.

8          Q   Did you interact with Mr. Cantwell?

9          A   Yes.

10         Q   What was the nature of that interaction?

11         A   I asked him how the Walmart meet up went ear-

12   lier that day.

13         Q   And what were you referring to?

14         A   Earlier in the afternoon of August 11th Mr.

15   Cantwell had a meet up in the Walmart parking lot up on 29

16   North.  I was present and observing from a distance and I

17   witnessed as police arrived on the scene and questioned Mr.

18   Cantwell.

19         Q   How did you know it was Mr. Cantwell?

20         A   I recognized him at first because he was

21   listed as a headliner for the Unite the Right Rally so I

22   had done my research as far as who the speakers were.  And

23   when I was there,  there was---happened to be an Albemarle

24   County Police officer who had parked next to me.  He was

25   standing outside of his vehicle taking notes and I over-

1 heard on the radio that an ID check came back for Mr.

2 Christopher Cantwell of Keene, New Hampshire and I heard

3 this while I was watching two officers talk to him.

4       Q What did Mr. Cantwell say to you that night on

5 the 11th?

6       A He asked me if I was the person who called in

7 a false police report. I said that I wasn't. And he made

8 some comment like next time---I told him that I was late in

9 arriving to the Walmart parking lot, so it wasn't me who

10 called in the report. And he made a comment like don't

11 stay out late drinking next time.

12       Q How would you describe his demeanor toward you,

13 the way he treated you?

14       A Somewhat hostile.

15       Q Do you recognize Mr. Cantwell? Is he in the

16 court today?

17       A Yes.

18       Q Can you identify him?

19       A Yes, he's right there.

20       Q The record will reflect---what is he wearing?

21       THE COURT: Yes.

22       A He's wearing a gray and black striped jumpsuit.

23       Q Now, tell the Court what happened then? What

24 was going on when you were there? What did you see as

25 things developed?

1      A   Sure.  So as we were down on Nameless Field.

2   I watched as they passed out torches and lit torches and

3   began assembling in formation.  Specific security assign-

4   ments were given out.

5      MR. WOODARD:  Objection, Your Honor.  I think

6   we've got plenty of context from Mr. Goad.

7      THE COURT:  I'll allow it.  Go ahead.

8      A   Specific security assignments were given out.

9   I watched as Mr. Cantwell was given a security assignment.

10  As the march proceeded, I followed alongside the march

11  filming it, talking about what they were chanting, what

12  they were saying.  And I followed the march up through UVA

13  up to the amphitheater.  At that point I went, I didn't

14  follow along closely, I went an alternate route so I could

15  see it from a distance, and when they got the lawn I ran

16  ahead to get to the rotunda to see, to be in position for

17  when they got there to see what they would be doing once

18  they got to the rotunda.

19     Q   And what were they doing when they got to the

20  rotunda.

21     A   When I got to the rotunda I actually saw a

22  small group of counter protesters that I---surprised me.  I

23  didn't---I wasn't aware of any counter demonstration that

24  had been planned when I was initially at the Jefferson

25  statue.  There was nobody there to stage a counter demon-

1  stration.  So when I saw the counter protesters there, I

2  wanted to make sure that I could film anything that was

3  happening and film whatever speeches or interactions might

4  take place.  After a couple of minutes of being at the

5  statute, I saw the torch march come down.  I was expecting

6  the headliners to come down and give some speeches.  And

7  the first few waves of people did, in fact, come to the

8  bottom of the steps and then line up side by side.  And

9  then the rest of the torch marchers proceeded to flood

10  around both sides and surround the counter protesters and

11  myself at the statue.

12          Q  How many protesters would you estimate there

13  were?

14          A  To be clear, are you referring to the torch

15  march or the counter demonstrators?

16          Q  The protesters or the white suprem---you know,

17  the white nationalists.

18          MR. WOODARD:  Objection, Your Honor.  If he wants

19  to testify---

20          Q  The people with the torches.

21          MR. WOODARD:  He's been calling them, he's been

22  calling them the protesters and he can sit there and say

23  the guys with the torches.

24          Q  I don't think Ms. Gorcenski had heard that de-

25  scription.

1              THE COURT:  Just so Ms. Gorcenski knows how

2    they've been identified.

3              Q  The protesters are the people we're here for,

4    Unite the Right, and the counter protesters were there to

5    counter protest the Unite the Right protesters.

6              A  I would estimate that there were about three

7    hundred (300) to three hundred and fifty (350) protestors.

8              Q  How any counter protesters?

9              A  I would say less than forty (40).  My estimate

10   is between two and three dozen.

11             Q  And what was going on?  What was the nature of

12   the interaction between---so that's a disparity approxi-

13   mately of ten to one?

14             A  Yes, I'd say about ten to one.

15             MR. WOODARD:  Objection, Your Honor.  This is

16   getting pretty far afield.

17             THE COURT:  What's the objection?

18             MR. WOODARD:  The disparity between the two pro-

19   testers?  What does it have to do with whether she got pep-

20   per sprayed by Mr. Cantwell.

21             THE COURT:  Again, there has to be some con-

22   text---

23             MR. WOODARD:  Yes, sir.

24             THE COURT:  In regard to it.  That's what the

25   Court is trying to find out.  Go ahead, Mr. Tracci.

1          Q   So that would be about a ten to one disparity,

2    is that correct?

3          A   That's correct, yes.

4          Q   What did you see?  Did things at some point

5    start becoming violent or confrontational?

6          A   The first thing I saw once I realized that we

7    were surrounded was that they started to encroach upon us.

8    There was a lot of shouting at the group of people that

9    were gathered around the statue, the counter protesters and

10   they started to encroach and encroach while shouting at us.

11   The counter protesters were chanting.  They were chanting

12   some antiracist slogans.

13         MR. WOODARD:  Objection.  Whatever she is going

14   to say is hearsay and it's irrelevant.

15         THE COURT:  I'll allow it.  Go ahead.

16         A   The counter protesters were chanting some an-

17   tiracist slogans and the protesters were shouting in our

18   faces.  I was being specifically targeted with several---

19         MR. WOODARD:  Objection to the hearsay and the

20   characterization of it.

21         THE COURT:  I'll allow it, but if you're direct

22   her attention, Mr. Cantwell hasn't been mentioned.  If we

23   could get there.

24         A   There's a lot of---

25

1          THE COURT:  Mr. Tracci is going to ask you anoth-

2     er question.

3          A  Okay.

4          THE COURT:  Go ahead.

5          Q  So you noticed that there was some hostility

6     from the protesters.

7          A  Yes.

8          Q  We haven't gotten to Mr. Cantwell yet, but

9     you're on the receiving end of that.

10         A  Yes.

11         Q  As well as the counter protesters.  And can

12    you describe some of those taunts or chants?

13         MR. WOODARD:  Objection, Your Honor.  It's call-

14    ing for more hearsay and this is more context.  We still

15    haven't gotten to Mr. Cantwell.

16         THE COURT:  The Court does have some context now,

17    I think.

18         Q  At some point did violence take place?

19         A  Yes.  The first violent act that I noticed was

20    when I was shoved.

21         Q  And what happened?  Just for the benefit of

22    the Court.  We're not talking about Mr. Cantwell here spe-

23    cifically.

24         MR. WOODARD:  Then objection, Judge, it's irrele-

25    vant.  Let's get to Mr. Cantwell.  If she had a bad time,

1    yeah, okay, fine.  But we're not here about her experience

2    at the monument.

3              THE COURT:  I understand your argument.

4              Q  Sufficient context, Your Honor?

5              THE COURT:  I do have context, yeah, go ahead.

6              Q  Okay.

7              THE COURT:  Go ahead, let's get to Mr. Cantwell.

8              Q  Okay, so you're noticing that things are be-

9    coming violent at some point.

10             A  Yes.

11             Q  And you reviewed video of these events after-

12   wards.

13             A  Yes.

14             Q  Correct?  And you are able to identify some of

15   the perpetrators of that violence afterwards, correct?

16             A  Correct.

17             Q  And we, the Court has already been provided

18   screen captures of several individuals including the person

19   known as beanie man.

20             A  Okay.

21             Q  Do you know Mr. beanie man?

22             A  I met him the next day.  I don't know his le-

23   gal name.  I only know him through a nickname.

24             Q  Through a nickname.  Is it fair to say we

25   tried to encourage you to identify him?

1       A   Yes, that is correct.

2       Q   And bring him in to testify?

3       A   That is correct.

4       Q   After being there did you review video of what

5   happened to get a better sense of the identities of various

6   parties that evening?

7       A   Yes, I did.

8       Q   And the Court has reviewed the evidence and

9   has the video.  Did you later identify someone either there

10  that night or through video as Mr. Cantwell?

11      A   Yes, I did.

12      Q   And how did you do that?

13      A   The first image that I saw that would identify

14  Mr. Cantwell was as still photograph that was posted on so-

15  cial media that showed Mr. Cantwell spraying pepper spray

16  into the face of beanie man.  I recognized Mr. Cantwell

17  from my earlier interactions during the day where I saw the

18  clothes that he was wearing.  I recognized him from my re-

19  search into the Unite to Right.  And I also recognized the

20  individuals in the photographs as being near me, right next

21  to me during that altercation.

22      Q   And after reviewing the video and that deploy-

23  ment that you just described, did you have any kind of

24  physical reaction?

25      A   Yes.

1      Q  Can you describe that impairment to the Court?

2          MR. WOODARD:  Objection, Your Honor.  No, no nev-

3  er mind.  I withdraw it.

4          Q  Please describe that.

5          A  Yes.  So after the incident shown in the photo

6  and the video.  I recall having a burning sensation in my

7  face and my eyes and my nose and my eyes started to water

8  and I started to lose my vision.

9          Q  Is it fair to say that there was some chaos

10 and you couldn't see exactly what preceded the deployment

11 of a caustic substance at the time?

12         A  The only thing I recall prior to, prior to

13 feeling the symptoms of the spray was some shoving, a small

14 altercation to my right.

15         Q  And you've since reviewed the video of the de-

16 ployment---

17         A  Yes.

18         Q  At beanie man?  We've already, the Court has

19 already heard evidence as to what he was doing at the time.

20 Did you, after your review, see any aggressive or hostile

21 action on the part of beanie man after reviewing the video?

22         A  No, I did not.  In fact, looking at the video

23 I---

24         MR. WOODARD:  Objection, Your Honor.  She's tes-

25 tifying to what's in the video.

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 136 of 291   Pageid#: 750

1          Q  She's testifying as to her interpretation of

2   the video.

3          THE COURT:  She can testify to what she saw.

4          Q  Yes.

5          A  I saw him in a nonviolent pose.

6          MR. WOODARD:  Your Honor, is this, is this---is

7   she testifying to what's on the video or is she testifying

8   to what she saw.  I'm not clear.

9          THE COURT:  That's what the question was.

10         Q  The question is, based on your review of the

11  video---

12         MR. WOODARD:  No, sir. She can't say, she can't

13  characterize what her opinion of the video is.

14         Q  Shall we play the video again and have her go

15  frame by frame?

16         MR. WOODARD:  No.  She's not allowed to interpret

17  the video.

18         THE COURT:  Just a minute.  What's your question?

19         Q  I was asking the witness if she had an opinion

20  as to what was happening immediately preceding the deploy-

21  ment of---

22         THE COURT:  Her opinion wouldn't make any differ-

23  ence.

24         Q  Her observations.

25

1           THE COURT:  And the Court, the Court has seen

2  that.  Do you want to ask her about what she observed?

3           Q  Based on the video or at the time---

4           MR. WOODARD:  I object to it being based on the

5  video.

6           THE COURT:  The Court has already seen the video,

7  so there wouldn't be any reason to ask the witness about

8  that.

9           Q  Okay.

10          THE COURT:  She may have some observations from a

11  different angle.

12          Q I'm sorry, I didn't hear the last point, Judge.

13          THE COURT:  She may have an observation from a

14  different angle that's not shown on the video.

15          Q  Is it fair to say that there was a lot going

16  on that evening?

17          A  Yes.

18          Q  Do you have any immediate clear recollection

19  based on those events what happened with respect to that

20  first deployment at beanie man?

21          MR. WOODARD:  Objection.  What happened in the

22  first deployment of beanie man?  Who is deploying beanie

23  man?

24          Q  The first deployment of mace by Mr. Cantwell

25  toward beanie man.

1          MR. WOODARD:  I'm going to object.  There's no

2    evidence that there was any deployment of mace.  There's no

3    evidence from her, anyway, that she had an idea who was hit

4    by beanie man.

5          THE COURT:  She's describe the burning sensation.

6    You're talking about immediately before the burning sensa-

7    tion, I assume.

8          Q  Yes, sir.

9          THE COURT:  All right, go ahead.  You can answer

10   that.

11         A  Can you repeat the question?

12         Q  There's a deployment of caustic substance by

13   someone who you identified as----

14         MR. WOODARD:  Objection.

15         Q  Your Honor---

16         MR. WOODARD:  She can't testify, she can't testi-

17   fy to that.

18         THE COURT:  I've got to hear the question.  Go

19   ahead, what's the question.

20         Q  Can you explain how that deployment affected

21   you?

22         A  Yes.  It was, I was in the vicinity of---

23         MR. WOODARD:  Objection.  She already testified

24   to the burning sensation.

25

1          THE COURT:  I'll allow it.  Go ahead.  How did it

2   affect you?

3          A  I was in the vicinity and the, I inhaled the

4   substance and it started burning my nose and my eyes.

5          Q  And do you have a, do you know what caused

6   that burning in your eyes?

7          A  I recognized the sensation as being a pepper

8   spray based substance.

9          Q  How do you know that based on your experience?

10         A Because I have experienced chemicals like that,

11  like pepper spray before.

12         Q  And how did that affect you?  Were you able

13  to---were you completely incapacitated at that point?

14         A  I was incapacitated over a period of I'd say

15  fifteen (15) to thirty (30) seconds.  Initially I just

16  started seeing---feeling my eyes water.  My initial reac-

17  tion was to try to get to safety and to retrieve my phone

18  which had been knocked out of my hand. Once I retrieved my

19  phone, I tried to find a path to safety and could not see a

20  way out.

21         Q  Did you call the police?

22         A  I did not.

23         Q  Why not?

24         A  During the procession when I was live stream-

25  ing I saw several people---

1          MR. WOODARD:  I'm going to object, Judge.  Wheth-

2     er she called the police or not is not relevant to whether

3     she was pepper sprayed.

4          THE COURT:  Mr. Tracci?

5          Q  It goes to her ability to seek help and we're

6     anticipating the question that we had earlier as to why Mr.

7     Goad didn't escape, but I'll withdraw the question.

8          THE COURT:  All right.  What's your next ques-

9     tion?

10         Q  Were you later able to identify based on your

11     review of the video who deployed that mace.

12         A  Yes.

13         Q  Or that caustic substance?

14         MR. WOODARD:  Objection, Your Honor.  There is

15     no possible, there is no possible way that by reviewing a

16     video she can determine that whatever caused her sensation

17     came from anybody in that crowd let alone Mr. Cantwell.

18     She didn't do any scientific tests.  She doesn't---she

19     hasn't testified as to her intimate knowledge of the dif-

20     ferent flavors of pepper spray.  All she can say is she had

21     a sensation.  She can't point to him and say if it was his,

22     nor could he point to him and say it was his.  There were

23     four separate, there are four separate deployments in evi-

24     dence at this point.  She can't tell you, she can't---

25

1        THE COURT:  Overrule the objection.  You can

2   cross-examine her on whatever she testifies about any de-

3   ployment.

4        Q   Did you subsequently---were you able to iden-

5   tify who was deploying mace?

6        A   Yes.

7        Q   And who was that person?

8        A   Mr. Cantwell.

9        Q   And based on your review of the video, did you

10  link those two deployments, the first at beanie man and the

11  immediate, immediately subsequent one---

12       MR. WOODARD:  Objection.  She never talked about

13  an immediate subsequent one.

14       Q   We are---

15       MR. WOODARD:  She talked about the one for beanie

16  man.

17       Q   Your Honor, we can go through the video.  The

18  Court indicated to the Commonwealth that you've already re-

19  viewed the videos.

20       THE COURT:  You're asking her about two deploy-

21  ments.  She's only testified as to one.

22       Q   Okay.  After reviewing the video you noticed

23  that there were at least two deployments by Mr. Cantwell.

24       A   That's correct, yes.

25

1          Q   One was directly at Mr. beanie man's face,

2   correct?

3          A   Yes.

4          Q   You testified that he was there and he was do-

5   ing nothing aggressive when he received that.

6          A   Yes.

7          Q   Was there a second deployment?

8          A   Yes.

9          Q   Can you describe that?

10         A   Yes.  What I saw on the video was that Mr.

11  Cantwell---

12         MR. WOODARD:  Objection, Your Honor.  She can't

13  testify to what she saw on the video.  It doesn't make it

14  true.  All it means is that's what I saw on the video that

15  I watched after the event.

16         THE COURT:  If you want to ask her what she ob-

17  served; the video is already in evidence.

18         Q   What did you observe with respect to the sec-

19  ond deployment?

20         MR. WOODARD:  Objection, leading.

21         THE COURT:  I'll allow it.

22         Q   Go ahead.

23         A   I observed Mr. Cantwell reaching over a group

24  spraying pepper spray into the group of people that I was

25  surrounded by.

1        Q   Did that affect you?

2        A   Yes.

3        Q   Did it impair you?

4        A   Yes.

5        Q   Did you notice that it had any effect on any-
6   body else?

7        A   Yes.

8        Q   Can you describe that?

9        A   Yes.  I saw somebody---

10       MR. WOODARD:  Objection, Your Honor.  She can't
11  testify as to what the effect might be on somebody else,
12  certainly without some foundation.

13       THE COURT:  Mr. Tracci.

14       Q   Can you describe other people around you and
15  their physical manifestations resulting from that deploy-
16  ment?

17       A   Yes.  I saw people with swollen eyes, with
18  tears and---

19       MR. WOODARD:  Objection as to time.  Was this at
20  the same time she felt it or was it later or was it before?

21       THE COURT:  I'll allow it.  Go ahead.  What did
22  you observe?

23       A   I saw other people with tears and snot running
24  down their face with swollen eyes red faces.

25       Q   May I approach?

1          THE COURT:  Yeah.

2          Q  I'm handing you an exhibit.  Does that indi-

3     cate where you are in the chaos at least immediately after

4     one of the deployments?

5          A  I believe this is immediately before one of

6     the deployments.

7          Q  Before one of the deployments.

8          A  Yes.

9          Q  Based on your recollection, were you closer

10    after the deployment?

11         A  Yes.

12         Q  I'll submit this to the Court.

13         THE COURT:  Any objection to this?

14         MR. WOODARD:  No.

15         Q  So what did you do next?

16         A  Next after---

17         Q  After being impaired.

18         A  After being impaired I looked for a way out of

19    the crowd knowing that I only had a few seconds before I

20    would completely lose my vision.  I could not find a way

21    out, so I tried to take a couple of pictures with my phone

22    and call for a medic and for medical assistance.

23         Q  And did that arrive at some point, the medical

24    assistance?

25

1          A   No, at no point did anybody come to me with

2   medical assistance.

3          Q   But did someone flush your eyes?

4          A   Eventually I found somebody that was able to

5   flush my eyes with water, yes.

6          Q   Now, the Court has the video in evidence and

7   there are at least four separate deployments of tear gas on

8   that video.  Did you observe separate sprays as well on the

9   video?

10         A On the video, yes I did observe separate sprays.

11             MR. WOODARD:  Objection.  What she observed on

12  the video isn't relevant.

13             THE COURT:  Again, the video is in evidence.  You

14  want her to testify in regard to what she observed that

15  night.

16         Q   It's going to the foundation of the next ques-

17  tion.  What did you observed, based on that, were there

18  multiple deployments that evening?

19         A   Yes.

20         Q   Now, how do you know that it was Cantwell

21  spray that affected you?

22         A   It was the closest to me and it was in a di-

23  rection towards where I was standing.

24         Q   Was it an aerosol or gel?

25

```
 1          A   I believe it was an aerosol.  I didn't feel a

 2    gel on my face.  Did you see counter protesters utilizing

 3    ---

 4          MR. WOODARD:  Objection.  Withdrawn.

 5          Q   Did you see any counter protesters?

 6          A   No, I did not.

 7          Q   And based on these events afterwards did you

 8    file a police report?

 9          A   Yes.  I went the next morning.

10          Q   And do you have that with you?

11          A   I do not have a copy with me.

12          Q   I'm going to hand you a statement and criminal

13    complaint.  Are these what you submitted immediately after-

14    wards?

15          A   Yes.  The complaint is and yes, this is a

16    statement I filled out a few days after that.

17          Q   I think the Court has these, but has anything

18    changed materially on any of these?

19          A   No.

20          Q   Thank you.  Those are my questions.

21

22                         CROSS-EXAMINATION

23    By:  Mr. Woodard

24          Q   You testified that you went to the thing and

25    you bumped into people, is that right?
```

1          A  Can you be more specific when you say bumped

2     into people?

3          Q  Well you---I'm using your words.  You said you

4     bumped into some people.  That's what you testified to,

5     right?

6          A  Yes.

7          Q  Did you bump into Josh, your security man?

8          A  I do not have a security man named Josh.

9          Q  Did you have any security man there?

10         A  I had somebody that escorted me after I ar-

11    rived.  I did not have---

12         Q  You called him your security man, didn't you?

13         A  Yes.  He provided me with security after the

14    fact.

15         Q  Okay.  Now, do you have your criminal com-

16    plaint and the things he just handed you?

17         MR. TRACCI:  Right there.

18         Q  Okay.  Thank you.  I'm going to show you a

19    document.  Can you review that for me, please?

20         A  Is there a specific section you'd like me to

21    focus on?

22         Q  Say again?

23         A  Is there a specific part you'd like me to fo-

24    cus on?

25         Q  I'd like you to review the whole document.

1          A   You handed me page 3.  Would you like me---

2          Q   You can turn the page.

3          A   Okay.

4          MR. TRACCI:  Are you showing the witness the

5    criminal complaint?

6          Q   No.  This is her statement to Albemarle PD.

7          A   This is not the statement to Albemarle PD.

8    This is the statement to the University of Virginia police.

9          Q   I'm sorry, it's UVA Police, that's correct.

10         A   Okay.  I've reviewed it.

11         Q   Now, here at the bottom of page 3, did you

12   tell the truth in that (unintelligible).

13         A   Specific to?

14         Q   No, did you tell the truth in that whole docu-

15   ment?

16         A   Yes.

17         Q   Okay.  And what you said then was as I tried

18   to get to safety I saw a person being hit with torches and

19   smelled fuel, is that right?

20         A   That's correct, yes.

21         Q   You didn't testify to that today, did you?

22         A   I did not.  I was not asked about torches or

23   fuel.

24         Q   You were asked what happened, weren't you?

25

1          A   I was attempting to describe the altercation

2     and you objected.

3          Q   Now, where is the criminal complaint.  May I

4     have that, too?  I'm showing you your criminal complaint.

5          A   Uh-huh (indicating yes).

6          Q   Would you review that, please?

7          A   Okay.

8          Q   Now you swore under oath to that, correct?

9          A   That's correct.

10          Q   And on this one there's nothing about torches,

11     about fuel, is there?

12          A   No, there's not.

13          Q   And this one, your sworn statement, it says

14     they began to shove me.  When a fight broke out to my right,

15     soon after I inhaled, slash, was affected by a chemical

16     spray, is that right?

17          A   That's correct.

18          Q   No talking about torches, correct?

19          A   Correct.

20          Q   No talking about looking there and seeing two

21     deployments by Chris Cantwell, correct?

22          A   Correct.

23          Q   No talking about it being right, the spraying

24     being right next to you, correct?

25

1          A  I said that it was to my right in the criminal

2     complaint.

3          Q  Okay.  Now, you were a counter protester, cor-

4     rect?

5          A  I was there to film the event.  I was not part

6     of a counter demonstration that was planned.

7          Q  But you were following it from several days

8     earlier on the Daily Stormer, correct?

9          A  I did a lot of research on the events leading

10    up to it, including Daily Stormer.

11         Q  And you got in your car and went all the way

12    out to Walmart to take pictures of Mr. Cantwell interacting

13    with the police, correct?

14         A  I went out to Walmart with the intent to ob-

15    serve the size of the crowd that Mr. Cantwell had assembled.

16    I didn't know that the police would be there, so I did not

17    go there to photograph an interaction with police.

18         Q  Do you recognize that document?

19         MR. TRACCI:  Your Honor, I have no idea what he's

20    showing the witness.

21         Q  I'm sorry.

22         MR. TRACCI:  I guess I'll wait till you ask a

23    question to see how it might be relevant to what happened

24    on August 11th in the evening.

25         Q  Do you recognize that document?

```
 1            A  Yes, I do.

 2            MR. TRACCI:  Can you---

 3            Q  Is that a picture of you---

 4            MR. TRACCI:  ---show the judge.

 5            Q  Huh?

 6            MR. TRACCI:  Can you show the judge?

 7            Q  Not yet.  I'm going to ask questions on it.

 8            MR. TRACCI:  Okay.  Go ahead.

 9            Q  That's a picture you posted to Twitter, isn't

10   that right?

11            A  That's correct, yes.

12            Q  And so you went down to Walmart, didn't you?

13            A  Yes, that's what I testified to.

14            Q  And you just said you weren't involved.

15            A  I said that I observed from several rows away

16   and that's a picture that I took from several rows away.

17            Q  And somehow you were able to publish on Twit-

18   ter that he was getting questioned by cops, questioned by

19   cops after allegedly brandishing a gun, isn't that right?

20            A  That is what I heard from the police scanner,

21   yes.

22            Q  Move that into evidence.

23            MR. TRACCI:  Judge, if he would allow the---

24            THE COURT:  Any objection?

25            MR. TRACCI:  Relevance, Your Honor.
```

1          Q  That was on August 11th, isn't that right?

2          A  That was on August 11th, correct.

3          Q  And that was the Walmart you're talking about,

4  isn't that right?

5          MR. TRACCI:  And if counsel would permit the wit-

6  ness the courtesy of answering questions going forward.

7          Q  I'll try.  Hang on, Judge, I've got to look at

8  my list.  Now, I'll show you another document.

9          A  Yes, sir.

10         MR. TRACCI:  Is this the same picture?

11         Q  Yeah.

12         MR. TRACCI:  Better resolution.

13         Q  Yeah.

14         MR. TRACCI:  Okay.  Okay.

15         Q  I'm going to show you, I'm going to show you a

16  document.

17         A  Yes.

18         Q  Is that a tweet you put up?

19         A  Yes.

20         Q  Okay, in that, in that picture that shows your

21  position at the monument, isn't that right?

22         A  Yes, it does.

23         Q  Move that in as evidence.

24         THE COURT:  Any objection?

25         MR. TRACCI:  No, sir.

1          Q  I'm going to show you another document.

2          MR. TRACCI:  I should see that---oh, it's the

3  same one.

4          Q  Yeah.

5          MR. TRACCI:  Yes, no objection.

6          Q  Do you recognize that document?

7          A  Yes.  This is a photograph that I took as I

8  was trying to find a way out of the altercation.

9          Q  Okay.  Move that into evidence.  And do you

10  recognize that as bigger picture of an earlier one with the

11  red arrow on it?

12          A  Yes, I do.

13          Q  Move that into evidence.

14          THE COURT:  Any objection to these two?

15          MR. TRACCI:  No, Your Honor.

16          THE COURT:  What would be Defendant's 5?  There

17  isn't an arrow indicating her location.  This one there is.

18          Q  That one.

19          THE COURT:  That one is.  This one doesn't

20  show---

21          Q  Correct.

22          THE COURT:  You're not identifying yourself in

23  this photo.

24          A  Correct.  I took that photo.

25          Q  Now, take a look at that photo.

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 154 of 291   Pageid#: 768

1          A    Yes.

2          Q    That's got a red arrow on it, it's just like

3     that one?

4          A    Uh-huh (indicating yes).

5          Q    Right?  And going from your memory and not

6     from looking at this on a video, doesn't the blue, the blue

7     arrow point to Mr. Goad?

8          A    The blue arrow does point to Mr. Goad, yes.

9          Q    Okay.  Move that into evidence.

10          THE COURT:  Any objection to this?

11          Q    Let me ask this question.  Let's count togeth-

12     er.  How many people are between you and Mr. Goad?

13          A    Your finger is in the way.  I can't tell.  The

14     red arrow is drawn over people, but I would estimate three

15     people between me and Mr. Goad.

16          Q    Three people between you and Mr. Goad?  Isn't

17     it more like about fifteen (15)?

18          A    In a direct line between me and Mr. Goad, I

19     can see three heads between me and Mr. Goad.

20          Q    Well, move that into evidence.

21          MR. TRACCI:  Your Honor, the Commonwealth does

22     not object to it being admitted.  The Court---the Common-

23     wealth asks that the Court consider its probative value.

24     There is no sequence or chronology whatsoever in that vide

25

1          THE COURT:  But there's no evidence to its admis-

2     sibility.

3          MR. TRACCI:  No.

4          THE COURT:  Okay.

5          Q  Now, you said you went there to observe.  Now,

6     let me show you another document.  I'll show you another

7     tweet.  Is that your tweet?

8          A  Yes, these are all, three of these are my

9     tweets.

10         Q  Move that into evidence.

11         THE COURT:  Any objection?

12         Q  So the Thinker, that video, Thinker Areta is

13    the best, in your opinion is the best recollection of your

14    experience that night, correct, at least around the monu-

15    ment?

16         A  Can you repeat the question?

17         Q  So the Thinker Areta video that you identify

18    in that tweet is your best, is in your opinion the best

19    record of your interaction around that monument?

20         A  No, that's not what I indicated with that

21    tweet.  What I indicated with that tweet is that it is the

22    clearest video that I had seen up until that point of my

23    involvement at the monument.

24         Q  Okay.  Now, bear with me, Judge, I've got to

25    find something.

1          MR. TRACCI:  May I present a question to defense

2     counsel?

3          Q  Yes.

4          MR. TRACCI:  Are you offering these tweets for

5     the truth of the matter asserted or for impeachment purpos-

6     es?

7          Q  Right now it's just the truth, her admissions.

8          MR. TRACCI:  Then we'd object seriously.

9          Q  Well, they're her statements.  She's saying,

10    you know, this is a picture, this is where I was, that's

11    all.

12         THE COURT:  These are already in evidence so

13    they're in.

14         Q  Yeah.

15         THE COURT:  All right.  If you offer something

16    else, we'll see if there's an objection, but these are al-

17    ready in.

18         Q  Yeah.  In fact, you went to---in fact, you

19    went to the monument because you're an Antifa media rela-

20    tions specialist didn't you?

21         MR. TRACCI:  Objection.  No foundation.

22         Q  Goes to motive to fabricate, Judge. Antifa is

23    the antithesis of his side, right?  And she's got a motive

24    to fabricate this charge, to put him in jail.

25         THE COURT:  Mr. Tracci?

1          MR. TRACCI:  (Unintelligible) the objection, Your

2   Honor.

3          Q  And, in fact, you were armed with a guardian,

4   right?

5          MR. TRACCI:  I think there was an outstanding

6   question.

7          Q  Oh, I'm sorry.

8          MR. TRACCI: What was the question?

9          Q  You're an Antifi media relations specialists

10  aren't you?

11         A  I don't know what you mean by that.  I---

12         Q  You told, you told---go ahead.

13         A  Okay.  I have done media relations for Char-

14  lottesville activists during the summer and I have done so-

15  cial media outreach during the summer.

16         Q  You told---

17         A  As far as being in Antifa, you would have to

18  be more specific as to what you mean by that, because I'm

19  not a member of any organization, so I do not act in any

20  official capacity.  So can you please be a little bit more

21  specific?

22         Q  You told Officer Acord that you were a media

23  relations specialist for Antifa, isn't that right?

24         A  That is not correct.

25         Q  It's not?  What did you tell him?

1          A   I told Sergeant Acord that I do media outreach

2     for Charlottesville activists including interviewing with

3     journalists and issuing press statements, press conferences.

4     I did not---I specifically told Sergeant Acord that I was

5     not a member of any Antifa organization.

6          Q   Okay.  And you wrote an article for The Guard-

7     ian shortly after August 11th, correct?

8          A   I wrote an article for The Guardian on I be-

9     lieve it was August 14th.

10          Q   Do you recognize that document?

11          A   This is an excerpt from the article that I

12     wrote for The Guardian.

13          MR. TRACCI:  Do you mind if I take a look, Mr.

14     Woodard?

15          Q   Sorry, you can keep that.  And in that docu-

16     ment, you said you went there to document the thing, but in

17     this you said I was there that night in Charlottesville and

18     then skipping down it says I was prepared to die too, isn't

19     that right?

20          A   Once I was surrounded I was prepared to die,

21     yes, that's correct.

22          Q   Move that into evidence.

23          THE COURT:  Any objection?

24          MR. TRACCI:  No objection.

25

1          Q   So, well, it's true that you monitored Storm

2   Front, you accosted, well, you were out there taking pic-

3   tures of Mr. Cantwell at Walmart, correct?  Correct?

4          A   I do not monitor Storm Front.  I did take pic-

5   tures of Mr. Cantwell at the Walmart parking lot that day.

6          Q   Well, you just said you accessed Daily Stormer,

7   I'm sorry, Daily Stormer?

8          A   Somebody else alerted me to the posting on

9   Daily Stormer.

10          Q   Okay, and you went there and watched it?

11          A   I'm sorry?

12          Q   You went there and looked at it?

13          A   I read the post, yes.

14          Q   Okay.  And then you went to UVA that night and

15   out of all of those hundreds of people, you specifically

16   spoke to Mr. Cantwell, isn't that right?

17          A   I specifically spoke to a couple of people.

18   Mr. Cantwell was one of them, yes.

19          Q   And you specifically spoke to Mr. Cantwell

20   about how the Walmart meet up was, isn't that right?

21          A   I asked him how the Walmart meet up went.

22          Q   And you did that because you wanted him to

23   know you were stalking him, isn't that right?

24          A   No, that's not correct.

25          Q   Now, let's light up the video for a while.

1          (The video was placed at this time.)

2

3          Q   That's you isn't it, Ms. Gorcenski?

4          A   That's me, yes.

5          Q   Okay.  Let's bump it.  Is that where they

6    knocked your phone down?

7          A   No.

8          Q   Okay.  Then there's a fight over there?

9          A   Yes.

10          Q   All right, but Chris Cantwell or Goad aren't

11    anywhere to be found, are they?

12          A   In this frame I don't see them.

13          Q   Bump it.  Bump it.  But there is white bald

14    guy in the wife beater, correct?

15          A   I see a bald guy in a white tank top.

16          Q   Yeah.  Bump it.  Bump it.  Bump it.  Bump it.

17    Bump it.  There's fighting right there, isn't there?

18          A   That's correct.

19          Q   Right beside you.

20          A   Uh-huh (indicating yes).

21          Q   Bump it.  Bump it.  Bump.  Bump.  Bump.  Bump.

22    Bump.  Bump.  Bump.  Bump.  Bump it.  Bump it.  This is al-

23    most from your point of view, isn't it?

24          A   No, this is not from my point of view.

25

1        Q  Okay.  Bump it.  Bump it.  Bump it.  Bump it.

2  Bump it.  Bump it.  Bump it.  Bump it.  And that's not you

3  back there, correct?

4        A  That is not me, no.

5        Q  Okay.  Bump it.

6        A  I am in front of that person.

7        Q  Bump it.  Bump it.  Goad and Cantwell aren't

8  anywhere in that frame, are they?

9        A  I can't say affirmatively whether they are or

10  are not.

11        Q  Let's roll it forward.  Stop it there.  No,

12  roll it forward.  Stop.  Now, that's beanie man right there

13  up there on the monument, isn't it?

14        A  Yes.

15        Q  Roll it back.  Roll it forward.  Let's watch

16  beanie man.  Now that's on the other side of the monument

17  from Mr. Goad and Mr. Cantwell, isn't it?

18        A  No, that's the same side of the monument.

19        Q  Well, stop.  You were about, actually you were

20  standing right about here and you look that way claiming to

21  have seen Cantwell spraying, is that right?

22        A  No, that's not correct at all.

23        Q  Okay.  Bump it forward.  Keep going.  Okay.

24  Well you say that's---at the time that was the best record

25  of your experience, right?

1          A   At the time that was the best, the clearest

2    video I had seen of myself.

3          Q   May I have the tweets, please.  In fact, you

4    said this is the clearest video I've seen that shows me and

5    my involvement on the Friday night, isn't that what you

6    wrote on Twitter?

7          A   That's what I wrote, yes.

8          Q   But now your story is different isn't it?

9          A   No.

10         Q   Now, and that was your involvement, but Chris

11   Cantwell is not in there anywhere is he?

12         A   I've seen Chris Cantwell in this video several

13   times already.

14         Q   Well, let's go back.  Do you need to go back

15   further?

16         A   Yes.

17         Q   Do you need to go back further?

18         A   Yes.

19         Q   All right.  Christ Cantwell---you tell me when

20   Chris---

21         A   Please pause.  Please advance.  Please advance.

22   One more.  One more.  Keep going.  Keep advancing, please.

23   Stop.  I see Mr. Cantwell in the upper left of that video.

24   I can see his bald head and his black shirt.

25         Q   Up here?

```
 1          A  Yes.

 2          Q  Up here?  And he is not fighting anybody,

 3   right?

 4          A  At that moment, no.

 5          Q  He's not pepper spraying anybody, right?

 6          A  At that moment, no.

 7          Q  All right.  Let's see the next time Mr. Cant-

 8   well is there.  Stop it.  Let's go back.  Yeah, get Mr.

 9   Cantwell back in the frame.

10          A  I see him right in the frame right there.

11          Q  Stop right there.  So come count with me.

12          A  Okay.

13          Q  That's Mr. Cantwell, right?

14          A  Uh-huh (indicating yes).

15          Q  One, two, three, four, somebody down there,

16   five, six.  There's five or six people at that time, right?

17          A  Sure.  I don't know what your specific frame

18   of reference you're looking for here.

19          Q  The number of people between you and Mr. Cant-

20   well.  (Unintelligible).

21          A  The number of people in a direct line between

22   me and Mr. Cantwell I would estimate as one, two, three,

23   four, five.  Five people between, in a direct line between

24   me and Mr. Cantwell.

25
```

1        Q  How many people would you estimate are in that

2  frame, forty (40)?

3        A  Yeah, sure, somewhere around that.

4        Q  Okay.  All right, let's go forward to the next

5  sighting of Mr. Cantwell.  Pause right there.  That's a

6  radical agenda shirt, right?

7        A  That's correct, yes.

8        Q  About the same spot.  Go forward.  (Unintelli-

9  gible).  And there he is crossing the monument, right?

10       A  Correct, yes.

11       Q  Okay.  And now you're what, about ten or fif-

12  teen (15) feet from the monument?

13       A  No.

14       Q  Five feet, two feet?

15       A  I would say that I'm four to five feet from

16  the monument on the rotunda side which is right to the

17  right in this, from this frame of reference.

18       Q  Okay.  Let's bump it.  Let's go back a little

19  bit.  That's beanie man on the monument, right?

20       A  Yes.

21       Q  Beanie man is the guy that you claim or beanie

22  man is the guy that Chris Cantwell sprayed, right?

23       A  Yes.

24       Q  And according to you he sprayed him seconds

25  before this right?

1          A   Yeah, I think it was approximately---

2          Q   And beanie man is back up on the monument,

3    right?

4          A   That's correct.

5          Q   Bump it.  Bump it.  Bump it.  Let's go to the

6    next sighting of Chris.  He's right there in the middle of

7    the frame, right?  Right here?

8          A   Correct, yes.

9          Q   Yeah, okay, keep going.  Advance it to her

10   next sighting of Chris.

11         A   I see, I see Mr. Cantwell.

12         Q   Yeah, he's right there?

13         A   Uh-huh (indicating yes).

14         Q   Keep going.  Keep going.  Keep going.  Keep

15   going.  Keep going.  Stop.  Let's go back a little bit.

16   You've got to go back some more.  Keep going.  See Chris

17   anymore here?

18         A   I don't see him in that frame, no, in this

19   scene.

20         Q   There's a lot of smoke up there, right?  A lot

21   of smoke in air, correct?

22         A   I see some smoke.

23         Q   All right, let's go to the next video.  Now

24   the video that was the best record of your experience or

25

1   whatever you said on Twitter, that didn't show Chris Cant-

2   well spraying anybody, did it?  Yes or---

3          A  No, it does show Mr. Cantwell reaching over to

4   spray into the group in one frame.

5          Q  That video we just saw?

6          A  Yes.

7          Q  Let's go back.  Tell me where, tell me where

8   it is?

9          A  Please pause, please pause and advance frame

10  by frame.  Frame by frame slowly, please.  Continue.  Con-

11  tinue.  Continue.  Keep going.  Keep going.  Keep going.

12  Little more.  Little more.  Little more.  Little more.

13  Keep going.  Keep going.  Keep going.  Continue.  Continue.

14  Continue.  Continue.  Continue.  Continue.  Continue.  His

15  arm is reaching up in the upper left, reaching over the

16  crowd to spray.

17         Q  What (unintelligible).

18         A  Pepper spray.  Advance the frame, please.

19  Keep going.  Keep going.  Keep going.  Keep going.  Keep

20  going.  Keep going.  Keep going.  Keep going.  Right there.

21  May I point at the screen?  No, left.  Right.  Up.  To the

22  right slightly.  That arm just to the right of the mouse

23  curser.

24         Q  That thing right there?

25         A  Yes.

1          Q   You're saying that's his arm.

2          A   I'm saying that is Mr. Cantwell's arm.

3          Q   And where is your clear sight to him spraying

4   beanie man down low on the backside of all of those people?

5          A   That happened prior to this.

6          Q   But it's not in here, is it?

7          A   It is in this video.

8          Q   Let's go back.

9          A   Please pause.  Advance frame by frame.  Keep

10  going.  Keep going.  I'll tell you when to stop.  Stop.

11  That's beanie man in the frame just above the dude's head

12  in the center.

13         Q   Right there?

14         A   Yes.

15         Q   That's beanie man there?

16         A   Yes.

17         Q   Okay.  Let's go forward.  So you see beanie

18  man, but you don't see Chris spraying anybody right?

19         A   At this point no, but---

20         Q   Let's go.

21         A   Okay.

22         MR. TRACCI:  Your Honor, at this point I'd just

23  like to ask the relevance.  Is there any question that---

24  are you trying to create doubt as to whether your client

25  sprayed beanie man?

1          Q   No.   I'm trying to create doubt as to whether

2    or not her sworn testimony that she saw him spray beanie

3    man from this position somehow miraculously through this

4    throng of people is not the truth.

5               THE COURT:  If there's an objection, the Court

6    will rule on the objection, but otherwise go ahead, ask

7    your questions.

8          Q   Okay.  Let's go to the next video which is

9    Guardian Gor.  Now, there you are, isn't it?  That's you

10   right, that's you right there, isn't it?

11         A   Yes.

12         Q   Okay.  Let's go forward a little bit.  Stop

13   there.  Now, you've got your eyes on your nose, right, or

14   your eyeglasses on your nose, right?

15         A   That's correct.

16         Q   And you're not rubbing your eyes, right?

17         A   Not in this frame, no.

18         Q   You're not wiping your face.

19         A   No, I---

20         Q   Let's go back.  Let's go back.  There are you,

21   right?

22         A   Yes.

23         Q   Right.  And let's go forward a little bit.

24   And you look to your right, right?

25         A   Uh-huh (indicating yes).

1        Q   Right.  And see, you somehow see through all

2   those people that Chris Cantwell sprays not once but twice,

3   correct?

4        A   This was after both of the pepper spray inci-

5   dents, so at this point I'm not seeing from this angle Mr.

6   Cantwell spraying because it has already happened.

7        Q   All right.  Let's go forward.  There you are

8   and there's Mr. Cantwell.  Let's go a little bit more.  Now,

9   stop right here.  Let's go back.  There you are and you

10  just retreat, but you're not showing any signs of being

11  pepper sprayed at all, are you?

12       A   I am showing signs of pepper spray.

13       Q   By retreating?  But not touching, you know,---

14       A   Yes.  When pepper sprayed---

15       Q   You're pulling out, is that right?

16       A   I'm attempting to find a way out while being

17  affected by the pepper spray.

18       Q   But you're not rubbing your eyes, not rubbing

19  your nose, correct?

20       A   That's correct.

21       Q   All right.  Let's go to number four.  No, I

22  think we're at number three.  Now, that's sideways, Judge,

23  and I apologize, but we can't figure out how to turn it the

24  other way.  That's from your live stream, isn't it?

25

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 170 of 291   Pageid#: 784

1       A   I don't know, possibly.  Yes, this is from my

2  live stream.

3       Q   Turn on the sound please.

4

5       (The video was played at this time.)

6

7       Q   Pause it there.  And there's a fight to your

8  right, isn't that right?

9       A   That's correct, yes.

10       Q   Let's go back a little bit.  Yeah, that's

11  about right.

12

13       (The video was played at this time.)

14

15       Q   Just hold it right there.  That's the fight

16  you see to your right and that's your view back there to-

17  wards Cantwell, isn't that right?

18       A   That's roughly correct, yes.

19       Q   Let's go forward.  And in that amount of time

20  you saw Cantwell spray twice, is that right?

21       A   Around that time, yes.

22       Q   Which one is that?  That was three?

23

24       (The video was played at this time.)

25

1          Q   There was a fight and there's Emily.  So pause

2    it right there.  There's Emily again and you're coming back,

3    right?  You're not screaming for anybody, right?

4          A   That's correct.  I have not yet called for a

5    medic.

6          Q   Okay.  This is after you claim to have been

7    pepper sprayed, isn't that right?

8          A   That's correct, yes.

9          Q   Go on back.  Go on forward.  And stop.  Go

10   back a little bit.  And right there, that's when you took

11   that photo of Chris, isn't it?

12         A   That's when I took a photograph, yes.  The one

13   that I believe that you've already entered into evidence.

14         Q   The one you posted on Twitter.  Let's go for-

15   ward a little bit.  And stop it right there.  You're a lot

16   further away from the monument now, aren't you?

17         A   I have moved to the side of the monument.  I

18   estimate I'm about four to six feet away.

19         Q   Somehow you've moved through a crowd that you

20   couldn't get through, right?

21         A   I moved a few feet from where I was.

22         Q   Okay, let's go forward.  Let's go back.  Stop.

23   Now, that guy there, he's covering up his head, right?

24         A   Which guy?

25         Q   The guy that just went by?

```
 1              A  With the green shirt?

 2              Q  No, not green shirt.  Go back a little bit,

 3  Jeremy.  That's Mr. Cantwell, right?

 4              A  That's Mr. Cantwell.

 5              Q  Let's go back.  And there's a guy covering his

 6  head.

 7              A  Yes, briefly.

 8              Q  And there you are, there's your back.

 9              A  Uh-huh (indicating yes).

10              Q  And there's Mr. Cantwell with his hands up,

11  isn't that right?

12              A  That's Mr. Cantwell right there.

13              Q  Let's go back.  That's Mr. Cantwell, isn't it?

14              A  That's Mr. Cantwell, yes.

15              Q  And somebody is claiming mace, isn't that

16  right?  Somebody is saying there's mace out there, right?

17              A  Somebody, yeah.

18              Q  So this would be the fifth mace incident, cor-

19  rect?

20              A  I don't know what the other four are.  I am

21  alleging two.

22              Q  Well, you say there were---Cantwell sprayed

23  two that you claim to have seen and this would be---I as-

24  sume there are two more and this would be one more, right?

25              A  I, I, what are the other two?
```

1          Q   There's Cantwell one, Cantwell two, dragon,

2    dragon arm and the mist, mysterious mist that Goad talked

3    about, number four.  Those are four so far that we've iden-

4    tified.

5          A   Okay.  I've seen those four.

6          Q   This would be number five, correct?

7          A   Okay.  I suppose.  I don't see mace in this

8    video.

9          Q   Okay, but I mean, it's possible there was mace

10   there, right?

11         A   Sure.

12         Q   Let's go back a little bit.  Stop right there.

13   That shows Mr. Cantwell's arms up.

14         A   Uh-huh (indicating yes).

15         Q   And you're what, three feet from him?

16         A   I would estimate less than that.

17         Q   Two feet from him?

18         A   Sure.

19         Q   Okay.  Let's go a little further.  A little

20   further.  Bump it.  Bump it.  Bump it.  Bump it.  Bump it.

21   Bump it.  Let's go.  Keep going.  Keep going.  You didn't

22   see Mr. Cantwell anymore after that night, correct?

23         A   I did not, no.  I saw him briefly the next day

24   if that's relevant.

25

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 174 of 291   Pageid#: 788

1    Q   Okay.  And that's an officer right there,

2    isn't it?

3    A   That is.

4    Q   And he was walking right there where you were,

5    wasn't he?

6    A   I didn't see him.

7    Q   Let's go back.  And you didn't see the officer

8    because that's about where you were, right?  We can go back.

9    A   At this point I don't know where I am.  I

10   don't see myself.

11   Q   Right, and the question is not where you were,

12   the question is where the officer is.

13   A   The officers are right there in the frame, I

14   see them.

15   Q   Yeah, they're going right by the monument

16   where you had been.

17   A   Where I had been.  I don't know where I was.

18   Q   Seconds earlier.

19   A   Seconds earlier, sure.  I had maybe gotten out

20   by that point, I don't know.

21   Q   Okay, okay.  We're done with that.  Now, as-

22   suming number five is a pepper spray event, how did you de-

23   termine that the burning sensation you had was caused by

24   Chris Cantwell's pepper spray?

25

1   A  I determined that the burning sensation that I

2  felt was caused by Mr. Cantwell's pepper spray because I

3  recognized myself in a near vicinity of his two pepper

4  spray events in after the fact examination of photo and

5  video evidence.

6   Q  Okay, and it's utterly impossible from your

7  point of view that it was from any of the citronella can-

8  dles, not the burning fuel that you smelled right?

9   A  Correct, I---

10   Q  And it's impossible that---

11   MR. TRACCI:  If the witness---

12   Q  I'm sorry.

13   MR. TRACCI:  Could be permitted to answer the

14  question.

15   Q  Go ahead.

16   THE COURT:  Did you finish your answer?

17   A  Correct.  The sensation I felt was commensu-

18  rate with pepper spray.

19   Q  And how did you determine that it wasn't from

20  event number three, the dragon arm spraying?

21   A  From the dragon arm spraying after the fact

22  when reviewing video evidence I did not see evidence that

23  he sprayed his chemical in my direction and that he was

24  farther away from me when he sprayed that.

25   Q  Three feet further, right?

1           A   Uh---

2           Q   Maybe four?

3           A   Possibly.

4           Q   And did you review the video of Mr. Cantwell

5    with is arms up?  Did you ever review that?

6           A   Which video with his arms up?  I see a

7    video---

8           Q   The one I just showed you.

9           A   That one there?

10          Q   Yeah.

11          A   When you say arms up, do you mean arms to his

12   face or arms like this?

13          Q   Going like this.  No, going like this.

14          A   I have seen that very recently, yes.

15          Q   And you discounted that as a possible source

16   of your pepper spray, isn't that right?

17          A   I don't see any pepper spray in that video so

18   I don't know if Mr. Cantwell was affected by pepper spray

19   prior to that.

20          Q   Do you recognize that?

21          A   I do, yes.

22          Q   Is that a picture of you?

23          A   It is a picture of me.

24          Q   It's a picture of you on October 15th, isn't

25   it?

1          A   That is correct.

2          THE COURT:  Any objection?

3          MR. TRACCI:  I'm just curious as to the relevance

4   of it.

5          Q   She is an Antifa operative.  She stalked my

6   client and then after the fact she, after the fact she

7   identified---

8          MR. TRACCI:  That sounds like argument to me,

9   Your Honor.

10          THE COURT:  You're showing the Court a picture of

11   October 15th.

12          Q   I'll withdraw it.  I'll withdraw it.  Correct

13   me if I'm wrong, your sworn statement that it was Chris

14   Cantwell's specific spray out of five is pretty much just

15   your opinion, isn't that right?

16          A   It is my belief that being as his deployments

17   were the closest to me and aimed in my direction that it is

18   most likely that his deployments of spray were the ones

19   that affected me.

20          Q   But you can't tell for sure, can you?  You can

21   just say it is most likely.

22          A   Yes.

23          Q   But you swore under oath that it was his pep-

24   per spray and nobody else's, isn't that right?

25

1          A   I swore that it was my belief that it was his

2    spray and nobody else's.

3          Q   Your Honor, can I have the criminal complaint?

4    Your statement here is, I recognize the man spraying the

5    agent as Christopher Cantwell.  Mr. Cantwell is a known po-

6    litical figure, and is a headliner of 12 August Unite the

7    Right rally.  Correct?

8          A   Correct.

9          Q   I recognize the people he is spraying from my

10   video.  Correct?

11         A   Correct.

12         Q   They were positioned to my right, correct?

13         A   All that is correct, yes.

14         Q   The overspray from the agent affected me di-

15   rectly, correct?

16         A   Yes.

17         Q   No mention of two events, correct?

18         A   At the time of the complaint, when I wrote the

19   complaint I did not know of any other deployments of pepper

20   spray.  Only after the fact upon reviewing video evidence

21   in the weeks following did I see other deployments of pep-

22   per spray.

23         Q   Somehow you managed to miss the other three,

24   right?

25

1          A   No, I did not manage to miss the other three.

2    I was asking you for clarification what you meant by the

3    other ones.

4          Q   Okay.  After all that, all that video and

5    things, I was able to find them, but you weren't, right?

6          A   I never said that I wasn't able to find them.

7    I don't see a fifth deployment.  I don't see mace deployed

8    in that fifth incident.

9          Q   Did you ever, did you ever tweet out that

10   Chris Cantwell was the only one who sprayed any pepper

11   spray?

12         A   I believe I may have made the statement based

13   on what a University police officer told me on the day of

14   August 12th.

15         Q   Okay.

16         A   But I don't know that that was correct nor are

17   my tweets under oath, so I don't know if that was a com-

18   plete version of the truth.

19         Q   Okay.  But you were, but you were swearing to

20   ---you were swearing it was Chris Cantwell based on basi-

21   cally your guess, right?

22         A   Based on the evidence I had seen up to that

23   morning and the report I had given to the University of

24   Virginia police I wrote that statement.

25

1          Q   One moment, Judge.  And your statement was

2   based on the, your assumption that no one else---your

3   statement that Chris Cantwell sprayed was on the basis of

4   your assumption that no one else but Chris Cantwell sprayed,

5   isn't that right?

6          A   I don't think that's correct.  I based my

7   statement on the available evidence I had at the time which

8   showed Mr. Cantwell spraying into the face of somebody that

9   I recognized as being positioned very close to me, to my

10  right, at that, at that time.  I did not say that only Mr.

11  Cantwell sprayed, just that to the best of my knowledge I

12  was affected by his overspray.  That is a statement that I

13  stand by after reviewing video evidence that shows that Mr.

14  Cantwell's deployments of pepper spray were both the clos-

15  est to me and in the direction of me at that time.

16         Q   And that's the only thing, they were close to

17  you, right?  But if you---is that right?  They were closest

18  to you than anybody else's that you reviewed, isn't that

19  right?

20         A   Correct.

21         Q   But you didn't review them all, did you?

22         A   I reviewed as much video as I have been privy

23  to.

24         Q   But you didn't review the one with his arms up

25  like this.

1          A   I did review that, yes.

2          Q   That was after the fact, isn't that right?

3          A   That was, and I---

4          Q   Long after the fact.

5          A   That was, I would say, fifteen (15) seconds,

6    fifteen (15) to thirty (30) seconds after---

7          Q   And despite the fact that you were within two

8    feet of a man who is apparently pepper spraying you still

9    maintain that it was overspray from twenty (20) or from

10   twenty (20) people away from you that affected you, isn't

11   that right?

12         A   I maintain that overspray from Mr. Cantwell at

13   a target who was not twenty (20) people away from me was

14   what affected me because prior to the video that shows Mr.

15   Cantwell's arms before his face I was feeling the effects

16   of the pepper spray, and I have testified to the fact that

17   I was feeling the effects of the pepper spray prior to that.

18         Q   And there's no possible way you could be mis-

19   taken is there?  No further questions.  Oh, sorry, I'm sor-

20   ry, I do have one.  Now, do you recognize that document?

21   I'm sorry.  Do you recognize that document except it's in

22   black and white?

23         A   This looks to be two documents printed over

24   each other.

25         Q   Right.

1          A  Which specifically?

2          Q  I'm referring to this down here.  Is that

3 something you posted on Twitter?

4          A  The Spencer, Enoch, Kessler, Baked Alaska---

5          Q  The hit list?

6          MR. TRACCI:  Can I ask what the purpose of the

7 document is here?  Are you going to try to---

8          Q  No, excuse me.  Let's do this.  Do you recog-

9 nize that document?

10         A  Yes, these are three of my tweets.

11         Q  And you posted them on August 18th I think?

12         A  No.

13         Q  What date?

14         A  August 17th.

15         Q  August 17th which was the same day Mr. Goad

16 took out his warrant, right?

17         A  I don't know when Mr. Goad took out his war-

18 rant.

19         Q  Well you communicated with Mr. Goad, didn't

20 you?

21         A  The only time I communicated with Mr. Goad

22 prior to August 17th was when I met him for the first time

23 on August 12th.

24         Q  Okay.  You never told him that Chris Cantwell

25 was the one who was spraying?

1        A  I told him on August 12th that I saw a picture

2  of Mr. Cantwell spraying and that I recognized him from the

3  photograph.

4        Q  Okay.  And somehow he just got it into his

5  head that he was sprayed by Cantwell too, is that right?

6        A  I can't speak to what Mr. Goad saw---

7        Q  Okay.

8        A  ---said, believed, how anything got into his

9  head.

10       Q  Now, who is Baked Alaska?

11       A  Baked Alaska is a political commentator whose

12  legal name is Anthime' Gionet.  He has a You Tube video and

13  a twitter account with several, with over a hundred thou-

14  sand followers.

15       Q  And on your list here you have a little chili

16  pepper by his name, right?

17       A  Correct.

18       Q  And you put that there because he got (unin-

19  telligible) the next day.

20       MR. TRACCI:  I object to this.

21       THE COURT:  What is the objection?

22       MR. TRACCI:  I'd like to object as to relevance.

23       Q  She's counting---

24       MR. TRACCI:  As to relevance.

25       Q  It goes to motive---go ahead.

1          THE COURT:  All right.

2          Q  It goes to motive fabricate, Judge.  She is,

3    she has put, she put the Walmart meet up on Twitter.  If

4    she were interested in justice, there's no point to put it

5    on Twitter.  She also put her live stream of her accosting

6    him at the torch light march.  She put that on Twitter and

7    made sure that he knew that she had seen him at Walmart.

8    And then she sometime after this event, she determined---

9          THE COURT:  I've heard all that evidence.  In re-

10   gard to that I find it's cumulative and I'll sustain the

11   objection.  What's your next question?

12         Q  And on this document on August 17th, there's a

13   big X on there on Cantwell, isn't it?

14         A  That's correct, yes.

15         Q  Move that into evidence.

16         MR. TRACCI:  I'm going to object as to relevance

17   and also what the purpose is that you're asking it be ad-

18   mitted.  If it's for the truth of the matter asserted, I'd

19   say it's hearsay.

20         Q  Well, it's her statement.

21         THE COURT:  She's already describe it.  It's al-

22   ready in evidence.  I don't need to document it.

23         Q  Okay.

24         THE COURT:  She's described it.  What's your next

25   question.

1          Q   That's all my questions.

2              THE COURT:  All right.  Mr. Tracci, any other

3    questions?

4          Q   Hold it, hold it.  One final question.  How

5    did you find out about the Walmart meet up?

6          A   I found out about the Walmart meet up because

7    Mr. Cantwell advertised the Walmart meet up on his own

8    mailing list.

9          Q   That's all the questions.

10             THE COURT:  Mr. Tracci?

11

12                  REDIRECT EXAMINATION

13   By:  Mr. Tracci

14         Q   Any question that you observed Mr. Cantwell

15   deploying mace on more than one occasion on August 11th in

16   Albemarle County?

17         A   There's no question, no.

18         Q   Any question in your mind that those deploy-

19   ments affected you directly?

20         A   No question at all.

21         Q   Any question that they caused impairment to

22   you?

23         A   No question at all.

24

25

1          Q  Any question that they caused what you per-

2    ceived to be physical manifestations of impairment in other

3    people?

4          A  No question at all.

5          Q  No further questions.

6          THE COURT:  Ms. Gorcenski, did you have any ver-

7    bal communication with Mr. Cantwell other than your ques-

8    tion of how did the Walmart meet up go?

9          A  It was a short back and forth exchange.  I

10   asked him how the Walmart meet up went.  He asked me if I

11   called in a false police report.  I said no, I got there

12   late and that was it.

13         THE COURT:  You testified in regard to---was

14   there any, on the night of August 11th was there any other

15   verbal exchange between you and Mr. Cantwell?

16         A  No, there was not.

17         THE COURT:  Questions?

18         MR. WOODARD:  No, sir.

19         THE COURT:  Mr. Tracci?

20         MR. TRACCI:  No, Judge.

21         THE COURT:  All right, thank you.

22         A  Am I free to go, Your Honor?

23         THE COURT:  Is there any objection to her being

24   released?

25

1          MR. TRACCI:  You might be called for another rea-

2  son is there's someone who contradicts you later.

3          THE COURT:  She can be released from this pro-

4  ceeding.

5          MR. TRACCI:  From the courtroom here, yes, Your

6  Honor.

7          THE COURT:  Any objection, Mr. Woodard?

8          MR. WOODARD:  No, sir.

9          THE COURT:  All right.  You're free to go or stay

10  as you wish.

11          MR. TRACCI:  There is a protective order.  Are we

12  going to address that today?

13          MR. WOODARD:  Judge, it ain't over.

14          THE COURT:  There is a protective order on the

15  docket that will have to be taken up if Ms. Gorcenski wants

16  to be heard on it.  All right, Mr. Tracci?

17          MR. TRACCI:  The Commonwealth rests and moves to

18  certify, Your Honor.

19          MR. WOODARD:  I move to strike.  Let me find my

20  materials here.  The Commonwealth has to prove---the Com-

21  monwealth hasn't put on evidence---hold on, Judge, let me

22  find this stuff.  All right.  Your Honor, I would move to

23  strike because I don't think the Commonwealth has estab-

24  lished probable cause.  They have to---and we're dealing

25  only with their evidence.  They have to establish malice.

1    I do not believe they have done so.  Malice is cool, calm

2    deliberation.  But the evidence is that there is a huge

3    fight going on here.  Now, of course, Commonwealth witness-

4    es are blaming it on the other side.  But malice is negated

5    by heat of passion or extreme provocation.  And you've seen

6    the videos and there's something going on there.  And I

7    would submit that despite what they say, the videos show

8    that beanie man was attacking Mr. Cantwell, Goad was right

9    next to him.  They were going forward attacking them and

10   that is extreme provocation and heat of passion.  When

11   you're getting attacked by six or seven people, and you saw

12   the video, then you have the right to defend yourself.  And

13   that's what Mr. Cantwell did.  So I submit that the evi-

14   dence does not support malice because malice is cool, calm

15   deliberation.  Jeremy---Judge, I'm going to show you---I'm

16   going to show you what malicious---no, maybe I won't.  And

17   that's not what's going on here.  He was in the middle of a

18   brawl.  As you saw on there, there was brawling on either

19   side of him, and I think that negates any kind of malice.

20   He obviously sprayed beanie man.  But under Diffendal v.

21   Commonwealth and Foster v. Commonwealth, and I've got to go

22   through this, a man has a right to defend himself.  And he

23   has the right under 312 to use pepper spray and deploy it

24   in self-defense.  It specifically says it's a felony unless

25   there's legal justification.  I submit there's legal justi-

1    fication here for deployment the pepper spray.  If the de-

2    ploying of the pepper spray was legally justified, then all

3    of its effects are legally justified.  Further, Judge, I

4    don't think that they have proven beyond any doubt---I

5    don't think they've proven squat, because neither one of

6    those two people have any way of determining which pepper

7    spray hit them.  We've got five different pepper spray

8    events.  And the Commonwealth has to prove that it was his

9    pepper spray.  They can't say oh, there was a lot of pepper

10   spray flying about.  Both of them said that there were cit-

11   ronella candles out there right next to them.  Both of them

12   acknowledged that the air was full of smoke.  Maybe it was

13   the smoke that caused their face to burn.  Maybe it was the

14   citronella candles.  Maybe it was one of five separate pep-

15   per sprays.  The Commonwealth, to meet their burden, has to

16   prove that it was his, not something that was floating in

17   the air.  So, I would move to strike.

18           THE COURT:  Mr. Tracci.

19           MR. TRACCI:  With respond---with regarding to by

20   the elements of 18.2-52 malicious bodily injury by means of

21   any caustic substance, the Commonwealth has met and exceed-

22   ed its burden. The Court heard evidence of a malicious de-

23   ployment of a caustic substance resulting in bodily injury

24   to another.  Ms. Gorcenski, and she testified to somebody

25   else being affected as well, by means of an acid, lye or

1  other caustic substance.  With respect to malice, I'm not

2  sure exactly where counsel derives his definition of malice,

3  but the model jury instruction defines malice as the state

4  of mind which results in the intentional doing of a wrong-

5  ful act to another without excuse or justification at a

6  time when the mind of the actor is under the control of

7  reason.  Malice may result from any unlawful or unjustifia-

8  ble motive, unjustifiable motive including anger, hatred or

9  revenge.  With respect to heat of passion, Williams v. Com-

10  monwealth indicates that, quote, where it is not the victim

11  of the crime who provoked the defendant's heat of passion,

12  the evidence will not support a finding of heat of passion.

13  The evidence the Court heard was from Mr. Goad and Ms.

14  Gorcenski, and also the video was of a person described as

15  beanie man standing there provoking no threat being mali-

16  ciously maced by the defendant without an excuse or justi-

17  fication.  There's no question as to who deployed the mace.

18  That's no longer in question.  There's no question that

19  that caustic substance caused some impairment.  Witnesses

20  and victims testified to that.  The only question is wheth-

21  er any of that was justified.  We submit that the eviden-

22  tiary testimony and testimony indicated and reflected no

23  excuse or justification whatsoever.  Furthermore, the de-

24  fense quoted Foster. In terms of the purpose of a prelimi-

25  nary hearing the Commonwealth has the burden to present ev-

1   idence sufficient to demonstrate that we have sufficient

2   cause to have charged the accused.  That is whether reason-

3   able ground exists to conclude that a crime has been com-

4   mitted and that the identity of the accused is who the Com-

5   monwealth alleges.  We've met both burdens there.  The le-

6   gal standard is not beyond a reasonable doubt.  It's akin

7   to a preponderance of evidence.  We've heard uncontested

8   evidence that the defendant deployed gas causing injuries

9   to other either maliciously or unlawfully, that's without

10  justification.  There's the first beanie man deployment

11  without provocation.  There is the second one which is sort

12  of an indiscriminate spray, clearly disproportionate and

13  unlawful to the threat.  We heard evidence about the size

14  of the crowds, three hundred (300) to thirty (30) uncon-

15  tested.  The only question is the proof, weight and credi-

16  bility of some of these issues and respectfully, sir, these

17  are questions for a trier of fact not the preliminary hear-

18  ing and not the district court and that's Foster v. Common-

19  wealth and Williams v. Commonwealth.  The Commonwealth has

20  met its burden and we ask that the charges be certified.

21          MR. WOODARD:  Your Honor, my law comes from

22  Witherow v. Commonwealth where it explains malice and heat

23  of passion very, very well, a 2015 case, Judge.  Quote, the

24  element of malicious wounding that distinguishes it from

25  unlawful wounding is malice, expressed or implied, and mal-

1  ice in the legal acceptation means any wrongful act done

2  willfully or purposefully. Skipping down, malice is evi-

3  denced either when the accused acted with a sedate, delib-

4  erate mind, and formed design, or committed a purposeful

5  and cruel act without any or great provocation. As noted

6  above, heat of passion excludes malice when provocation

7  reasonably produces fear. Again, heat of passion is deter-

8  mined by the nature and degree of the provocation and may

9  be founded upon rage, fear or a combination of both. You

10 saw the videos, Judge. The Supreme Court has rejected the

11 argument that a plea of self-defense and a claim of pro-

12 voked heat of passion do not conflict with each other. You

13 can do them in the same thing. Your Honor, there are two

14 problems. One of them is Goad changes his identity. I

15 mean you ask him right there, you're no longer certain, no,

16 sir, I'm not. And it's pretty clear that what happened was

17 when he got off of that the Commonwealth started saying oh,

18 well, here are the other two ones and that's the problem

19 that I have. That's why I move to quash. They can't

20 change the testimony that supports the warrant. They can

21 only change the charge and they haven't done that. So I

22 don't think that goes anywhere. Additionally, you watch

23 the video. These people are sitting there saying I smelled

24 pepper spray and claiming that they were grievously wounded.

25 But you watch the video. Mr. Goad continued to fight. He

1  didn't leave immediately.  And we've got the video of him

2  managing to leave and he was grinning and giggling when he

3  left.  That's not impairment.  That's not bodily injury.

4  That's nothing.  And no, I think I get the end of it.  And

5  Ms. Gorcenski is the same way.  I showed that video of her

6  retreating showing she's so impaired she's taking pictures

7  with her phone.  That's how impaired she is.  No, she's not

8  impaired.  She's not impaired one darn bit.  Additionally,

9  Judge, on her live stream, the reason I showed that, was to

10 show that the sound was off and what she claims to have

11 been pepper sprayed and got this with she doesn't say a

12 word.  She doesn't say a thing.  She's quiet as a mouse

13 which I'm pretty sure what everyone in this room wishes I

14 would be.  But she never mentioned it.  She never said

15 Cantwell sprayed me on that.  She never said I saw Cantwell

16 spray somebody.  She never said oh Lord, I smell anything,

17 I smell something.  What happens here is both of these peo-

18 ple and especially Gorcenski, she saw a way to take out a

19 political opponent and she took it.  And now she comes in

20 here and says oh, I was affected.  Well, it's not on the

21 video.  She wasn't affected.  She was able to get out of

22 there on the video.  And if she was unable to leave, what's

23 she doing here now?  What was she doing here today?  I ask

24 that the evidence be stricken.

25

1          THE COURT:  (Unintelligible) motion to strike.

2    Overrule the motion to strike.  Any evidence from the de-

3    fense?

4          MR. WOODARD:  Yes, sir.

5          THE COURT:  First witness.

6          MR. WOODARD:  Mr. Newcome.

7          THE COURT:  Mr. Newcome, you were sworn earlier.

8          MR. WOODARD:  Talk to that man.  He makes the de-

9    cisions.

10

11

12          **TED NEWCOME**, having been duly sworn testified as

13   follows:

14

15                      DIRECT EXAMINATION

16   By:  Mr. Woodard

17          Q  You're Mr. Newcome?

18          A  Yes.

19          Q  And were you at the monument on August 11th in

20   Charlottesville?

21          A  At the Jefferson monument, yes.

22          Q  Yes, sir.  And, and where in relation to you

23   was---

24          THE COURT:  What's your first name just for the

25   record.

1          A   Ted.

2          Q   Where in relation to you was Chris Cantwell?

3          A   Oh, probably three yards to his right.

4          Q   You were three yards to his, three yards, nine

5     feet to his right?

6          A   Roughly three, four yards, yes.

7          Q   Okay.  And did there come a time when a brawl

8     broke out?

9          A   Certainly.

10         Q   Okay.  Please start right before the brawl.

11    Well, was Mr. Cantwell in view during that, during that

12    time?

13         A   Yes.

14         Q   Okay.  Tell the Judge what you saw concerning

15    that brawl?

16         A   Wherever, I was in the, I was directly between

17    the monument and the building behind us.

18         Q   That would be the rotunda with the pillars?

19         A   Correct.

20         Q   Okay.

21         A   There was a brawl breaking out to my eleven

22    o'clock and I'd seen some violence going on over there.  I

23    moved forward, but then stopped from going all the way for-

24    ward so I was ahead of everybody else, so I could look to

25    my left and see what was going on with Christopher Cantwell

1   at this point.  To my left I seen somebody charging at

2   Christopher Cantwell at which point I seen Christopher

3   Cantwell spray that guy in the face with pepper spray in

4   self-defense.

5           Q  Stop here.  The guy you saw charging, did he

6   have kind of a brown shirt and a kind of beanie hat on?

7           A  Yes.

8           Q  And we talked, you've reviewed the same videos

9   I have.  We've talked about him being beanie man, right?

10          A  Correct.

11          Q  Okay.  Now, where did beanie man come from?

12          A  From the crowd of counter protesters.

13          Q  Yeah, we're going to call them counter pro-

14  testers today.  And what did he look like?

15          A  Well, he had big glasses, some facial hair,

16  dark facial hair, a beanie on.

17          Q  Jeremy can you run the unicorn riot Goad vid-

18  eo?  Yeah, that's good.

19

20          (The video was played at this time.)

21

22          Q  That's beanie man right there getting sprayed,

23  right?  Go back a little bit, Jeremy.  Yeah.  That right

24  there.  Stop it.

25

1    A   Yeah.  I'm on the, I'm on the other side there

2  looking in, but yes, that's the guy that I seen.  That's

3  exactly the scene that I seen, except I'm on the other side

4  there a little ways.

5    Q   And you see the guy in the jean jacket right

6  next to beanie man?

7    A   Yes.

8    Q   Yeah.  What were those two doing right before,

9  right before this?

10    A   No clue.

11    Q   Say again?

12    A   No clue.

13    Q   Okay.  But then beanie man comes out and goes

14  towards Chris, right?

15    A   That's correct.

16    Q   And what was beanie man's stance?

17    A   It was a fighting stance, two feet---

18    MR. TRACCI:  If the witness could describe with-

19  out editorializing.

20    A   That's what I was about to do.

21    MR. TRACCI:  Well, if you could let me finish my

22  objection.

23    A   Certainly.

24

25

1          MR. TRACCI:  Without editorializing what he was

2     doing.  If he could just answer the question as to where

3     his hands were.

4          Q  Your Honor, I'll update the question.  Mr.

5     Newcome could you please stand up?  Could you please move

6     out here?  Could you please replicate the stance that you

7     saw beanie man in?

8          A  Okay.

9          Q  Okay.  Now, your fists are clenched?

10         A  Yes.

11         Q  Were his fists clenched?

12         A  Yes.

13         Q  Okay.  And your knees are bent?

14         A  Knees are bent as if to charge at somebody.

15         Q  Okay.  Do you have any experience with what

16    the use of that stance might be?

17         A  Yes, sir.

18         Q  What kind of experience is that?

19         A  Martial arts experience.

20         Q  Okay.  What kind?

21         A  I have had four years of Ninjutsu, a half a

22    year of Mui Tai and a half a year of Jiu Condo.

23         Q  Any Taekwondo?

24         A  No.

25

1          Q   You got to look into it.  Please have a seat.

2   And in those martial arts, those stances are for fighting

3   one on one with another person, right?

4          A   Correct.

5          Q   Okay.  Now, did you see his face?

6          A   Yes.

7          Q   What did his face look like?

8          A   His eyes were trained---

9          Q   Was he smiling?

10         A   No, he was not smiling.

11         Q   What were his teeth doing?  Were then clenched

12  or open?

13         A   I didn't see his teeth.

14         Q   Okay.

15         A   Yeah, it was clenched jaw.

16         Q   Okay.  Is there, is there any---now, who is

17  behind beanie man?

18         A   Counter protesters.

19         Q   Okay.  Any idea how many?

20         A   I imagine---well, from my, the best recollec-

21  tion of my memory I think there was like twenty-five (25),

22  thirty (30) of them.

23         Q   Okay.  And were they all going forward follow-

24  ing beanie man?

25         A   Some of them were.

1          Q  Okay.  How many of them were?

2          A  I couldn't tell you offhand.

3          Q  More than five?

4          A  Yeah.

5          Q  Okay.  And so you saw Chris spray beanie man,

6    right?

7          A  Yes.

8          Q  Okay, and then what did you see?

9          A  Then I seen a long haired guy---well, okay, so

10   the guy was sprayed, I looked forward and there's some vio-

11   lence in front of me and---

12         Q  I'm sorry, I didn't hear you.

13         A  Yeah, so after I see Chris spray beanie man,

14   my focus shifts directly to my front because there's vio-

15   lence.  And then I look to my left again and that's when I

16   see a long haired guy grab somebody's tiki torch, hit some-

17   body with it and fling, like run right past my twelve

18   o'clock.

19         Q  Okay.

20         A  And that's when I see Chris Cantwell charge

21   across my twelve o'clock as well and then they end up on

22   the ground here.

23         Q  Okay.

24         A  To my three o'clock.

25         Q  What happened next?

1    A   Then some guy, a big guy, comes to attack

2  Christopher Cantwell.  I go to physically remove that per-

3  son.  And then Chris Cantwell is taken up by a few guys.

4  And then I look forward to assess my situation again be-

5  cause at this point it's a complete melee.  And there's a

6  hand in my face and I'm wondering what's going on at this

7  point.  And then I realize that that hand has pepper spray

8  spraying me in the face, and then I realize that it burns

9  and I withdraw from the melee.

10    Q   How quickly did you realized it burned?

11    A   I stood there and took it for about a full two

12  and a half seconds before I realized what was going on.

13    Q   Okay.  And where was this pepper spray event

14  happening?

15    A   Right where Christopher Cantwell was on the

16  ground and then got taken up.

17    Q   Okay, okay.  Right at the corner of that monu-

18  ment?

19    A   Yes, sir.

20    Q   Okay, and what happened next concerning Chris-

21  topher Cantwell?

22    A   Well, at this point I'm blind.  I can hear him

23  in the background.  But my concern at this point, you know,

24  as much as I like Christopher Cantwell, is isn't for his

25  well being, it's for my own.  And so I get with my guys.

1  We go to some other people that say that they have water

2  and then there ends up not being very much water.  And then

3  I go and sit at a bench and I wait in agony until we final-

4  ly go back to the initial park where we find water.

5          Q  Let's move to where you see Chris spray beanie

6  man.

7          A  Okay.

8          Q  Okay.  You were nine feet away, right?

9          A  Roughly, yeah.

10          Q  Did you get a big old lungful of his spray?

11          A  I didn't receive any pepper spray from that

12  direction, no.

13          Q  Okay.

14          A  I received some pepper spray from my right

15  during that period of time, didn't realize what it was, of

16  course, hindsight being what it is.

17          Q  What about the second time---so you never got

18  any, you never got a big old lungful of pepper spray from

19  Chris's direction at all?

20          A  No, not from the left side, from the right

21  side, yes.

22          Q  Okay, okay.  Jeremy, pull me up a picture of

23  Gorcenski.  It's just going to be---it's going to be the

24  very beginning clip of that video.

25

1          (The video was played at this time.)

2

3          Q  Taking a look at the person on the screen.

4          A  Okay.

5          Q  Have you ever seen her before?

6          A  I thought that was a guy because of the Adam's

7   apple and that's the person that stole somebody's torch,

8   hit them with it and then came across my twelve o'clock.

9          Q  Okay.

10         A  I seen that guy one more time on the ground

11  after Christopher Cantwell got picked up.

12         Q  Okay.  Was that---so that was the person who

13  was running across your front?

14         A  Yes, with a tiki torch.

15         Q  With a tiki torch.

16         A  Yes.

17         Q  Really?  Okay.  Did you notice any impairment

18  that that person might have had?

19         A  No.  It was a full on sprint like, like he was

20  trying to get away from somebody.

21         Q  Didn't bump into the monument in their blind-

22  ness?

23         A  No. He certainly seen everything that was go-

24  ing on.  In fact, he looked me square in the eye after

25  Christopher Cantwell was picked up.

1        Q   Okay.  Can you move it forward a little bit?

2   Stop it there.  Do you see, do you see the guy in the wife

3   beater tee shirt?

4        A   I do.

5        Q   Can you tell the Court whether you were to---

6   I'm going to be wife beater, were you two wife beaters left

7   or to his right or---

8        A   Well, that dashing gentleman right there looks

9   like of like me, doesn't it?

10       Q   This one right here?

11       A   No.

12       Q   Right here?

13       A   No, the guy right in front of you.  There you

14  go.

15       Q   This guy here?

16       A   Yeah.

17       Q   Can you go forward with that, Jeremy?  So you

18  were right there?  You didn't smell a whiff of pepper

19  spray?

20       A   I didn't---

21       Q   From Chris's direction?

22       A   No.

23       Q   That's all my questions.

24       THE COURT:  Mr. Tracci?

25

1              CROSS-EXAMINATION

2   By:  Mr. Tracci

3            Q  So you testified and I'll just remind you you

4   are under oath.  You testified that you didn't see what

5   happened?  You had no clue about what happened immediately

6   preceding the first deployment of mace?

7            A  Correct.

8            Q  No clue at all?

9            A  No clue.

10           Q  And how many folks did you see behind Mr.

11  Cantwell when he deployed the mace at beanie man?

12           A There was countless people behind Mr. Cantwell.

13           Q  At the moment he deployed mace your testimony

14  is there were countless people, and how far back were they

15  behind Mr. Cantwell?

16           A  I'm not sure---

17           MR. WOODARD:  Your Honor, do you mean people be-

18  hind Mr. Cantwell or people behind beanie man?

19           Q  Mr.---both, I'm going to ask both.

20           MR. WOODARD:  Okay.

21           A  Okay, so behind Mr. Cantwell is a bunch of ti-

22  ki torch wielding gentlemen, a lot of them, right.

23           Q  And how far behind Mr. Cantwell were those ti-

24  ki torch wielding gentlemen?

25

1          A   They were all around at this point.  I'm look-

2     ing to my left and all I can see if a sea of tiki torches

3     and Christopher Cantwell who I single out because I know

4     him personally.

5          Q   So you don't know the answer to that question?

6          A   No.

7          Q   And your observations are based on, solely on

8     your recollections of that evening?  You haven't--have you

9     looked at the video since?

10         A   I did like right after and I haven't really

11    paid attention to the whole thing until today really.

12         Q   So your testimony to the Court is all of those

13    very precise recollections are predicated on your recollec-

14    tion of what was happening in all that chaos?

15         A   Yes.

16         Q   Now, you claim that Mr. beanie man was in a

17    fighting stance, correct?

18         A   Correct.

19         Q   Did you realize that he had been pushed to the

20    ground immediately before that?

21         MR. WOODARD:  Objection.  There is no evidence he

22    had been pushed.  I ask the question be changed to was on

23    the ground?

24         THE COURT:  The question is, did the witness re-

25    alize that?

1          Q  It's a yes or no question.

2          MR. WOODARD:  He's got the right to give his an-

3  swer.

4          A  I did not.

5          Q  Now you talked about how you liked Mr. Cant-

6  well.

7          A  Certainly.

8          Q  And made a joke out of the fact you were con-

9  cerned about your safety more than his.

10         A  Right.

11         Q  How long have you know him?

12         A  Since 2015.

13         Q  How do you know him?

14         A  Well, from his podcast back when it was some

15  garbage podcast back in his, his anarcho (sic) capitalist

16  days.

17         Q  So he was involved in something better in your

18  view since those garbage days?

19         MR. WOODARD:  Objection, irrelevant.

20         Q  Going to bias.

21         MR. WOODARD:  Not really bias.

22         THE COURT:  You can develop some evidence on bias

23  but again, there's just---the Court will allow it for some

24  limited basis.  Go ahead.

25

1          Q  So he's involved in something better over the

2     last year or so?

3          A  Well, no, it's a question of philosophy and

4     it's always good to have a conversation, regardless of

5     where that conversation may take you.  It's not a good idea

6     to shy away from having a dialogue with whomever it is that

7     might have an idea that's different than yours.

8          Q  You indicated Mr. Cantwell is someone you like.

9          A  Certainly.

10         Q  Is it his views that you like or do you like

11    him as a person?

12         A  I like him as a person.

13         THE COURT:  How he arrives at it I don't think is

14    material.

15         A  So---

16         Q  Do you think---

17         THE COURT:  You don't have---

18         Q  Do you think this is a---what are your views

19    as to this, the charges against him?  Do you have any views

20    as to the charges?

21         MR. WOODARD:  Objection, Your Honor.  His opinion

22    of the charges against him is utterly irrelevant.

23         Q  Do you think he's---

24         THE COURT:  Mr. Tracci---

25         Q  Yes, sir.

1          THE COURT:  Do you want to be heard on the objec-

2     tion?

3          Q  Yes, sir.  I do think it goes to his bias.  I

4     think his willingness to---

5          THE COURT:  The Court is not interested in any-

6     body's political feelings.  It makes no difference.  He's

7     indicated he has positive feelings for Mr. Cantwell.  He

8     hadn't indicated anything about any other witness.

9          Q  Your Honor, the Court permitted questions as

10    to Ms. Gorcenski's identity as an activist and so forth and

11    indicated that it went to her bias as to alleging something

12    that didn't occur.

13         MR. WOODARD:  It went to her motive to fabricate.

14         THE COURT:  And the Court has just indicated that

15    he has positive feelings about Mr. Cantwell.  Now, whether

16    that's going to make---impact his testimony, that's a mat-

17    ter for argument, but we're not going to address the polit-

18    ical issues.

19         Q  You deliberately misrepresented the gender of

20    the witness in this case, is that true?

21         MR. WOODARD:  Objection, Your Honor.

22         A  No.

23         THE COURT:  What's the objection?

24         MR. WOODARD:  You just told him, you just told

25    him to get away from politics and now he is saying you mis-

1    represented the gender by identifying somebody with an Ad-

2    am's apple.

3              Q   I think it goes to bias, Your Honor, and hos-

4    tility---

5              MR. WOODARD:  There you go, Judge.  I've got an

6    Adam's apple, too.

7              Q   Hostility toward a victim in this case and his

8    deliberate misrepresentation of that victim's gender, know-

9    ing that she doesn't identify as (unintelligible).

10             THE COURT:  I don't see how gender is relevant or

11   not except he may not be identifying the correct person.

12             A   I don't even know that this person---

13             MR. WOODARD:  Be quiet.

14             THE COURT:  That's right, you don't have to---I

15   sustain the objection.  It makes no difference.

16             A   Sorry.  If it's a girl I'll---

17             MR. WOODARD:  Be quiet.

18             THE COURT: Mr. Newcome, you don't have to answer.

19             Q   Now, you were talking about your expertise in

20   martial arts.  So can you go into more detail about that?

21   How skilled in martial arts you are?

22             A   I've---

23             MR. WOODARD:  I have a soft objection to that.

24

25

1          THE COURT:  I'm not sure how to address a soft

2     objection.  The Court received it for the purposes of he

3     might know what a defensive or offensive stance is.

4          Q  How much, how much experience in the martial

5     arts do you have?

6          A  Well, I stated that I had a total of five

7     years about experience.

8          Q  Do you have general views and just an opinion

9     as to the fighting abilities of counter protesters general-

10    ly that you---

11         MR. WOODARD:  Objection.  His opinion of their

12    fighting abilities is irrelevant.  He testified I saw this

13    guy in a stance that looks to me like an offense fighting

14    stance.  Now we're getting back into politics.

15         Q  He was---we're not getting onto politics.  He

16    was testifying as to the reasonableness of Mr. Cantwell's

17    response to a fighting stance and I wanted to have his

18    opinion as to---

19         THE COURT:  It's what he observed.  That's the

20    only thing that's relevant.

21         Q  Were you physically afraid of the counter pro-

22    testers?

23         A  No.

24         Q  Those are my questions.

25         MR. WOODARD:  Briefly, Judge.

1                    REDIRECT EXAMINATION

2    By:  Mr. Woodard

3          Q  Mr. Newcome, did any, you know, five or ten of

4    them ever come after you alone?

5          A  No.

6          Q  Nothing further.

7          THE COURT:  Any objection to the witness being

8    excused?

9          MR. WOODARD:  No, sir.

10         THE COURT:  Mr. Tracci?

11         MR. TRACCI:  No objection.

12         THE COURT:  Free to go.  All right, Mr. Woodard?

13         MR. WOODARD:  David Rotter.

14         THE COURT:  Mr. Rotter, you've already been sworn.

15

16         **DAVID ROTTER**, having been duly sworn testified as

17   follows:

18

19                     DIRECT EXAMINATION

20   By:  Mr. Woodard

21         Q  Can you state your name, please?

22         A  David Rotter.

23         Q  And talk to this gentleman, he makes the deci-

24   sions.  And you were there on August 11th at the Jefferson

25   monument at UVA?

1          A   Correct.

2          Q   And there came a time when some brawls broke

3   out and there was some pepper spraying done?

4          A   Yes.

5          Q   Okay.  Where were you in relation to Chris

6   Cantwell?

7          A   I was slightly behind him to his right.

8          Q   Okay, and did there come a time when he

9   sprayed a guy with a beanie hat?

10         A   Yes.

11         Q   Okay.  What was going on before that?

12         A   So the man in the beanie hat with the beard

13  had---

14         Q   We call him beanie man.

15         A   Beanie man had attacked somebody else with a

16  white wife beater, bald head, he had been knocked to the

17  ground.

18         Q   Okay, hold on.  I'm sorry, beanie man attacked

19  the bald guy in the wife beater?

20         A   Yes, sir.

21         Q   Tee shirt.  Okay.  Okay.  And beanie man,

22  that's how beanie man got on the ground?

23         A   Yes.

24         Q   Okay.  Had you noticed beanie man before he

25  got into a fight with wife beater?

1           A   No.

2           Q   Now, I said got into a fight.  I think you

3 said beanie man attacked wife beater.

4           A   Yes, with another person, I believe.

5           Q   Okay.  So it was two on one with wife beater?

6           A   Yes.

7           Q   And what happened to the one that wasn't bean-

8 ie man?

9           A   He was knocked to the ground as well.

10           Q   Okay.  So wife beater took care of both of

11 them?

12           A   Yes.

13           Q   Okay, and so beanie man is on the ground.

14 What happens next?

15           A   He popped up very quickly and aggressively and

16 charged towards Mr. Cantwell.

17           Q   Okay.  Was there anybody with him?

18           A   No, not to my knowledge.

19           Q   Okay.  What were the people behind beanie man

20 doing?

21           A   They were---as he was coming forward they

22 started to move forward as well.

23           Q   Okay.  Jeremy can you call up a picture, call

24 up the Goad video again?

25

1          (The video was played at this time.)

2          Q  Now, see the guy there with the glasses and

3    the jean jacket?  Now, can you---let me do this.  Can you

4    point yourself out in this picture?

5          A  Yes, I'm right there behind Mr. Cantwell.

6          Q  Right there?

7          A  Yes, sir.

8          Q  Okay.  Okay.  Right here?

9          A  Yes.

10         Q  Okay, and---

11         A  There are better shots of me.  That picture

12   that's now somewhat famous, it's pretty obvious it's me.

13         Q  Well, this is the one we got.  We'll have to

14   go with this.  We'll have to go with this one.  Okay.  And

15   so since you're right behind him, let's bump it forward a

16   little bit.  Let's go back a little bit.  All right, now,

17   yeah, let's go back a little more.  Okay.  Bump it, bump it.

18   Now, that's wife beater right there, right?

19         A  Uh-huh (indicating yes).

20         Q  And you're kind of over here?

21         A  Yeah, I've got my hands out.

22         Q  Is that your hand?

23         A  Like to say, you know, stay back.

24         Q  Both?

25         A  Yep.

1          Q   Okay, okay, and that's beanie man on the

2    ground, isn't it?

3          A   Yes, it is.

4          Q   Okay, and that's where he popped back up from?

5          A   Correct.

6          Q   Okay, bump it.  Bump it.  Bump it.  Bump it.

7    Bump it.  Bump it.  Bump it.  Bump it.  Bump it.  Bump it.

8    Bump it.  Okay, now, when beanie man popped back up, what

9    was he doing?

10         A   He looked like he was coming right at Chris

11   with a clenched fist.

12         Q   Okay.  What did his face look like?

13         A   Enraged, furious, teeth clenched.  He was fu-

14   rious.

15         Q   Okay.  And, I mean, in that picture you're

16   right behind Chris.  What do you think?

17         A   If I was standing where Chris was standing and

18   he was coming at me in that manner I would be ready to de-

19   fend myself.

20         Q   All right.  Bump it forward.  Bump it forward.

21   Bump it.

22             THE COURT:  Excuse me.  Excuse me, go ahead.

23         Q   Okay, bump it forward.  Bump it.  Bump it.

24   And so he's sprayed and the giant group of people coming at

25   him, they recoiled, right?

1          A  Uh-huh (indicating yes).

2          Q  Now there are people behind Chris and you're

3   one of the, right?

4          A  Uh-huh (indicating yes).

5          Q  Are you glad that Chris stopped the charge?

6          A  Absolutely.  I mean, I had already seen vio-

7   lence break out.  I mean, throughout the whole thing I had

8   my hands out in this manner to say---

9          Q  All right, stop it right there.

10         A  Please don't come any closer.

11         Q  That's you, correct?

12         A  Yes, sir.

13         Q  You're trying to say, you know, whoa, calm

14  down, we don't want to do this?

15         A  Yes, yes.

16         Q  Okay.  And what was the---Mr. Tracci, is he a

17  protester or counter protester?

18         MR. TRACCI:  He's a protester.

19         Q  Okay.  What were the counter protesters doing?

20         A  They kept screaming and they kept coming for-

21  ward.

22         Q  Okay.  Bump it forward.  Bump it forward.

23  Bump it forward.  Bump it forward.  And also an arm comes

24  out.  Okay, you're still, that's still you with your arm

25  out there, right?

1          A   Yes, sir.

2          Q   Okay.  Now, at that point did you get a big

3    old lungful of pepper spray?

4          A   No, not at that point.

5          Q   Okay.  You're still breathing pure air.

6          A   Yes, sir.

7          Q   Okay.  Bump it forward.  Bump it forward.

8    Bump it forward.  Keep going.  Keep going.  Keep going.

9    Keep going.  Keep going.  Keep going.  Bump it forward.

10   There you go.  Now, the second thing here, what's going on

11   with that?

12         A   It happened very quickly, but basically that's

13   the point where everybody had of kind of collided.  I be-

14   lieve, I heard Chris or somebody else say that somebody had

15   a baton.  The next thing I remember was seeing Chris on the

16   ground and I had gone to his left side.  Now we had moved

17   to the right and Chris was on the ground.  I go to his left

18   side to get his back and try and grab him and that's when I

19   got the pepper spray.

20         Q   Okay, but you made it---how far to you reckon

21   it was from---I mean, you're going to be back in there

22   somewhere, right?

23         A   Uh-huh (indicating yes).

24         Q   How many people---the---were you wound up?

25   Right?

1          A  Oh, yeah, yeah.

2          Q  Between there and this, how far do you esti-

3  mate that would be?

4          A  Maybe ten, fifteen (15) feet?

5          Q  Okay.  How many people are there?

6          A  I couldn't tell you.  Everybody, there were a

7  lot of people there.

8          Q  It was packed, right?

9          A  Yeah, oh yeah.

10          Q  Okay.  Now, at this point did you get a big

11  old whiff of pepper spray?

12          A  No.

13          Q  Okay, you're still---

14          A  Yeah.

15          Q  So you're still breathing clear air?

16          A  Correct.

17          Q  Okay.  Let's go forward a little bit.  And

18  keep going.  There, now Chris is---stop right there.

19  That's, that's Chris right there, right?

20          A  Yeah.

21          Q  In the middle.  Do you know where you are in

22  that?

23          A  I can't tell.

24          Q  Okay.  Okay.

25

1    A  That could be me in the blue jeans with the

2  short---nah, it's hard to tell.

3    Q  Okay.  Let's go forward.

4    A  Yeah, at that point I'm still right there be-

5  hind Chris.

6    Q  Okay.  All right, keep going.  Stop.

7    A  That's me.

8    Q  Who is this guy right here?

9    A  That's me.

10    Q  No, no, this guy here.

11    A  Oh.

12    Q  That's you.

13    A  Yeah, that's me.

14    Q  Who is that guy there?

15    A  I can't---

16    Q  That's beanie man, isn't it?

17    A  It's hard for me to tell, yeah.

18    Q  (Unintelligible).

19    A  Yeah, that's him.

20    Q  Okay.

21    MR. TRACCI:  He's leading the witness.

22    THE COURT:  Well, it's suggestive.

23    Q  Do you know who that is?

24    A  Who, who is?

25    Q  That guy?

1    A  Yeah, it looks like the same guy that just got

2  pepper sprayed by Chris.

3    Q  Okay, and what were you two doing?

4    A  Me and him, at that point Chris was either at

5  the ground or almost on the ground and I was getting ready

6  to try and pull him out of there.  I was, I was fixing to

7  leave right at that point.

8    Q  What was beanie man doing?

9    A  I couldn't---I couldn't tell you, I don't re-

10  call.

11    Q  Bump it forward.  Let me ask you this, he

12  wasn't sitting on the side of the monument crying because

13  he had been pepper sprayed, was he?

14    A  No.

15    Q  Okay.  Bump it forward.

16    A  Everybody was fighting.

17    Q  Okay.  Keep going.  Okay.  Leave it there,

18  Jeremy.  Let me fast forward with you, David.  You're at

19  the corner of the monument.

20    A  Yes.

21    Q  And Chris is somewhere on the ground.

22    A  Uh-huh (indicating yes).

23    Q  What happened next?

24    A  I had gone to, I believe I had put my hands on

25  his back or on his shoulder to try and pull him off and

1   then at that point people had gotten in between us and we

2   were separated.  I did not see Chris the rest of the night.

3          Q   Okay.  Answer any questions Mr. Tracci might

4   have.

5          A   Yes, sir.

6

7                    CROSS-EXAMINATION

8   By: Mr. Tracci?

9          Q   We've seen this video a few times.  You're

10  basing your observations from that evening on the video or

11  what you observed at the time?

12         A   What I remember at the time.  I don't---like

13  at this point during the video I don't recall what the guy

14  with the beanie that got peppered sprayed was doing.  It

15  was a huge mash of people.  It was a lot going on.

16         Q   You don't recall what Mr. beanie man was doing.

17  Who do you recall?

18         A   I recall Chris being on the ground and---

19         Q   Was that before or after he maced beanie man?

20         A   After.

21         Q   After.  Did you see what happened immediately

22  preceding beanie man being maced?

23         A   Yeah, he had---

24         Q   You just testified---

25

1           A  Gotten into a scuffle with the man with the

2    wife beater.

3           Q  And you described your recollection of events

4    as how?  I don't want to mischaracterize what you just said.

5           A  My recollection of the event was---

6           Q  Of the events in terms of how chaotic it was?

7           A  Yeah, it was, it was confusing.

8           Q  No further questions.

9           MR. WOODARD:  I'm done with him.

10          THE COURT:  Any objection to Mr. Newcome being

11   excused?

12          MR. TRACCI:  No.

13          MS. PATHER:  Free to go or stay as you wish.

14   Thank you.  All right, Mr. Woodard?

15          MR. WOODARD:  Might I confer with my client,

16   Judge?

17          THE COURT:  Yes.

18          MR. WOODARD:  Call Chris Cantwell.

19          THE COURT:  Mr. Cantwell, I'm not sure if you

20   were sworn or not.

21          MR. CANTWELL:  I don't believe I was, Your Honor.

22

23

24          **CHRISTOPHER CANTWELL**, having been duly sworn tes-

25   tified as follows:

1                        DIRECT EXAMINATION

2  By:  Mr. Woodard

3          Q  Mr. Cantwell, do you remember the evening of

4  August 11th at the monument?

5          A  I do.

6          Q  Let's go back before that.  Let's go back to

7  ---the whole thing started about nine, 9:30, something like

8  that, right?

9          A  In the evening?

10         Q  Yeah.

11         A  At UVA?

12         Q  Yeah.

13         A  I would say roughly, yes.

14         Q  And I believe there was a meeting before that?

15         A  Yes.

16         Q  Okay.  And you were present at that meeting?

17         A  I was.

18         Q  And did you---what if anything did you tell

19  them were your conditions for attending any rallies?

20         A  Since I had been made aware of threats against

21  us, and since I had been falsely accused of brandishing a

22  firearm earlier that day, I said that I would not attend

23  the UVA demonstration unless we were coordinating with law

24  enforcement because I was afraid that we would be attacked.

25

1          Q   Mr. Cantwell, he gets the answers, not the

2     bench.  His bench gets the answers.

3          A   I was, I was, I had been made aware that we

4     had been threatened.  I had been falsely accused of bran-

5     dishing a firearm earlier in the day, and so I told the or-

6     ganizers of the event that I would not attend unless they

7     coordinated with law enforcement.

8          Q   And did there come a time when your condition

9     was satisfied?

10          A   I was told by Ely Moseley that law enforcement

11     would be, would be at UVA with us and that they would pro-

12     tect us from counter protesters.

13          Q   Okay.  And did there come a time that you went

14     to UVA?

15          A   I did.

16          Q   And before that, and you-all were forming up

17     and did there come a time when you saw Emily Gorcenski?

18          A   Yes.  I now know that that was Emily Gorcenski.

19     I did not know that at the time.

20          Q   You didn't know that was her at the time.

21          A   But, yes.

22          Q   Okay, and then, and what was she doing?

23          A   She asked me about my Walmart meet up which is

24     the meet up that I posted behind my pay wall for paying

25     members of my listening audience.

1       Q   Was she filming you?

2       A   Yes.

3       Q   And so let's fast forward here to---did there

4  come a time when you were down by the monument?

5       A   Yes.

6       Q   Okay.  Did there come a time when brawling

7  broke out?

8       A   Yes.

9       Q   All right.  What had you been doing before

10 that?

11      A   As we---well, along the march it became obvi-

12 ous to me that law enforcement was not protecting us.  All

13 right, we were---I did not have a torch and the people at

14 the front of the march said if you don't have a torch, get

15 off to either side and if Antifa comes you are to confront

16 them.

17      Q   Okay.  Did you have a flashlight?

18      A   I did.

19      Q   Okay.  And did you have a can of pepper spray?

20      A   I did.

21      Q   Where did you get the pepper spray from?

22      A   I bought it on eBay many, many months prior.

23      Q   Okay.

24      A   It's on my key chain at all times.  I always

25 have it.

1           Q   So when you say many, many months, is that six

2    or ten or fifteen (15)?

3           A   I don't remember exactly when I bought this

4    one because it was to replace another one.  The one I had

5    was in a plastic casing and I bought it to replace a metal

6    one that was all banged up from having been on my key chain

7    for years prior with no use.

8           Q   Okay.  Okay.  Now, so you had a flashlight and

9    you had pepper spray and everybody gets over to the monu-

10   ment.  What happens next?

11          A   I feel it's important to point out that along

12   the march agitators were trying to bump into people with

13   torches and this was giving me a safety concern.

14          Q   Is that what kind of set you off, you know---

15          A   Yes.  I was on edge the entire time because

16   they kept on bumping into the torches.  And so, and it was

17   my instruction to keep them away from the people with the

18   torches, so I attempted to do that.

19          Q   Did you---

20          A   I put myself between the agitators and the

21   marchers.

22          Q   And that's when you grabbed them by the hair

23   and beat the hell out of them, right?

24          A   No, no, nothing of the sort.

25          Q   Did you use harsh words to them?

1          A  I certainly did.

2          Q  Okay.  Okay.  Did you engage in any kind of

3 fisticuffs whatsoever with those people?

4          A  No fisticuffs, but I did push one gentleman.

5          Q  Okay, okay.  What happened next?

6          A  As we approached the Jefferson statue, we came

7 through, I believe, it's been called the rotunda, the pil-

8 lars there.  We saw more counter protesters surrounding the

9 statue, and I became afraid at that moment because I was

10 under the impression that law enforcement was going to be

11 between us and the Antifa.

12         Q  And that didn't happen.

13         A  No, that did not happen.  And allow me to dif-

14 ferentiate two things.  There's been some confusion as to

15 what somebody sees on the video versus what they remember,

16 okay.

17         Q  You have to answer my questions.

18         THE COURT:  Just answer Mr. Woodard's questions.

19         A  Okay.

20         Q  Yeah, you've got to answer my questions.

21         A  I'm sorry.

22         Q  Did there come a time some brawling happened?

23         A  Yes.

24         Q  Okay, because the police ain't there, right?

25         A  That's right.

1          Q   Okay, and, and David is right behind you,

2    right?

3          A   I did not know that at the time.  I know that

4    today.

5          Q   Okay, okay, so put us there.  You're standing

6    there and I believe, I believe you've got your flashlight

7    up in your left hand?

8          A   Yeah.

9          Q   Okay.  And where is your pepper spray?

10         A   And my pepper spray is down at my waist in my

11   right hand.

12         Q   Okay.  What happened next?

13         A   I see the guy in a white tank top, the bald

14   guy in the white tank top fighting with the guy we've

15   called beanie man.  And there is other violence breaking

16   out around me that is---I can't describe because it's out

17   of my---I'm focused on that conflict.

18         Q   Were you surprised that there was that

19   fighting going on right there?

20         A   It's difficult to say that I was surprised be-

21   cause I talk about this stuff for a living.  I know those

22   people are dangerous and the reason I asked for law en-

23   forcement is because I knew that they would attack us.  But

24   I was concerned with it, yes.

25

1          Q   Okay.  Were you kind of, you know, holy cats,

2     there's a brawl going?

3          A   Yeah.

4          Q   Okay.  What happened next?

5          A   It occupied my full attention and then, though

6     I did not---I saw beanie man go down and tank top disengage,

7     and then beanie man pop back up and come towards me in what

8     I perceived to be a threatening stance at which point I

9     pepper sprayed him.

10         Q   Okay.  Was there anybody with beanie man?

11         A   Yeah.

12         Q   Who?

13         A   I don't know these people.  I recognized Goad,

14    now that I've been able to see the videos and him being

15    here today, but I had no idea who he was at the time.  I

16    don't know any of the other people there say for Ms.

17    Gorcenski who I now know about.  But there were, you know,

18    several people.  I would have a difficult time estimating

19    how many were directly behind the beanie man guy, but there

20    were several people behind him.

21         Q   Was it like five, seven, ten?

22         A   Depending on how one defines behind, right,

23    because he can't have more than two people directly behind

24    him but he's in front of a mob of people.

25

1          Q  Okay.  And was he---what was his relationship

2 to the mob of people?

3          A  He was in front of them.

4          Q  Okay.  Were they, were they moving together?

5          A  Yes.

6          Q  Okay, and what direction were they moving in?

7          A  Towards me.

8          Q  Okay, and where was Goad in relation to beanie

9 man?

10         A  To my left.  I'm sorry.  He's to, well, he

11 would be to beanie man's right then.  He was to my left.

12         Q  Okay, and he was coming forward, too?

13         A  Yes.

14         Q  Okay.  What did he look like?  What did his

15 face look like?  Was he smiling?

16         A  I don't think a whole lot of people were smil-

17 ing out there that night.

18         Q  Okay, okay.  What happened next?

19         A  Allow me to differentiate my recollection from

20 the video, okay?

21         Q  Okay.

22         A  In that in my mind spraying beanie man and

23 what we've seen in the video as me going back happens as

24 one thing, okay.  I have, I, it's not until you bring that

25

1  ---it's not until my attorney brings this video to the jail

2  and shows me that I'm made aware of this going back in the

3  second time, okay.  In my mind I'm dealing with a singular

4  threat of a group of people coming at me, okay.  And so ap-

5  parently, looking at the video I see that there are two

6  separate deployments, but I'm in my mind dealing with the

7  same threat.

8       Q  Okay, and so beanie man is coming at you, Goad

9  is with him, right?

10      A  I see Goad off to the left.  I make a con-

11  scious decision not to engage Mr. Goad.  I saw him and

12  looked at him.  He disengaged and I disengaged from him.  I

13  did not spray him.

14      Q  Okay.  He---did he disengage when he saw you

15  spray beanie man?

16      A  Yes.

17      Q  Okay, and you weren't going to----

18      A  Shortly after.

19      Q  Okay, like a split second after, right?

20      A  Yeah.

21      Q  Okay, and so you weren't going to spray him

22  because he wasn't---

23      A  He was not a threat to my safety, so I didn't

24  spray him.

25

1         Q  Okay, okay.  And you don't have any conscious

2 recollection of the Red Sea parting and going back together,

3 correct?

4         A  I'm sorry, Red Sea?

5         Q  People.

6         A  I mean, there's like a sea of humanity behind

7 me comes in after I spray.

8         Q  Okay.

9         A  Right, so as I sprayed, from looking at the

10 videos it appears that my group was emboldened by me spray-

11 ing and they came in after that.

12         Q  Okay.

13         A  And this, this, I was, you know, I panicked at

14 this point, frankly.

15         Q  Okay.  Were there counter protesters coming

16 forward, too?

17         A  Yes.

18         Q  At the time, at the time you pepper sprayed?

19         A  Yeah, it was two groups of people who hated

20 each other attacking one another.

21         Q  Okay, and you were kind of in the middle,

22 weren't you.

23         A  I sure was.

24         Q  Okay.  All right, what happened next?

25

1          A   So as the groups clash, I believe that several

2    counter protesters are attacking one of my guys, that sev-

3    eral of them are on top of one of mine, at which point I

4    run over there.  In the course of my deploying at beanie

5    man and the people behind him my pepper spray ran out.  I

6    let go of it.

7          Q   Okay.

8          A   And I ran over to the, to the people who were,

9    I perceived were on top of one of our guys and I began to

10   hit them with my fists.  Once that pile broke up I, I moved

11   further towards the rotunda.  I saw a woman with an expand-

12   able baton.  I yelled get that fucking stick, I believe

13   several times and I got pepper sprayed.  If you have seen

14   the video, my hands go up here is when I felt it.  I hear

15   someone yell mace and I yell get that fucking stick again

16   because I perceive that she's a threat to me and others.

17   I'm afraid she's going to break my skull open with this

18   thing.  And I urgently got out of there as fast as possible

19   with the help of others.

20         Q   An expandable baton?

21         A   Yes.

22         Q   Bailiff, come over here please.  Bailiff.

23         BAILIFF:  What do you need, Mr. Woodard.

24         Q   I just want to show him the baton.  We're not

25   going to take it off of him.  Your baton is just as good.

1   No, I didn't want to handle it, I just wanted you to---

2   Something like this?

3           A  Well, it was expandable.  I can see the ridges

4   in the thing is how I gather that it's expandable.

5           Q  Okay.  And so you dive in there and you pepper

6   spray him?

7           A  Yes.

8           Q  Okay, and that's why you're going like this in

9   the video?

10          A  Yes.  And, well, on top of the pepper spray, I

11  had already been pepper sprayed and I put my hands up be-

12  cause I was afraid I was going to get hit with the stick.

13          Q  Okay, okay.  And then what happened next?

14          A  Several guys guided me towards what I later

15  found out was like a first aid station with police.  They

16  guided me over to some bench and I sat down and while---as

17  my vision recovered I saw a bunch of reporters and police

18  around me.

19          Q  Okay.  Did you get zapped straight in the

20  fact?

21          A  Huh?

22          Q  Did you get pepper sprayed straight in the

23  face?

24          A  Straight in the face and all down my bo---I

25  mean, I got soaked with it.  It was like a fire hose.

1    Q Okay.

2    A It went, it was so bad literally it went down

3 my pants and I had to shower, yes.

4    Q Okay. Now, when you were---by the time you

5 got over to the bench, police had shown up?

6    A I'm sorry?

7    Q Police had shown up?

8    A Yes.

9    Q Okay.

10    A That was the first time I saw them was when my

11 eyes opened from the pepper spray.

12    Q Okay. Answer any questions Mr. Tracci may

13 have.

14           CROSS-EXAMINATION

15 By: Mr. Tracci

16    Q Mr. Cantwell, you have combat training, is

17 that true?

18    A I took wrestling in junior high school and I

19 did one semester in college when I took a karate class, yes.

20    Q So you've never had multiple types of combat

21 training?

22    A Well, that is two different types of combat

23 training, yes, wrestling and karate.

24    Q I just want to read something that you had

25 written about your capacity for violence.

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 237 of 291   Pageid#: 851

1         A   Yeah.

2         Q   You said you fucking bet I do.  I carry two

3    pistols and I've been in multiple different types of combat

4    training.  I can fucking harm a man and I'll put an end to

5    a life if I have to.  I've been involved with enough vio-

6    lence to know that it can go very bad and I take prudent

7    measures to avoid getting myself into violent conflict.

8         A   Yeah.

9         Q   Did you say those words?

10        A   I sure did.

11        Q   And when you came to Charlottesville were you

12   expecting violence?

13        A   I was hoping very much to avoid violence.

14   However, I had been threatened---

15        Q   If you could just start answering the question.

16        MR. WOODARD:  Objection, Your Honor.

17        A   I had been threatened repeatedly.

18        THE COURT:  Go ahead.  You can finish your an-

19   swer.  Go ahead.

20        A   I had been threatened repeatedly.  I came to

21   Charlottesville expecting to participate in a permitted

22   demonstration championed by the ACLU where we coordinated

23   with law enforcement to avoid violent conflicts.

24        Q   So you were anticipating violence though?

25

1        A  I was anticipating people attacking us.  I was

2  also anticipating the government preventing that from hap-

3  pening like they did in Pikeville.

4        Q  Did you refer to the police and people prepar-

5  ing as the criminal element?

6        A  I'm sorry, say that again?

7        Q  As the criminal element---the protesters were

8  the criminal element?

9        A  The counter protesters?

10        Q  Yes.

11        A  The counter protesters, I perceived to be a

12  criminal element, yes.

13        Q  What are your views of the counter protesters?

14  Do you hold them in high regard?

15        MR. WOODARD:  I'm going to object here, Judge.

16  This is getting kind of far afield, I think.

17        MS. PATHER:  Mr. Tracci, what's the relevancy of

18  that?

19        Q  Your Honor, it goes to his bias and the malice

20  that he has towards these people, including Mr. Goad and Ms.

21  Gorcenski.

22        MS. PATHER:  The Court has already ruled.  The

23  Court is not going near any political issue, it's complete-

24  ly irrelevant.

25

1    Q Your Honor, this is not a political issue.

2 This is his view of the protesters.  This is highly rele-

3 vant.

4    THE COURT:  He's already described his view of

5 them, all right, and he's (unintelligible) what he's done.

6    A I perceived them to be a threat.

7    THE COURT:  That's all right.  That's all right.

8    MR. WOODARD:  Be quiet.

9    THE COURT:  And that's the only (unintelligible).

10 What's your next question, Mr. Tracci.

11    Q I do have a quote about protesters I want to

12 read and see if he recognizes it, Your Honor.  Just a mo-

13 ment, please.  Did you say these words about left wing pro-

14 testers?  I think chemical and biological weapons can do a

15 great deal of good for mankind.

16    MR. WOODARD:  Objection, Your Honor.  You just

17 told him not to go into political stuff and then he did.

18    A Judge, if we go over---

19    MR. WOODARD:  Be quiet, Chris.

20    THE COURT:  Mr. Tracci?

21    Q I'm sorry, Judge, I was trying to get on the

22 record his views about left wing protesters.

23    THE COURT:  And it doesn't make any difference.

24    Q Okay, withdrawn. I'll take it back, okay.

25

1          THE COURT:  It doesn't make any difference, com-

2    pletely irrelevant.

3          Q  You have some combat training.  You're a per-

4    son who can take care of himself?

5          A  I can.

6          Q  Tend to remain in control of yourself most of

7    the time?

8          A  Yeah.

9          Q  You carry weapons?

10         A  Yes.

11         Q  In order to carry weapons you've got to main-

12   tain your composure and control yourself, is that true?

13         A  That's right.

14         Q  And you had weapons when you came to Char-

15   lottesville that day, correct?

16         A  Sure did.

17         Q  Can you just quickly describe to the Court

18   what weapons you had?

19         A  I had an AR15, an AK47.  I had a Ruger LC9.  I

20   had a Kel-Tec P3AT.  I had a Glock 19.  I had the now infa-

21   mous can of pepper spray, police brand pepper spray on my

22   keychain.  I had a folding knife somewhere and I had a bal-

23   listic, two different ballistic vests.

24         Q  So you were expecting more than opposition,

25   maybe a war when you came to Charlottesville, is that true?

1          A   Well, now, that's not accurate.   As a matter

2     of fact, I had the rifles because I thought I might go

3     shooting with some of my friends later on, but I did bring

4     the pistol for self-defense because I thought that I might

5     be attacked, and I find pistols to be a very effective

6     method of stopping people from attacking you.

7          Q   How many rounds of ammunition did you bring?

8          MR. WOODARD:   Objection.   He's got the gun.

9          THE COURT:   Mr. Cantwell, did you have anything

10    with you on the night that we've been talking about other

11    than a flashlight and some pepper spray?

12         A   No.   I was told---

13         THE COURT:   All right, that's fine.

14         A    That UVA was a gun free zone.

15         THE COURT:   That's fine.   What's your next ques-

16    tion, Mr. Tracci.

17         Q   Can you describe the size of the counter pro-

18    testers, the number?

19         MR. WOODARD:   Objection, irrelevant.   It's al-

20    ready been testified to be a bunch of people.   We haven't

21    challenged it.

22         Q   I don't think he's testified directly to his

23    perception of it.

24         THE COURT:   He hasn't testified to it.

25         MR. WOODARD:   Okay.

1         A  I'm notoriously bad at estimating crowd sizes.

2 I'm worse than Donald Trump at this but I, I would, I don't

3 disagree with the assessments of your prior witnesses as to

4 the crowd sizes.

5         Q  And how would you adjust them?

6         A  Three hundred to five hundred?  I'm sorry,

7 three hundred to fifty, somewhere around there.  That

8 doesn't sound objectionable to me.

9         Q  What are your views about the fighting abili-

10 ties of the counter protesters and left wingers generally?

11         A  Well, they're very danger people so, you know,

12 it depends on which one you're talking about.  I can't as-

13 sess the fighting skills of a group of people.  It doesn't

14 work that way.

15         Q  Did you make a statement about how it's likely

16 that when left wing groups and right wing groups get to-

17 gether that right wing people are going to kick their ass

18 because---

19         THE COURT:  Mr. Tracci, it's the same line.

20         Q  Yes, sir, Your Honor.

21         THE COURT:  It's not relevant.

22         Q  Now, you were talking about Mr. beanie man.

23         A  Yeah.

24

25

1          Q  And you saw video evidence and we've seen it

2    ad nauseum at this point, of him being on the ground and

3    then coming back up.

4          A  Yeah.

5          Q  From the ground.

6          A  Yeah.

7          Q  At that point you race into him, is that true,

8    with your, with your pepper spray?

9          A  It doesn't seem that way to me.  If you want

10   to show me on the video again, I'll look at it and I'll

11   tell you if that's the assessment.  I perceive him coming

12   at me.  That's my perception of it.

13         Q  Your perception is that getting off the ground

14   is a lunge at you directly?

15         A  As he's, he's springing up off the ground with

16   is hands and his knees bent.  He's coming towards me, yeah.

17         Q  And do you race toward him as a result?

18         A  If you're saying that's me, I don't recall it

19   that way.  I'm happy to review the video.

20         Q  Does the Court wish to review the video at

21   this point?

22         THE COURT:  I've seen the video.

23         Q  Now, you testified that you brought a can of

24   pepper spray that you bought online?

25

1          A   Yes.   Police brand pepper spray, I bought it

2    on eBay.

3          Q   Do you know how large is was?

4          A   I mean, it was a key chain, I mean, it's, you

5    know, maybe this big.   I do not know the---what's that?

6          MR. WOODARD:   Dimensions?

7          A   The dimensions.   I---

8          Q   Do you have the receipt?

9          MR. WOODARD:   Somewhere.   Not that big a deal.

10         A   Well, I had forwarded an email copy of the re-

11   ceipt to my attorney, but it is a---

12         MR. WOODARD:   And I've got it somewhere buried in

13   my file.

14         A   But, I mean, it's not much bigger than a fin-

15   ger.   I mean, a little bit wider.   I mean, could I guess a

16   fluid ounce, I don't---

17         Q   But you, had you deployed it before that even-

18   ing?

19         A   I had never deployed it before that evening,

20   no.

21         Q   But you deployed it enough time for it to be

22   empty, enough times for it to be empty?   You ran it out?

23         A   Yeah.

24         Q   So that's multiple deployments?

25

1          A   Well, I, as I said before, I've seen the video

2   and from the video it looks like multiple deployments.   In

3   my mind I was dealing with a singular threat.   It happened

4   very fast but yeah, I've seen the video and that's what it

5   looks like.

6          Q   You indicated it was two groups of people that

7   hated each other.

8          A   Yeah.

9          Q   Were you one of those people who hated?

10          A   Yeah.

11          Q   You indicated that you were scared and you al-

12   so indicated that you are a person possessed of your own

13   wits and you don't lose control.

14          A   Well, I indicated---

15          THE COURT:   What's the---wait a minute.   There's

16   no question before you yet.

17          Q   Can you reconcile those two statements that

18   seem to be inconsistent?

19          A   Well, when I fear for my safety I can deal

20   with the threat to my safety and I can deal with that

21   threat by using violence to deter it, but it's a threat

22   nonetheless and I get scared of people who threaten me,

23   yeah.

24          Q   Did you describe the nature of the threat on

25   the radio a couple of days ago as the following, I could

1   have been like oh, there's violence erupting, I'd better

2   run away, right?  I could have done the faggot pussy assed

3   thing a million different times and been in so much a bet-

4   ter position?

5           A  Yeah.

6           Q  So did that reflect in your mind legitimate

7   fear of your life and self-defense or just not being a pus-

8   sy or a faggot?

9           A  It reflects that if I---

10          Q  If you could just answer the question please?

11          A  I'm trying to answer your question.  The point

12  is that if I retreat every time I'm threatened, I'm never

13  going to be able to do anything because everybody hates me.

14  And so if every time somebody threatens violence I go away,

15  then I'm never going to do anything, so I do no run away

16  when I am threatened.  And I, and my understanding of it is

17  that I don't have any obligation to do that in the State of

18  Virginia and if I did I never would have come here.

19          THE COURT:  You've answered, you've answered.

20  What's your next question, Mr. Tracci?

21          Q  You indicated at the bond hearing, I don't

22  have the transcript in front of me, Mr. Cantwell, that you

23  were backed up and had nowhere to retreat when sprayed by

24  beanie man.

25          A  I was not sprayed by beanie man.

Case 3:17-cv-00089-NKM-JCH   Document 37-3   Filed 05/04/18   Page 247 of 291   Pageid#: 861

1          Q   When---before you sprayed beanie man, sorry.

2          A   Well, there are people behind me. I don't know

3    that I said I was backed---I don't recall that statement,

4    I'm sorry.

5          Q   And the video shows the deployment not only

6    toward beanie man, directly to his face after he gets up,

7    it shows another one where you're sort of raising up and

8    who are you shooting at then?

9          A   So, as I told you before, now I'm describing

10   to you what I saw in the video now, okay.  In my mind I'm

11   dealing with the same problem.  I don't recall that, okay.

12   Watching the video I see my guys come in and I'm pepper

13   spraying over their shoulder towards the threat that was

14   coming at all of us.

15         Q   So who were you spraying?

16         A   The counter protesters that were behind beanie

17   man coming at us.

18         Q   Had you seen beanie man before?

19         A   No.

20         Q   In your life?

21         A   No.

22         Q   How would you describe him?  How big was he?

23         A   I'd say he was roughly my size.

24         Q   Particularly strong?

25         A   What?

1          Q   Particularly strong looking?

2          A   I mean, he was---I don't think the guy was a

3    lot bigger than me, no.  He was roughly my size.

4          Q   And when you see people with hands at their

5    sides, do you perceive that as an act of aggression?

6          A   If they are bringing the hands up as he was,

7    yeah.

8          Q   When you're getting up off the ground, you

9    probably have your hands where as you're rising?

10         A   Well, depending on what you're doing you might

11   have them on the ground.

12         MR. WOODARD:  Objection, calls for speculation on

13   getting up off the ground which are subject to millions and

14   millions of variations.

15         A   And I think, if I recall correctly seeing on

16   that video you see his hand cocked back.

17         THE COURT:  Mr. Cantwell---Mr. Cantwell---  He's

18   describe what he did.  It's a matter of argument as to what

19   you think that shows.

20         Q   I'm going to show you the picture here.  Is

21   there any objection to that scene?

22         MR. WOODARD:  No, not really.  You know, it's got

23   politics on it, Judge.  I'd object to that, but, you know,

24   we've been around the block on that.  It's not that big a

25   deal.  Thank you.  That's fine.

1          THE COURT:  No objection to that.

2          Q  Is this you?

3          A  That's me.

4          Q  What is the flashlight for exactly.

5          A  The flashlight?

6          Q  Yeah.

7          A  I took the flashlight because we were marching

8    through a dark area.  Everybody else had torches, I had a

9    flashlight.

10         Q  You were using it to blind people, weren't

11   you?

12         MR. WOODARD:  Objection.

13         A  I don't think that that would have worked out

14   very well, frankly.

15         Q  You weren't trying to---

16         THE COURT:  Wait a minute, wait a minute.

17   There's an objection.  I've got to hear the objection.

18         MR. WOODARD:  Objection, Your Honor.  There's ab-

19   solutely no evidence that he was doing that.

20         Q  I'm asking the question.

21         MR. WOODARD:  Okay.

22         THE COURT:  You can answer that one.

23         A  No.  I don't even think that would work.

24         Q  Did you ever shine your flashlight in the eyes

25   of counter protesters that night?

1          A   I mean, it was shining at eye level, yeah.

2          Q   Were you---did the video ever support an in-

3    terpretation of you deliberately using the flashlight---

4          MR. WOODARD:  Objection, Your Honor.  He is not

5    charged with causing photonic discomfort to the protesters

6    and making their pupils dilate or undilate.

7          A   Could I---

8          MR. WOODARD:  Be quiet.  Okay.  He's charged with

9    pepper spraying somebody.  Whether he had a flashlight and

10   whether he shined it at people is utterly irrelevant.

11         THE COURT:  There's an argument of self-defense.

12   Mr. Tracci is asking whether or not he did something that

13   was (unintelligible).

14         A   I don't have any recollection of that.  What I

15   can say is that I'm aware that that flashlight can be used

16   as a weapon, but I think of it as a striking instrument and

17   not something that's going to blind people.  It's not that

18   bright.

19         Q   And you described how you became agitated that

20   the, some of the counter protesters were trying to knock

21   the tiki torches, is that what you said?

22         A   That doesn't ring a bell to me.

23         Q   Did you just testify as to something that

24   was---

25

1           A   I'm sorry, yes.  As we were walking towards,

2   yes.  They were trying to bump into the, to the marchers,

3   yes.

4           Q   What are you holding here, do you think?

5           A   That's the pepper spray.

6           Q   And did you have that out the whole time?

7           A   No.  That was when I---I put my hand on my

8   pepper spray.  I had it on like a, it's on my key chain and

9   I had it clipped to like a belt loop thing with a retracta-

10  ble thing, okay, and so as we approached the counter pro-

11  testers at the, at the Jefferson statute, since I was not

12  expecting to see them, and I was afraid of them, I put my

13  hand on my pepper spray then.

14          Q   The video that we've all seen with Mr. Goad

15  and beanie man, was that the first encounter you remember

16  having with them?

17          A   With beanie man, yeah.

18          Q   So earlier that evening you can't recall

19  stalking them or moving after them as they moved with you

20  with pepper spray and your hand just like this?

21          A   I mean, we circled the rotunda---I'm sorry,

22  the statute, but like not before---are you talking about

23  before?  I'm not sure I understand your question.  I'm sor-

24  ry.  I'm genuinely trying to answer you.  When we came down,

25  we all went around like this.

1          MR. WOODARD:  Let him, let him clarify the ques-

2    tion before you answer.

3          Q  The first interaction you had with beanie man,

4    are you testifying, is it your testimony your first inter-

5    action with beanie man is when you deployed mace at his

6    face after he got up off the ground?

7          A  No, that is not my---no.  He was in front of

8    us, both sides were chanting.  I saw him chanting.  I saw

9    him fighting and the first time I engaged him, yes, was

10   when I pepper sprayed him, but I saw him before that.

11         Q  And what was that interaction that you had be-

12   fore that?

13         A  I'm sorry, my only interaction, my first in-

14   teraction with beanie man was when I pepper sprayed him.

15   I'm saying I was aware of his presence when he was fighting

16   with tank top.

17         Q  Now, when you sprayed beanie man, had you been

18   sprayed?

19         A  No.

20         Q  And you testified to that at the bond hearing,

21   is that true?

22         A  I'm sorry, what?

23         Q  You had testified to that at the bond hearing.

24         A  I testified that I had not been sprayed when I

25   sprayed beanie man, that is accurate.  I did spray him be-

1  cause I thought he was going to spray me---I sprayed him

2  because I thought he was going to punch me.

3         Q  Thank you.  Those are my questions.

4         THE COURT:  Mr. Woodard?

5

6                    REDIRECT EXAMINATION

7  By:  Mr. Woodard

8         Q  How many fights have you been in this year,

9  fistfights?

10        A  This year, just the one.

11        Q  The one here in Charlottesville?

12        THE COURT:  Is that relevant?  Is that relevant?

13        Q  I would say it counters, it counters the mal-

14  ice, but I'm not really going very far with it.

15        A  If I wanted violence, it's not difficult for

16  me to find.  I get threatened all the time.

17        THE COURT:  You don't have to, you don't have to

18  answer that.  I'm not interested in how many fights you've

19  been in.  All right, Mr. Woodard, what's your next ques-

20  tion?

21        Q  All the weapons and stuff you carry that is

22  for self-defense, right?

23        A  I sure do.

24        Q  Why?

25        A  Because I get threatened frequently.

1          Q   Okay.  Who threatens you?

2          A   People who don't like my politics or my way of

3   describing current events.

4          Q   Have you gotten death threats?

5          A   Oh, yeah.  I have an episode---

6          THE COURT:  That's already been---

7          Q   You've answered the question.  Answer the

8   question.

9          A   Yes.  I receive death threats on a regular ba-

10  sis, threats of violence on a regular basis.

11         Q   Mr. Cantwell---

12         THE COURT:  You don't need to answer.

13         Q   Be quiet.  Now---no, I'm not going to do it.

14  Those are the questions.  Officer Pleasants is my next wit-

15  ness and he's going to be short.

16         THE COURT:  Thank you, Mr. Cantwell.  You just

17  need to have a seat.

18

19

20         **SERGEANT BRADLEY PLEASANTS,** having been duly

21  sworn testified as follows:

22

23                          DIRECT EXAMINATION

24  By:  Mr. Woodard

25         Q   Good afternoon.  You're Officer Pleasants?

```
 1              THE COURT:  Mr. Woodard, are you going to need
 2    this?  I can't, I can't see counsel.
 3              Q  I might.  We can move it back.
 4              THE COURT:  That's even better.
 5              Q  I think the chances are slim, but I don't want
 6    to break it down yet.
 7              THE COURT:  Yeah, if you could just move it to
 8    the side.  If you need to bring it back, certainly do but
 9    it's better than trying to dodge---
10              Q  Okay.  You are Officer Pleasants?
11              A  Sergeant Bradley Pleasants.
12              Q  Sergeant Pleasants, okay.
13              A  Yes, sir.
14              Q  And we're going to have to go through this.
15    Now, we've spoken before, right?
16              A  Sure.
17              Q  And we're going to have to go through this
18    again.  You are with the City of Charlottesville police de-
19    partment?
20              A  That is correct, sir.
21              Q  Okay.  There we are.  And you were out there
22    on August 11th, right?
23              A  That is correct.
24              Q  And did there come a time when Emily Gorcenski
25    approached you?
```

1          A   She did.

2          Q   Okay.  Now, let's go back.  How long have you

3   been a police officer?

4          A   Since the fall of 2008.

5          Q   Okay.  And, and during that time have you ever

6   had any training on the effects and use of pepper spray?

7          A   Yes.

8          Q   Let's go to the use of pepper spray.   In your

9   experience what is the range of cheap pepper spray?

10         A   I mean, that's completely dependent upon the

11  type of carrying agent that it's in, the delivery method.

12         Q   Five hundred (500) feet?

13         A   No.

14         Q   Okay.  Ten feet?

15         A   I mean, if we're talking a small hand held can

16  of pepper spray---

17         Q   The small cheap stuff.

18         A   From you to me, ten feet, maybe a little fur-

19  ther.

20         Q   Okay.  And what about---there's a word for it

21  but it's been a long day and I don't remember it.  What

22  about the dissipation from that?  For example, if you shot

23  me with pepper spray---

24         A   Correct.

25         Q   Could they smell it in the back of the room?

1          A   Absolutely.

2          Q   Okay. Would they suffer anything more than

3   smelling it?  The smell goes everywhere, right?

4          A   Once you've been exposed to the smell, it's a

5   smell I'll never forget.  I can tell, you know, probably

6   from much further than the back of the room if it's been

7   deployed.  There's a whole lot of factors in that, the wind

8   direction, whether or not you're in a contained area, an

9   open area and how much a person suffers on it is entirely

10  dependent.  Some people have awful reactions to it.

11  There's a very small percentage of the population who is

12  immune to it, so to speak.

13         Q   Okay.

14         A   It has no effect.

15         Q   Is there, is there any way to tell---let's say,

16  you know, he and I both pepper spray that direction---

17         A   Those are two different directions.

18         Q   Yeah, two different directions.

19         A   Okay.

20         Q   Is there any way you can, that you know of

21  that somebody can determine which one of us, which one of

22  our pepper sprays is affecting you or your smelling?

23         A   I mean, if the wind were blowing I would say I

24  could venture a pretty good guess, but probably not for

25  sure.

1          Q   Okay.   So if somebody were, let's say in this

2 room and there were five different people pepper spraying,

3 it would be impossible to figure out who was smelling what,

4 right?

5          A   I mean, unless you saw the person spray you in

6 the face with it, for example, then yeah.

7          Q   Okay.   Now, let's go back to August 11th.

8 Charlottesville's finest came out there and established a

9 one rank line?

10          A   Eventually, yes.

11          Q   Okay.   And I believe Ms. Gorcenski came up to

12 you?

13          A   She did.

14          Q   And what is your recollection of what she

15 said?

16          A   She approached.   She had a camera.   She was

17 initially complaining that we had been staged across the

18 street and in her opinion didn't do anything about what was

19 going on.   I'm sorry.   And then she began wanting to know,

20 walking down the line filming all the officers wanting to

21 know who was in charge, and I ultimately told her that I

22 was in charge.

23          Q   And that was you?

24          A   That was me.

25          Q   Okay, yeah.

1          A   And when I did, she came up, because I didn't

2    tell her who I was, I just told her that I was the person

3    that was in charge.  She came up and read the name tag off

4    of my uniform and said my name out loud and made some ref-

5    erence to some interaction that I'd had with her or someone

6    she knew years ago that I'm not familiar with.  I don't

7    know what the context of that was.

8          Q   Did she call you a douchebag?

9          A   I don't---she said a lot of stuff.  I don't

10   remember.

11         Q   Okay.  And at what range did you-all interact?

12   Was it, you know, feet?

13         A   Feet.  It was pretty---the furthest probably

14   ten feet and then like I say, it was dark and she came up

15   close enough to read the name tag on my uniform.

16         Q   What's your knowledge of the effects of pepper

17   spray?

18         A   I know what it does to you.

19         Q   Okay. And how long have you known that, since

20   2008 when you started or thereafter?

21         A   Before that, 2005.

22         Q   Okay.  And with your knowledge of the effects

23   of pepper spray and with Ms. Gorcenski, did it appear to

24   you at the time she was under any effect of pepper spray?

25         A   No, it didn't.

1       Q   Answer any questions Mr. Tracci may have.

2       A   Sure.

3

4                        CROSS-EXAMINATION

5   By:  Mr. Tracci

6       Q   You testified that pepper spray can affect

7   people differently?

8       A   Absolutely.

9       Q   Can some people withstand a blast directly to

10  the face without much side effect?

11      A   They can.

12      Q   What is your experience with pepper spray?

13      A   Like I say, it's different.  If someone gets

14  blasted directly in the face with it typically what you see

15  is near incapacitation of the person.  I know of people who

16  have been sprayed with it who have had little to no effects.

17  There are other people, like I say, can just be downwind of

18  it or maybe in the same room that have a terrible reaction

19  to it.  Other people will have little to no reaction.

20      Q   Is it fair to infer that when someone observes

21  in your experience an aerosol mist of mace that that mace

22  might affect them if it moves in their direction?

23      A   Certainly.

24      Q   And could it be a small amount that causes

25  that---

1          A  Oh, certainly.

2          Q  Impairment?

3          A  Yes.

4          Q  And what are the physiological manifestations

5   of that impairment?

6          A  It's usually, one of the main ones is involun-

7   tary closing of the eyes.  It also gives you the sensation

8   that you can't breathe and typically any sort of mucus or

9   whatever you have in your head often finds its way out.

10         Q  And there are gradients of that.

11         A  Yes.

12         Q  It could go from---and describe if you would

13  the three worsts, you know, from least to words impairment.

14         A  Well, I mean, for someone who is, who has only

15  been exposed to a little bit, it doesn't have a very bad

16  reaction.  It could be just a tingling to the skin or eyes

17  or maybe a little coughing all the way to like I said that

18  night I saw people after the fact who were actually laying

19  on the ground with people throwing water or saline in their

20  eyes trying to alleviate the, what I can only assume is the

21  burning sensation that they were feeling.

22         Q  And at what point in the evening did you see

23  Ms. Gorcenski?

24         A  In between the initial, what I only know is

25  some sort of disorder that broke out around the statute in

1    front of the rotunda, in between when that happened and

2    when the unlawful assembly was declared and everyone was

3    removed from the area of the rotunda.

4         Q   Could she have suffered from inhalation after

5    you saw her?

6         A   Sure.  Like I say, I wasn't there.  I'm not

7    sure what happened to her or when, so I couldn't say.

8         Q   No further questions.

9

10                    REDIRECT EXAMINATION

11   By:  Mr. Woodard

12        Q   All you-all police showed up more or less to-

13   gether, right?

14        A   No.

15        Q   Okay.  Well, I'm sorry, was there any brawling

16   going on when you showed up?

17        A   No, sir.

18        Q   Okay, everybody was relatively calm.

19        A   There were still a lot of people milling

20   around, but we had been asked to respond by the University

21   Police Department.  And when I got there I was awaiting di-

22   rection from their supervisor who had asked for our assis-

23   tance to find out what exactly they needed from us.

24        Q   And Officer Bryant and Officer Clyburn or is

25   it Clymore?

1          A  I think it's Clymore.

2          Q  Okay, me too.  They are UVA police?

3          A  They are.

4          Q  Did you see them there that night?

5          A  I don't think so.

6          Q  Okay.  Now, smelling pepper spray isn't inju-

7     rious to you is it?  I mean, if you get blasted but if you

8     just get a whiff of it it's no big deal.

9          A  It brings back some painful memories but

10    that's about it.

11         THE COURT:  Sergeant, in some of the questions

12    they've asked you about mace and some about pepper spray.

13    Are you making a distinction between the two?

14         A  They both have similar effects.  I know they

15    are technically different things.

16         THE COURT:  But in your answers, again, some

17    questions they've asked you about mace and some have asked

18    you about pepper spray.  Should the Court receive your tes-

19    timony as it doesn't make any difference which one it is?

20         A  For the purpose of what we're talking about,

21    no, not really.  I was basing my answers with pepper spray

22    in my mind.  I didn't even realize someone said mace.  I'm

23    sorry.

24         THE COURT:  Go ahead.

25

1         Q  So, I mean, people smell it and you cough.

2  People cough all the time from it, right?

3         A  Yes, that's accurate.

4         Q  That's not, that's not a kind of injury that

5  needs treatment, correct?

6         A  I mean, again, it completely depends on the

7  person.  It depends on people, people react differently.

8         Q  That's all my questions.

9         THE COURT:  Mr. Tracci?

10        MR. TRACCI:  No, sir.

11        THE COURT:  Thank you, sir.

12        A  Thank you.

13        MR. WOODARD:  Thank you, Officer Pleasants.  May

14  I confer with my client?  Okay, Ely.  One more.

15

16        (Conversation about releasing witnesses.)

17

18        THE COURT:  You're under oath.  Go ahead.

19

20

21        **ELLIOTT CLINE**, having been duly sworn testified

22  as follows:

23

24                  DIRECT EXAMINATION

25  By:  Mr. Woodard

1        Q  Can you state your name, please?

2        A  My name is Elliott Cline, but I go by Ely

3  Mosely.

4        Q  Okay, and were you present on August 11th in

5  Charlottesville at the monument?

6        A  Yes.

7        Q  Okay.  Did there come a time that you were

8  with Chris Cantwell?

9        A  Yes, before the event.

10        Q  All right.  Yes, is the answer.

11        A  Yes.

12        MR. TRACCI:  One of the defense witnesses is back

13  in the courtroom.

14        THE COURT:  He was released.

15        MR. TRACCI:  He was just released?

16        THE COURT:  He was released after he testified.

17  Sir, you're welcome to stay or go as you wish.  You're re-

18  leased from the subpoena.

19        WITNESS:  Thank you, Your Honor.

20        Q  Okay, you were with him?

21        A  Yes.

22        Q  Did there come a time when he was in physical

23  distress?

24        A  Yes.

25        Q  Okay, and when did that begin?

```
 1          A   When we got down to the monument we were basi-
 2   cally around the monument area.  About five minutes into
 3   that or so, maybe a little bit less there was kind of like
 4   a scuffle and it happened right over my left shoulder and I
 5   turned around and I kind of saw the scuffle going on. We
 6   were trying to break it up.  I was one of the people that
 7   was kind of leading this, so I was trying to keep people
 8   apart, keeping no one from kind of getting violent or any-
 9   thing like that, so I was trying to break everything up.
10          Q   Okay.  Were any of the counter protesters
11   leaving?
12          A   Leaving?
13          Q   Yeah.
14          A   No, they were all like staying together and
15   basically like we, when we got there we were surrounding
16   them.  They were like trying to hold that ground around the
17   monument.
18          Q   What would have happened if they tried to
19   leave, do you know or---
20          A   I think that they would have been able to get
21   right through if they were to walk right through kind of
22   the crowd.
23          Q   Okay.
24          A   I definitely would have let them go through if
25   I had been hey, can we let guys through.
```

1        Q  Right.

2        A  I would have been able to control our guys to

3 get them out of there.

4        Q  Okay. There came a time when Mr. Cantwell was

5 distressed.  My understanding is it's near a park bench.

6        A  Yes.  It's, yeah---

7        Q  Tell me what Mr. Cantwell appeared---tell me

8 what was going on with Mr. Cantwell at that time.

9        A  So it was after I guess the little scuffle

10 broke out.  The pepper spray went out.  I don't know like

11 what was going on with it, but there was like a park bench

12 to the side of the statue where people were kind of gather-

13 ing that had been sprayed and the police were helping out

14 and a couple of our guys that had medical equipment or like

15 milk and things like that were getting, getting it out of

16 people's eyes.  There was like several people there, proba-

17 bly like I don't know, seven or eight people who were just

18 getting like pepper spray and things like that out of their

19 eyes.

20        Q  Okay.  What were they doing to him?

21        A  Well, he was trying---they were trying to get

22 it out of his eyes, but everyone was like around crowding

23 him, like press was as well as some of the like counter de-

24 monstrators were also like screaming at us and things like

25 that while we were trying to like, you know, basically per-

1 form like medical treatment like from, if you were like in

2 the military or something on some of our guys. And it

3 wasn't just our guys, it was also theirs. And theirs were

4 basically being left alone, but they were like screaming at

5 our people while they were trying to get stuff out of his

6 eyes and other people's eyes as well.

7       Q  Did he have a shirt on?

8       A  No, I don't think he had his shirt on.  I

9 think he had---his shirt was off when he was getting the

10 stuff out of his, out of his eyes.

11       Q  Okay.  You know, what was his reaction to the

12 pepper spray?

13       A  I think it might have been the first time he

14 was pepper sprayed.  I've been pepper sprayed before, so

15 I'm kind of---I had some in my eyes but it wasn't like di-

16 rect contact so I was used to it a little bit, but I could

17 tell it was kind of probably his first time and he was just

18 like worried about getting it out.  Also, they were asking

19 for like water.  And like that's not a good way to get pep-

20 per spray out of your eyes is like putting water in.  So

21 people were using like milk and like mixtures with like

22 this calcium kind of mixture and things like that.

23       Q  Answer any questions Mr. Tracci might have.

24

25

1              CROSS-EXAMINATION

2   By:  Mr. Tracci

3              Q   How long have you known the defendant in this

4   case?

5              A   I actually met him at the Friday night rally.

6              Q   You indicated that the protestors surrounded

7   the counter protestors?  Your testimony was you surrounded

8   them?

9              A   Yeah, like when we got down to the area it was

10  like around that kind of the base of the statue they were

11  kind of around.

12             Q   And that they, quote, held their ground?

13             A   Yes.

14             Q   Could they have escaped through or over the

15  statue in your view?

16             A   I don't know what you mean by that.

17             Q   Could they have escaped if they wanted to re-

18  treat and it's a circular statue, the rotunda statue, is

19  that correct?

20             A   Yes.  So they were like around, like if this

21  is the statue, and it is a circular base and they were

22  linking arms around the base of the statue.  However, if

23  they wanted to get out, I would have, because like I said,

24  I was part of leading the scene, they would have easily

25  been able to just say hey, and I would have yelled let they

1  through, make a hole, and they would have been able to get

2  right out.

3       Q  Were you the sole guardian as to who could

4  egress and remain?

5       A  No, I wasn't.  There was several other people

6  that could have had the ability to do this as well.

7       Q  Are you aware if other people sang fill in to

8  prevent them from leaving?

9       A  No, I did not hear that.

10      Q  Did you see any of the interaction between the

11 defendant and who has been described as Mr. beanie man that

12 evening?

13      A  I know like the guy with the beanie, I remem-

14 ber seeing him and he was like really kind of like scream-

15 ing back and forth, but I didn't see the actual conflict or

16 anything like that.

17      Q  You didn't see any of the conflict or anything

18 like that?

19      A  I saw the tail end.  Basically what happened

20 was I had walked past them and I saw that they were scream-

21 ing at each other, and then I saw, turned around and I saw

22 a scuffle and I didn't know like what was going on.  I was

23 just pushing people away to keep the violence from going on.

24      Q  So you didn't see what happened immediately

25 preceding.

1          A  Well, I saw the scuffling going on, but I

2     didn't, it wasn't like I knew, oh, that's that person, this

3     is this person.  I immediately got between it to separate

4     them.  So I know that there was like several different

5     counter protesters and several different of our guys who I

6     was just getting between them and pushing them aside.  And

7     that's, like I don't know which ones were which people, I

8     was just trying to get them aside from each other, just

9     getting people separated.

10          Q  Thank you.

11          MR. WOODARD:  That's all.

12          THE COURT:  Thank you, sir.  You're free to go.

13          MR. WOODARD:  Oh, yeah.  One final question.

14

15               REDIRECT EXAMINATION

16    By:  Mr. Woodard

17          Q  One final question.  When he was, when Chris

18    was at the park bench, was he trying to run away or flee

19    law enforcement?

20          A  Absolutely not.  Actually what happened was we

21    made---I stayed with him there to make sure that the, the

22    stuff was out of their eyes and that he was good to go.

23    And then we all walked back together to Nameless Field so I

24    was like one of the last people with him and we weren't

25    like running from the police.  The police were actually es-

1  corting with us.  They were right next with us.  They

2  weren't like leaving, or we weren't running or anything

3  like that.  We just like all walked back together after the

4  stuff was cleared out of the eyes.  And he, you know, he

5  was still throwing stuff in his eyes as he was walking or

6  whatever, but, you know, once we were able to move we moved

7  out of there.

8           Q  That's all.

9           THE COURT:  Any other questions, Mr. Tracci?

10          MR. TRACCI:  No, sir.

11          THE COURT:  Free to go.

12          MR. WOODARD:  That's our case, Judge.

13          THE COURT:  All right.  Mr. Tracci, any other ev-

14  idence?

15          MR. TRACCI:  We have no other evidence, Your Hon-

16  or.

17          THE COURT:  Do you want to be heard?

18          MR. TRACCI:  We do, Your Honor.  We'll just go

19  through.  Both statutes, 18.2-52, malicious bodily injury

20  caused by means of caustic substance or agent, the elements

21  are maliciously, a person who maliciously causes bodily in-

22  jury to another by means of acid, lye or caustic substance.

23  There's no question that Mr. Cantwell deployed a caustic

24  substance.  The case law if very clear that the Common-

25  wealth has discretion as to whether to charge mace or caus-

1    tic substance or pepper spray.  That's the <u>Foster</u> case and

2    the <u>Somerville</u> case as well and the Court heard argument on

3    that.  There was testimony from Mr. Goad and Mr. Gorcenski

4    that they suffered.  They were impaired as a result of the

5    deployments that were directly attributable to Mr. Cantwell.

6    The first deployment was clear deployment on video, was to-

7    ward Mr. beanie man after he got back from the ground.

8    Again, the question of what he's doing, the victims of the

9    case described him as standing there is a defensive pose,

10   arms at side and Mr. Cantwell moved in his direction and

11   sprayed him directly in the face.  When he was sprayed di-

12   rectly in the face the evidences shows and the testimony

13   confirms that Mr. Goad was affected by that secondary re-

14   coil and he testified to those effects on him.

15            With respect to the 18.2-312 charge, the ele-

16   ments are malicious release of gas in a public space.  We

17   have that as well.  Tear gas, mustard gas or phosgene capa-

18   ble of injurious odors.  We have that based on the testimo-

19   ny of the victims who also testified that other people were

20   affected in a similar way and impaired by whatever Mr.

21   Cantwell was deploying, producing bodily injury.  Now, the

22   only question is malice.  And malice is defined through the,

23   I think the Court has this already, I might have submitted

24   this, is the intentional doing of an unlawful act, a wrong-

25   ful act to another without legal excuse or justification at

1 a time when the mind of the actor is under the control of

2 reason. Malice may result from any unlawful or unjustifia-

3 ble motive including anger, hatred or revenge. It may be

4 inferred from any deliberate, willful or cruel act against

5 another, however sudden. The testimony would certainly

6 support the proposition and the video as well, that the act

7 here was malicious. It wasn't justifiable. There was no

8 reasonable self-defense claim and it wasn't excused. That

9 testimony comes from Mr. Goad, from Ms. Gorcenski and the

10 video. Frankly it also comes from Mr. Cantwell. He ex-

11 plains how he hated the protesters. He said it was two

12 groups of people who hated one another. And as the jury

13 instruction indicates, malice may result from any unlawful

14 or unjustifiable motive including anger, hatred or revenge.

15 He was mad. He was mad that people were disturbing his

16 ACLU sponsored protest. He had his mace ready to go. He

17 had his flashlight ready to go and he looked for any provo-

18 cation or pretext to utilize that mace and he found one

19 with a guy who had been pushed onto the ground. He raced

20 over, no threat to him, clear opportunity to withdraw. He

21 didn't want to be, as he put it a pussy or a faggot, so he

22 ran up and maliciously deployed mace directly in someone's

23 face. That malicious deployment directly injured that in-

24 dividual without excuse or justification as well as Mr.

25 Goad. Seconds later no threat to him, he decides to indis-

1  criminately spray over a group of people behind beanie man.

2  If malice hasn't been met, and it certainly has, it's

3  clearly unlawful because it's grossly disproportionate to

4  any reasonable threat posed to him at that time in an envi-

5  ronment where even, according to his estimate, the counter

6  protesters were outnumbered dramatically by the protesters.

7  There's a question of intent and we would suggest here that

8  notwithstanding the fact that beanie man is not here and

9  the Commonwealth attempted to bring him here and the testi-

10 mony reflected that, that malicious intent transfers from

11 beanie man to Mr. Goad, to Gorcenski and other people who

12 were there. Those are the elements. We've met those ele-

13 ments. We have exceeded those elements. And, Your Honor,

14 I just want to remind everyone here that this is a prelimi-

15 nary hearing. His is not a trial on the merits. Very

16 clear, the Supreme Court has held that the purpose of a

17 preliminary hearing is essentially a screening process to

18 determine whether there is sufficient cause for charging

19 the accused. That is, whether reasonable ground exists to

20 conclude a crime has been committed and the identity of the

21 accused. We know who the identity of the person deploying

22 mace in the video and after appearing in front of the wit-

23 nesses is. It's the defendant, uncontested. He admitted

24 it. He actually admitted to deploying an entire can that

25 he had never utilized before that evening and that's Moore

1  v. Commonwealth.  Reasonable ground exists to conclude a

2  crime has been committed.  You've heard the elements.

3  We've met the elements.  You've heard the malice, clearly

4  supported by the evidence in this case and the jury in-

5  struction that we heard.  We've heard evidence about a lack

6  of excuse or justification.  The only questions that we've

7  heard today go to proof, credibility, bias, other issues

8  squarely within the ambit of the trier of fact, not this

9  Court.  So this is not a question of guilt beyond a reason-

10  able doubt under Foster v. Commonwealth.  It is an effort

11  to ascertain whether there's sufficient cause to proceed

12  forward.  We have met and exceeded that burden.  Now, we

13  allowed other people to testify.  Their testimony was in-

14  conclusive.  The defense witnesses were inconclusive.  Many

15  admitted bias toward the defendant.  Others indicated they

16  had no idea what was going on.  Others indicated their only

17  recollection of the offense is predicated on their experi-

18  ence that night in a completely chaotic situation.  I would

19  submit and the Commonwealth would submit that that testimo-

20  ny should be accorded the credibility and weight it de-

21  serves and that's virtually none whatsoever.  The fundamen-

22  tal question here, Judge, is malice or unlawful utilization

23  of pepper gas, pepper spray that the defendant acknowledges

24  using on more than one occasion.  The testimony of the Com-

25  monwealth witnesses were much different from the testimony

1    of the defense witnesses.  That's precisely what goes to

2    the purpose of a trier of fact in this case.  We have met

3    our burden.  We've exceeded it and I ask that you certify

4    all three charges.

5         THE COURT:  Mr. Woodard.

6         MR. WOODARD:  I disagree, Your Honor.  The situa-

7    tion is this.  Using statements that were false the Common-

8    wealth arrested this man.  He's been sitting in jail for

9    over two months.  And a week ago the Commonwealth found out

10    that the identification of this man on one of those charges

11    was absolutely false.  And yesterday they told me, oh, by

12    the way, I think I talked to Mr. Goad, I think it's pretty

13    clear that his problem was with a gel mace spray.  There's

14    not a single mention of any of this other stuff.  And I

15    think I brought out how the Commonwealth came up with that

16    as a backup plan when their main charge went out the window

17    because their client had lied---I'm sorry, because their

18    witness had lied.  Now, Mr. Tracci doesn't seem to under-

19    stand and I've got to tell you this is common with every

20    Commonwealth's Attorney I've ever found.  Not a single one

21    of them believes that self-defense exists.  Self-defense

22    only applies to the 52 charge, because it's not actually in

23    the statute, but it's the same thing as what's in the 312

24    statute.  In the 312 statute it says, without legal justi-

25    fication.  And Mr. Tracci would have you believe that there

1  is some reasonable ground for this. It's not. When it

2  comes to self-defense, it is not what Mr. Tracci thinks is

3  reasonable, it's not what you think is reasonable. It's

4  not what he thinks is reasonable, it's not what I think is

5  reasonable. It's what's in that man's head at the time.

6  It's what's in that man's head at the time. If he thinks

7  he is in imminent danger of fear or bodily harm, then he

8  gets to react and that's what he did. He reacted in a pro-

9  portional response because Mr. Cantwell, would you stand up

10 for me? He is not the God of Sheba with eight arms. He

11 can't fight that mob that was coming to him. Sit back down.

12 When all these guys are coming at me I'm going to lose to

13 two of them because I only got two fists, and he's only got

14 two fists and beanie man and goad were coming at him to-

15 gether which means he automatically loses. Now, he's got

16 the flashlight, but he doesn't do that. He uses the pepper

17 spray because the flashlight could be more damaging than

18 the pepper spray. He chose one level up under Diffendal v.

19 Commonwealth and that is justification. Again, it's what's

20 in his mind. It's he gets to determine what the threat is,

21 and he did that. And of course the Commonwealth called

22 people who were far, far away saying oh, we were all being

23 peaceful. Really? Our evidence is that beanie man was

24 screaming at people. Our evidence is that beanie man who

25 got sprayed in the face was continuing to riot through the

1    next couple of minutes at least.  Everybody that got

2    sprayed in the face except him was continuing to riot and

3    they come in there and say oh, I felt a tingling in my nose.

4    Officer Pleasants described what it is with involuntary

5    shutting of eyes.  Well, you watched Emily and Goad both

6    walk all over the place.  If there was a temporary loss of

7    vision they should have been bumping into the monument or

8    tripping over somebody.  Of course, they want to say I felt

9    tingling because they're counter protesters or they're pro-

10   testers.  Whichever one they are, he's the opposite.  Ms.

11   Gorcenski is the key here.  She stalked him all Friday and

12   she got into the mess of the thing and after that, that

13   very night she got on there and started, showed up the next

14   morning saying it was Chris Cantwell who sprayed me.  It

15   was Chris Cantwell who sprayed me.  Why did she know it was

16   Chris Cantwell?  She had been stalking him.  Why did she go

17   there the first thing the next morning?  Because he was

18   supposed to be a speaker at ten.  That's why it was so im-

19   portant.  And then Ms. Gorcenski sat there and said oh yeah,

20   I communicated with Goad.  Well, despite his equivocation,

21   who do you think identified Cantwell to Goad?  It was

22   Gorcenski, and they both admitted communicating with each

23   other.  They're not going to admit what they said, because

24   I can't prove otherwise, but it doesn't take a rocket sci-

25   entist to figure it out.  What boiled down here is Gorcen-

1    ski has an ax to grind with Mr. Cantwell.  She came up with

2    this charge to get him politically and then she and Goad

3    conspired because the Commonwealth had only charged him

4    with unlawful.  Those are only class six felonies.  But she

5    wanted a class three, so she got Goad to come down here and

6    lie to the Commonwealth and say it was Chris Cantwell.

7            MR. TRACCI:  Your Honor, I know this is argument,

8    but I must respond to the allegation that the Commonwealth

9    conspired with the victims in this case.

10           MR. WOODARD:  No, I didn't say you-all conspired.

11   It was Goad and Gorcenski conspired.  Goad and Gorcenski

12   were conspiring to get a class three felony against him and

13   Judge, it worked.  The first day I walked into this court

14   Mr. Tracci moved to amend the charges from unlawful to ma-

15   licious.  And now he's coming in here saying oh, we can

16   prove unlawful or malicious.  He's the one who jacked it up

17   to malicious.  Why is he now saying he only has to prove

18   unlawful?  Because he wants them certified, Judge.  Mr.

19   Cantwell has the right to get on that stand and say I was

20   scared to death and that's why I used this weapon and that

21   is legal justification under the statute.  That's legal

22   justification under 312.  That also negates any malice be-

23   cause if I'm terrified I'm not thinking in cool deliberate

24   reason.  I'm not going to say oh, I'm going to pepper spray

25   this gentleman because I don't like his shirt.  But Judge,

1  if he's coming at me, if he's coming at me I'm sure going

2  to resist him. but I may not because he's a police officer,

3  but if somebody else is, I'm going to resist him, I have

4  the right.  And if I resist a police officer, I get to say

5  Judge, Bailiff Woods is coming at me with his inflatable

6  baton and so yeah, I kicked him in the shin or whatever I

7  did.  It's his, that's the right everybody has.  Self-

8  defense exists in this state.  It's existed since the first

9  people got here and it doesn't just exist in this courtroom

10  and it doesn't exist in the circuit courtroom.  It exists

11  out there where people are fighting each other and they're

12  fighting each other to put the other people in jail because

13  they want to win politically.  And a man should not have to

14  rot in jail for six months before his claim of self-defense

15  is adjudicated.  But that's what's going on here.  He de-

16  fended himself against attacker and he's been rotting in

17  jail for two months.  I'm absolutely appalled.  He was le-

18  gally justified to use the force he did.  There is no mal-

19  ice because, and he testified it popped on him all of the

20  sudden, holy smokes, I'm in the middle of a brawl.  There's

21  no malice.  The legal justification makes it lawful, makes

22  it a lawful use of force.  It's fully justified.  We ask

23  that none of them be certified.

24           THE COURT:  Mr. Tracci.

25

1          MR. TRACCI:  Your Honor, I think the Commonwealth

2    has been clear that malice can be inferred by words from

3    the defendant's mouth.  He hated, he was mad, he was angry.

4    He also testified that he was not out of control.  He's a

5    man who had his wits about him because he can proportion-

6    ately respond to violence when he sees it because he's ex-

7    perienced it before and he does have self-control and meas-

8    ure of self-control.  I asked that question and he said di-

9    rectly, yes.  We have demonstrated that the defendant met

10   our burden of showing that the defendant exercised that de-

11   cision not under the heat of passion.  He was there, he was

12   in an environment that was a little chaotic, but he also

13   said that he doesn't lose control and that he didn't that

14   night.  He said he was scared but it wasn't blind rage and

15   it wasn't a lack of control or capacity as to what he was

16   doing.  We never heard any evidence like that.  Malice is

17   very clear, as we said, can be inferred by actions.  It's

18   the deliberate doing of an unlawful act.  We saw Mr. beanie

19   man come up, get sprayed in the face for merely rising with

20   his hands at his side.  That's not any justification.  Mr.

21   Cantwell raced over to him, pepper sprays him, pepper maced

22   him directly in the face affecting him and other around him.

23   Frankly, that is a question as the Commonwealth has indi-

24   cated that ultimately ought to be decided by a trier of

25   fact hearing all of these witnesses, giving the Common-

1  wealth an opportunity to present that evidence in a proper

2  setting to determine guilt or innocence beyond a reasonable

3  doubt.  For purposes of this hearing we have met and ex-

4  ceeded our burden and I respectfully ask that you certify

5  these charges.

6          THE COURT:  At the beginning of the hearing today

7  there was a motion to take up a matter outside of the pub-

8  lic.  That motion was made by Mr. Woodard and it was done

9  in the Court's view out of an abundance of caution as to

10  how to address the issue.  The cases which could be heard

11  in the public, but without the Court having the information,

12  the Court had to conduct the hearing.  At the hearing there

13  were certainly things that are relevant to this case, but

14  the Court upon review doesn't find any reason for it to be

15  a secret.  So nothing will be sealed from that hearing.

16  There was a court reporter present.  The Court always does

17  that so that whatever the Court does or whatever is said,

18  it can be viewed by anybody that wants to view it.  So

19  there's a recording and there can be a transcript of that,

20  of that hearing, but none of it will be sealed at this

21  point.

22          In regard to these three charges, the first one

23  where Mr. Goad is the complainant who went and obtained a

24  criminal warrant, this gets to the issue of this hearing.

25  In the hearing Mr. Woodard provided the Court with an email

1  from Mr. Tracci and my comments here are not to be con-

2  strued by anybody as any condemnation of Mr. Tracci.  What

3  Mr. Tracci told Mr. Woodard yesterday in this email which

4  is part of our record, is that Mr. Goad is no longer cer-

5  tain that the direct deployment of gel pepper spray as he

6  describes in his complaint resulted from action by Mr.

7  Cantwell.  In fact, it was indicated it was the result of

8  action by another individual.  This warrant that, one of

9  the three that I'm trying, a violation of 18.2-312 is based

10  on a statement signed by Mr. Goad where he told the magis-

11  trate, Cantwell used a gel mace pepper spray at my face and

12  caused me to lose my vision temporarily.  In his testimony

13  this morning he talked about four deployments.  He said the

14  last two didn't affect him.  The first two did and he iden-

15  tified Mr. Cantwell.  The Court has concern that there's

16  been a case pending here for two and a half months based on

17  the testimony of Mr. Goad that Cantwell sprayed him at his

18  face and there is nothing about overspray and the Common-

19  wealth relies on overspray in this case.  In the Court's

20  opinion it does two things.  It raises into question what

21  Mr. Goad's recollections are.  And the other one is a con-

22  cern that Mr. Cantwell should be forced to stand trial on a

23  warrant where the complainant says he did it, he did it at

24  my face where he could identify somebody and then there is

25  a representation a day before the preliminary hearing that

1  he's not certain about it.  I don't think Mr. Cantwell

2  should stand trial on that.  The Court is going to dismiss

3  that charge.

4         In regard to the other two charges, the case of

5  violation of 18.2-52 which is a charge of maliciously in-

6  juring Emily Gorcenski by release of a caustic substance.

7  In the Court's view of the Court found significant and, in

8  fact, the Court asked Ms. Gorcenski the question itself.

9  The only verbal communication between Mr. Cantwell and Ms.

10 Gorcenski for the entire day was when she approached him at

11 No Name Field and asked him about an incident at Walmart.

12 Other than that there is no evidence that Mr. Cantwell did

13 or said anything to Ms. Gorcenski.  The incident that she

14 describes, she said it was most---she was sprayed most

15 likely by Mr. Cantwell based upon their vicinity.  The tes-

16 timony that's unchallenged, that there was someone else

17 there who was described as dragon man that was releasing a

18 spray.  She says that she was affected by the overspray.

19 There is no way for the Court to determine that Mr. Cant-

20 well maliciously caused bodily injury to Ms. Gorcenski.

21 When the Court hears a malicious bodily injury case, the

22 testimony generally isn't, was well I was affected by what

23 the defendant did.  And here in close proximity, again the

24 unquestioned evidence is that there was another person who

25 was releasing a spray.  The Court can't find from that evi-

1   dence that there's probable cause for Mr. Cantwell to stand

2   trial on that charge.

3         The third charge is under the same code section

4   as Mr. Goad's, the one that Mr. Goad obtained which is ma-

5   liciously releasing a caustic substance. There's been var-

6   ious descriptions in regard to what the substance was.

7   It's been described as mace primarily in questions. It's

8   been described as pepper spray. Mr. Cantwell describes it

9   as pepper spray. It is a caustic substance whatever it was

10   and that part of the statute is met. There isn't any issue

11   that Mr. Cantwell deployed the pepper spray a number of

12   times in a crowd. He doesn't challenge that. It's not an

13   issue of controversy for the Court. The issue of contro-

14   versy is whether or not Mr. Cantwell deploying the pepper

15   spray was done in self-defense. That's part of the statute,

16   but ultimately it's up to the trier of fact. So again,

17   there's no issue that he had the caustic substance.

18   There's no issue that he sprayed it four times. There's no

19   issue that it was in a public place and the Court finds

20   that an issue of self-defense, that will have to be re-

21   solved by the trier of fact. So the Court finds there is

22   probable cause in regard to the case 18.2-312. It's case

23   number GC1711628. The Court will certify that case to the

24   circuit court for what action it feels is appropriate. In

25   the regard to the cases that have been dismissed, Mr. Trac-

1    ci knows he can proceed as he wishes in regard to that.  So

2    that will end the criminal case.

3              HEARING CONCLUDED.

1  STATE OF VIRGINIA AT LARGE:

2       I, Brittany L. Herring, Notary Public in and for

3  the State of Virginia at Large, having been so duly commis-

4  sioned and qualified, do certify that the foregoing court

5  proceeding was so duly taken at the time and place speci-

6  fied in the caption hereof.

7       I do further certify that said hearing was

8  correctly taken by mechanical methods and that the same was

9  accurately written out in full and transcribed into the

10 English language by Sarah R. Lane and that said transcript

11 is a true, accurate and correct record of the testimony by

12 said witness.

13      I further certify that I am neither attorney nor

14 counsel for or related to or employed by any of the parties

15 to the action in which this hearing was taken and, further,

16 that I am not a relative or employee of any attorney or

17 counsel employed by the parties hereto or financially in-

18 terested in this action.

19      My commission expires November 30, 2019.

20      Given under my hand and seal this 12th day of De-

21 cember, 2017.

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24     STATE OF VIRGINIA AT LARGE:

25

1    I, Brittany L. Herring, Notary Public in and for

2 the State of Virginia at Large, having been so duly commis-

3 sioned and qualified, do certify that the foregoing court

4 proceeding were so duly taken at the time and place speci-

5 fied in the caption hereof.

6    I do further certify that said hearing was

7 correctly taken by mechanical methods and that the same was

8 accurately written out in full and transcribed into the

9 English language by (typist name) and that said transcript

10 is a true, accurate and correct record of the testimony by

11 said witness.

12    I further certify that I am neither attorney nor

13 counsel for or related to or employed by any of the parties

14 to the action in which this hearing was taken and, further,

15 that I am not a relative or employee of any attorney or

16 counsel employed by the parties hereto or financially in-

17 terested in this action.

18    My commission expires November 30, 2019.

19    Given under my hand and seal this 3rd day of De-

20 cember, 2016.

21

22

23

24

25